## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| MASON ORTEGEL, | |
| Plaintiff, | |
| v. | Civil Action No. ___7:22cv510___ |
| VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY; | |
| DASHAWN DILWORTH, *In his individual capacity;* | |
| *and* | |
| KATIE POLIDORO, *In her individual and official capacities;* | |
| Defendants. | |

## COMPLAINT

Plaintiff Mason Ortegel was unlawfully and unconstitutionally disciplined by Defendant Virginia Polytechnic Institute and State University ("Virginia Tech" or "University"). Accordingly, he files this Complaint against Virginia Tech and the individual defendant employees of the University for violation of Title IX of the Education Amendments of 1972 to the Civil Rights Act and of Title VI of the Civil Rights Act. He also seeks damages, injunctive, and declaratory relief under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

<u>PARTIES AND JURISDICTION</u>

1.      Plaintiff Mason Ortegel is domiciled in the Commonwealth of Virginia and was, at all times relevant herein, a student at Virginia Tech.

2.      Defendant Virginia Tech is a public university with its principal place of business located in Blacksburg, Virginia.

3.      Defendant DaShawn Dilworth was, at all relevant times herein, an employee of the University. He was employed as a hearing officer in Title IX matters at the University and was the chief hearing officer in Mr. Ortegel's case. Upon information and belief, he is presently domiciled in the State of Florida.

4.      Defendant Katie Polidoro is an employee of the University. She is the University's Title IX Coordinator, responsible for the proper investigation of sexual harassment grievance complaints at the University. She is domiciled in the Commonwealth of Virginia.

5.      This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because all claims in this lawsuit arise under the laws of the United States and the United States Constitution.

6.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

7.      This Court possesses personal jurisdiction over the University because it is a Virginia government entity, and over Defendant Polidoro by virtue of her domicile in Virginia. Personal jurisdiction is proper over out-of-state Defendant Dilworth because, among other things, he transacted business in Virginia, contracted

to supply services or things in Virginia, and caused tortious injury in Virginia. Va. Code § 8.01 328.1(A).

## FACTS COMMON TO ALL CLAIMS

### Defendants' Motivation to Discipline Male Students

8.      Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX (20 U.S.C. § 1681). Title IX is a federal statute prohibiting discrimination on the basis of sex in education.

9.      Should the University fail to adequately remedy sexual harassment on campus, it could be very costly for the University, including having to face litigation from alleged victims of sexual assault. These plaintiffs tend to be female.

10.     In April 2011, pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This guidance, despite not having undergone the formal rulemaking process, demanded universities receiving federal funding weaken procedural protections for accused students, including limiting the right to a hearing for students accused of sexual harassment and lowering the burden of proof to preponderance of the evidence.

11.     The Dear Colleague Letter and later-issued guidance publicized statistics of an alleged rape epidemic on college campuses targeting female students. These statistics are demonstrably false and debunked.

12.     The Dear Colleague Letter incentivized universities receiving federal funding, including Defendant University, to find male accused students responsible

3

regardless of the weight of the evidence against them because if the Department of Education saw the University as insufficiently protective of alleged female sexual harassment victims, it could withdraw federal funding from the University.

13.     Defendant University receives federal funding.

14.     Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

15.     Therefore, the University and its employees had an incentive to find Mr. Ortegel responsible, as a male accused student, regardless of the lack of weight of evidence against him, to ensure it continued to receive federal funding.

16.     Thus, once Mr. Ortegel was falsely accused, the University and its employees had incentive to limit any chance Mr. Ortegel had at defending himself by subjecting him to an inherently unfair process.

17.     The Dear Colleague Letter was rescinded in 2017. The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus. This operationalized the anti-male bias inherent in the Dear Colleague Letter and subsequent guidance, permitting that bias to remain in full force at the University after the federal guidance was formally rescinded.

18.     The author of subsequent guidance enforcing the Dear Colleague Letter, Assistant Secretary for Civil Rights of the Department of Education Catherine Lhamon, resumed her position at the Department of Education as of October 20,

2021, after a party-line confirmation vote in the United States Senate. Therefore, Virginia Tech was on notice that a proponent of the Dear Colleague Letter, who expressed open hostility to male accused students in her confirmation hearings and past writings, was again in a position to withdraw federal funding from Virginia Tech if she felt that Virginia Tech was inadequately protective of female victims.

19.     Virginia Tech took no meaningful steps to ensure that individuals who investigated and adjudicated its Title IX matters were free of bias on the basis of sex. Its employees, however, were at least nominally trained or informed that they may not discriminate on the basis of sex or race.

20.     Virginia Tech maintains a "Women's Center" wherein students may make complaints of sexual harassment or assault.

21.     Virginia Tech does not maintain any "Men's Center."

<u>Mason Ortegel and Jane Roe</u>

22.     Mr. Ortegel matriculated at Virginia Tech during the Fall 2020 semester and was, at all relevant times, a member of the Virginia Tech Corps of Cadets and the United States Army's Reserve Officers' Training Corps ("ROTC") program at Virginia Tech.

23.     Mr. Ortegel is a white male.

24.     Jane Roe[1] matriculated at Virginia Tech during the Fall 2019 semester and was similarly, at all relevant times, a member of the Virginia Tech Corps of Cadets and the United States Army's ROTC program at Virginia Tech.

25.     Roe is a black female.

26.     During the first two years of school, Mr. Ortegel and Roe became acquaintances and socialized occasionally.

27.     On August 21, 2021, Mr. Ortegel socialized with several friends and inadvertently consumed a significant amount of alcohol. His consumption of alcohol eventually resulted in his incapacitation.

28.     That night, around 11:00 p.m., Roe called Mr. Ortegel and asked if he could take the morning flag detail shift the next day for Color Guard.

29.     Mr. Ortegel was audibly severely intoxicated when he spoke with Roe. He followed up the conversation by texting Roe "No, I am actually pretty sloshed right now."

30.     Understanding that Mr. Ortegel was in no position to take her shift in the early morning, Roe proceeded to ask another student to take her shift.

31.     Shortly thereafter, feeling embarrassed and concerned about admitting to drinking underage, Mr. Ortegel texted Jane Roe that he was not in fact "sloshed." Jane Roe knew, however, that he was indeed severely intoxicated, having just spoken with him.

---

[1] "Jane Roe" is not the false accuser's real name. Her true identity is irrelevant to the instant case and is known to the parties. In order to consolidate the issues in this case and to avoid harm to non-parties, her name is omitted.

32.     Roe then texted Mr. Ortegel, "I'm a tiny bit sloshed but I'm alive" and that she found someone to cover her shift.

33.     Considering the conversation over, Mr. Ortegel did not respond further to Roe.

34.     Around the time of this text conversation, Mr. Ortegel went with his friends to "Cook-Out" to purchase late-night food. Mr. Ortegel purchased a milkshake, which he later was unable to carry due to his intoxication.

35.     Mr. Ortegel needed physical assistance to return to his room that night.

36.     After Mr. Ortegel returned to his room, he fell asleep on his bed, fully clothed and without first putting sheets on the bed.

37.     Falling asleep is the last thing Mr. Ortegel remembers from that night.

38.     Around this same time, Roe indicated to others that she was going to check on Mr. Ortegel and that she believed he was romantically "available."

39.     When Mr. Ortegel woke up the next morning, he discovered that his phone was on his bedside table and not in his pocket. He has no memory of using his phone in his room and did not take his phone out of his pocket before falling asleep on the bed.

40.     Shortly after waking up, Mr. Ortegel was met with two Color Guard superiors, who questioned him about his whereabouts and actions the night prior. Mr. Ortegel explained the foregoing.

41.     Mr. Ortegel was subsequently informed that Roe alleged that he had sexually assaulted her the previous night.

42.     Roe told the Color Guard superiors that, among other things, Mr. Ortegel had forcibly pulled Roe into his room while she was patrolling the hallway and physically assaulted her. Roe further stated that she was not drinking at all that night and that Mr. Ortegel was drinking while in his room at the end of the night.

43.     Notably, Roe alleged to the Color Guard that Ortegel had "tried" to kiss her but not that Mr. Ortegel had actually kissed her.

44.     Around this time, Mr. Ortegel discovered that someone had texted Roe from his flip phone after he had fallen asleep. Mr. Ortegel did not text Roe after he returned to his room because he was asleep or otherwise incapacitated from alcohol consumption.

45.     During the early morning hours of August 22, 2021, Roe texted at least five individuals alleging falsely that Mr. Ortegel had physically assaulted her during the previous night.

<u>Jane Roe files a Title IX Complaint</u>

46.     On or about August 31, 2021, Roe was encouraged by the Virginia Tech "Women's Center" to file a Title IX complaint against Mr. Ortegel.

47.     On September 13, 2021, Roe met with Dan Hardy, the Virginia Tech Title IX investigator, and her "advisor," Shannon Alford, at the Women's Center where Roe filed a formal Title IX complaint against Mr. Ortegel.

48.     Roe knew her complaint was false when she made it.

49.     That same day, a Title IX investigation was opened into Mr. Ortegel, per Virginia Tech Policy 1026, which is designed to be compliant with federal Title IX regulations codified at 34 C.F.R. § 106.

50.     Virginia Tech has a policy or practice of not disciplining students arbitrarily or without cause; rather it maintains conduct policies, only by or through which it may discipline students. Indeed, the purpose of such a policy is to articulate the very reasons why a student might expect to be disciplined.

51.     If a student does not commit a violation of Virginia Tech's policies, the student has a legitimate expectation that he will not be disciplined by Virginia Tech.

52.     Policy 1026 and federal regulations requires that Virginia Tech presume Mr. Ortegel "not responsible" unless and until a finding of responsibility is reached at the end of the grievance process.

53.     Policy 1026 and federal regulations requires that Virginia Tech never place the burden of proof or production on either student in the Title IX process; rather, the burden of proof and production are always on the University to prove by a preponderance of the evidence that Mr. Ortegel had violated Policy 1026.

### Virginia Tech investigates Jane Roe's Complaint

54.     From September 13 to December 8, 2021, Virginia Tech investigated Roe's complaint for a violation of "Title IX Sexual Harassment" according to Policy 1026 and federal regulations.

55.     Policy 1026 defines "Title IX Sexual Harassment" as in relevant part, "(1) unwelcome conduct that a reasonable person would determine to be so severe, (2)

pervasive, and (3) objectively offensive that it would (4) effectively deny a person equal access to a university program or activity." (numeration added).[2]

56.     On September 24, 2021, Virginia Tech issued a no-contact order against Mr. Ortegel, barring him from having any direct or indirect communication with Roe, even through third parties. Virginia Tech issued a similar no-contact order to Roe regarding Mr. Ortegel.

57.     On or about September 28, 2021, Mr. Ortegel met with the investigator and indicated, among other things, that he felt that, if Roe's complaint was accurate and the two engaged sexually, Mr. Ortegel was the victim of sexual assault without his consent.

58.     Under Policy 1026, the investigator is a "responsible employee" who is obligated to report possible Title IX violations to the Title IX Coordinator for investigation.

59.     Here, the investigator failed to report Mr. Ortegel's allegation of sexual assault to the Title IX Coordinator.

60.     Policy 1026 provides that a student may not consent to sexual activity when he is "incapacitated due to drugs or alcohol."

61.     Virginia Tech defines "incapacitation" as, among other things, "being asleep, drugged, intoxicated, or unconscious."

62.     Roe and Mr. Ortegel agreed that he was "intoxicated" due to alcohol.

---

[2] In deciding whether conduct violates this provision, including in hearing decision letters, Virginia Tech divides the definition into these four elements, each of which must be met for a finding of responsibility.

63.     Despite Mr. Ortegel's clear allegation that Jane Roe violated Virginia Tech Policy, Virginia Tech never investigated his allegation that Roe sexually assaulted him or otherwise engaged in sexual activity with him without his consent.

64.     Over the course of Virginia Tech's investigation of Roe's complaint, the investigator gathered statements from several witnesses and evidence from both Roe and Mr. Ortegel, including statements from both Roe and Mr. Ortegel.

65.     Roe changed her story throughout the Title IX adjudication. For example, where Roe had previously stated that Mr. Ortegel "tried" to kiss her, to the investigator she stated that Mr. Ortegel had actually kissed her; where Roe previously alleged that she was forcibly pulled into Mr. Ortegel's room while she was patrolling the hallway, she stated during the investigation that she entered Mr. Ortegel's room because she was told by another individual, J.R.,[3] to "check on" Mr. Ortegel because of his intoxication.

66.     Multiple witnesses and pieces of evidence further contradicted Roe's account. For example, Roe stated that she met with J.R. in his room directly prior to going to Mr. Ortegel's room and that C.S. (J.R.'s roommate) was not present in J.R.'s room; however, the access logs uncovered by the investigator reveal this impossible. This is because the latest possible time in which Roe was in Mr. Ortegel's room was at 11:50 p.m., whereas C.S. did not leave his and J.R.'s room until 11:54 p.m.

67.     The investigator also uncovered various witness statements wherein it was revealed that Roe told very different iterations of the alleged assault. Specifically,

---

[3] To protect the confidentiality of the students, initials are used. Defendants are aware of the identities of these students.

and among other things, it was revealed that Roe had contradictorily alleged that Mr. Ortegel had pulled her into the room and that she had willingly entered the room; that Mr. Ortegel had "let go of her" when there was a "noise in the hallway" and that Mr. Ortegel kissed her through the noise; and that she exited the room by running out and that she exited by calmly walking out of the room.

68.     Roe further stated to different witnesses that she decided to check on Mr. Ortegel because he had called her and in contradictory fashion also stated she checked on Mr. Ortegel because J.R. had asked her to check on him.

69.     At one point during the investigation, Roe harassed Mr. Ortegel by writing a message on his roommate's whiteboard.

70.     Mr. Ortegel raised this issue with the University, but the University took no action in response.

71.     Roe's action in writing a message on Mr. Ortegel's roommate's whiteboard violated the no-contact order.

72.     Despite these inconsistencies, and without ever addressing any of Mr. Ortegel's concerns, Virginia Tech referred the matter to a formal hearing.

<u>Virginia Tech's Sham Hearing and Decision</u>

73.      When Virginia Tech referred Roe's complaint to a formal hearing, it appointed three hearing officers, one of which was appointed chair of the hearing panel.

74.    Virginia Tech was required to ensure that its hearing officers were not infected by any bias that would deprive students of their constitutional and civil rights.

75.    Defendant Polidoro was responsible for ensuring that the University did not violate students' rights in the Title IX process.

76.    Defendant DaShawn Dilworth was appointed chair of the hearing panel by Defendant Polidoro.

77.    Defendant Dilworth has expressed on his private social media accounts a vicious bias against men and in favor of black women, categorically. Specifically, and among other things, he has tweeted that he is "doing [his] part to hold men other men [sic] accountable"; retweeted  "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space"; retweeted criticism of black men as "whining like babies"; retweeted "stop policing black women's existence"; and tweeted about his belief in a "Black Patriarchy" that oppresses black women.

78.    Defendant Dilworth expanded on his racist and sexist biases when he appeared on the "Success in Black and White" podcast, episode 118. In that episode, Defendant Dilworth argued categorically that black women have "lived experiences" that must be believed, and that asking black women to explain their behavior is asking them to do "emotional labor" which must be avoided.

79.    Defendant Dilworth also states his adherence to critical race theory and critical theory generally, which "questions the very foundations of the liberal order,

including *equality theory*, legal reasoning, Enlightenment rationalism, and *neutral principles of constitutional law*." Delgado & Stafancic, *Critical Race Theory: An Introduction*, NYU PRESS (1995) (emphasis added).

80.   Defendant Dilworth also indicated on the podcast that he views his role in higher education as a "power disruptor," which, considering his other beliefs and statements, meant favoring races and sexes he views as oppressed and disfavoring those he categorizes as oppressors.

81.   Because Defendant Dilworth subscribed to these theories and philosophies which criticize and oppose the very concept of equality and legal neutrality among identity groups, Defendant Dilworth could not be impartial. Indeed, he intentionally engaged in racial and sexual favoritism in making his decision regarding Mr. Ortegel.

82.   When Virginia Tech, through Defendant Polidoro, appointed Defendant Dilworth as the hearing panel chair in Mr. Ortegel's matter (where Mr. Ortegel is a white male and the accuser is a black female), it knew of Defendant Dilworth's stated biases and open opposition to the concept of equality among the races and sexes as well as his hostility towards the "neutral principles of constitutional law."

83.   The formal hearing was held on January 10, 2022.

84.   During the hearing, the hearing panel failed to probe the inconsistencies in Roe's testimony or the contradictions between her testimony and the evidence.

85.   After the hearing, Defendant Dilworth, writing for the hearing panel, found Mr. Ortegel responsible for sexual harassment and issued a three-semester

deferred suspension and other sanctions. These sanctions included an assignment to read a book titled *Man Enough: Undefining My Masculinity*, which posits that masculinity itself, traditionally constructed, is a social evil.

86.     Defendant Dilworth's purported logic in his hearing decision raises serious questions of competence and bias. For instance, in addressing the issue of Mr. Ortegel's incapacitation, Defendant Dilworth wrote not that Mr. Ortegel's significant intoxication rendered him unable to consent (if any alleged conduct did in fact occur), but that his significant intoxication made him less credible.

87.     Further, where Defendant Dilworth was required to test whether it was more likely than not that Roe's allegations were true, he appeared to apply only a "possibility" standard, wherein as long as Roe's allegations were "possible," they were sufficient. For example, in addressing the issue of whether J.R. had met with Roe before she went to Mr. Ortegel's room, Defendant Dilworth wrote (erroneously) that due to C.S.'s sign in sheet, "it is possible" that Roe was in J.R.'s room.

88.     Defendant Dilworth wrote this despite writing in the immediately preceding section that J.R. had denied that any such meeting occurred.

89.     In sum, in keeping with his stated biases, Defendant Dilworth accepted Roe's statements as true and summarily disbelieved Mr. Ortegel and other male students testifying against Roe's statements.

90.     Following the decision, Mr. Ortegel timely submitted an eight-page single spaced appeal.

15

91.     In his appeal, Mr. Ortegel provided the University with, among other things, new evidence showing that Roe has a history of falsely accusing students of Title IX violations.

92.     Mr. Ortegel's appeal was summarily denied on February 10, 2022, in a one-page letter with no substantive discussion of the issues raised in his appeal. The appeal decision was nothing more than a rubber-stamp of Defendant Dilworth's decision.

93.     In the cover letter to the denial of appeal letter issued by the University, the University directed Mr. Ortegel to "contact your hearing officer DaShawn Dilworth" with any questions.

<u>Impact on Mason Ortegel</u>

94.     Following the erroneous finding against Mr. Ortegel, Virginia Tech transmitted the finding to the ROTC program, despite Mr. Ortegel's full and unambiguous assertion of his FERPA privacy rights.

95.     As a result of the erroneous finding, Mr. Ortegel is no longer in good standing with the ROTC program, and he lost his scholarship.

96.     Further, Mr. Ortegel was denied access to the University's educational programs as he has been denied membership to at least one recognized student organization.

97.     With the erroneous finding on Mr. Ortegel's record, he is effectively barred from graduate level education and employment requiring a background check, which includes his occupation of choice: military service.

98.     Further, as a result of the erroneous finding, Mr. Ortegel suffers immense emotional and psychological harm.

## CAUSES OF ACTION

### COUNT I:
### Violation of Title IX
### (Against Virginia Tech)

99.     Mr. Ortegel incorporates the above paragraphs by reference.

100.   Mr. Ortegel was a "person" at Virginia Tech, entitling him to rights under Title IX, codified at 20 U.S.C. §§ 1681 *et seq.*

101.   Virginia Tech receives federal funding.

102.   Virginia Tech discriminated against Mr. Ortegel on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against Mr. Ortegel as a male throughout the same.

103.   Virginia Tech was motivated by pressure from the Department of Education and by its own ideological bias to find male students responsible and discipline them.

104.   Virginia Tech exhibited anti-male bias against Mr. Ortegel by (1) intentionally appointing a hearing chair with a demonstrated anti-male and pro-female bias and with a demonstrated hostility towards principles of equality and neutrality; (2) immediately believing the female complainant's statements, even when contradicted by evidence or inconsistency; (3) applying a "possibility" standard to the female complainant's allegations instead of the required preponderance of the

evidence standard; (4) intentionally failing to rectify these errors on appeal or to consider the relevant new evidence raised by Mr. Ortegel; and (5) failing to investigate Mr. Ortegel's complaint of sexual assault against the female complainant. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

105.   Virginia Tech's decision to discipline Mr. Ortegel and issue sanctions against him was motivated and caused by its bias against him on the basis of his male sex.

106.   There is no legitimate, nondiscriminatory reason for Virginia Tech's behavior.

107.   Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

108.   Mr. Ortegel suffers severe harm as a result of this discriminatory process orchestrated against him. Therefore, Mr. Ortegel requests compensatory damages, declaratory relief in the form of a declaration stating Virginia Tech unlawfully discriminated against him on the basis of his sex, injunctive relief clearing his disciplinary record at Virginia Tech, and any other relief the Court deems just and proper.

<u>COUNT II</u>:
Violation of Title VI
(Against Virginia Tech)

109.   Mr. Ortegel incorporates the above paragraphs by reference.

110.   Virginia Tech is prohibited from engaging in discrimination on the basis

of race, by virtue of its receipt of federal funding pursuant to 42 U.S.C. §§ 2000d *et*

*seq.*

111.   Virginia Tech discriminated against Mr. Ortegel on the basis of race by

granting preferential treatment to his black accuser throughout the investigation and

adjudication of her claim and manifesting prejudice against Mr. Ortegel as a white

student throughout the same.

112.   Virginia Tech exhibited anti-white bias against Mr. Ortegel by (1)

intentionally appointing a hearing chair with a demonstrated pro-black female bias

and with a demonstrated hostility towards principles of equality and neutrality; (2)

immediately believing the black complainant's statements, even when contradicted

by evidence or inconsistency; (3) applying a "possibility" standard to Roe's allegations

instead of the required preponderance of the evidence standard; (4) intentionally

failing to rectify these errors on appeal or to consider the relevant new evidence raised

by Mr. Ortegel; and (5) failing to investigate Mr. Ortegel's complaint of sexual assault

against the female complainant. This is a non-exhaustive list of Defendants' anti-

white or pro-black bias shown in this case.

113.    Virginia Tech's decision to discipline Mr. Ortegel and issue sanctions against him was motivated and caused by its bias against him on the basis of his white race or on the basis of his accuser's black race.

114.    There is no legitimate, nondiscriminatory reason for Virginia Tech's behavior.

115.    Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

116.    Mr. Ortegel suffers severe harm as a result of this discriminatory process orchestrated against him. Therefore, Mr. Ortegel requests compensatory damages, declaratory relief in the form of a declaration stating Virginia Tech unlawfully discriminated against him on the basis of his race, injunctive relief clearing his disciplinary record at Virginia Tech, and any other relief the Court deems just and proper.

<u>COUNT III</u>:
**Violation of the Due Process Clause of the Fourteenth Amendment
to the United States Constitution
(Against Dilworth and Polidoro sued in their individual capacities,
under 42 U.S.C. § 1983)**

117.    Mr. Ortegel incorporates the above paragraphs by reference.

118.    Virginia Tech is a Virginia government entity subject to the United States Constitution.

119.    The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

120.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

121.    Mr. Ortegel had a property interest in his contractual relationship with Virginia Tech, including but not limited to his housing contract and the loss of his scholarship. As Mr. Ortegel did not commit a policy violation, he had a legitimate expectation in his continued education concurrent with his educational benefits.

122.    Mr. Ortegel had a liberty interest in his reputation and status as student in good standing because (1) he had an interest in pursuing his occupation of choice and (2) Defendants severely impaired his right to continued education or employment beyond Virginia Tech. Defendants erroneously stigmatized Mr. Ortegel as a student who committed a sexual misconduct violation and effected a change in his legal status by removing him from good standing in the ROTC program due to Virginia Tech's transmission of the finding to ROTC.

123.    Defendants, by their unlawful actions, altered Mr. Ortegel's legal status as student in good standing by issuing a deferred suspension for three semesters.

124.    Defendants harmed Mr. Ortegel's liberty interest in his reputation by their erroneous determination (and the publishing thereof to the ROTC) that he committed sexual harassment, which impairs his education prospects and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

125.    Defendants Dilworth and Polidoro, acting on behalf of Virginia Tech, deprived Mr. Ortegel of his due process rights, including the right to an impartial decisionmaker.

126.    Defendant Dilworth knew that he harbored racist and sexist biases that prevented him from serving as an impartial decisionmaker, and he served as the hearing chair regardless.

127.    Defendant Polidoro also oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at Virginia Tech.

128.    Defendant Polidoro had the authority to rectify the due process deficiencies in this case. She chose not to do so.

129.    Defendants Polidoro and Dilworth, as agents of Virginia Tech and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving Ortegel adequate procedural safeguards during the adjudication of the charges against him.

130.    This finding severely limits—if not destroys—Mr. Ortegel's future. With this finding on his record, Mr. Ortegel will very likely be unable to continue his secondary education or seek any graduate education. He will certainly face severe and irreparable harm to his ability to seek professional employment, especially as a member of the armed forces, absent judicial intervention.

131.    Mr. Ortegel requests compensatory and emotional damages including attorneys' fees, punitive damages, and any other relief the Court deems just and proper, against Defendants Polidoro and Dilworth sued in their individual capacities.

**COUNT IV:**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**to the United States Constitution**
**(Against Defendant Polidoro in her official capacity as Title IX Coordinator of**
**Virginia Tech, under 42 U.S.C. § 1983)**

132.    Mr. Ortegel incorporates the above paragraphs by reference.

133.    Virginia Tech is a Virginia government entity subject to the United States Constitution.

134.    The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

135.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

136.    Mr. Ortegel had a property interest in his contractual relationship with Virginia Tech, including but not limited to his housing contract and the loss of his scholarship. As Mr. Ortegel did not commit a policy violation, he had a legitimate expectation in his continued education concurrent with his educational benefits.

137.    Mr. Ortegel had a liberty interest in his reputation and status as student in good standing because (1) he had an interest in pursuing his occupation of choice and (2) Defendants severely impaired his right to continued education or employment beyond Virginia Tech. Defendants erroneously stigmatized Mr. Ortegel as a student

who committed a sexual misconduct violation and effected a change in his legal status by removing him from good standing in the ROTC program due to Virginia Tech's transmission of the finding to ROTC.

138.   Defendants, by their unlawful actions, altered Mr. Ortegel's legal status as student in good standing by issuing a deferred suspension for three semesters.

139.   Defendants harmed Mr. Ortegel's liberty interest in his reputation by their erroneous determination (and the publishing thereof to the ROTC) that he committed sexual harassment, which impairs his education prospects and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

140.   Defendants Dilworth and Polidoro, acting on behalf of Virginia Tech, deprived Mr. Ortegel of his due process rights, including the right to an impartial decisionmaker.

141.   Defendant Polidoro also oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at Virginia Tech.

142.   Defendant Polidoro had the authority to rectify the due process deficiencies in this case. She chose not to do so.

143.   Defendant Polidoro, as an agent of Virginia Tech and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving Ortegel adequate procedural safeguards during the adjudication of the charges against him.

144.    This finding severely limits—if not destroys—Mr. Ortegel's future. With this finding on his record, Mr. Ortegel will very likely be unable to continue his education beyond Virginia Tech. He will certainly face severe and irreparable harm to his ability to seek professional employment, especially as a member of the armed forces, absent judicial intervention.

145.    Mr. Ortegel requests declaratory and injunctive relief against Defendant Polidoro in the form of (1) a permanent injunction prohibiting her or any agent of Virginia Tech from making or maintaining any notation on Mr. Ortegel's educational record relating to the investigation of the Roe's complaint at Virginia Tech and from taking any further action depriving him of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Ortegel's right to due process.

### COUNT V
**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution
(Against Defendants Dilworth and Polidoro sued in their individual capacities,
under 42 U.S.C. § 1983)**

146.    Mr. Ortegel incorporates the above paragraphs by reference.

147.    Virginia Tech is a Virginia government entity subject to the United States Constitution.

148.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

149.    Throughout the Title IX process at Virginia Tech, Mr. Ortegel was treated differently than Roe on the basis of race and sex.

150.    This differential treatment was a result of discriminatory animus as evidenced by Defendant Dilworth's statements.

151.    This discrimination serves no legitimate governmental interest.

152.    If there is a legitimate governmental interest served by race and sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

153.    Mr. Ortegel requests compensatory and emotional damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against Defendants Polidoro and Dilworth sued in their individual capacities.

<u>COUNT VI</u>
**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution
(Against Defendant Polidoro sued in her official capacity as Title IX Coordinator of
Virginia Tech, under 42 U.S.C. § 1983)**

154.    Mr. Ortegel incorporates the above paragraphs by reference.

155.    Virginia Tech is a Virginia government entity subject to the United States Constitution.

156.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

157.    Throughout the Title IX process at Virginia Tech, Mr. Ortegel was treated differently than Roe on the basis of race and sex.

158.   This differential treatment was a result of discriminatory animus as evidenced by Dilworth's statements.

159.   This discrimination serves no legitimate governmental interest.

160.   If there is a legitimate governmental interest served by race and sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

161.   Mr. Ortegel requests declaratory and injunctive relief against Defendant Polidoro in the form of (1) a permanent injunction prohibiting her or any agent of Virginia Tech from making or maintaining any notation on Mr. Ortegel's educational record relating to the investigation of the Roe's complaint at Virginia Tech and from taking any further action depriving him of his constitutional right to equal protection; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Mr. Ortegel's right to equal protection and a declaration that the Equal Protection Clause bars race and sex discrimination in public higher education disciplinary proceedings.

## JURY DEMAND

162.   Mr. Ortegel hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Ortegel respectfully requests that this Court grant him the following relief against all Defendants:

1.   Damages in the amount to be proved at trial of no less than $1,000,000;

2.   Costs of suit;

3. Attorneys' fees, pursuant to 42 U.S.C § 1988(b);

4. Injunctive relief in the form of expunging his disciplinary record; and

5. Such other and further relief as the Court deems necessary and proper.

Dated: August 30, 2022                     Respectfully submitted,


*/s/ Benjamin North*
Benjamin North (VSB No. 97439)
Lindsay R. McKasson (VSB No. 96074)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930
ben@binnall.com
lindsay@binnall.com

*Counsel for Plaintiff Mason Ortegel*

28