UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

MASON ORTEGEL,

               Plaintiff,

v.

VIRGINIA POLYTECHNIC
INSTITUTE AND STATE
UNIVERSITY, et al.,

            Defendants.

Case No. 7:22-cv-00510-EKD

## MASON ORTEGEL'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Mason Ortegel's life was forever altered when he was wrongfully found responsible for sexual misconduct by Virginia Polytechnic Institute and State University and its agents. Little did he know at the beginning of the Title IX process that he had no chance to win. The hearing panel chair was biased going into the hearing, resulting in an unfair and untrue finding. "[I'm] doing my part to hold men other men [sic] accountable." "[It's] quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space." "Stop policing black women's existence." These are but a few of the statements made or republished by the hearing panel chair. With these statements properly alleged by Plaintiff, Defendants are in the strained position of arguing that the hearing panel chair's racially and sexually charged statements do not suggest that the decisionmaker was biased on the basis of race and sex. Critically, Defendants do not meet their heavy burden in arguing that

Mr. Ortegel fails to state a plausible claim. Defendants' motion to dismiss should be denied.

## BACKGROUND

Mason Ortegel ("Mr. Ortegel") matriculated to Virginia Polytechnic Institute and State University ("Virginia Tech" or "University") in Fall 2020. ECF No. 1, ¶22. He was eagerly awaiting the opportunity to formally serve his country in the armed forces after graduation. *Id.* During his time in the Virginia Tech Corps of Cadets and the United States Army's Reserve Officers' Training Corps ("ROTC") program, he met a female student, "Jane Roe." *Id.*, ¶24. As would become relevant later, Mr. Ortegel is a white male; Jane Roe is a black female. *Id.*, ¶23, 25. During the first two years of school, Mr. Ortegel and Roe became somewhat acquainted, having socialized occasionally. *Id.*, ¶26.

On August 21, 2021, Mr. Ortegel consumed a significant amount of alcohol during a social gathering. *Id.*, ¶¶27-36. He became intoxicated, eventually to the point of incapacitation. *Id.* Around 11:00 p.m., Roe contacted Mr. Ortegel to ask if he could take her Color Guard shift the next day. *Id.*, ¶¶28-29. Mr. Ortegel replied that he was unable to do so and explained he was "pretty sloshed right now." *Id.* Mr. Ortegel and Roe continued to communicate through phone conversation and text that night. *Id.*, ¶¶30-32. Through both mediums, Roe knew that Mr. Ortegel was severely intoxicated, if not incapacitated. *Id.* Eventually, Roe found someone else to cover her shift and the two stopped communicating. *Id.*, ¶¶32-33.

Around the time of his text conversation with Roe, Mr. Ortegel went to get food and was physically unable to carry his milkshake due to his intoxication. *Id.*, ¶34. Eventually, he needed physical assistance to get to his room that night. *Id.*, ¶35. Finally in his room, he fell asleep on his bed, fully clothed, and without any sheets on the bed. *Id.*, ¶36. Falling asleep is the last thing Mr. Ortegel remembers from that night. *Id.*, ¶37. Unbeknownst to Mr. Ortegel, however, Roe had an interest in him and considered him romantically "available." *Id.*, ¶38.

When Mr. Ortegel woke up the next morning, he immediately noticed that his phone was on his bedside table and not in his pocket, which he thought was odd because he had no memory of using his phone in his room or even taking his phone out of his pocket while in his room. *Id.*, ¶39. Shortly after waking up, he was confronted by two Color Guard superiors, who questioned him about his whereabouts the previous night. *Id.*, ¶40. Mr. Ortegel was then informed that Roe had alleged that he had sexually assaulted her. *Id.,* ¶41.

Mr. Ortegel discovered that Roe had told the Color Guard superiors that Mr. Ortegel had forcibly pulled Roe into his room while she was patrolling the hallway and physically assaulted her. *Id.,* ¶42. She also alleged that she was not drinking but that Mr. Ortegel was drinking in his room *Id.,* ¶43. Subsequent to this conversation, Mr. Ortegel discovered that someone had texted from his flip phone after he had fallen asleep. *Id.*, ¶44.

What Mr. Ortegel did not know was that even before he ever attended Virginia Tech, the school was primed and conditioned to find male accused students

responsible of misconduct. Since at least April 2011, the school has been on the receiving end of pressure from the Department of Education's Office for Civil Rights, which had previously released "guidance" documents, including the Dear Colleague Letter, pressuring the school to find more male accused students responsible and suspend or expel them. *Id.*, ¶¶8-14. Although the guidance was rescinded in 2017, Virginia Tech retained the staff positions required by the guidance. *Id.*, ¶17.

Moreover, following the 2020 Presidential Election, the author of much of the guidance following the Dear Colleague Letter, Catherine Lhamon, was confirmed by the Senate to her previous position as Assistant Secretary for Civil Rights in the Department of Education. *Id.*, ¶18. Lhamon has expressed hostility to male accused students and accused students generally in her confirmation hearings and elsewhere. *Id.* Therefore, Virginia Tech knew that if Lhamon viewed it as insufficiently protective of female victims, its federal funding was once again at risk. *Id.* Perhaps as a result, Virginia Tech did not take meaningful steps to ensure that its Title IX investigators and adjudicators were free of bias on the basis of sex. Virginia Tech also maintains a "Women's Center" but not a "Men's Center." *Id.*, ¶¶20-21.

Against this backdrop, Mr. Ortegel's Title IX case began with the Virginia Tech Women's Center encouraging Roe to file a formal complaint against Mr. Ortegel. *Id.*, ¶¶46-47. Roe knew her complaint was false when she made it. *Id.*, ¶48. Virginia Tech has a policy or practice of not disciplining students except for violations of its policies; therefore, as opposed to summarily dismissing Mr. Ortegel, it began to investigate him for a violation of its Title IX Policy. *Id.*, ¶¶49-53.

Throughout the course of the investigation, Roe changed her story numerous times. For example, where Roe had previously stated that Mr. Ortegel "tried" to kiss her, to the investigator, she stated that Mr. Ortegel had actually kissed her; where Roe previously alleged that she was forcibly pulled into Mr. Ortegel's room while she was patrolling the hallway, she stated during the investigation that she entered Mr. Ortegel's room because she was told by another individual, J.R., to "check on" Mr. Ortegel because of his intoxication. *Id.*, ¶65. Roe stated to different witnesses that she decided to check on Mr. Ortegel because he had called her and in contradictory fashion also stated she checked on Mr. Ortegel because J.R. had asked her to check on him. *Id.*, ¶68.

Throughout the same investigation, Mr. Ortegel reported that if any sexual encounter actually occurred, as Roe claimed, he was incapacitated and therefore could not consent – a clear violation of the same Title IX policy. *Id.*, ¶¶57-63. Mr. Ortegel also reported Roe's violation of a no-contact order implemented by the University. *Id.*, ¶¶69-71. Neither of Mr. Ortegel's complaints was ever investigated. *Id.*, ¶¶63, 70. Eventually, the matter was referred to a hearing. *Id.*, ¶72.

Virginia Tech, through Defendant Polidoro, intentionally decided to appoint Defendant Dilworth as the hearing panel chair, who it knew had made racially and sexually charged statements. *Id.*, ¶¶73, 75-76, 82. Defendant Dilworth wrote on Twitter that he is "doing [his] part to hold men other men [sic] accountable" *Id.*, ¶77. Defendant Dilworth retweeted "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but

not when it comes to someone else's body and space," retweeted criticism of black men as "whining like babies," retweeted "stop policing black women's existence," and tweeted about his belief in a "Black Patriarchy" that oppresses black women. *Id.* Defendant Dilworth also argued on a podcast that that black women have "lived experiences" that must be believed, and that asking black women to explain their behavior is asking them to do "emotional labor" which must be avoided. *Id.*, ¶78. Defendant Dilworth also stated his adherence to critical race theory and critical theory generally, which is expressly opposed to the very concept of "equality" and "neutral principles of constitutional law." *Id.*, ¶79. Finally, Defendant Dilworth stated that he views his role in higher education as a power disruptor which likely means that he favors races and sexes that he views as disempowered and disfavors races and sexes he views as traditionally powerful. *Id.*, ¶80. Defendant Polidoro or Virginia Tech generally knew about these statements when she appointed him as hearing panel chair for Mr. Ortegel's hearing. *Id.*, ¶82.

The formal hearing was held on January 10, 2022. *Id.*, ¶83. During the hearing, the hearing panel failed to probe any of the inconsistencies or contradictions in Roe's story. *Id.*, ¶84. Following the hearing, Defendant Dilworth and the hearing panel found Mr. Ortegel responsible for sexual harassment. *Id.*, ¶85. Defendant Dilworth's logic in his decision appeared outcome-driven; for instance, Defendant Dilworth decided that Mr. Ortegel's incapacitation did not mean that he could not consent, but rather that he was not credible. *Id.*, ¶86. Defendant Dilworth also appeared to hold a "possibility" standard of proof: he wrote in at least one factual dispute that it is

"possible" that Roe was telling the truth, and the implication was that this was sufficient to mean she was in fact telling the truth. *Id.*, ¶87. In sum, Defendant Dilworth summarily disbelieved Mr. Ortegel and his male witnesses, and summarily believed Roe. *Id.*, ¶89.

Defendant Dilworth and Virginia Tech issued a three-semester deferred suspension, among other sanctions. *Id.*, ¶85. One other sanction included an assignment to read *Man Enough: Undefining My Masculinity*, which argues that masculinity itself, traditionally constructed, is a social evil. *Id.*

Following the decision, Mr. Ortegel timely submitted an eight-page single spaced appeal, which included, among other things, arguments and new evidence relating to Roe's previous false accusations. *Id.*, ¶91. His appeal was summarily denied in a one-page decision that contained no substantive analysis *Id.*, ¶92. The appeals officer directed Mr. Ortegel to direct any questions he had to Defendant Dilworth. *Id.*, ¶93.

Following the final resolution of the case, Virginia Tech transmitted the finding to the ROTC program, despite Mr. Ortegel's full assertion of his FERPA rights. *Id.*, ¶94. Consequently, Mr. Ortegel is no longer in good standing with the ROTC program, and he lost his scholarship. *Id.*, ¶95.

Mr. Ortegel was also denied access to at least one recognized student organization. *Id.*, ¶96. As a result of the finding, Mr. Ortegel is effectively barred from graduate level education or his desired career: military service. *Id.*, ¶97.

Unsurprisingly, Mr. Ortegel suffers immense emotional and psychological harm. *Id.*, ¶98.

Left with no other option, Mr. Ortegel filed the instant suit. Defendants have moved to dismiss his claims for failure to state a claim. For the following reasons, Defendants' motion should be denied.

## ARGUMENT

### I.    Legal Standard.

Fed. R. Civ. P. 12(b)(6) tests whether a complaint states "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). To survive a 12(b)(6) motion, a complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a 12(b)(6) motion, the Court does not resolve factual disputes; rather, when a Complaint states well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The Court is "required to accept all well-pleaded allegations of [Mr. Ortegel's] complaint as true and draw all reasonable factual inferences in his favor." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

## II.   Mr. Ortegel stated a violation of his due process rights because he was deprived of his right to an impartial decisionmaker.[1]

The Fourteenth Amendment of the United States Constitution prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. Therefore, to state a violation of his due process rights, a plaintiff must first identity a "life, liberty, or property" interest. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 239 (4th Cir. 2021). Mr. Ortegel has done so here.

### A. *Mr. Ortegel identified a protected liberty interest.*

Decades ago, the Supreme Court recognized that, in the public education context, "[t]he Due Process Clause . . . forbids arbitrary deprivations of liberty." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). The Court squarely held that a 10-day suspension from high school based on charges of misconduct implicates a student's liberty interest in his education because "those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later

---

[1] By enacting 42 U.S.C. §1983, Congress expressly permitted suits by private plaintiffs against state officials who violate their federal constitutional rights. 42 U.S.C. §1983. A plaintiff may bring a §1983 claim for prospective injunctive relief against a state official in his official capacity and a §1983 claim for damages against a state official in his individual capacity subject to the official's assertion of qualified immunity. *See Hafer v. Melo*, 502 U.S. 21, 25-31 (1991). Mr. Ortegel structured his claims accordingly. See ECF No. 1, at 117-131, 132-145. By not raising any threshold §1983 defenses, such as whether Defendants Dilworth and Polidoro are properly "persons" under the statute or whether the officials in their official capacities are entitled to sovereign immunity, Defendants impliedly concede that Mr. Ortegel's §1983 claims are properly structured. See ECF No. 7, n.7. Therefore, Mr. Ortegel's official capacity constitutional claims survive if he plausibly alleges a violation of his constitutional rights, and, provided Defendants assert qualified immunity as a defense, his individual capacity claims survive if he plausibly alleges a violation of "clearly established" constitutional rights. *Hafer*, 502 U.S. at 25-32; *Doe v. Purdue Univ.*, 928 F.3d 652, 665-667 (7th Cir. 2019). Here, Mr. Ortegel concedes that Defendants Dilworth and Polidoro are entitled to qualified immunity as to his individual capacity due process claims but maintains his official capacity due process claim against Defendant Polidoro.

opportunities for higher education and employment." *Id.* at 575. The Court explained its liberty interest holding in a separate paragraph from its holding that the student's property interest was also implicated because the state had deprived him of a right to education protected by state statute, which reinforces that the considerations supporting a property interest are not necessarily required to support a liberty interest. *Id.* at 574. The Court rejected the arguments from the State that a student had no liberty or property interest, writing that "it is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution." *Id.* The Court concluded that a student's "liberty interest in [his] reputation" was implicated by the 10-day suspension. *Id.*

This holding was later modified—but not overruled—by the Court's decision in *Paul v. Davis.* 424 U.S. 693, 695 (1976). In *Paul,* the Court considered whether a citizen's liberty interest in his reputation was implicated when the police department posted flyers around the city accusing him of being a shoplifter. *Id.* The Supreme Court ultimately concluded that no liberty interest was implicated because, although the citizen was stigmatized, the stigma was not associated with a concurrent change in his status that would likely foreclose other employment opportunities, such as a termination of employment. *Paul*, 424 U.S. at 709–10. This liberty interest test became known as the "stigma plus" test. *See, e.g., Purdue Univ.*, 928 F.3d at 661–63 (holding that a suspended public university student satisfied the "stigma plus" test and alleged a liberty interest), *citing Paul*, 424 U.S. at 708–9, 712. Therefore, to allege

a liberty interest under the "stigma plus" test, a plaintiff must allege that "a state actor has injured his reputation or otherwise imposed a reputational 'stigma' on him and must also have been deprived of 'some more tangible interests.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 722 (E.D. Va. 2015).

Admittedly, the Supreme Court in *Paul* did not distinguish between liberty and property interests in much of its analysis, which creates some confusion. *See Paul*, 424 U.S. at 710–11. Throughout Section III of the opinion, for example, the Court repeatedly refers to "liberty" and "property" together, and states generally that due process is implicated where the State "distinctly alter[s] or extinguishe[s]" a right previously protected or recognized by state law. *Id.* Accordingly, without paying close attention, this section could be read to support the view that a plaintiff has no protected liberty or property interest unless the State violates a right recognized by state statute. Further adding to the confusion, the Court elsewhere appeared to conflate the liberty and property interests discussed in *Goss*, writing that "while the Court noted that charges of misconduct could seriously damage the student's reputation, . . . it also took care to point out that Ohio law conferred a right upon all children to attend school." *Id.* at 710.

In Section III of the opinion, however, there is an important footnote which makes clear a violation of state statute is not required to support a claim for a liberty or property interest violation. *Paul*, 424 U.S. at 710 n.5. The footnote states, "our discussion in Part III is limited to consideration of the procedural guarantees of the Due Process Clause and is not intended to describe those substantive limitations

upon state action which may be encompassed within the concept of "liberty" expressed in the Fourteenth Amendment." *Id.* This footnote expressly disclaims the view that a violation of a state statutory right is necessary to state a violation of a protected liberty interest. Such a violation may be sufficient to state a liberty interest (provided that the plaintiff has alleged the requisite "stigma"), but it is not necessary.

Even if the Court's footnote was not sufficiently clear on this point, the Court's discussion in Section II drives this point home. In Section II, the Court distinguished liberty and property interests. While property interests stem from "independent source such as state law rules or understandings," liberty interests may arise where the government, for example, defames someone (the stigma) while refusing to rehire him (the plus). *Id.* at 709, *citing Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570, 577 (1972).

Also in this section, the Court reiterated that a liberty interest may be implicated not merely when the government defames an individual, but when the government terminates that individual as an employee in connection with the defamation. *Id.* at 710. Finally, at the end of Section II, the Court reaffirmed its holding in *Goss*, which as previously discussed, held that the state statutory right to education was relevant to the student's property interest but did not contain any discussion of the statutory right with respect to the liberty interest. *Paul*, 424 U.S. at 710; *Goss*, 419 U.S. at 574–75. In sum, *Paul* does *not* hold that a state statutory right must be violated to state a violation of a protected liberty interest.

A 2012 case in this Circuit makes this point even clearer. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012). In *Shirvinski*, the Fourth Circuit considered whether a liberty interest was implicated where the Coast Guard defamatorily "requested" the plaintiff's removal from a project with one of its subcontractors. *Shirvinski*, 673 F.3d at 314. The Fourth Circuit explained that a liberty interest requires that the plaintiff suffer a "reputational injury [that] was accompanied by a state action that 'distinctly altered or extinguished' his legal status if he wants to succeed." *Id.* at 315, *citing Paul*, 424 U.S. at 711. The court expounded that "in the context of public employment, this change in status occurs when the government acting as an employer discharges one of its employees." *Id.* Finally, the court concluded that because the plaintiff was not a government employee—and therefore was not terminated from government employment—he had not suffered "a change in legal status."[2] *Shirvinski*, 673 F.3d at 315. Notably, this Court did not hold that the plaintiff was required to show that he was deprived of a state statutory right; rather, termination from government employment would have qualified as the requisite "change in legal status."[3] *Id.*; *see also Ridpath v. Bd. of Governors Marshall*

---

[2] The Fourth Circuit noted as well that "diluting the requirement of a change in legal status would needlessly" conflict with the D.C. Circuit's liberty interest test. *Shirvinski*, 673 F.3d at 315. In the D.C. Circuit, in order to meet the *Paul* test, a government subcontractor plaintiff must show either that the government formally excluded her from present or future contracts, or that the government's action had the effect of "precluding [plaintiff] from pursuing her chosen career." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). Nowhere did the D.C. Circuit hold that a D.C. statutory right need be violated to state a violation of a liberty interest.

[3] The *Shirvinski* case originated in Virginia. *See Shirvinski v. U.S. Coast Guard,* No. 1:09-CV-896 AJT TRJ, 2010 WL 4279254 (E.D. Va. Oct. 25, 2010), *aff'd,* 673 F.3d 308 (4th Cir. 2012). As the district court noted, the plaintiff was an at-will employee. *Shirvinski v. U.S. Coast Guard,* No. 1:09-CV-896 AJT TRJ, 2010 WL 4279254, at *1 (E.D. Va. Oct. 25, 2010). Obviously, an at-will employee could not demonstrate that he was deprived of any state statutory right. It is telling, therefore, that the Fourth

*Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) (recognizing a liberty interest in a person's his reputation and choice of occupation).

In the same way that loss of state employment changes a person's legal status, loss of state university enrollment changes a person's legal status. *See Purdue*, 928 F.3d at 662 ("Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year"); *see also, e.g., Overdam v. Texas A&M Univ.*, 43 F.4th 522, 529 (5th Cir. 2022) ("Van Overdam alleges a cognizable liberty interest in seeking to restore his reputation and clear his student disciplinary record"). As then-Judge Barrett explained in *Purdue*, in the campus disciplinary context, it is not the defamatory rumors that cause the harm, it is the formal determination of guilt made by the university that both labels the student a sexual offender and actually forecloses enrollment or employment opportunities. *Purdue*, 928 F.3d at 662–63.

A district court within this Circuit similarly held that an accused student plaintiff alleged a liberty interest where "he was wrongly held responsible for sexual misconduct and that this stigmatizing label will impair his ability to seek further education or employment elsewhere." *Rector and Visitors of George Mason University*, 132 F. Supp. 3d at 724. These rulings recognize the obvious reality: getting suspended (even a deferred suspension) from a public university for violations of a sexual misconduct policy causes both disastrous reputational harm and an actual

---

Circuit did not discuss the plaintiff's at-will employment as disqualifying a liberty interest in the first instance.

change in the student's status because the student is no longer a student in good standing.[4]

Beginning with *Doe v. Alger*, 175 F. Supp. 3d 646, 658-661 (W.D. Va. 2016), this Court previously and repeatedly held that public university students have no protected liberty interest in their education. In *Alger*, this Court held that "*Paul* instructs that there must be a statutory right that was altered or extinguished" to state a liberty interest. *Alger*, 174 F. Supp. 3d at 660. But as discussed *supra*, *Paul* does not instruct that a "statutory" right need be violated in order to state a liberty interest. *Paul* instructs that a plaintiff must show "(i) the infliction by state officials of a 'stigma' to plaintiff's reputation and (ii) the deprivation of a *legal* right or status." *Rector and Visitors of George Mason University*, 132 F. Supp. 3d at 722 (emphasis added), *citing Paul*, 424 U.S. at 710–11.[5]

---

[4] In fact, the "status change" in the education context may be even more severe than in the employment context. In the employment context, a terminated employee may seek other employment in his chosen career, despite how very difficult that may be after having to disclose the termination. In the education context, a suspended or expelled college student is effectively barred, categorically, from his chosen occupation because he may not be able to attain the required degree to even be able to apply to jobs in his chosen field.

[5] Mr. Ortegel is aware that this Court previously noted in a footnote its disagreement with *Rector and Visitors of George Mason University* court's interpretation of *Paul. See Alger*, 175 F. Supp. 3d at 660 n.8 ("While there may be binding precedent in the future that borrows from public employment cases to find a liberty interest in cases of suspension or expulsion from public colleges and universities, there is none now"). In the six years that have followed *Alger*, however, federal circuit courts seem to have agreed with *Rector and Visitors of George Mason University* and recognized a liberty interest in this context. *See, e.g., Purdue*, 928 F.3d at 662; *Van Overdam*, 43 F.4th at 529; *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 65 (1st Cir. 2019) ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process") (alteration in original), *citing Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) (recognizing a liberty interest in a public university student's pursuit of an education); *Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018) ("allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest'") (alteration in original), *citing Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). This subsequent clear weight of circuit authority should counsel this Court towards reconsidering its contrary holding first articulated in *Alger*.

There is another problem with this Court's prior holding that a "statutory" right need be implicated to state a liberty interest: it "would render liberty interest claims irrelevant, completely swallowed up by property interest claims." *Rector and Visitors of George Mason University*, 132 F. Supp. 3d at 722. As discussed *infra*, a plaintiff can typically show a property interest by pointing to a right protected by state statute. *See, e.g., Goss*, 419 U.S. at 574. To require a plaintiff to state a deprivation of a statutory right (*i.e.*, a property interest) in order to state a liberty interest would render liberty interests claims irrelevant. The Constitution protects both "liberty" and "property." It would not list both terms if one was fully encompassed by the other. Thus, this Court's prior conclusion cannot be correct. This point is buttressed by the fact that the Fourth Circuit has indeed found liberty interests even where a plaintiff could not show a property interest. *Rector and Visitors of George Mason University*, 132 F. Supp. 3d at 722 n.10 (cataloguing cases).

Here, Mr. Ortegel alleged a "stigma plus" liberty interest. It is obvious that a finding of sexual harassment imposes a stigma on Mr. Ortegel, and he alleged as such. ECF No. 1, ¶85; *Ridpath*, 447 F.3d at 308 ("The type of communication that gives rise to a protected liberty interest implies the existence of serious character defects such as dishonesty or immorality") (internal quotations omitted). He also alleged a deprivation of a legal right or status: "he went from a full-time student in good standing to one suspended." *Purdue*, 928 F.3d at 662; *Overdam*, 43 F.4th at 529; *Univ. of Cincinnati*, 872 F.3d at 399 (suspension from public university implicates a liberty interest); *see also Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th

Cir. 2020) (assuming accused student possessed a liberty interest because defendant university did not dispute the point). Further, Mr. Ortegel alleged that as a result of the erroneous finding, he lost his scholarship and his good standing with the ROTC. ECF No. 1, ¶95; *see Purdue*, 928 F.3d at 663 ("[the wrongful finding] caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it. John has satisfied the 'stigma plus' test"). Mr. Ortegel properly alleged a liberty interest.

## B. *Mr. Ortegel identified a protected property interest.*

Defendants are correct that the Constitution cannot be the source of a property interest; rather, there must be a "legitimate claim of entitlement" deriving from another source, such as a state statute, regulation, contract, or policy. ECF No. 7, at 6; *Doe v. Virginia Polytechnic Inst. & State Univ.*, No. 7:19-CV-00249, 2020 WL 1309461, at *5 (W.D. Va. Mar. 19, 2020), *citing Roth*, 408 U.S. at 577. Mr. Ortegel did not allege a right arising from a state statute or regulation; instead, he alleged a right arising from a contract or a policy. ECF No. 1, ¶¶121, 136.

To allege a "legitimate claim of entitlement" to his education based on policy, an accused student plaintiff must point to a policy which provides a plausible objective basis for such entitlement. *Alger*, 175 F. Supp. 3d at 658. In *Alger*, this Court found that the accused student plaintiff had plausibly alleged a legitimate claim of entitlement when he alleged that the defendant university "has a system of expelling, suspending, or dismissing students only after a finding of cause." *Id.* In its reasoning, this Court cited the Supreme Court's opinion in *Perry v. Sindermann*, 408 U.S. 593,

599–600, 603 (1972), which held that a junior college professor had alleged a property interest sufficient at the pleading stage where he plausibly alleged a "de facto tenure program" where employees were not terminated except for cause. *Alger*, 175 F. Supp. 3d at 657, *citing Perry*, 408 U.S. at 599–600, 603.

Following *Perry*, the *Alger* Court did not hold definitively that the student had any legitimate claim of entitlement, but merely found that the student's reliance on the university's practice of not expelling students arbitrarily was sufficient at the pleading stage. *Id.* The court stated that it would give him "the opportunity to prove the legitimacy of his claim to a property right 'in light of the policies and practices of the institution.'" *Id.* at 658, *citing Perry*, 408 U.S. at 603.

Subsequent to that decision, the university admitted that it has a practice of only disciplining students for cause, which vindicated the student's claim and precluded summary judgment. *See Doe v. Alger,* 228 F. Supp. 3d 713, 727–29 (W.D. Va. 2016) ("*Alger II*"). Therefore, in the *Alger* case, this Court correctly "accept[ed] all well-pleaded allegations in the plaintiff's complaint as true and dr[ew] all reasonable factual inferences from those facts in the plaintiff's favor." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Indeed, the Court took as true at the pleading stage that there existed a policy or practice at the university of not disciplining students except for cause—which could support a property interest—and permitted the plaintiff to proceed to discovery to develop those facts more fully, which he did.

Here, as in *Alger*, Mr. Ortegel alleged that "Virginia Tech has a policy or practice of not disciplining students arbitrarily or without cause; rather it maintains

conduct policies, only by or through which it may discipline students. Indeed, the purpose of such a policy is to articulate the very reasons why a student might expect to be disciplined." ECF. No. 7, ¶50. Taking his allegations as true, Mr. Ortegel had a reasonable expectation that he would remain a student in good standing if he paid tuition and did not violate Virginia Tech policies. Consequently, this Court should give him "an opportunity to prove the legitimacy of his claim [to a property right] 'in light of the policies and practices of the institution.'" *Alger*, 175 F. Supp. 3d at 658, *citing Perry*, 408 U.S. at 603.

Defendants may argue at a later stage in litigation,[6] that they are permitted "to take a student's tuition and housing money and then expel him on the second day of classes for no reason whatsoever, and the student would not have any enforceable right to recourse." *Alger II*, 228 F. Supp. 3d at 729 n.12. This argument is contrary to common sense. All parties know that the purpose of having a code of conduct is to inform students of the rules on campus and assure them that they will not be disciplined except for a violation of the code. As such, and this Court should give Mr. Ortegel the "opportunity to prove the legitimacy of his claim [to a property right] 'in light of the policies and practices of the institution.'" *Alger*, 175 F. Supp. 3d at 658, *citing Perry*, 408 U.S. at 603. In accordance with the Court's holding in *Alger*, Mr. Ortegel has stated a property interest.

---

[6] Such an argument would go beyond the pleadings and would properly be argued at summary judgment, not at the pleading stage.

19

### C. *Mr. Ortegel stated a violation of procedural due process.*

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Henson v. Honor Comm. Of U. Va.*, 719 F.2d 69, 73–74 (4th Cir. 1983). Generally, in the academic setting, "disciplinary proceedings require more stringent procedural protection than academic evaluations" and universities enjoy less deference with disciplinary proceedings as compared to academic proceedings. *Id.*; *Purdue*, 928 F.3d at 663.

It has long been established that "a fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *Morris v. City of Danville, Va.*, 744 F.2d 1041, 1044 (4th Cir. 1984) (holding that an impartial adjudicator is an "essential element" of due process). Generally, however, administrative decisionmakers are entitled to a "presumption of honesty and integrity," and their decisions stand unless a plaintiff can marshal evidence of bias stemming from a source external to the proceedings in question. *Morris*, 744 F.2d at 1045. Such evidence, if brought by the plaintiff, may be constitutionally disqualifying for the defendant. *Id.*

Here, Mr. Ortegel alleged plausible evidence of race and sex bias by the adjudicator in his case, Defendant Dilworth, including:

- Wrote on Twitter that he is "doing [his] part to hold men other men [sic] accountable" ECF No. 1, ¶77.

20

- Retweeted "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space"; retweeted criticism of black men as "whining like babies"; retweeted "stop policing black women's existence"; and tweeted about his belief in a "Black Patriarchy" that oppresses black women. *Id.*

- Argued on a podcast that black women have "lived experiences" that must be believed, and that asking black women to explain their behavior is asking them to do "emotional labor" which must be avoided. ECF No. 1, ¶78.

- Stated his adherence to critical race theory and critical theory generally, which is expressly opposed to the very concept of "equality" and "neutral principles of constitutional law." ECF No. 1, ¶79.

- Finally, he stated that he views his role in higher education as a power disruptor. ECF No. 1, ¶80.

Mr. Ortegel also alleged that Defendant Polidoro knew about these statements when she appointed him as hearing panel chair. ECF No. 1, ¶82.

Defendant Dilworth's statements plausibly evidence a race and sex bias external to the facts of Mr. Ortegel's case. Moreover, Mr. Ortegel's Title IX matter concerned a dispute between a white man and a black woman. Defendant Dilworth, by his own statements, is opposed to equality and neutral principles of constitutional law. *Id.*, ECF No. 1, ¶79. Defendant Dilworth pledged to believe black women's "lived experiences" and has said disparaging things about men as a class. *Id.*, ¶78.

21

Defendant Dilworth is not entitled to a presumption of impartiality when he has expressly disclaimed the very concept of impartiality. Accordingly, Defendant Dilworth was constitutionally disqualified from serving as the decisionmaker in Mr. Ortegel's case. *See Morris*, 744 F.2d at 1045. Defendant Polidoro knew about his disqualifying statements and appointed him anyway. Drawing all reasonable inferences in Mr. Ortegel's favor at the pleading stage, he plausibly alleged that he did not receive an impartial adjudicator because that adjudicator was biased against him on the basis of his race or sex.

For the above reasons, Mr. Ortegel stated a claim for a violation of his constitutional due process rights.

## III.   Mr. Ortegel stated a Title IX claim.

To state a Title IX claim in the Fourth Circuit, a plaintiff must allege sufficient facts such that it is plausible that sex was "a but for cause" of the discipline. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 (W.D. Va. Aug. 11, 2022); *Sheppard*, 993 F.3d at 236. Courts look at the totality of the circumstances. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 (W.D. Va. Aug. 11, 2022); *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 792 (7th Cir. 2022) ("the ultimate inquiry must consider the totality of the circumstances"). "So long as the plaintiff's sex was one but-for cause of that decision [to discipline], that is enough to trigger the law." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020).

As an initial matter, Defendants argue that sex must be "the" but-for cause of the discipline, not "a" but-for cause (*i.e.*, one of many possible but-for causes). ECF No. 7, at 15. This Court has already rejected that position. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 n.11 (W.D. Va. Aug. 11, 2022) ("The court finds that sex must be 'a' but-for cause, not 'the' but-for cause"). Indeed, in the Fourth Circuit, a student plaintiff need only plead facts sufficient to raise a plausible inference that sex was one of many but-for causes for the discipline. *See Sheppard*, 993 F.3d at 236, *citing Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020) ("a defendant cannot avoid liability just by citing some other factor that contributed to its challenged . . . decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law"); *see also Doe v. Univ. of Denver,* 1 F.4th 822, 831-36 (10th Cir. 2021) (denying summary judgment on Title IX claim where university posited "anti-respondent bias" as a nondiscriminatory reason for its discipline of plaintiff, because whether the university disciplined Doe on the basis of his sex or his status as a respondent is a question of fact for the jury to decide).

Mr. Ortegel pled sufficient facts here. He alleged that Virginia Tech was pressured by the Department of Education's Dear Colleague letter and its subsequent guidance, especially considering that Catherine Lhamon – a key proponent of the Dear Colleague Letter – is once again leading the Department of Education's Office for Civil Rights. ECF No. 1, ¶¶11-18. Federal courts have consistently held that federal or social pressure provides a "backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible

[Title IX] claim." *Doe v. Baum*, 903 F.3d at 586; *see, e.g., Purdue*, 928 F.3d at 668-69, *Doe v. Columbia Univ.*, 831 F.3d 46, 58-59 (2d Cir. 2016), *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018), *Schwake v. Arizona Bd. of Regents*, 967 F.3d at 948 (noting in dicta that OCR pressure may be relevant to a Title IX claim).

Accordingly, against this backdrop, he alleged explicitly gendered statements published by the University decisionmaker in his case. *See, e.g., Purdue*, 928 F.3d at 669 (finding that University's republishing of an article titled "Alcohol isn't the cause of campus sexual assault. Men are" strengthened plaintiff's inference of sex discrimination). For instance, he alleged that Defendant Dilworth:

- Tweeted that he is "doing [his] part to hold men other men [sic] accountable" ECF No. 1, ¶77.

- Retweeted "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space;" retweeted criticism of black men as "whining like babies"; retweeted "stop policing black women's existence"; and tweeted about his belief in a "Black Patriarchy" that oppresses black women. *Id.*

- Argued on a podcast that black women have "lived experiences" that must be believed, and that asking black women to explain their behavior is asking them to do "emotional labor" which must be avoided. ECF No. 1, ¶78.

24

- Stated his adherence to critical race theory and critical theory generally, which is expressly opposed to the very concept of "equality" and "neutral principles of constitutional law." ECF No. 1, ¶79.

- Finally, he stated that he views his role in higher education as a power disruptor. ECF No. 1, ¶80.

Each of these statements directly evidence Defendant Dilworth's bias against men and suggest that he uses his role in higher education Title IX adjudication as a way to favor women and disfavor men – to "disrupt power" in his view.

Mr. Ortegel also alleged more evidence "particularized" to his case. *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020). For instance, he alleged Virginia Tech knew of Defendant Dilworth's statements when it appointed him the hearing panel chair in Mr. Ortegel's case, which means that it intentionally appointed a decisionmaker with an expressed hostility to neutrality and an expressed bias against men to Mr. Ortegel's case. ECF No. 1, ¶82. And, and in keeping with Defendant Dilworth's stated priorities, Mr. Ortegel alleged that Defendant Dilworth summarily disbelieved Mr. Ortegel and his male witnesses. *Id.*, ¶89. Defendant Dilworth appeared to apply a "possibility" standard to Roe's wrongful claims, finding that at least one factual contention was sufficiently proven if it was merely "possible" that it occurred. *Id.*, ¶87. Finally, Defendant Dilworth found Mr. Ortegel responsible for sexual harassment and issued him sanctions, including a requirement for him to read *Man Enough: Undefining My Masculinity*, which posits that masculinity itself, traditionally constructed, is a social evil. *Id.*, ¶85. In taking these actions in Mr.

25

Ortegel's case specifically, Defendant Dilworth made good on his promise to – in his view – "hold men other men [sic] accountable." *Id.*, ¶77.

Even if were not sufficient to demonstrate at the pleading stage that the chief decisionmaker expressly stated his bias against men and applied it in his case, Mr. Ortegel also alleged that Virginia Tech reinforced Defendant Dilworth's actions. Specifically, Mr. Ortegel alleged that the appeal process was a sham. He alleged that his appeal was summarily denied without any substantive analysis of his arguments and without addressing Mr. Ortegel's new evidence of Roe's history of falsely accusing other students of Title IX violations. *Id.*, ¶¶91-92. Further, the appeals officer directed Mr. Ortegel to "contact [his] hearing officer DaShawn Dilworth" with any questions. *Id.*, ¶93. Both the lack of any substantive analysis in the appeal and the direction to refer back to Defendant Dilworth strongly suggest that the appeal process was perfunctory at best. Defendant Dilworth was *de facto* the only decisionmaker in the case. Virginia Tech had no interest in earnestly reviewing Defendant Dilworth's conclusions; rather, it reinforced them.

Finally, Mr. Ortegel alleged disparate treatment between himself and his female accuser. *See, e.g., Doe v. Princeton Univ.*, 30 F.4th 335, 344 (3d Cir. 2022) ("Doe has plausibly alleged that he reported a violation that was not investigated by the University. And that, in turn, plausibly supports the inference that sex was a motivating factor in Princeton's investigation"). Mr. Ortegel stated to the investigator that he was incapacitated by alcohol consumption at the time of the alleged sexual encounter, if the sexual encounter did in fact occur. ECF No. 1, ¶57. Mr. Ortegel

alleged that under Virginia Tech policy, he did not consent to any sexual encounter with Roe, if any occurred while he was unconscious. *Id.* Mr. Ortegel's allegations clearly and unequivocally constituted violations of Virginia Tech policy, yet the University took no steps to investigate or to encourage him to file a complaint. *Id.*, at ¶¶58-63, 86. Instead, it punished Mr. Ortegel for his incapacitation by finding his less credible as a result of his incapacitation *Id.*

By contrast, Virginia Tech through its "Women's Center" (it has no "Men's Center") encouraged Roe to file a complaint against Mr. Ortegel. *Id.*, at ¶¶21, 46-47. Mr. Ortegel even reported a violation of the no-contact order that the University imposed, yet the University again never investigated. *Id.,* at ¶¶68-71. In failing to take any action in response to any of Mr. Ortegel's legitimate complaints, Virginia Tech made clear that it would simply not take any action to defend a male student and would side with the female at every juncture. *Univ. of S. Indiana*, 43 F.4th at 793 ("if procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination").

In Defendants' attempt to avoid this conclusion, they seemingly attempt to persuade this Court that gender-biased statements do not raise an inference of gender bias if the statements are made on "private social media." ECF No. 7, at 3 ("Ortegel claims that Dilworth has expressed views on his *private social media*") (italicization in original). Furthermore, as a matter of common sense, the fact that a decisionmaker has expressed hostility to men as a class – through any medium – raises an inference of gender bias. Drawing all reasonable inferences in Mr. Ortegel's favor, Defendant

Dilworth's statements raise a plausible inference of gender bias. *Massey*, 759 F.3d at 347. Considering that Virginia Tech knew of Defendant Dilworth's statements when it appointed him, and subsequently reinforced his erroneous decision, it is plausible that Virginia Tech disciplined Mr. Ortegel because of his sex.

Defendants argue that their motion should be granted because Mr. Ortegel failed to discuss the other two hearing officers. ECF No. 7, at 18. This argument fails on both the facts and the law. First, Mr. Ortegel did allege that the "hearing panel" (which includes the entire panel) failed to probe inconsistencies and contradictions in Roe's varied story. ECF No. 1, ¶84. Together with the fact that Defendant Dilworth (the chair) wrote for the entire panel and had significant evidence of bias himself, it is at least plausible that the panel was infected with gender bias. Regardless, Defendants' argument misstates the law. Mr. Ortegel is not required to disprove any possible alternative explanations to gender bias at the pleading stage, such as the extent to which other members of the panel may have ruled against him for any other reason. *See, e.g., Princeton Univ.*, 30 F.4th at 345 ("Though Princeton suggests another explanation for why it treated the violations differently, anti-male bias is still a plausible explanation. And we must construe the facts in the light most favorable to Doe at this stage"). This argument fails.

Far from "conclusory," ECF No. 7, at 19, Mr. Ortegel alleged facts that directly support the conclusion that the decisionmaker in his case was biased against him on the basis of his sex. He has stated a Title IX claim.

### IV.    Mr. Ortegel stated a Title VI claim.

Mr. Ortegel agrees with Defendants that Title VI and Title IX "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate" on the basis of race and sex, respectively. ECF No. 7, at 20. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Accordingly, it follows that the test for a Title VI claim in this context must be whether a plaintiff has alleged sufficient facts to make it plausible that race was a but-for cause of the discipline. *See Sheppard*, 993 F.3d at 236-237.

For mostly the same reasons that Mr. Ortegel's Title IX claim should survive, his Title VI claim should survive.[7] As discussed *supra*, Virginia Tech failed to investigate any of his claims (he is white), while at the same time believing all of the black student's factual assertions, even when contradicted by evidence or her other testimony. Virginia Tech intentionally appointed a hearing panel chair that had a stated bias towards black students. Defendant Dilworth stated, among other things discussed *supra*, that black women's "lived experiences" need to be believed (ECF No. 1, ¶78) and stated his adherence to critical race theory, which opposes the very concepts of "neutral principles of constitutional law" and "equality." *Id.*, ¶82. These beliefs are unacceptable for someone who is charged with deciding allegations of sexual misconduct by a black woman against a white man. Virginia Tech was aware of these statements when it appointed him, but never engaged in any effort to

---

[7] Mr. Ortegel also notes the curious capitalization of "black" in Defendants' brief. Defendants capitalize "black" when referring to race, but they never capitalize "white." ECF No. 7, at 2. Even their brief reveals a favoritism of one race over the other.

29

seriously review his rulings. ECF No. 1, ¶¶82, 92. In a zero-sum adjudication where one side wins and the other loses, a bias towards one race is a bias against the other race.

Title VI prohibits all racial discrimination, including where the recipient favors one race over the other. 42. U.S.C. § 2000d. Due to Defendant Dilworth's racially biased statements and the University's knowing appointment and ratification of his decisions, it is plausible that Mr. Ortegel was disciplined on the basis of his race. He has stated a Title VI claim.

## V.   Mr. Ortegel stated Equal Protection claims.

As with his Title VI claims, Mr. Ortegel agrees with Defendants that his equal protection claims should be analyzed together with his Title IX and Title VI claims, respectively. ECF No. 7, at 13, 19. Therefore, for the same reasons his Title IX and Title VI claims survive, so too do his equal protection claims arising out of sex and race bias survive. *See Sheppard*, 993 F.3d at 238 (deciding equal protection claim "for largely the same reasons" as Title IX claim); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018) (same).

Critically, however, Defendants failed to assert qualified immunity as to Mr. Ortegel's individual capacity equal protection claims and it is therefore waived. *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) ("It is well-settled that qualified immunity is an affirmative defense, and that the burden of pleading it rests with the defendant"). The burden of pleading is satisfied if the defense is made in the first instance either in the answer or in a dismissal motion. *Ridpath*, 447 F.3d at 305. As

the Defendants failed to raise the defense in their motion to dismiss, they may "plead qualified immunity in their answer and the issue could then be presented at the summary judgment stage." At the present stage, the defense is waived, and his individual capacity Equal Protection claims survive. *Sales*, 224 F.3d at 296 (failure to "press seriously" the defense of qualified immunity results in a waiver); *see also Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 76 (1st Cir. 2019) (failure to raise qualified immunity defense results in waiver).

For the above reasons, Mr. Ortegel's equal protection claims survive dismissal.

## CONCLUSION

Mr. Ortegel was subjected to a process in which an expressly biased decisionmaker was knowingly appointed. He was then deprived of his status as a student in good standing and was erroneously disciplined. For the above reasons, Defendants fail to meet their burden in showing that Mr. Ortegel failed to state a claim. Therefore, Defendants' motion should be denied.

Dated: November 22, 2022                     Respectfully submitted,


                                             */s/ Benjamin North*
                                             Benjamin North (VSB No. 97439)
                                             Lindsay R. McKasson (VSB No. 96074)
                                             BINNALL LAW GROUP, PLLC
                                             717 King Street, Suite 200
                                             Alexandria, Virginia 22314
                                             Tel: (703) 888-1943
                                             Fax: (703) 888-1930
                                             ben@binnall.com

lindsay@binnall.com

*Counsel for Plaintiff Mason Ortegel*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.


Dated: November 22, 2022              */s/ Benjamin North*
                                       Benjamin North (VSB No. 97439)

                                       *Counsel for Plaintiff Mason Ortegel*