IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MASON ORTEGEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:22-cv-00510 |
| | ) | |
| VIRGINIA POLYTECHNIC | ) | By: Elizabeth K. Dillon |
| INSTITUTE & STATE | ) | United States District Judge |
| UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Mason Ortegel alleges that he was unlawfully disciplined by defendants Virginia Polytechnic Institute & State University ("Virginia Tech"), DaShawn Dilworth (one of the hearing officers in Ortegel's disciplinary case), and Katie Polidoro (the University's Title IX Coordinator), in violation of Title IX, Title VI, and the Equal Protection and Due Process clauses of the Fourteenth Amendment.

Pending before the court are two motions: (1) Ortegel's motion for leave to file an amended complaint (Dkt. No. 14)[1] and (2) the defendants' motion to dismiss for failure to state a claim (Dkt. No. 6). The court held a hearing on the motion to dismiss (Dkt. No. 13), and both matters are now fully briefed and ripe for resolution. For the reasons stated below, the court will

---

[1] Ortegel attached a copy of the proposed first amended complaint to his motion for leave to amend. (Dkt. No. 14-1.) Because the court grants the motion to amend, it will refer to that document as the amended complaint throughout this opinion.

grant Ortegel's motion for leave to file an amended complaint and will grant in part and deny in part the defendants' motion to dismiss that complaint.[2]

## I.   BACKGROUND

The following factual allegations are from Ortegel's proposed amended complaint (Dkt. No. 14-1), and the court accepts them as true for the purpose of the motion to dismiss.

### A.  Ortegel's Interactions with Jane Roe

At all times relevant to this complaint, Ortegel was a student at Virginia Tech.  Dilworth was a Virginia Tech employee who worked as a hearing officer in Title IX matters at the University and was the chief hearing officer in Ortegel's disciplinary case.  Polidoro is also a Virginia Tech employee, serving as the University's Title IX Coordinator.

Ortegel—a white male—matriculated at Virginia Tech during the Fall 2020 semester and was a member of the Virginia Tech Corps of Cadets and the United States Army's Reserve Officers' Training Corps ("ROTC") program at the University.  Jane Roe—a Black female— matriculated at Virginia Tech during the Fall 2019 semester and was also a member of the Corps of Cadets and ROTC program.  During the first two years of school, Ortegel and Roe became acquaintances and socialized occasionally.

On August 21, 2021, Ortegel inadvertently consumed a significant amount of alcohol while socializing with several friends, eventually resulting in his incapacitation.  That night, around 11:00 p.m., Roe called Ortegel and asked if he could take the morning flag detail shift the next day for Color Guard.  Ortegel was audibly severely intoxicated during that phone conversation, but he subsequently texted Roe "No, I am actually pretty sloshed right now."

---

[2]  Because defendants included their arguments for dismissal of the putative amended complaint in their opposition brief to Ortegel's motion for leave to amend, in lieu of requiring them to re-file and brief a duplicative motion to dismiss, the court will construe the pending motion to dismiss as seeking dismissal of the amended complaint.

Understanding that Ortegel was in no position to take her shift in the early morning, Roe proceeded to ask another student to take her shift.

Shortly thereafter, Ortegel—feeling embarrassed and concerned about admitting to drinking underage—texted Roe that he was not "sloshed."  However, Roe knew—having just spoken with Ortegel—that Ortegel was severely intoxicated.  Roe then texted Ortegel "I'm a tiny bit sloshed but I'm alive" and that she found someone to cover her shift.  Considering the conversation over, Ortegel did not respond further to Roe.

After getting food with his friends, Ortegel needed physical assistance to return to his room that night, due to his intoxication.  After returning to his room, Ortegel fell asleep on his bed—fully clothed and without first putting sheets on the bed.  Falling asleep is the last thing Ortegel remembers from that evening.  Around this same time, Roe indicated to others that she was going to check on Ortegel and that she believed he was romantically "available."

When Ortegel woke up the next morning, he discovered that his phone was on his bedside table and not in his pocket (he has no memory of using his phone in his room and did not take his phone out of his pocket before falling asleep on the bed).  Shortly after waking up, Ortegel was met with two Color Guard superiors, who questioned him about his whereabouts and actions the previous night.  Ortegel explained the foregoing.

After doing so, Ortegel was informed that Roe alleged he had sexually assaulted her. Roe told the Color Guard superiors that, among other things, Ortegel had forcibly pulled Roe into his room while she was patrolling the hallway and physically assaulted her.  Roe further stated that she was not drinking at all that night and that Ortegel was drinking while in his room at the end of the night.  Roe alleged to the Color Guard that Ortegel had "tried" to kiss her, but not that he indeed kissed her.

Around this time, Ortegel discovered that someone had texted Roe from his flip phone after he had fallen asleep.  Ortegel did not text Roe after he returned to his room because he was asleep or otherwise incapacitated from alcohol consumption.  During the early morning hours of August 22, 2021, Roe texted at least five individuals alleging falsely that Ortegel had physically assaulted her during the previous night.

## B.  Roe Files, and Virginia Tech Investigates, the Title IX Complaint

On or about August 31, 2021, Roe was encouraged by the Virginia Tech Women's Center to file a Title IX complaint against Ortegel.  On September 13, 2021, Roe met with Dan Hardy, the Virginia Tech Title IX investigator, and her advisor, Shannon Alford, at the Women's Center, where Roe filed a formal Title IX complaint against Ortegel.  Ortegel alleges that Roe knew her complaint was false when she made it.

That same day, Virginia Tech opened a Title IX investigation into Ortegel, per University Policy 1026, which is designed to comply with federal Title IX regulations.  Virginia Tech has a policy/practice of not disciplining students arbitrarily or without cause; rather, it maintains conduct policies, only by or through which it may discipline students.  Policy 1026 requires that Virginia Tech presume Ortegel "not responsible" unless and until a finding of responsibility is reached at the end of the grievance process.  Moreover, Policy 1026 requires that Virginia Tech not place the burden of proof or production on either student in the Title IX process.

From September 13 to December 8, 2021, Virginia Tech investigated Roe's complaint for a violation of "Title IX Sexual Harassment,"[3] according to Policy 1026 and federal regulations. On September 24, 2021, Virginia Tech issued a no-contact order against Ortegel, barring him

---

[3] Policy 1026 defines "Title IX Sexual Harassment" as, in relevant part, (1) unwelcome conduct that a reasonable person would determine to be so severe, (2) pervasive, and (3) objectively offensive that it would (4) effectively deny a person equal access to a university program or activity.

from having any direct or indirect communication with Roe, including through third parties. Virginia Tech issued a similar no-contact order to Roe regarding Ortegel.

On or about September 28, 2021, Ortegel met with the investigator and indicated, among other things, that he felt that, if Roe's complaint was accurate and the two engaged sexually, he was the victim of sexual assault without his consent. As Ortegel alleges in the complaint, Policy 1026 provides that a student may not consent to sexual activity when he is "incapacitated due to drugs or alcohol," and the University defines "incapacitation" as, among other things, "being asleep, drugged, intoxicated, or unconscious." Ortegel alleges he and Roe agreed that he was "intoxicated" due to alcohol. Further, under Policy 1026, the investigator is a "responsible employee" who is obligated to report possible Title IX violations to the Title IX Coordinator for investigation. However, the investigator did not report Ortegel's allegation of sexual assault to the Title IX Coordinator.

Over the course of Virginia Tech's investigation of Roe's complaint, the investigator gathered statements from several witnesses and evidence from both Roe and Ortegel, including statements from both Roe and Ortegel. According to Ortegel, Roe changed her story throughout the Title IX adjudication. For example, where Roe had previously stated that Ortegel "tried" to kiss her, to the investigator she stated that Ortegel had actually kissed her; where Roe previously alleged that she was forcibly pulled into Ortegel's room while she was patrolling the hallway, she stated during the investigation that she entered Ortegel's room because she was told by another individual, J.R., to "check on" Ortegel due to his intoxication.

Multiple witnesses and pieces of evidence further contradicted Roe's account, Ortegel alleges. For example, Roe stated that she met with J.R. in his room directly prior to going to Ortegel's room and that C.S. (J.R.'s roommate) was not present in J.R.'s room; however, the

access logs uncovered by the investigator indicated that this could not be so because, according to the logs, the latest possible time in which Roe was in Ortegel's room was at 11:50 p.m., whereas C.S. did not leave his and J.R.'s room until 11:54 p.m.

The investigator also uncovered various witness statements wherein it was revealed that Roe told very different iterations of the alleged assault.  Specifically, and among other things, it was revealed that Roe had alleged in one instance that Ortegel had *pulled her into* the room and in another instance that she had *willingly entered* the room; on one instance that Ortegel had "let go of her" when there was a "noise in the hallway" and on another instance that he kissed her through the noise; and one instance that she exited the room by running out and on another instance that she exited by calmly walking out of the room.  Roe further stated to different witnesses that she decided to check on Ortegel because *he* had called her and then stated she checked on Ortegel because *J.R.* had asked her to check on him.

At one point during the investigation, Roe wrote a message on Ortegel's roommate's whiteboard.  Ortegel considered this message to constitute sexual harassment and a violation of the no-contact order; he raised the issue with Virginia Tech, but the University took no action in response.

## C.  Virginia Tech Refers the Matter to a Disciplinary Hearing; Polidoro Appoints Dilworth as Hearing Panel Chair

Virginia Tech referred the matter to a formal hearing on or about December 7, 2021.  In doing so, the University appointed three hearing officers—one of whom would be appointed chair of the hearing panel.  Virginia Tech was required to ensure that its hearing officers were not infected by any bias that would deprive students of their constitutional and civil rights.  In particular, Polidoro, as Virginia Tech's Title IX Coordinator, was responsible for ensuring that the University did not violate students' rights in the Title IX disciplinary process.

6

Polidoro appointed Dilworth as chair of the hearing panel.  According to the complaint, Dilworth has expressed on his private social media accounts a "vicious bias against men and in favor of black women, categorically."  Specifically, and among other things, he has posted on Twitter that he is "doing [his] part to hold men other men [sic] accountable"; re-posted a message on Twitter with the statement: "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space"; re-posted a message on Twitter which included a criticism of Black men as "whining like babies"; re-posted a message on Twitter including the statement: "stop policing black women's existence"; and posted his own messages on Twitter about his belief in a "Black Patriarchy" that oppresses Black women.

According to the complaint, Dilworth elaborated on his views when he appeared on episode 118 of the "Success in Black and White" podcast.  In that podcast episode, Dilworth argued categorically that Black women have "lived experiences" that must be believed, and that asking Black women to explain their behavior is asking them to do "emotional labor" which must be avoided.  Further, Dilworth explains on the podcast his adherence to critical race theory and critical theory generally.[4]  Lastly, Dilworth also indicated on the podcast that he views his role in higher education as a "power disruptor"—which, considering the context, Ortegel took to mean "favoring races and sexes he views as oppressed and disfavoring those he categorizes as

---

[4]  In the complaint, Ortegel offers a definition of "critical race theory" as a theory that "questions the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law"—by reference to a book on the topic.  (*See* Am. Compl. ¶ 79 (citing Richard Delgado & Jean Stefancic, *Critical Race Theory: An Introduction*, NYU Press (1995) (emphasis omitted)).)  But there is no allegation that Dilworth has ever read this book or that this definition either reflects Dilworth's understanding of critical race theory or is widely accepted.

oppressors."[5]  (Am. Compl. ¶ 80.)  Ortegel alleges that, because Dilworth "subscribes to these theories and philosophies which criticize and oppose the very concept of equality and legal neutrality among identity groups, [he] could not be impartial" in Ortegel's case.  (*Id.* ¶ 81.)

When Virginia Tech, through Polidoro, appointed Dilworth as the hearing panel chair in this matter (in which Ortegel is a white male and Roe is a Black female), it knew of Dilworth's stated views.  Specifically, at the time Polidoro appointed Dilworth to this role, the Title IX Office at Virginia Tech had already been informed by e-mail of the aforementioned statements by Dilworth.  Additionally, on October 15, 2021, another accused student at Virginia Tech (who happened to be Black) formally challenged Dilworth's objectivity based on his aforementioned statements.  In response to this challenge, on October 19—before Ortegel's case was referred for a hearing—Virginia Tech removed Dilworth from that student's hearing panel.[6]  Ortegel alleges that, because Polidoro "is the official with the authority to remove Title IX hearing panel individuals, it follows that she must have given the authorization" to remove Dilworth from that panel, "or knowingly authorized another member of her staff to do so."  (*Id.* ¶ 86.)  Accordingly, Ortegel alleges, Polidoro "not only knew of" Dilworth's statements, "but she also considered them sufficiently biased to warrant removal in another sexual misconduct case" involving a Black female accuser and a Black male accused student.  (*Id.* ¶ 87.)  Nevertheless, despite having removed Dilworth from a Black accused student's hearing panel, Polidoro appointed Dilworth to be chair of Ortegel's hearing panel on or around December 8, 2021.

---

[5]  Again, however, the complaint does not allege that Dilworth agrees with or has outwardly adopted this understanding of the term "power disruptor."

[6]  Ortegel further alleges that, "[b]ecause Defendant Polidoro is the official with the authority to remove Title IX hearing panel individuals, it follows that she must have given the authorization to remove Defendant Dilworth, or knowingly authorized another member of her staff to do so.  Accordingly, Defendant Polidoro not only knew of Defendant Dilworth's statements, but she also considered them sufficiently biased to warrant removal in another sexual misconduct case concerning a black female accuser and an accused black male."  (Am. Compl. ¶¶ 86–87.)

8

**D.  Ortegel's Disciplinary Hearing and Virginia Tech's Decision**

The formal hearing was held on January 10, 2022.  Ortegel asserts that, during the hearing, the panel did not probe the alleged inconsistencies in Roe's testimony or the alleged contradictions between her testimony and the evidence.

After the hearing, the hearing panel, in a decision written by Dilworth, found Ortegel responsible for sexual harassment and issued a three-semester deferred suspension, along with other sanctions—including an assignment for Ortegel to read a book titled *Man Enough: Undefining My Masculinity.*  As Ortegel recalls it, the book "posits that masculinity itself, traditionally constructed, is a social evil."  (*Id.* ¶ 91.)

Ortegel takes issue with the logic employed in several aspects of the written decision.  First, in addressing the issue of Ortegel's incapacitation, the panel wrote not that his significant intoxication rendered him unable to consent (if any alleged conduct did in fact occur), but rather that his significant intoxication made him less credible.  Additionally, where the panel was required to test whether it was more likely than not that Roe's allegations were true, Ortegel alleges, the panel appeared to apply only a "possibility" standard, wherein as long as Roe's allegations were "possible," they were sufficient.  For example, in addressing the issue of whether J.R. had met with Roe before she went to Ortegel's room, the panel wrote (erroneously, in Ortegel's view) that due to C.S.'s sign-in sheet, "it is possible" that Roe was in J.R.'s room.  Yet, in the immediately preceding section, the panel wrote that J.R. had denied that any such meeting occurred.  In sum, Ortegel asserts that, "in keeping with his stated biases, [ ] Dilworth accepted Roe's statements as true and summarily disbelieved [ ] Ortegel and other male students testifying against Roe's statements."  (*Id.* ¶ 95.)

9

Following the decision, Ortegel timely submitted an eight-page single-spaced appeal—providing Virginia Tech with, among other things, new evidence showing that Roe has a history of falsely accusing students of Title IX violations.  On February 10, 2022, Ortegel's appeal was summarily denied "in a one-page letter with no substantive discussion of the issues raised in his appeal."  (*Id.* ¶ 98.)  In Ortegel's words "[t]he appeal decision was nothing more than a rubber-stamp of [ ] Dilworth's decision."  (*Id.*)  In the cover letter to the denial of appeal letter issued by Virginia Tech, the University directed Ortegel to "contact your hearing officer DaShawn Dilworth" with any questions.  (*Id.*)

Following the hearing panel's finding of responsibility, Virginia Tech transmitted that finding to the ROTC program.  As a result, Ortegel lost his scholarship and is no longer in good standing with the ROTC program.  Moreover, since the hearing panel's decision, Ortegel has been denied membership to at least one recognized student organization.  Ortegel alleges that, with this finding on his record, he is "effectively barred from graduate level education and employment requiring a background check, which includes his occupation of choice: military service."  (*Id.* ¶ 103.)

**E.  Ortegel's Claims**

On August 30, 2022, Ortegel brought this action against Virginia Tech, Dilworth, and Polidoro.  He asserts the following causes of action:

- <u>Count I</u>: Title IX sex discrimination claim (against Virginia Tech);

- <u>Count II</u>: Title VI race discrimination claim (against Virginia Tech);

- <u>Count III</u>: 42 U.S.C. § 1983: Fourteenth Amendment procedural-due-process claim (against Dilworth and Polidoro in their individual capacities);

- <u>Count IV</u>: 42 U.S.C. § 1983: Fourteenth Amendment procedural-due-process claim (against Polidoro in her official capacity as Title IX Coordinator of Virginia Tech);

- <u>Count V</u>: 42 U.S.C. § 1983: Fourteenth Amendment equal-protection claim (against Dilworth and Polidoro in their individual capacities); and

- <u>Count VI</u>: 42 U.S.C. § 1983: Fourteenth Amendment equal-protection claim (against Polidoro in her official capacity as Title IX Coordinator of Virginia Tech).

Defendants moved to dismiss the complaint in its entirety for failure to state a claim. (Dkt. No. 6.)  After the hearing on that motion, Ortegel moved for leave to amend his complaint and attached to that motion a proposed amended complaint with further factual allegations.  (Dkt. No. 14.)  Both motions are now ripe for decision.

## II.  LEGAL STANDARDS

### A.  Leave to Amend

As applied to the circumstances here, Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  Leave should be freely given, however, "when justice so requires." *Id*.  This liberal standard, the Fourth Circuit has explained, "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).  Accordingly, the Fourth Circuit has explained that a court should only deny leave to amend when the amendment (1) would be prejudicial to the opposing party, (2) there has been bad faith on the part of the moving party, or (3) the amendment would be futile. *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 509 (4th Cir. 1986) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  Delay alone is not a sufficient reason to deny leave to amend; delay must be accompanied by prejudice, bad faith, or futility. *Id*. at 509–10 (citations omitted).

**B.  Failure to State a Claim**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 129 S. Ct. 1937, 1940 (2009) (quoting *Twombly*, 550 U.S. at 570).  This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and any documents incorporated into or attached to it. *Sec'y of State for Defence v. Trimble Navigation Ltd*., 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments,'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).  "In adjudicating a motion to dismiss, 'a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.'" *Rothy's, Inc. v. JKM Techs., LLC*, 360 F. Supp. 3d 373, 378 (W.D. Va. 2018) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448 (4th Cir. 2011)).

III. DISCUSSION

**A. Ortegel's Motion for Leave to Amend the Complaint**

In rather conclusory fashion, the original complaint alleges that Virginia Tech "knew of Defendant Dilworth's stated biases" at the time Polidoro appointed Dilworth as the hearing panel chair.[7]  (Compl. ¶ 82.)  At the hearing on the motion to dismiss, the defendants argued that the equal-protection claim against Polidoro should be dismissed because there were no allegations in the complaint that could plausibly show Polidoro knew about any past statements Dilworth had allegedly made (or views he allegedly adopted) reflecting race- or sex-based animus at the time she appointed him to the panel.

Following the hearing, Ortegel moved for leave to file an amended complaint (Dkt. No. 14) and attached a putative amended complaint (Dkt. No. 14-1).  That putative amended complaint includes six additional numbered paragraphs of allegations to substantiate the allegation that Polidoro was aware of Dilworth's alleged earlier statements and expressed views. (*See id.* ¶¶ 83–88.)  Specifically, Ortegel now asserts that Polidoro was made aware of Dilworth's earlier statements via e-mail before she appointed him to the panel.  (*Id.* ¶ 83.) Additionally, Ortegel alleges that Virginia Tech removed Dilworth from a hearing panel in another Title IX disciplinary case earlier that semester after the accused student (a Black man) challenged Dilworth's objectivity on the same basis but nevertheless continued to appoint Dilworth to Ortegel's hearing panel a month and a half later.  (*Id.* ¶¶ 83–85, 87.)

---

[7]  As this court has recognized in other contexts, an allegation that someone "knew" something—without any supporting details to show *how* they came to know that—is insufficient at the pleading stage.  *See, e.g.*, *McDaniel v. Campbell*, No. 7:21-cv-00649, 2022 WL 329887, at *3 (W.D. Va. Feb. 3, 2022) ("Although his complaint alleges in conclusory fashion that Mr. Norris 'knew' he was there, McDaniel offers no facts to support that assertion.").

Defendants take issue with Ortegel's delay in moving to amend the complaint to add these allegations—which came over four months after the defendants filed their motion to dismiss.  (Defs.' Opp'n to Mot. to Amend 2–3, Dkt. No. 15.)  However, "it is well established in the Fourth Circuit that 'delay alone is not sufficient reason to deny leave to amend.  The delay must be accompanied by prejudice, bad faith, or futility.'"  *Syngenta Crop Prot., Inc. v. EPA*, 222 F.R.D. 271, 278 (M.D.N.C. 2004) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509–10 (4th Cir. 1986)).  Thus, even if Ortegel's four-month delay did militate against permitting amendment, defendants would still also need to demonstrate prejudice, bad faith, or futility.  The defendants do not allege bad faith, and they have not established either prejudice or futility.

With respect to prejudice, the defendants argue that, because Ortegel waited until after the hearing to move for leave to amend, they had to incur the costs of reviewing and responding to Ortegel's opposition brief and appearing for oral argument on their motion to dismiss, "result[ing] in increased litigation costs to the defendants as well as unnecessarily prolonging the proceedings."  (Defs.' Opp'n to Mot. to Amend 2–3.) But allowing amendment of the complaint does not mean that the defendants' efforts and expenses were all for naught.  Indeed, the proposed new allegations relate to only one of the 162 numbered paragraphs in the original complaint, and the defendants likewise devoted only one paragraph to responding to that

allegation in their initial brief (and only one sentence in their reply brief).[8]  (*See* Defs.' Mem.

Support Mot. Dismiss 18, Dkt. No. 7; Defs.' Reply to Pl.'s Opp'n to Mot. to Dismiss 12, Dkt.

No. 11.)  Moreover, defendants had ample opportunity to respond to those new allegations and

explain why they would not change the substantive analysis in their response to Ortegel's motion

to amend.

    With respect to futility, "[a]n amendment to a complaint is futile 'when the proposed

amendment is clearly insufficient and frivolous on its face.'"  *Daulatzi v. Maryland*, 338 F.R.D.

587, 589 (D. Md. 2021) (quoting *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 880 (4th

Cir. 2020)).  One form of insufficiency is where "the proposed amended complaint fails to

satisfy the federal rules," because it "does not properly state a claim under Rule 12(b)(6)."

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).

However, claims of futility based on susceptibility to dismissal under Rule 12(b)(6) must identify

deficiencies that are "obvious on the face of the proposed amendment."  *Johnson v. Oroweat*

*Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).  For example, the Fourth Circuit has affirmed

denials of leave to amend on futility grounds where a plaintiff's putative amendments raised

frivolous legal theories or had readily apparent factual flaws.  *See, e.g.*, *Harris v. Salley*, 339 F.

App'x 281, 283 (4th Cir. 2009) (affirming denial of leave to amend to add equal protection

claims seeking to require "that several putative defendants cooperate to ensure [a] criminal

---

[8] Defendants cite *Stidham v. Jackson*, No. 2:07-cv-00028, 2007 WL 2156155 (W.D. Va. July 26, 2007), *report and recommendation adopted*, 2007 WL 2405722 (W.D. Va. Aug. 17, 2007), for the proposition that "it is proper for a court to deny a motion to amend when the plaintiff knew or should have known facts which formed the basis for the . . . claim and failed to present any valid reason why they were not previously raised."  (Dkt. No. 7 at 2 (quoting *Stidham*, 2007 WL 2156155, at *3).)  But what defendants conveniently omit by ellipses—and what ultimately distinguishes *Stidham* from this case—is that the plaintiff in *Stidham* sought to amend the complaint to add a *new* claim with "a different legal theory of relief" which was barred by the applicable statute of limitations. 2007 WL 2156155, at *3, *6.  As a result, the magistrate judge recommended denying the motion to amend because the plaintiff "knew or should have known facts which formed the basis for the *new claim*."  *Id.* at *3 (emphasis added).  Here, Ortegel only aims to provide more detail.

prosecution"); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012) (affirming denial of leave where amended claims would be clearly subject to "liability waivers [that] preclude recovery"). Conversely, the Fourth Circuit has found amendment to not be futile where "[t]he complexity of the arguments advanced by counsel on both sides indicates the issue . . . is not obviously frivolous." *Johnson*, 785 F.2d at 511.

Here, the court is not convinced that Ortegel's proposed amendments are clearly insufficient or frivolous on their face. The new allegations, taken as true, would demonstrate that Virginia Tech (through Polidoro) appointed Dilworth to Ortegel's hearing panel despite having recently removed him from another student's Title IX hearing panel in response to that student's challenge to Dilworth's objectivity on similar grounds as are allegedly present in this case. Synthesizing this information, Ortegel surmises that Polidoro "not only knew of Defendant Dilworth's statements, but she also considered them sufficiently biased to warrant removal in another sexual misconduct case" involving a Black female accuser and a Black male accused student. (Am. Compl. ¶ 87.)

Accordingly, the court will grant the motion for leave to file an amended complaint. And, as noted *supra* note 2, the court will construe the defendants' pending motion to dismiss as seeking dismissal of the amended complaint.

## B. Defendants' Motion to Dismiss for Failure to State a Claim

### 1. Individual-capacity Fourteenth Amendment claims (Count III)

The court will dismiss Ortegel's individual-capacity due process claims against Polidoro and Dilworth in Count III pursuant to Ortegel's concession that they are both entitled to qualified immunity. (Pl.'s Mem. in Opp'n to Mot. Dismiss 2 n.1, Dkt. No. 8.) It is "a well-established principle of federal civil rights litigation . . . that government officials sued in their personal

capacities for violations of federal rights are entitled to qualified immunity if the right was not clearly established at the time of the violation." *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 724 (E.D. Va. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)).  In *Sheppard v. Visitors of Virginia State University*, 993 F.3d 230, 240 (4th Cir. 2021), the Fourth Circuit ruled that it is not clearly established that a university student has a right to continued education.  Moreover, Ortegel "concedes that Defendants Dilworth and Polidoro are entitled to qualified immunity as to his individual capacity due process claims." (Pl.'s Opp'n 9 n.1.)  The court will therefore dismiss Count III of the complaint.

**2. Violations of Title IX and Equal Protection as to Gender Bias (against Virginia Tech, Polidoro and Dilworth in their individual capacities, and Polidoro in her official capacity) (Counts I, V, and VI)**

The court will deny the defendants' motion to dismiss the claims based on gender bias, which include Count I (Title IX against Virginia Tech), and portions of Counts V (equal-protection claim against Dilworth and Polidoro in individual capacities) and VI (equal-protection claim against Polidoro in her official capacity).[9]

Ortegel alleges that "Virginia Tech discriminated against [him] on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and

---

[9]  Ortegel correctly points out that defendants have not sought dismissal of the individual-capacity equal protection claims on the grounds of qualified immunity.  (Pl.'s Opp'n 30.)  He therefore argues that the defense is waived "at the present stage."  (*Id.*)  "It is well-settled that qualified immunity is an affirmative defense, and that the burden of pleading it rests with the defendant."  *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000).  The burden of pleading is satisfied if the defense is made in the first instance either in the answer or in a dismissal motion.  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006).  Because defendants have not raised the issue in the motion or reply as a grounds for dismissal, the court finds that, for the motion-to-dismiss stage, defendants have waived any qualified immunity argument as to the individual capacity claims in Counts V and VI.  Should the claims go forward, defendants may "plead qualified immunity in their answer and the issue could then be presented at the summary judgment stage."  *Cantrell v. Frame*, No. 2:18-cv-01106, 2019 WL 1234335, at *2 (S.D.W. Va. Mar. 18, 2019).

adjudication of her claim and manifesting prejudice against Mr. Ortegel as a male throughout the

same." (Am. Compl. ¶ 108.) Further, Ortegel claims,

> Virginia Tech exhibited anti-male bias against Mr. Ortegel by (1) intentionally appointing a hearing chair with a demonstrated anti-male and pro-female bias and with a demonstrated hostility towards principles of equality and neutrality; (2) immediately believing the female complainant's statements, even when contradicted by evidence or inconsistency; (3) applying a "possibility" standard to the female complainant's allegations instead of the required preponderance of the evidence standard; (4) intentionally failing to rectify these errors on appeal or to consider the relevant new evidence raised by Mr. Ortegel; and (5) failing to investigate Mr. Ortegel's complaint of sexual assault against the female complainant.[10]

(*Id.* ¶ 104.)

The requirements for pleading a Title IX claim and an equal-protection claim based on

sex are similar. In *Sheppard*, the Fourth Circuit clarified the pleading standard for Title IX

claims, adopting the Seventh Circuit's approach in *Doe v. Purdue University*, which asks, "Do

the alleged facts, if true, raise a plausible inference that the university discriminated against the

student on the basis of sex?" 993 F.3d at 235 (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667

(7th Cir. 2019)). Inherent in this approach is a requirement that "a Title IX plaintiff adequately

plead causation" by demonstrating the existence of a but-for "causal link between the student's

sex and the university's challenged [decision]." *Sheppard*, 993 F.3d at 236. To meet that

standard, the plaintiff must identify "sufficiently particularized allegations of gender

discrimination" such as statements or "patterns of decision-making that also tend to show the

influence of gender." *Doe v. Va. Polytechnic Inst. & State Univ.,* 400 F. Supp. 3d 479, 503

(W.D. Va. 2019). Evidence of "clear procedural irregularities" that are "sufficiently numerous,

---

[10] Furthermore, Ortegel claims the 2011 "Dear Colleague" letter from the Department of Education motivated Virginia Tech's "anti-male bias." This court has previously stated that the letter was "about procedural protections for accused students, which does not lead to an inference of anti-male bias." *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *8 (W.D. Va. Aug. 11, 2022).

lopsided, and/or important" can support a case of sex bias. *Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-00249, 2022 WL 3334501, at *9 (W.D. Va. Aug. 11, 2022) (quoting *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020)).

Similarly, to state a claim under the Equal Protection Clause, "a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't. of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). However, it is important to note that "[a]llegations of a procedurally or otherwise flawed proceeding combined with a conclusory allegation of gender discrimination [are] not sufficient to survive a motion to dismiss." *Sheppard v. Visitors of Va. State Univ.*, No. 3:18cv723, 2019 WL 6039953, at *5 (E.D. Va. Nov. 14, 2019) (internal quotations omitted), aff'd 993 F.3d 230 (4th Cir. 2021).

Many of Ortegel's accusations are conclusory and speak to Virginia Tech's *intent* without sufficient factual basis. However, other allegations in the complaint could support a plausible inference of gender bias. One of Ortegel's sanctions was to read a book titled *Man Enough: Undefining My Masculinity*, which apparently "posits that masculinity itself, traditionally constructed, is a social evil." (Am. Compl. ¶ 91.) Dilworth, the hearing panel chair, allegedly had tweeted that he is "doing [his] part to hold men other men [sic] accountable" and re-tweeted a message that read: "quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space". (*Id.* ¶ 77.) Further still, Polidoro had previously removed Dilworth from another Title IX hearing panel after an accused student challenged Dilworth's objectivity given his "sexist" statements. (*Id.* ¶¶ 84–85.) These foregoing allegations could plausibly lead to an inference that the defendants treated Ortegel differently because he was a man. Therefore, the

defendants' motion to dismiss Count I and the gender-bias aspects of Counts V and VI will be denied.

### 3. Violation of Title VI and Equal Protection Claims as to Race (against Virginia Tech, Polidoro and Dilworth in their individual capacities, and Polidoro in her official capacity) (Counts II, V, and VI)

The court will grant the defendants' motion to dismiss Count II (Title VI against Virginia Tech) and the racial bias aspects of Ortegel's Equal Protection claims in Counts V (individual-capacity equal-protection claims against Dilworth and Polidoro) and VI (official-capacity equal-protection claim against Polidoro). Ortegel alleges that Virginia Tech exhibited anti-white bias against him by "intentionally appointing a hearing chair [(Dilworth)] with a demonstrated pro-black female bias and with a demonstrated hostility towards principles of equality and neutrality." (*Id.* ¶ 110.) Ortegel provides several examples of Dilworth's statements and beliefs as evidence of his purported anti-white bias. Dilworth retweeted the statement "stop policing black women's existence" and "tweeted about his belief in a 'Black patriarchy' that oppresses black women." (*Id.* ¶ 77.) Ortegel also points to Dilworth's adherence to critical race theory and critical theory generally as evidence of race bias. (*Id.* ¶ 79.) Ortegel further alleges that Virginia Tech, through Polidoro, "knew of Defendant Dilworth's stated biases and open opposition to the concept of equality among the races and sexes as well as his hostility towards the 'neutral principles of constitutional law,'" yet appointed him to Ortegel's hearing panel anyway. (*Id.* ¶ 82.)

42 U.S.C. § 2000d (Title VI) prohibits any program or activity receiving federal funding, like Virginia Tech, from discriminating against individuals on the grounds of race, color, or national origin. Title VI parallels Title IX "except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education

programs." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286 (1998). Thus, Title VI

and Title IX effectively "operate in the same manner." *Id.* To state a claim of Title VI

discrimination in this context, therefore, a party must demonstrate the existence of a but-for

causal link between the party's race and the university's challenged decision. *See Sheppard*, 993

F.3d at 236-237.

    To prove an equal protection claim, a litigant "must first demonstrate that he has been

treated differently from others with whom he is similarly situated." *Veney v. Wyche*, 293 F.3d

726, 730 (4th Cir. 2002) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). A

party then must show "that the defendant's actions had a discriminatory effect and were

motivated by a discriminatory purpose." *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625,

634-35 (4th Cir. 2016). To survive a motion to dismiss in an equal protection claim, the plaintiff

must set forth specific factual allegations that are probative of an improper motive. *See Johnson

v. Holmes*, 204 F. Supp. 3d 880, 890 (W.D. Va. 2016) (citing *Williams v. Hansen*, 326 F.3d 569,

584 (4th Cir. 2003)).

    Ortegel's allegations fail to demonstrate that Dilworth's statements and beliefs caused a

discriminatory effect, nor do they convey that the defendants' actions were motivated by a

discriminatory purpose. Dilworth's statements supporting Black women did not contain any

derogatory comments toward white men. Ortegel points to the fact that Dilworth retweeted

criticism of Black men for "whining like babies" as further evidence of his anti-white bias when

this actually demonstrates, if anything, bias *against* Black men. In fact, it was a *Black* accused

student who had previously requested Dilworth be removed from his panel because of

Dilworth's alleged biases. (Am. Compl. ¶ 84.) Further still, Ortegel fails to demonstrate how

critical race theory constitutes or endorses anti-white bias and how Dilworth's support of critical

race theory necessarily indicates that *Dilworth himself* possesses anti-white biases.  Ortegel's allegations lack any causal link indicating discriminatory race-based animus from Virginia Tech toward him.  Ortegel has failed to plausibly allege that Virginia Tech exhibited anti-white bias against him in violation of Title VI.  For these reasons, the court will grant the defendants' request to dismiss Count II and the racial bias aspects of Ortegel's equal protection claims in Counts V and VI.

### 4.  Procedural due process (against Polidoro in her official capacity) (Count IV)

Defendants' motion to dismiss Count IV (Ortegel's due process claim against Polidoro in her official capacity) will be denied.  Although the amended complaint does not plausibly allege a protected liberty interest, it does plausibly allege a protected property interest and a deficiency in due process.

The Fourteenth Amendment provides that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  In order to allege a due process deprivation claim under the Fourteenth Amendment, Ortegel must allege facts sufficient to show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate."  *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). The deprivation of a protected interest warrants some notice and opportunity to be heard.  *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

#### a.  Ortegel fails to allege a liberty interest

Ortegel claims a liberty interest based upon his "reputation and status as a student in good standing" because (1) he had an interest in pursuing his occupation of choice and (2) the defendants impaired his right to continued education or employment beyond Virginia Tech. (Am.

Compl. ¶ 128.)   He alleges that Virginia Tech's erroneous process "effected a change in his

legal status."  In particular, it led to: (1)  his removal from good standing by the ROTC program

due to Virginia Tech's transmission of the results of the hearing to the ROTC; (2) his receipt of a

three-semester deferred suspension; and (3) the permanent "impair[ment of] his education

prospects" and career prospects for any job that would require a background check or character

& fitness evaluations (including his occupation of choice: military service).  (*Id.* ¶¶ 128–30).

"'Injury to reputation by itself is not a liberty interest protected under the Due Process Clause.'"

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (quoting *Siegert v. Gilley*, 500

U.S. 226, 233 (1991)).  Under *Paul v. Davis*, 424 U.S. 693, 696 (1976), to constitute a liberty

interest, reputational injury must be accompanied by some "state action that distinctly altered or

extinguished a legal status or right." *Doe v. Alger*, 175 F. Supp. 3d 646, 660 (W.D. Va. 2016)

(citing *Shirvinski,* 673 F.3d at 315; *Doe v. Rector & Visitors of George Mason Univ.*, 132 F.

Supp. 3d 712, 722 (E.D. Va. 2015)).  This "stigma-plus" test dictates that allegations must show

that "as a result of the state action complained of, a right or status previously recognized by state

law was distinctly altered or extinguished." *Doe v. Va. Polytechnic Inst. & State Univ*., 617 F.

Supp. 3d 412, 429 (W.D. Va. 2022) (internal quotations omitted).

　　　　Ortegel's allegations here are similar to those this court rejected in *Alger*.  There, the

plaintiff asserted "a protected liberty interest in his good name, reputation, honor and integrity"

and that the "stigmatizing information" resulting from his university's finding that he was

responsible for sexual misconduct "will be part of his permanent record and will be shared with

other college or universities." *Alger*, 175 F. Supp. 3d at 658.  This court held that the plaintiff

there did not "allege[] sufficient facts to show that he had a legal right or status that was altered

or extinguished by [the university's] actions." *Id.* at 660.  The same is true here.  Even assuming

the disciplinary findings will cause the requisite reputational injury, this alone would be insufficient. *Doe v. Va. Polytechnic Inst. & State Univ.*, 617 F. Supp. 3d at 429 (discussing the stigma-plus test). No action by Virginia Tech distinctly altered or extinguished Ortegel's legal status.[11] For the foregoing reasons, the court finds that Ortegel has not plausibly alleged a liberty interest.

### b. *Ortegel alleges a plausible property interest*

Ortegel claims he had a "property interest in his contractual relationship with Virginia Tech, including but not limited to his housing contract and the loss of his scholarship." (Am. Compl. ¶ 127.) Ortegel also argues that he derives a property interest in his "continued education" from Virginia Tech's "policy or practice of not disciplining students arbitrarily or without cause." (Am. Compl. ¶ 50.)

A property interest is "created and its dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits.'" *Alger*, 175 F. Supp. 3d at 656 (citing *Roth*, 408 U.S. at 577). As *Roth* made clear, a property interest is not created by a mere "abstract need or desire for it." *Alger*, 175 F. Supp. 3d at 656. Instead, there must be "a legitimate claim of entitlement to it." *Id*. Neither the Supreme Court nor the Fourth Circuit has "explicitly recognized a property interest in a student's continued enrollment in a public college or university." *Id*. Nor have they recognized that "the Commonwealth of Virginia has created such a right." *Id*. at 657. Indeed, it is "undisputed that the Commonwealth of Virginia has not created a property interest in continued university education." *Doe v. Va. Tech*, 617 F. Supp. 3d at 425 (citations omitted).

---

[11] Furthermore, Virginia Tech does not control the U.S. Army (which operates the ROTC), and Ortegel never alleged that the University had any role in the decision to remove him from ROTC, participated in any ROTC investigation, or encouraged the ROTC program to remove him or revoke his scholarship.

Here, Ortegel relies on a purported "housing contract" as the source of his property interest but provides no information as to the contents of the contract.  Moreover, he relies on a scholarship, but the scholarship he received was from the U.S. Army ROTC, not from Virginia Tech.  Ortegel's allegations regarding Virginia Tech's policy of not disciplining students without cause are, however, similar to what this court considered sufficient to state a property interest at the motion-to-dismiss stage in *Alger*.  There, the plaintiff alleged that "through its policies and practices, JMU has a system of expelling, suspending, or dismissing students only after a finding of cause," and further pointed to JMU's Policy on Student Rights.  *Alger*, 175 F. Supp. 3d at 658.  Relying on the Supreme Court's decision in *Perry v. Sindermann*, 408 U.S. 593 (1972), this court concluded that "while the court is 'not now hold[ing] that [Doe] has any legitimate claim of entitlement to [continued enrollment],' it will give him the opportunity to prove the legitimacy of his claim to a property right 'in light of the policies and practices of the institution."  *Alger*, 175 F. Supp. 3d at 658 (quoting *Perry*, 408 U.S. at 603).  The court will also afford Ortegel the opportunity to prove the legitimacy of his claim to a property right in this case.

c.  *Ortegel plausibly alleges a deprivation of due process*

Ortegel claims that the defendants "deprived him of his due process rights, including the right to an impartial decisionmaker" in reference to Dilworth's presence on the hearing panel. (Am. Compl. ¶ 146.)   Ortegel also notes that the hearing panel "appl[ied] a 'possibility' standard to the female complainant's allegations instead of the required preponderance of the evidence standard." (*Id.* ¶ 110.)  Ortegel further states that "Defendant Polidoro also oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at Virginia Tech" by appointing Dilworth to Ortegel's hearing panel. (*Id.* ¶ 147.)

25

The fundamental requirements of due process are fair notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Due process also requires an impartial, disinterested decision-maker. *See Tellefsen v. Univ. of N.C. at Greensboro*, No. 89–2665, 1989 WL 64301, at *1 (4th Cir. June 14, 1989); *Henson v. Honor Comm. of U. Va.*, 719 F.2d 69, 74 (4th Cir. 1983). Administrative decision-makers are ordinarily entitled to a "presumption of honesty and integrity," and their decisions stand unless a plaintiff can demonstrate evidence of bias stemming from a source external to the proceedings in question. *Morris v. City of Danville*, 744 F.2d 1041, 1044–45 (4th Cir. 1984). "Unconstitutional bias may be shown through evidence that the adjudicator 'had it 'in' for the party for reasons unrelated to the officer's view of the law.'" *Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d 508, 520 (E.D. Va. 2019) (quoting *Stivers v. Pierce*, 71 F.3d 732, 744 (9th Cir. 1995)). That showing must demonstrate "that the 'adjudicator has prejudged, or reasonably appears to have prejudged, an issue,'" requiring "a strong showing of bad faith or improper behavior." *Id.* at 520–21 (quoting *Stivers*, 71 F.3d at 744); *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 177–78 (4th Cir. 2015).

Ortegel has not alleged any facts indicating that Virginia Tech deprived him of fair notice or an opportunity to be heard. Instead, Ortegel's claims center around the assertion that Dilworth was not an impartial or disinterested decision-maker. Ortegel alleges that Dilworth possessed biases "stemming from a source external" to Ortegel's hearing (namely, Dilworth's own personal beliefs on sex and race), rendering him an improper decision-maker. *See Morris*, 744 F.2d at 1045. Ortegel surmises that Dilworth likely "prejudged" Ortegel's guilt due to Dilworth's preexisting biases against men. *See Doe v. Fairfax Cnty. Sch. Bd.,* 403 F. Supp. 3d at 520. The

court finds that Ortegel has alleged sufficient facts to plausibly show that Dilworth was not an impartial or disinterested decision-maker; in turn, Ortegel has plausibly stated a claim for deprivation of due process.

The court accordingly holds that Doe has alleged sufficient facts to state a procedural due process claim based on a property interest. The court will therefore deny the defendants' motion to dismiss Count VI, Ortegel's due process claim against Polidoro in her official capacity.

## IV. CONCLUSION

For the foregoing reasons, the court will grant Ortegel's motion for leave to file an amended complaint (Dkt. No. 14) and will grant in part and deny in part defendants' motion to dismiss for failure to state a claim (Dkt. No. 6). The motion will be granted as to Counts II and III as a whole, and Counts V and VI as to race. The motion will be denied as to Counts I and IV as a whole, and Counts V and VI as to gender. This will leave in the case Ortegel's claim against Virginia Tech for violation of Title IX, his claim of a procedural due process violation against Polidoro in her official capacity, and his claims of equal protection violations as to gender against Polidoro and Dilworth in their individual capacities and against Polidoro in her official capacity. An appropriate order will follow.

Entered: November 20, 2023.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

27