# EXHIBIT NO. 17

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

________________________________________________________

MASON ORTEGEL,

Plaintiff,

v. Case No.:

VIRGINIA POLYTECHNIC INSTITUTE 7:22-CV-00510-EKD

AND STATE UNIVERSITY, et al.,

Defendants.

________________________________________________________

VIDEOTAPED DEPOSITION

________________________________________________________

WITNESS: DASHAWN MARQUEZ DILWORTH

DATE: Friday, April 11, 2025

START TIME: 9:03 a.m., ET

END TIME: 1:17 p.m., ET

REMOTE LOCATION: Remote Legal platform

PROCEEDINGS OFFICER: Allison Sewell, CER-1401

JOB NO.: 35300

A P P E A R A N C E S

BINNALL LAW GROUP, PLLC
717 King Street
Suite 200
Alexandria, Virginia 22314
By: BENJAMIN NORTH, ESQUIRE
ben@binnall.com
KATIE RAYMOND, ESQUIRE, (pro hac vice)
katie@binnall.com
Appearing for Plaintiff

FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road Southwest
Roanoke, Virginia 24006
By: NATHAN H. SCHNETZLER, ESQUIRE
nschnetzler@faplawfirm.com
Appearing for Defendants

A P P E A R A N C E S (Continued)

UNIVERSITY LEGAL COUNSEL
Burruss Hall
Suite 236
Virginia Tech
800 Drillfield Drive
Blacksburg, Virginia 24061
By: KRISTINA J. HARTMAN, ESQUIRE
kjhart06@vt.edu
Appearing for Defendants

I N D E X O F T E S T I M O N Y

EXAMINATION OF DASHAWN MARQUEZ DILWORTH: PAGE

By Mr. North 8

# I N D E X O F E X H I B I T S

(available for download)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A | Copy of Mr. Dilworth's Resume | 23 |
| B | Student Conduct Hearing Decision Letter Dated 1/24/2022 | 47 |
| C | Title IX Investigation Report Case Number 20215302 Dated 12/7/2021 | 48 |
| D | Blackmaled by Academia 2nd Edition Uploaded February 2021 | 65 |
| E | Journal of Student Affairs NYU Volume XVI Last Edited May 27, 2020 | 66 |
| F | Photo of Some Tweet Exchange, 5/15/2021 | 71 |
| G | Screenshot of a Retweet Post, March 8 | 82 |
| H | Screenshot of a Series of Tweets Dated March 26 | 85 |
| I | Photo of a retweet Dated Sept 15, 2019 | 93 |
| J | Photo of a retweet Dated January 5, 2020 | 140 |

P R O C E E D I N G S

THE PROCEEDINGS OFFICER: We are now on the record. Okay. Good morning, everybody. Today's date is Friday, April 11, 2023 (sic), and the time is approximately 9:03 a.m., Eastern Standard Time.

My name is Allison Sewell and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the deposition of DaShawn Dilworth taken in the matter of Mason Ortegel versus Virginia Polytechnic Institute and State University, filed in the District -- the United States District Court for the Western District of Virginia, Case Number 7:22-CV-C00510-EKD (sic).

Would all counsels please identify themselves for the record, stating whom they represent, starting with the noticing attorney.

MR. NORTH: Hi. Good morning, everyone. This is Benjamin North for the plaintiff. And here with me is Katie Raymond, who also represents the plaintiff.

MR. SCHNETZLER: Morning. This is Nathan Schnetzler. I represent the defendants, Virginia Tech, DaShawn Dilworth, and Katie Polidoro along with Kristina Hartman from the Office of the University, Legal Counsel

at Virginia Tech.

THE PROCEEDINGS OFFICER: Thank you.

This deposition is being taken remotely on behalf of the plaintiff and is being conducted pursuant to the procedural rules and laws governing this matter.

As such, all parties agree to the means of capturing this official record which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony of this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the proceeding officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Do all parties so stipulate?

MR. NORTH: Yes.

MR. SCHNETZLER: Yes.

THE PROCEEDINGS OFFICER: Mr. Dilworth, could I ask you please to state and spell your full name for the record?

MR. DILWORTH: My name is DaShawn Marquez Dilworth. Did you also say spell?

THE PROCEEDINGS OFFICER: Yes. Please.

MR. DILWORTH: D-A-S-H-A-W-N M-A-R-Q-U-E-Z. Last name, D-I-L-W-O-R-T-H.

THE PROCEEDINGS OFFICER: Thank you. May I ask you to raise your right hand?

Do you swear or affirm that the testimony you will give in this proceeding today will be the truth, the whole truth, and nothing but the truth?

MR. DILWORTH: I do.

WHEREUPON,

D A S H A W N M A R Q U E Z D I L W O R T H ,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Thank you. You may lower your hand.

And we're ready to proceed.

MR. NORTH: All right. Thank you very much.

EXAMINATION

BY MR. NORTH:

Q DaShawn -- Mr. Dilworth, I called you DaShawn earlier, but I should have asked, would you prefer to be referred to as Mr. Dilworth, or DaShawn?

A DaShawn is perfectly fine.

Q All right. Was -- you heard a bit earlier, my name is Ben North and I represent the plaintiff. Just

want to, kind of, go over a couple of ground rules for the deposition before we really get started. First question is, have you ever been deposed before?
A I have not.
Q Okay. All right. Just going to go over a couple of, kind of, boilerplate questions. Are you aware that you're under oath today?
A I am.
Q All right. And are you aware that that's the same oath that would apply as if you were testifying in court?
A I am.
Q Are you under the influence of any drugs or alcohol that would affect your ability to testify truthfully?
A I am not.
Q During this deposition, I'm going to ask you a series of questions, but I don't want you to guess at any answers and my questions won't ask you to guess.
If you need me to rephrase a question at any time, please let me know. Can we agree that if you provide an answer to my questions, it won't be a guess and it'll be a truthful answer to the best of -- best of your ability?
A Yes.

Q All right. If you need any breaks during the deposition, just let me know. The only thing I'll ask is that you answer any question that's pending before we take a break; is that fair?
A That is perfectly fine.
Q All right. During the deposition, your counsel may object from time to time, but unless you're instructed not to answer the question, you still have to answer the question. Does that make sense?
A Yes. It does.
Q Finally, just for purposes of the record, if you give a yes/no answer, I'll ask you to please say yes or no instead of shaking your head, or nodding or, you know, any, mm-hmm, uh-huh, kind of, stuff, just so that we have a clear record. Does that make sense?
A Yes. It does.
Q I know I said finally on the last point, but this is really finally. During the deposition, it may end up being somewhat of a conversation, but it's important for the record to let each other finish before the other one starts talking.
So I will do my best to let you finish your answer before asking another question. And will you do your best to let me finish my question before you start giving your answer?

A Yes. I will.
Q Okay. Thank you. Just give me one second. All right. DaShawn, where are you currently employed?
A I'm currently employed at the University of Tennessee.
Q Okay. And how long have you been employed there?
A I -- as of now, a little over two-and-a-half years, going on three.
Q Okay. And what do you do at the University of Tennessee?
A I currently serve as a Senior Academic Advisor in The College of Business.
Q At the University of Tennessee, do you have any involvement in either Title IX or Student Conduct departments?
A I do not.
Q Okay. Before working at the University of Tennessee, what was your position prior to that?
A Before the University of Tennessee, I worked as a student conduct coordinator in the Office of Student Conduct at Virginia Tech.
Q Okay. And how long were you in that position?
A I was in that position close to a year. I can't give specified number of months, but it was close

to a year.

Q Okay. And when you were in that position, was that, kind of, roughly speaking, during the COVID era?

A What -- can you clarify your question? Like, what do you classify as the COVID era?

Q Sure. Let me ask a different question. When you worked at Virginia Tech in that position, were you primarily in person in the office, or were you primarily remote?

A I was primarily in person.

Q Okay. And perhaps I should have been more clear. When I say primarily in person, let me get a bit more detailed. Were you in -- were you expected to be in person every day at that position, or was it a hybrid work schedule?

A From what I recall, it was an expectation to be present at every -- to be present in the office every day. There were opportunities for hybrid schedules, but to my knowledge, from what I recall, it was that we -- it was required that we were in person unless there were extenuating circumstances.

Q Okay. And did you interview for that position?

A I did.

Q Who did you interview with?

A Would you like the full roster? I don't remember fully of everyone I interview with. It was a multi-interview process. Are you asking, like, who specifically I remember interviewing with from the office or from -- there were multiple parties that, like, interviewed me that were from different departments as well.

Q Well, let's start with, kind of, the first, what you would call an interview in chronological order. So after you applied, what was the first time you spoke to anyone at Virginia Tech about your application?

A The first time that I spoke with anyone, I would say from what I recall was Rachel Tully, who was serving as one of the assistant directors at the time. And she conducted my first interview.

And then after that, I want to say, when I moved on to the next round, I went through a multi-step process of meeting with other individuals from the office, but also campus departments, representatives as well. I don't remember all -- who all of those folks would have been, but that's what I remember the makeup of the process being.

Q Okay. Did you ever interview with Katie Polidoro?

A I do not recall. I don't know.

Q Okay. Do you remember ever interviewing with anyone from the Title IX office?
A I do not recall.
Q Okay. And how many interviews did you do?
A I do -- I don't want to give, like, I guess, an approximation. So I will -- just going to say I don't know and leave it at that.
Q Sure. In terms of an estimate, though, was it less than five interviews?
A Yes. It was less than five.
Q Okay. Was it more than three interviews? Or three or more, I should say?
A I'm just going to say that it was -- it was less than five, but I'm not sure if it was less than three.
Q All right. Fair enough. During any of your interviews at Virginia Tech for that position, did you discuss Title IX or the requirements of Title IX in any way?
A I don't recall from the interviews ever discussing Title IX. I think majority of the conversations were specifically geared towards operations within the student conduct office, but like I said, I don't recall.
Q Okay. And was it your understanding when you

applied and when you were interviewing that you would potentially be serving as a hearing officer for student conduct hearings at Virginia Tech?

A Yes.

Q Okay. And was is it your understanding that those student conduct hearings would sometimes be referred from the Title IX office?

A Yes.

Q Okay. Aside from serving as a hearing officer at Virginia Tech, what other roles did you serve in the Office of Student Conduct?

A I did not serve any other roles other than acting as a student conduct coordinator in the office and within the bounds of also being a hearing officer, which was part of the description for my role.

Q Okay. Aside from being a hearing officer, though, when you worked as a conduct coordinator in the Office of Student Conduct, what other roles did you serve in that position?

A The only other roles that I can recall that were part of the description was any time that I did not directly serve as a hearing officer, I was also a -- a hearing coordinator, which just meant that I coordinated some of the pieces of making sure a space was reserved for a different hearing officer in the office that

needed a space for a particular hearing, coordinating complainant and respondent email communications.

And making sure that everyone was essentially online in terms of, like, knowing when a hearing was, dates, times, making sure communications were followed through, more so -- so much more of a logistical role than direct interference as a -- as a hearing officer. That's the only other role that I can recall, one that was a part of my position.

Q All right. And what caused you to apply to Virginia Tech for this position?

A I needed a different form of employment. I was leaving the position that I had currently been in before joining Virginia Tech, and I was just looking for something different.

Q All right. When you applied to this position, were you seeking to become a hearing officer for these kinds of cases? And I should say by "these kinds of cases," I mean student conduct cases. Was that something that you had wanted to do and that's why you applied? Perhaps that's a sloppy question let me know if you need me to rephrase it.

A I will just say I was open to the opportunity. I had previously had a student conduct experience beforehand in graduate school, and it was something I

was somewhat familiar with, but not super in depth. It would just -- seemed like good opportunity at the time to do something different within the scope of higher ed, which was always my goal.

Q Okay. So you mentioned a student conduct experience that you had in graduate school. What was that student conduct experience?

A Primarily it was an internship -- internship experience between my first and second year of graduate school where I was an assessment intern in the student conduct office. And so I primarily was helping them organize a lot of data and information that they collected from some of their conduct hearings. Nothing Title IX of that nature.

It was more of their more run of the mill, day-to-day student conduct operations and, kind of, organizing some data so that they could get an idea of, like, what they were seeing most often as an office standpoint as far as demographics of students that were coming through the process, as well as types of cases that they were typically seeing.

That was primarily my role. So I was not a hearing officer or anything of that nature. It was always assessment and research based.

Q Okay. And you said you collected demographics

of students that would be in the student conduct process when you were in the internship; is that accurate?

A I -- I would not say that I collected it. It -- they already had the -- the data and demographic information on hand from independent research they'd already done. My job was just more so to organize it.

Q Okay. And how did you organize it?

A I organized it using Excel. And so I tried to de-identify all of the -- the data so that -- that no sensitive student information could be attached to any of the reports that would have been generated from it, and just more so created documentation that outlined the type of cases that we saw.

And then the very minimal baseline demographics information in terms of gender, race, and any other information -- identifying information they would have collected from their previous surveys. So I did not determine what information that they had already collected.

Like I said, I just organized it based off of -- (cough) excuse me. Organized it based off of what they already had present and what they were looking for and -- and having their assessment report done.

Q All right. And what did you understand was the purpose of organizing that data?

A To my knowledge, it was for them to have an understanding of what type of conduct cases they were most often seeing. That was the -- the bare bones, like we're trying to see exactly what type of conduct cases are we seeing the most as far as, like, student behavior.

Because I think they were trying to implement a different model of getting cases seen, but also working more closely, if I recall correctly, with their dean of students office to provide better student support in case of if they were seeing -- a prime example I do recall was if they were seeing a lot of cases with alcohol involvement.

And maybe partnering with the dean of students to do more alcohol awareness in particular communities or something like that. So it was more -- mostly to do forms of prevention more than anything.

Q Okay. You mentioned earlier, I think that in this role you didn't deal with any Title IX related student conduct incidents; is that right?

A Are you referring to the internship?

Q Yes.

A Yes. I did not deal with any Title IX or anything -- or any incidents related to that. I was still a grad student, and so it would have been

inappropriate for me to be involved in some of those things.

Q All right. And why do you say it would have been inappropriate?

A I wasn't trained in the internship as far as, like, to be able to conduct Title IX training. That wasn't the purpose of my internship. I was trained enough to handle their assessment data and make sure that things were de-identified and no information could be shared out if they decided to create a report and then share it interdepartmentally.

So my training only included the assessment and the research, and that was what they were hiring for and that's what I had applied to the position knowing. So I did not go in knowing that or wanting to do any of the hearing officer work.

Q Got it. Okay. Just want to make sure I understand you correctly. So did the data you were compiling, did some of that come from Title IX cases or sexual misconduct cases when you were in the internship role?

A I will say I don't recall that being the case. I'm not sure. But to my knowledge that wasn't -- if there was information like that there, I don't remember if it was, but most of it was not.

The information -- the data that had been presented to me had all been separated from the Title IX and any other sensitive matter incidents just because I didn't have clearance or approval to -- to see a lot of that information. That is to the best of my ability that I can recall it.

Q Okay. All right. And when you were at Virginia Tech, did you take any Title IX training?

A Yes. I did

Q Okay. And how many hours of training would you say -- it's all right if you don't know an exact number, but just, kind of, a rough estimate.

A I don't recall how many -- how much time that was designated to it. If I were to guess, and I really don't want to, I'd probably say it was definitely -- it was a multi-day training. I'll just leave it at that.

Q Okay. And was that shortly after you were hired?

A Yes.

Q When you worked at Virginia Tech, were you a part of any divisional committees?

A Yes. I was.

Q Okay. And which divisional -- well, first question, what is a divisional committee?

A From what I understand, the divisional

committee would have just been professional development opportunities to get involved with either an initiative or program that was connected to an initiative that the -- the Department of Student Affairs was offering through the time which the Office of Student Conduct was housed in. So that's what I understand to be a divisional committee.

Q Okay. And which divisional committees were you a part of?

A I was only a part of one divisional committee I met -- that I met with regularly which was -- I don't recall the name of the committee, but it was centered around one of the monthly events that the division did where a lot of professionals were gathered together and awards were given out.

I don't remember what it was called. I think it was based off of a strengths initiative or something like that, that they were doing at the time. That's all I can recall about it. But yeah.

Q Okay. And when you were in that committee, were you representing the Office of Student Conduct as far as that committee was concerned?

A I don't recall if the -- if I represented the Office of Student Conduct or if I was just there as another professional that was involved. So I do not

know.

Q Okay. Just give me one second here. I'm going to refer you to what I'll mark as Exhibit A to the deposition.

(Exhibit A marked for identification.)

BY MR. NORTH:

Q DaShawn, can you see this document?

A Yes. I can.

Q Okay. And I think you should be able to scroll independently from me or from anyone else. But let me know when you've reviewed it and if you recognize it.

A I do recognize it.

Q All right. And it's a copy of your resume; is this -- is that correct?

A Correct.

Q All right. And you should be able to see on the bottom right corner of both pages, first page, bottom-right corner reads Dilworth-000012. You produced this document in discovery; is that correct?

A I do not know if I presented it during discovery. I believe it was asked for as an inclusion of documents for discovery, but I'm hesitant to say I directly included it as part of discovery.

Q Fair enough. You're aware that you received

discovery requests for production of documents in this case?

A I am.

Q Okay. And you produced documents to your attorneys in response to that request?

A I did.

Q And was one of those documents a copy of your resume?

A Yes.

Q All right. Fair enough. All right. I want to direct you to partway down the first page under the heading "Conduct Coordinator." And then it says, Virginia Tech under that. Do you see that?

A I do.

Q The last bullet point under that heading says:

Represents the Office of Student Conduct on divisional committees such as the VT Student Experiences Committee, the Aspire Awards committee, the Inclusion and Belonging Strategic Planning committee, Black Advisory Council.

Do you see that?

A I do see that.

Q Does that refresh your recollection as to the divisional committees that you were involved with when you were at VT?

A It does.
Q Okay. So which divisional committees were you involved in when you were at Virginia Tech?
A So based off of the document, from what I can see, because it does refresh my memory, the Aspire Awards is the one that I remember consistently being a part of, which I believe that was one of the VT Student Experience opportunities as well.
So that was a committee in and of itself, part of a larger committee, which was the VT Student Experiences. The Inclusion -- the Inclusion and Belonging Strategic Planning committee, and where it says Black Advisory Council, that should technically -- I think that's actually -- this is weird to see.
But this is -- I think that's actually a typo. The Inclusion and Belonging Strategic Planning committee was the part of the Black Advisory Council that I -- that I sat on. So that's not a separate -- that's not a separate committee.
Q All right. Thank you. Closing the exhibit. What is the Black Advisory Council?
A The Black Advisory Council was an opportunity that was presented to me by the Vice President of Student Affairs at the time, where he gathered together a group of Black student affairs professionals and --

and professionals throughout the university to come together during meetings and just talk about what we were seeing or just observations and conversations around the Black student experience, but also the Black professional experience on campus.

And being able to talk through either solutions or being able to talk about any opportunities that we saw for potential growth, programming, initiatives or anything like that that could be beneficial as far as measure of support for either Black professionals on campus or for the Black student population.

Q All right. And were there any non-Black members of the Black Advisory Council as far as you can recall?

A As far as what I can recall, the only one would have been the VPSA himself.

Q Okay. And who was that?

A Frank Shushok.

Q Okay. And I think you said part of the Black Advisory Council was the Inclusion and Belonging Strategic Planning committee?

A Mm-hmm.

Q What was that?

A So the Black Advisory Council, it was part of

the Inclusion and Strategic Planning committee in terms -- from what I can recall, the overarching initiative was having different committees and programs that were talking about what are the ways that Virginia Tech can be more inclusive and what does that look like to plan out what that -- what that can encompass.

Whether that be different initiatives, different programs. That's all I recall initial conversations about because if I'm being honest, I only went to a couple of those meetings. Not really more than that from -- from what I remember about that particular experience.

Q Okay. When you were at Virginia Tech, what was your understanding of the structure of the Office of Student Conduct as it relates to the Title IX office?

MR. SCHNETZLER: Objection.

Sorry.

MR. NORTH: Sorry. Nate, did you object to form?

MR. SCHNETZLER: My mind is running really slow. Yes.

Objection to form.

Mr. Dilworth, you can answer the question. I apologize.

THE WITNESS: Can you -- before I answer,

can you clarify your question? Just so I'm understanding, are you asking what was the structure of the student conduct office in our partnership with the Title IX office, or are you asking something else?
BY MR. NORTH:
Q Let's start there. If you understand that question, you can go ahead and answer that.
A Okay. So to my understanding, the -- our offices work collaboratively, but we were our own independent -- independent entity, from what I recall. So it was a director, an associate director, and assistant director as far as the structure for student conduct.
And there were multiple student conduct coordinator -- conduct coordinators, of which I was one myself. And in regards to our relationship with our Title IX -- with the Title IX office at the time, that relationship primarily just went -- excuse me, just involve collaboration of sharing.
If they were doing an investigation and a student wanted to move that through the student conduct process, they would disseminate that information to the director of student conduct at the time. And then either the director or the associate director would disseminate those cases to any of the conduct

coordinators or the assistant director just for those to be heard.

And then we would only really follow up with the investigators if we had questions about the investigation report. But that could have been either during the actual hearing or beforehand if were -- there were, like, grammatical errors or we felt like something was missing as far as the -- the communication documents. That's -- that's all I recall of a particular partnership and how our offices collaborated at the time.

Q All right. Did the student conduct office ever investigate student complaints? (Indiscernible - simultaneous speech.)

A So just so -- so just so I'm understanding, when you're saying "investigate student complaints," are you referring to Title IX complaints, or are you referring to non-Title IX complaints?

Q Well, let's start with Title IX complaints. Did the Student Conduct Office ever investigate Title IX complaints?

A We did not.

Q Okay. And how about non-Title IX complaints?

A Generally, if it was a violation of the student code of conduct in terms of student behavior, we

did -- I wouldn't say necessarily investigated. What I would more say this -- the -- I would refer to the student conduct process, which was either the formal or informal process of bringing a student in, asking and getting more information about the incident or whatever might have happened.

And then disseminating a decision based off of the information that we -- we collected. So if you choose to refer to that as an investigation, sure. But that's not how we looked at it as a process as far as non-Title IX things. Title -- as far as Title IX, like I said, we didn't do any of those investigations.

Q Okay. All right. When you served as a hearing officer for Title IX cases, was it your understanding that you were following -- that you had to follow Policy 1026, the Title IX policy at Virginia Tech?

A I -- if you happen to have a copy of what the policy was designated as, and then you could share that with me, I'm happy to confirm or deny that. I don't remember what the policy number was. Yes. We did follow policy as it was designated as a part of the student code of conduct in relation to Title IX, but I'm not sure what that policy was titled.

Q Okay.

A If possible, as well, it -- would it be all right if we could go ahead and just take a break. I think I need to definitely just drink some more water for a second.

Q Yeah. Sure. You want to take a break for -- you want to come back at 9:45?

A That works fine.

Q Okay.

MR. NORTH: All right. Let's go off the record we'll be back at 9:45.

THE PROCEEDINGS OFFICER: Thank you.

We're off the record. It's 9:36 a.m.

(Off the record.)

THE PROCEEDINGS OFFICER: It's 9:45 a.m., Eastern Standard Time. We're back on the record.

MR. NORTH: Thank you.

BY MR. NORTH:

Q All right. DaShawn, we were talking earlier about your role as a hearing officer at Virginia Tech. When you were serving in that role, how many other hearing officers were there (indiscernible - audio disruption) Student Conduct office?

A Sorry. Can you repeat your question? You broke up just a little bit at the end.

Q Sure. When you were working as a hearing

officer in the Office of Student Conduct, how many other employees also served as hearing office officers?

A I would say everyone that worked in the office other than our office manager and case manager at the time. So when we were fully staffed, I think that would have been myself -- myself included, six other individuals, but pretty much anyone other than the office manager and the case manager at the time, usually served as a hearing officer, and that included our graduate assistants as well.

Q Okay. And you said when you were fully staffed it probably would have been six other individuals aside from yourself; is that right?

A Yes.

Q Okay. And do you remember who those six people would have been?

A When I first started it was myself, Lindsay Pritchard, now Sharman, then Rachel Tully, Nick Whitesell, and our director at the time, Dennis McMurray. And I want to say that was everyone that was regularly working as far as like doing hearings.

And then our graduate assistants would hear some of our non-Title IX -- non-Title IX cases. So more of our average run of the mill student conduct -- student conduct cases.

Q All right. And when you were working at Virginia Tech, how many Title IX cases did you hear as a hearing officer?
A I do not know.
Q Okay. Do you have any, sort of, an estimate? Was it more or less than five?
A I would probably say it more than likely was at least five, potentially more, but again, I'm not sure. But I'd probably say at -- at least five.
Q Okay. Again, just in terms of an estimate, do you know if it was less than 10?
A I do not know.
Q Okay. Less than 15?
A I could probably say more than likely less than 15. Just because I don't think I would have heard that many cases each semester that were Title IX specific because there were -- there were still a decent number of people in the office. And we tried to rotate who was doing Title IX cases if we could.
Q All right. Now to those cases, did you ever have a case where there was a male Title IX complainant?
A Yes.
Q Okay. How many cases did you have where there was a male Title IX complainant?
A I believe there was only one.

Q Okay. For the rest of those cases, was there a female complainant?
A That is a little bit of a trick question. I'm not saying that you're intentionally asking a trick question, it's a little complicated to answer because I do recall there were a couple of cases where the individuals identified as non-binary or gender non-conforming.
And so I think we made that known in some of the -- the case records when we did that too. I would probably say as far as Title IX cases, depending on what the allegations were, more than likely it was -- more likely than not, more of the time it was a -- a female complainant is probably where I would leave that at.
Q Okay. All right. You said for a couple of the cases -- or I don't want to misquote you. You -- for some of the cases, you said there might have been non-binary or gender non-conforming complainants; is that right?
A Yes.
Q Okay. Was that -- were there more female complainants than there were non-binary or gender non-conforming complainants as far as you can remember?
A As -- as far as I can remember, I would say yes.

Q Okay. And do you know if those non-binary or gender non-conforming complainants were assigned female at birth?
A I do not know that.
Q Okay. Do you know if those non-binary or gender non-conforming complainants presented primarily as female?
A I -- I will say I don't know, mainly because I can give you my perspective or my speculation, but as far as a hard fact, I'd probably say I don't know.
Q Okay. In terms of your -- now I don't want you to speculate. But in terms of your -- I can ask what your opinion or, you know, perspective is. So why don't you give me that if you can?
A Yeah. In terms of my perspective? Yes. The -- what I would consider to be female presenting that is how the individuals had looked.
Q All right. And when you say that that refers to all of the non-binary or gender non-conforming complainants, is that accurate?
A Yes.
Q All right. Fair enough. Did you ever have any cases where there was a female respondent?
A I'm just going to say I don't know.
Q Okay. Obviously, as we sit here today, you

did have cases where there was a male respondent, right?
A Yes.
Q Okay. Were the majority of the cases that you heard involving male respondents as far as you remember?
A As far as I can recall, yes. There tended to be in -- in -- I guess, in stereotype, typically male respondents and female complainants.
Q Okay. And when you say "stereotype," what are you referring to there?
A I'm thinking about as far as -- I guess I would say like what was -- would be deemed typical of, like, what we saw most often when it came to those types of cases. So that was usually like stereotypically the standard, if that makes a little bit more sense.
Q All right. And the standard you're referring to there is that -- is that female complainant, male respondent?
A Yes.
Q Okay. All right. Again, just so I have an idea of the amount of cases where there was a male respondent, is it fair to say that almost all or all of the cases that you heard involved male respondent?
I know you -- earlier you couldn't remember if there was some case in which there was a female respondent. But in terms of the percentage of male

respondents, is that -- is that accurate to say that it was like a super majority of the cases that you heard at least?

MR. SCHNETZLER: Object to the form.

You can answer.

THE WITNESS: I will just say I -- I don't know. I don't recall. Yeah.

BY MR. NORTH:

Q Okay. Have you ever had a case where a female complainant alleged that -- well, let me ask you this first. Have you ever had a case where a female complainant alleged that she was a victim of sexual assault?

A Yes. I have.

Q Okay. Have you ever had a case in which a female complainant alleged that she was sexually assaulted where she was too intoxicated to consent to sexual activity?

A Yes.

Q Okay. And how many cases roughly have you had with that (indiscernible - audio disruption)?

A I don't know, and I don't want to speculate.

Q Okay. Just in terms of an estimate, was it more, or less than three?

A I would say more than three because I know

that I heard more than three Title IX cases.
Q Okay. All right. Just going back to your -- well, let me share the exhibit again with you.
A Okay.
Q Briefly on the background, I'm showing you Exhibit A again. At the end of the first page, there's a heading that's "Qualitative Research (sic)." Do you see that?
A Yes. I do.
Q Okay. And that was at Tufts University?
A Yes.
Q Okay. Is this the internship that we discussed earlier, or is this a different experience?
A This is a different experience. That -- that was a full time position.
Q Got it. Okay. Under the "Qualitative Researcher" heading, there's a bullet point that -- it's the first one that says:
Oversees 10 plus qualitative research projects related to research grants, primarily the campus-wide Equity Case Studies sponsored by the Melian -- or Mellon Grant, partnering with several university leads and offices.
Do you see that?
A Yes. I do.

Q Okay. What are the Equity Case Studies?

A So I don't fully remember what the Equity Case Studies encompassed, but I was a part of a research team where part of what we were doing was, kind of, looking at research -- qualitative research projects, where universities were conducting case studies to see how equitable they were in terms of, like, creating -- if I recall correctly, creating student voter engagement experiences, because that was the primary focus of a lot of the research projects that we had.

So most of those would have been looking at what were the different discrepancies or the different things that universities were doing as far as student voter engagement and helping students get more democratically involved.

Q Okay. And you use the word "equitable" there. How do you know if something is equitable?

A Are you referring to -- in regards to the case -- in the context of the case studies?

Q Sure.

A In the context of the case studies, because I came onto the team after they were already doing that project and I was past the baton, for last of -- lack of a better term, I didn't define the scale in which they clarified what equitable meant.

I think they had several factors that they checked for that the universities agreed to, or however you say it. But in regards to the case studies, I'm not sure -- I do not recall what they defined as equitable based off of the scales that they used, just because it's been so long ago.

Q Okay. All right. Thank you. All right. I want to talk a bit about the case involving Mason Ortegel. You were a hearing officer on that case; is that right?

A Yes.

Q How did you come to be a hearing officer on that case?

A I don't recall specifics, but I believe I was designated that case from our either director or assistant director at that time. It was one of a few different Title IX cases, I think, we had going on at the office, and I just got selected for that one.

Q Okay. And how were you informed that you were selected as a hearing officer?

A As far as I recall, the easiest way that we typically did it was when we had our weekly staff meetings, we would discuss what sort of cases were on the docket and what investigation reports we received from the Office of Title IX.

And then usually prior the director and the Associate Director -- or the Assistant Director, after our director position was vacant for a short period of time, they would just assign the cases based off of who had the availability, I think, beforehand to oversee the case. And then they would connect with whoever would be coordinating the case to make sure that everything lined up for getting everything scheduled.

Q Okay. At that time who did you understand to be in charge of the Office of Title IX?

A If I'm understanding by your question, are you asking, like, who oversaw, like, the day-to-day operations of the Office of Title IX?

Q No. Just -- I mean, who was the employee in charge of the -- of the Title IX office at Virginia Tech when you were there?

A Katie Polidoro is who I understood to be in charge of Title IX at the time.

Q All right. And she was the Title IX coordinator?

A I believe that was her role. Yes.

Q Okay. All right. When you were as a -- when you were serving as a hearing officer at Virginia Tech, was Katie Polidoro involved in any of the hearings in which you were hearing officer in any way?

A I don't recall her being involved in any of the hearings, not from my memory.
Q Okay. Did Katie Polidoro have any input as to who could be selected as a hearing officer?
A To my knowledge, I do not believe so. I don't recall if there had ever been conversations that I was not privy to. And again, this is me not trying to speculate, but to my knowledge? No. She never provided any input of who she thinks or she thought should have heard a particular case or not. That was always something that was designated by our -- our director in student conduct.
Q Okay. Have you ever had a meeting with Katie Polidoro?
A I don't recall if I've ever had a meeting -- like a one-on-one meeting with Katie Polidoro. No.
Q Have you ever had a meeting with Katie Polidoro -- I know you -- because you just referenced one-on-one meeting. Have you ever had a group meeting with Katie Polidoro?
A I have been in a meeting where Katie Polidoro was present. I don't recall if it was a once or twice experience, but it was not a frequent occurrence for me to interact with her.
Q Okay. You mentioned case meetings that the

Office of Student Conduct would have. Do you recall that?

A Yes. Our staff meetings. Of -- yes.

Q Okay. Would Katie Polidoro attend any of those meetings?

A I don't recall her ever having attend -- attended a meeting. No.

Q Okay. All right. When you served as a hearing officer at Virginia Tech, what was your normal practice after you were assigned a case to serve as hearing officer?

A Typical practice after being assigned a case was just to read through the investigation report. And then, because Title IX cases were always held not by a singular hearing officer, it was always a team of at least two or three, the individual responsibility was to review the investigation report.

And then for myself, my standard practice was to review, highlight specific things that I noticed or that I might still have questions about based off of the investigation report. And then the hearing officers would get together, have a conversation about how they - - how we wanted to approach just, like, question asking for the -- and just, like, things that we understood -- question asking for the hearing, things that we

understood from the investigation report versus things that we might want to ask more intentional questions about.

And then after that it is pretty common for us to share, like, a Microsoft Word document or just a shareable Google document and start populating questions based off of the investigation report just to make sure that we have a clear outline of, like, if there was overlapping questions that we wanted to ask or if there were questions that we were just in general confused about and wanted to make sure that we got clarification.

Those were the big things that I recall as far as prepping. And then any logistical pieces, like I said, would have been done by whoever the coordinating officer -- coordinating officer was at the time.

Q Okay. And following Title IX hearings, there had to be a written decision of the outcome, right?

A Yes.

Q And how was it decided -- who would write that decision?

A So from what I recall, standard practice for most of us that -- that ended up working on cases together, we would both have a hand in writing it. We usually would just go through a document of information that we collected, if we took notes from the hearing,

and then just go through and write what we knew if there was any points of confusion that we were still unclear about.

And then we would take -- essentially take turns writing and editing different parts of it. And then we would review it together. And then once we got to a good point where we felt like the decision and everything was appropriate and represented both of our opinions, then that's when we considered it done and we would go through final review with our director or assistant director, whoever had assigned us the case.

Q All right. And for Mr. Ortegel's case, do you recall what parts of this -- of the decision you wrote yourself?

A I do not. It's been too long -- too long since then. I don't recall.

Q Okay. Who were the hearing officers, if you remember, from Mr. Ortegel's case?

A It was myself, Lindsay Sharman, and Lieutenant Carrie Cox, I believe. I always mess up on her last name, so I apologize if that's not written down, but it was Lieutenant Carrie.

Q Okay. And Lieutenant Carrie was from the Corps of Cadets, right?

A Yes.

Q Is it accurate that whenever a Title IX case involved a cadet, a member of the Corps of Cadets leadership would serve on the hearing panel?
A That is correct. Yes.
Q With regard to Mr. Ortegel's case, before you had the hearing, did you review the investigation report?
A Yes.
Q Okay. Did you review any other materials in preparation for the hearing?
A I do not recall if I did or not.
Q Following the hearing -- and I'm going to ask some more questions in detail about the hearing itself later. But following the hearing, did you and the other hearing officers deliberate?
A Yes. We did.
Q Okay. And how long did you deliberate?
A I don't recall the specified amount of time, just because I remember that we did have to come back and have conversations at least twice, if I recall correctly, just because of schedules and different things like that, just to make sure that we were aligning on thoughts, questions, and different things like that. But I'm not how -- I'm not sure how long our deliberation process was.

Q Okay. And is it fair to say that the decision the hearing panel came to represents your personal opinion on the facts of the case?
A What do you mean by my -- my personal opinion? Do you -- can you clarify?
Q Sure. Let me ask -- yeah. Let me ask it a different way. Is there anything in the hearing decision letter that you disagree with?
A If you were able to provide me a copy of the letter, I'm happy to look through it, but at the time that I would have submitted it, I would estimate that I probably did not have any issues with it because we always made sure that everyone was on the same page before we submitted the final copy of the document and anything was ever sent out to the -- the parties of the hearing.
Q Okay. Yeah. Let me share this. I'll mark this as Exhibit B.
(Exhibit B marked for identification.)
BY MR. NORTH:
Q Please review this and let me know if you recognize it.
A Yes. I do recognize it. Yes. I do.
Q All right. Was this the hearing decision?
A Let me read through this one more time. I

would say yes. This is the hearing -- this is at least the first page of the hearing decision. And then I can see -- okay. Now I can see the rest of it. Yes. This was the -- the decision. Sorry. For some reason, it was taking a second to load, so I only saw the first page at first. So my apologies.

Q No worries. And just for the record, you are able now to review the whole document; is that right?

A Let me see. Yes. At this time, I can see the entire document.

Q All right. Just want to make sure if I show you a document, you can see all the pages. Thanks. Is there anything that you can see in this hearing decision letter that you would disagree with or that doesn't represent your own views?

A At this time, I don't currently see anything that would contradict this decision myself and the other hearing officers made at the time of drafting the decision.

Q All right. Thank you. I'm going to refer you to another document that I'll mark as Exhibit C.

(Exhibit C marked for identification.)

BY MR. NORTH:

Q I'll ask you to review this document just like we did for the last one. There should be many pages,

but let me know if you recognize the document.
A Yes. I do recognize the document. And I wanted to confirm that -- again, that I can see that it's multiple -- multiple pages.
Q All right. And you'd agree with me -- if you need more time to review, let me know. But you'd agree with me that this is the investigative report for that case?
A Yes. I would.
Q All right. What was your understanding of whether any rules of evidence applied to Title IX (indiscernible) when you were the hearing officer?
A Can you clarify your -- clarify your question? What do you mean?
Q Sure. Yeah. So when you were hearing officer, did you understand that there was any rule against hearsay or anything of the sort? That is that you couldn't rely on anything that'd be hearsay?
A For hearsay are you referring to things that I -- I would have heard about the case outside of the investigation report?
Q Now let me maybe ask it this way. So in your understanding, when you were hearing officer, were you allowed to consider witness statements from witnesses that didn't appear at the hearing?

A If I recall correctly, I don't believe that was our -- our case of operation. I think specifically, anytime that we did a Title IX case, we operated by the standards that were set for the student code of conduct in relation to Title IX.

And I think, if I recall correctly, the standard was that witnesses that had participated in the investigation process were allowed to be present during the actual hearing, and we could take consideration of what they were denoting or confirming from their witness statement, but we were not able to consider anything else outside of that, to my knowledge, from what I remember.

Q Okay. Were you allowed to consider anything that was in the investigative report?

A Yes. Yes. We were.

Q Okay. As you were -- or in your role as hearing officer, did you evaluate credibility of witnesses?

A Yes. Generally, it was standard practice for all of us as a hearing officer team to do credibility assessments as a part of the process.

Q Okay. And how do you evaluate the credibility of witnesses?

A From what I recall, as far as when it came to

Title IX cases, credibility we usually tried to establish based off the -- the student conduct standard. Still thinking about the -- the crux of the entirety of the investigation report as we understood it, the information that they provided and how closely it aligned with the consistency of their initial witness statement to what they -- what information they provided during the hearing.

And like I said, whether or not that information was consistent in terms of the initial statement and what they provided hear -- during the hearing. And then if what they were providing continuously lined up context wise with all -- with the all -- all the other witnesses were saying as far as big picture.

And then also if it was either in alignment with the general timeline of events that we gathered from the investigation report, or if they were way off base and they were telling us a story that we couldn't even piece together in terms of, like, if it happened at the same time or not. Does that make sense?

Q Yeah. So if a witness gave different accounts of the same event, would you consider that to detract from their credibility?

A I would not consider that to detract from

credibility. I think if they give accounts that are different, but add more information to the narrative of the -- of what we believe took -- happened and took place and other witnesses are able to verify that information, or at least can consistently agree that that -- that also happened, then I would -- I would still consider them credible.

I would only consider them not credible based off my prior experience. If they were deviating in any way from the main narrative that has been consistently covered by respondent, complainant and multiple of the witnesses.

Q Okay. I want to make sure I understand that answer. So if a witness gave different versions of the same event, you would not -- that would not detract from their credibility in your view?

A It would not detract from their credibility unless there was something present in the investigation report or information that we were able to gather from other witnesses that directly contradicted what they were saying, and we had any form of evidence or proof to verify that, we either are not getting the whole truth or like something is missing that makes it hard to -- to find the individual credible.

I will say, when it came to the credibility

assessments, that was often the most difficult part to assess when it came to Title IX hearings purely because there was a lot of things to take into consideration as far as credibility when it came to the investigation report, witness statements, and information that was given to us during the hearings as well.

But I would leave it at that. Credibility, I did not necessarily think a witness was not credible if they said something that was different from anything that was previously presented. Because I always tried to approach student conduct hearings and Title IX hearings from the perspective of everyone is just trying to give what they believe to be true.

And we always ask them to tell us what they knew and what they experienced firsthand to be able to account. And so that differed from someone else's, that was perfectly fine.

If it -- it was only when we started to put all of the pieces together, if we were noticing, like, there were multiple holes in what they're saying or they say something in the hearing that directly contradicts what they put in their earlier witness statement, then would we -- we have an issue of credibility.

Q Okay. All right. When you were trained as a hearing officer, were you -- were you told that you --

well, let me ask you a different way.
Is it important for hearing officers to not let any personal biases affect the decision?
A I would say so. Yes.
Q Okay. And do you hold any biases, you know, in favor of women or in favor of men generally?
A I'm inclined to say I'm -- I'm not really sure by your question. Can you, like, either clarify or, like, rephrase it?
Q Sure. Are you familiar with the concept of implicit bias?
A Yes. I am.
Q Okay. And what does that mean to you?
A Implicit bias is just either underlying bias or things that you have as associations that you anecdotally or from prior experience that you automatically come into a situation with.
Q All right. And you spoke on a podcast at one point, the Success in Black and White podcast; is that right?
A Yes. I did.
Q Okay. And at one point in that podcast, you discussed implicit bias?
A I don't recall specifically talking about implicit bias, but if we have the audio recording or you

want me to listen to the audio recording, I can definitely listen and confirm. But I don't specifically recall talking about that.
Q Okay. Do you believe that you have implicit bias?
A Well, I believe that everyone has implicit bias.
Q Okay. What implicit biases do you have?
A I'm not sure.
Q Are you able to identify your implicit biases?
A I would probably say that I have implicit biases just as anyone else in terms of how I approach the world. And I navigate things based off of my personal experiences, especially identifying as a Black American.
So I think there are more than likely inherently biases. But I think a lot of biases can also be, I guess, hidden or, like, very unconscious. I think it's just depending on situation and different things like that.
Typically, I acknowledge that I have biases and I do my best to make sure that I'm accountable and acknowledgeable of those and still being able to -- to do my job or act in a professional manner and work against those biases as well. And -- and that's

something that I would have talked about if I did talk about implicit bias on -- on that particular podcast, I think that's also -- would have been part of that conversation.

Q Okay. You said that you try to acknowledge your biases. What biases are those that you acknowledge?

A I think if I could think of a typical bias, I think is pretty common that I work pretty often to unpack. I think there's inherently a male bias that -- that takes place and that's regardless of race, ethnicity and different things of that nature.

I think it's very common to see men often believe or take the side of -- of men either in colloquial conversation or in larger scale issues. And so I think that's something that I actively acknowledge and I try to work against, so that everyone feels like they have an equal voice in terms of, like, addressing a problem or a conversation.

I think that's one of those things that can very much fly under the radar, given how often spaces are, like, very male dominated. And so that's something that wouldn't come up as often. I would not be the recipient of male-dominated power in -- in any of those situations.

Q Okay. Do you believe that -- I'm just trying to understand your answer. Do you believe that you hold this bias towards males, or you're trying to counteract that (indiscernible - audio disruption)?

A I believe it's a little bit of both. I think bias, and especially if we're discussing implicit bias, that's something that everyone inherently has because it's a cultivated part of our -- our orientation to the world.

And so I'm saying, yes. I, more than likely, do have a form of implicit bias where I either naturally I'm likely to believe men in their conversations or not hold them accountable for either misogynistic or problematic things they might say in reference to women or other things like that, because that is something that I've had to learn over the years to -- to address.

That's not -- that's not always been something that's been instinctual. And so that's why I consider that a form of implicit bias, because you're -- myself as well as anyone, you're constantly learning new ways that those things show up and trying to address them accordingly.

Q Okay. And do you believe that that comes from the fact that you're -- that you yourself are a man or from some other source?

A I think it comes not just from the fact that I myself am a man, but I think it also comes from the fact that we live in a very patriarchal society.

Q Okay. And what do you mean by "patriarchal society"?

A So I think we live in -- but to define patriarchy is just to define a society in which males, male dominance and things from a masculine framework are often the center of conversation, power in the way that things are organized in the world. And so there's always going to be more privilege and/or just natural inclination to believe for things to be easier for men in those spaces.

Q Okay. And do you believe we live in a patriarchy?

A I would say so.

Q Okay. And why do you say that?

A I think we could go into the depths of bodies of research, but I think -- I just think that given how especially the US is organized and oriented, I think misogyny and various other forms of male dominance are just very prevalent, that it would be hard to argue that we don't live in a patriarchal society.

Q Okay. And does that patriarchal society include the university system like Virginia Tech, or is

that separate?

A I would say it permeates pretty much every institution. So I don't think Virginia Tech would be exclusive to that.

Q Okay. And when you say "exclusive," did you mean to say "excluded"?

A Yes. It -- Virginia Tech -- I will just say Virginia Tech, yes, is included in that system of patriarchy. Yes.

Q Okay. All right. And did I understand you correctly that you're -- well, do you see yourself as trying to work against the patriarchy?

A As much as I can. Yes.

Q And how do you work against the patriarchy?

A For me, I think it depends on situations and being able to use the fact that I do identify as male or just carry some semblance of -- of male privilege, being able to acknowledge that in spaces and use that to benefit others, whether that be addressing -- that be addressing forms of misogyny in -- in conversations, addressing anything that -- cease to demean or degrade women or even non-heterosexual men.

Just different things of ways that I can just show up and show forms of empathy for other people, either through tangible action like speaking up or just

even being able to -- to acknowledge that something might not seem fair or equal based off of certain assumptions that might be had.

Q Okay. All right. So we talked a little bit about the male bias that we described. Do you -- do you believe you have any sort of bias, implicit or otherwise, that has to do with race?

MR. SCHNETZLER: Objection. Relevance.

You can answer.

THE WITNESS: Sorry. Nate, did you say I can't answer, or should answer? Okay.

MR. SCHNETZLER: You can. Sorry. Yeah.

THE WITNESS: Got you.

I guess I would be inclined to say, yes that I have implicit bias that may be race oriented. Yes.

BY MR. NORTH:

Q Okay. And what implicit bias do you have that might be race oriented?

A I think it would be an initial --

THE WITNESS: Sorry, Nate.

MR. SCHNETZLER: You're all right. You can answer.

THE WITNESS: I think the implicit bias can range from anything of having a uncertainty or

fearfulness -- fearfulness of -- of Whiteness or White people, as well as just, like, extra sensitivity towards any forms of anti-Blackness or things that come across as being harmful to Black -- myself or Black people collectively.

BY MR. NORTH:

Q Okay. All right. You used the term "Whiteness" earlier. What do you mean by Whiteness?

A I was careful to use the term "Whiteness" because I think there's oftentimes a -- a perception that when particularly people of color or Black people specify that they have concerns in regards to racism, they think -- there is a common misconception that that's only in reference to White people rather than Whiteness, which is the construct that privileges White people in certain spaces above Black people and other people of color.

So I'm very particular when I have conversations like that, I don't often just reference just White people. I -- I reference the structure of Whiteness, which is the system itself that's connected to racism that privileges one group versus another.

Q Okay. I guess I'm trying to understand why it's called -- or why you're using the term "Whiteness" as opposed to some other term for that system. Is that

related to White people? Can you explain that to me?

MR. SCHNETZLER: Same objection.

THE WITNESS: So the reason that I use it that way is because I think that's the most appropriate framework. So I think to say just racism, kind of, creates an amorphous, like, invisible cloud, for lack of a better term.

I like to say Whiteness because that is again, what we're talking about in terms of -- if we understand racism to be the actual construct that leads to oppression and prejudice and different things of that nature, then the argument then is that everything that subsides from that which is race are products of racism.

And so when I say "Whiteness," I don't specifically mean White people. I mean Whiteness as a structure because there are people who are not necessarily what we -- you can -- who we would deem to be White that can benefit from Whiteness. To say that racism only hurts people of color and benefits White people misunderstands the issue. And so I say that more so from a fact of being clear.

BY MR. NORTH:

Q Okay. What other groups aside from White people would benefit from Whiteness, in your view?

MR. SCHNETZLER: Same objection.

THE WITNESS: I apologize. I'm not -- I am taking it serious I'm not trying to laugh. But it -- I think it can be very structural and society based. I think there are often conversations just in general public discourse about proximity to Whiteness. And so anybody that is able to be in that close proximity to Whiteness is a close proximity to power.

A common example that -- it's usually used in academic circles is thinking about, quote-unquote, the model minority theory, which is the use of Whiteness projected by White people to bring Asian or Asian-American folks closer and affording them more privileges in certain spaces in comparison to Black and other darker skinned people of color just because they are -- they are deemed close enough to Whiteness, i.e., close enough to assimilate -- assimilate, deemed appropriate for certain spaces in contradiction to other minority groups.

BY MR. NORTH:

Q Okay. Thank you. Do you believe that all White people benefit from Whiteness as you see it?

A Yes.

Q Okay. Do you -- do you oppose Whiteness, or what's your perspective on your place relative to Whiteness?

MR. SCHNETZLER: Same objection.

THE WITNESS: Both theoretically and in actuality, yes. I do oppose Whiteness because I think at the end of the day, Whiteness is, again, just another structure of racism. And at the end of the day, it hurts all of us, not just people of color.

We -- I think Black people as well as any other folks on the spectrum that identify as people of color, we always will receive the brunt of the force of racism. But at the end of the day, it hurts all of us as a society. So yes. I do oppose Whiteness.

And at the same time, I can acknowledge that Whiteness is a structure that exists and that I, as well as any other person of color has to navigate in the day-to-day. And so it's not something that -- I'm every day -- I'm every day opposing it. Yes. And at the same time, I also acknowledge that is a structure that exists and is meant to be unpacked consistently.

BY MR. NORTH:

Q Okay. And kind of same question as it related to the issue of sex. Do you -- do you believe that Virginia Tech is included in the system of Whiteness?

MR. SCHNETZLER: Same objection.

THE WITNESS: Yes. I do.

BY MR. NORTH:

Q Okay. Okay.
A If it's all right, Ben, before you move on to your next question, is it okay if we take another break?
Q Yeah. Sure. You want to come back at 10:45?
A That should be enough time. Yes.
MR. NORTH: All right. We can go off the record.
THE PROCEEDINGS OFFICER: (Indiscernible - audio disruption) off the record.
(Off the record.)
THE PROCEEDINGS OFFICER: It's 10:47. We're back on the record.
MR. NORTH: Thank you.
BY MR. NORTH:
Q DaShawn, I just want to refer you to a couple of exhibits. I'll mark this as Exhibit D.
(Exhibit D marked for identification.)
THE WITNESS: Okay. Yes. I see it.
BY MR. NORTH:
Q You could scroll, I think, to the third page. There's a table of contents. And section 5 looks to be a reference to an article titled, "Are We Allowed" by DaShawn Dilworth. You can see that?
A Let's see. It's loading. Okay. There we go. Yes. I see it.

Q Okay. And feel free to scroll to page 61, but if you could let me know if you wrote that article that's attributed to DaShawn Dilworth.

A Yes. I did write that article.

Q Okay. All right. Thank you. All right. Got one more for you. I'll mark this as Exhibit E.

(Exhibit E marked for identification.)

BY MR. NORTH:

Q On page 9, again, there's table of contents, the third one down reads:

Elephants in the room, Examining and Understanding the Black Assembly Line, attributed to DaShawn Dilworth from Florida State University.

MR. SCHNETZLER: Objection. Relevance.

THE WITNESS: Here we go. Sorry. It was just taking a long time to load everybody. Yes. I can see it. And yes. That is me that wrote that article.

BY MR. NORTH:

Q All right. Thank you. All right. All right. So we've been discussing your views on the patriarchy and Whiteness. It's fair to say that you didn't stop believing those things at the time you served as hearing officer in Mason Ortegel's case, correct?

A That is correct. Yes.

Q Okay. When you were employed at Virginia

Tech, did you ever -- were you ever assigned to a case as a hearing officer and then removed from that case?

A I don't recall specifically when. But yes. I do believe there was a case either once or twice where I was assigned a case and then asked to be removed from the case and the case was given to someone else in our office.

Q Okay. And when did you first learn that you were being taken off that case?

A You're -- sorry. Can you repeat your question just to make sure I'm processing it correctly?

Q Sure. So the case where you were assigned as a hearing officer and then taken off that case, I'm asking when you first learned that you were taken off the case?

A I don't recall the specific dates or time that would have -- that it took place. I just recall being assigned the case, and I think within the next couple of days, because I don't even believe I had an opportunity to, like, fully read the investigation report for that particular case. And then the director had just let me know that they were going to reassign it, and I just said, Okay.

Q Okay. And the director being?

A At the time, Nick Whitesell.

Q Okay. Did Mr. Whitesell tell you why he was taking you off the case?
A There had been -- if I'm recalling, this is the same case that we're talking about, that there had been an objection from the respondent's attorney, I believe, or whoever was acting as that individual's advisor, saying that I wasn't a good representative and may bring bias into the potential conversation -- conversation in the hearing.
And so it had been deemed after Nick Whitesell and I think the office of Title IX and General Counsel, I want to say, all had a conversation and just agreed to have the -- the case heard by somebody else.
Q Okay. Do you know who at the office of Title IX was in that conversation?
A I do not.
Q All right. Do you -- did Mr. Whitesell tell you the basis for the respondent's objection in that case?
A I don't recall if he did or not. I just remember he had mentioned the respondent's attorney bringing up an issue of racial bias. But that's all I really recall. I don't recall anything else.
Q Okay. Did Mr. Whitesell discuss any social media posts that you may have made with you regarding

your removal from that case?
A In regards to removal from that particular case? No. I don't recall Mr. Whitesell having a conversation with me about that. No.
Q Okay. All right. Do you have any social media accounts?
A I do. Yes.
Q Okay. Do you have a Twitter account or X, I guess?
A Yes. I do.
Q Okay. And what is your, kind of, handle on X?
A I believe it's still just my -- if we're -- if we're referring to, like, the -- what you type in the @ symbol and then whatever the name, it should just be @DaShawnDilworth. I believe that's still the case. I have not used the platform in quite some time.
Q Okay. Do you have any other social media accounts?
A Yes. I do.
Q Okay. And what other social media accounts do you have?
A I also have an Instagram and I have a Facebook page as well as a -- if we were considering it in the realm of social media, a LinkedIn profile as well.
Q Okay. What is your Instagram handle?

A I believe it's @ -- it should just be @TaSawn -- @DaShawn_Dil or something like that.
Q Okay. And is it fair to say that your Facebook and LinkedIn pages are just using your name, DaShawn Dilworth?
A Yes. That is correct.
Q Okay. All right. Have you ever deleted any tweets that you posted?
A Not to my knowledge to what I can recall. I'll -- I -- I'll just say I don't know.
Q Okay. While I'm trying to pull something up, when you were on the Success in Black and White podcast, do you recall talking about disrupting power?
A Yes. I remember that being a portion of our conversation. Yes.
Q Okay. What do you -- or what did you mean by disrupting power?
A So I was a part of that conversation in regards to a article that I had been working on, I believe at the time, related to job fit and navigating professional spaces, specifically when it comes to hiring committees.
And so I specifically -- if I -- if in regards to that conversation, I would have been talking about disrupting power in reference to when individuals are

part of such committees and asking more -- asking more intentional questions and not letting it -- like, let the designation of who gets hired or anything like that be the sole decision of, like, the hiring chair or anything like that.

Like, it should be more of a democratic and equal process in terms of conversation. So pushing against the idea that a singular person has all of the decision making power in that -- in that situation.

Q Okay. And what kind of -- is there any other sort of power you're referring -- you were referring to, aside from an individual's decision making power?

A I'm not sure. Like I said, I'd be happy to give the podcast -- I don't think it was very long, another listen. But it's been many years since that conversation. Now I remember that was the primary reason that they had had me on, the conversation was to talk -- talk about hiring practices.

Q Okay. Turning to your -- sorry. Remote depositions can always be, kind of, tricky. All right. For this document, I think we're on Exhibit F. I'll mark this Exhibit F.

(Exhibit F marked for identification.)

BY MR. NORTH:

Q DaShawn, do you recognize this document?

A Yes. I do.
Q Okay. The first -- I'll represent to you that it's from Twitter. The first tweet here that begins with, Wow, is that a tweet from your account?
A Yes. It is.
Q Okay. Is that your Twitter handle?
A Yes. It is.
Q Okay. And when it says, "Sooooo, [redacted]'s Killers," is that your username on Twitter?
A Yes.
Q Okay. All right. Your tweet reads, Wow. Just wow. I'm honestly just at a loss for words after watching On The Record Doc. I don't understand how anyone can watch this and not believe Dear Drew Dixon as well as the other women.
Did I read that correctly?
A Yes. You did.
Q Okay. What was this tweet in reference to?
A That tweet was in reference to a documentary that came out on HBO, I believe, at the time. And it was centered around the experience of Drew Dixon and multiple other women who were all victims of sexual violence by Russell Simmons, who at the time was the head of Jef -- Def Jam Recordings.
And so she was talking about her experience

starting in the music industry, the initial assault that had taken place between her and Russell Simmons, and just the aftermath of that experience and how it had hindered a lot of her progression in the music industry. And then her finding a network of other women who were also victims of the same individual.

So it -- it's in reference to having watched the documentary and responding and giving input that it was a really well orchestrated documentary. And a lot of information was shed that I had never heard or seen before, including, like, learning more about Drew Dixon herself.

Q Okay. And I -- I'm honestly just not familiar with the Drew Dixon story. Was there any sort of criminal trial related to that case?

A I believe at the time, Drew did not -- and this is me going based off of what I recall from the documentary. It's been a couple years since I've seen it. I don't believe if there had been a specific criminal case filed immediately after what had happened to her, but there was a lawsuit filed later on that was her as well as, like, many of the other women's at a -- women as a collective lawsuit against Russell Simmons.

I'm not -- unsure if it's a criminal lawsuit or a civil lawsuit. But I don't -- I don't recall if

there was an initial criminal lawsuit after what happened to her back in the '90s, I want to say.

Q Okay. And why did you believe Drew Dixon and the other women?

A I think just watching the documentary in and of itself, it was very hard not to. Because I think the information that they provided, the way that they were talking about their experiences, the -- I think just the consistency of all of their stories, even though many of these women had never met each other.

And when they had initially shared -- shared what had happened with their interactions with Russell Simmons, none of them knew each other. They -- so I think there were initially a lot of conversations around, like, were they colluding together and sharing the same story?

But realistically, that wouldn't have been possible, at least from my perspective, just because they had never interacted with each other. And the documentary was the thing that, kind of, brought them all together.

Q Okay. And below that tweet, it looks like Drew Dixon replied to you. Do you see that?

A Yes. I do.

Q Okay. And then below that tweet there --

there's another tweet from you that's a reply to Drew Dixon's reply; is that right?

A That is correct.

Q Okay. And your second tweet here, your reply to Drew Dixon reads:

One, incredibly shook and humbled you actually responded to my tweet because, you know, you're literally amazing, two, I send you unwavering support in your healing journey as well doing my part to hold men other men accountable.

Did I read that correctly?

A Yes. You did.

Q Okay. What -- how are you doing your part to hold other men accountable?

A So I think this goes back to the earlier portion of our conversation, and I'm talking about that implicit male bias.

I think without having the context of her and many of the other people sharing their stories, it can be very easy as just writing off a lot of women who share their experiences of sexual violence or just violence in general, and just saying, like, Oh. That was just maybe that one individual, or maybe that's just an isolated incident versus more of a cultural phenomenon that might be happening.

And so, for me, I think the accountability piece goes back to how am I intentionally having conversations with other men. How am I also in my role and whatever capacity that I have, like, making sure that I'm having conversations where -- or validating the experiences of women who feel like their experiences, emotions or anything like that are not validated by the men around them.

Because I think that was something that was very much a cornerstone of the documentary, is that it's less -- yes. The sexual violence and everything that happened to Drew Dixon was very important. But along the way, there were so many both women, but also male friends who didn't simply just didn't believe her or didn't -- didn't -- who didn't support her in -- in the ways that she needed, and she felt just very isolated and alone.

And so I think the implicit bias piece is much more of, it's easy to just side with the male perspective or just to think of it as, again, isolated incidents, rather than what does it mean to look at it from the perspective of maybe there's this -- this issue and the -- this issue and what happened a lot more nuanced than that.

Q Again, just on the implicit bias piece of

race, it sounds like what you're describing is you're working to counteract what you believe is an implicit bias you have in favor of men. Is that a fair way to describe (indiscernible - audio disruption)?

MR. SCHNETZLER: Object to the form.

THE WITNESS: Yes.

BY MR. NORTH:

Q All right.

A I -- I think there -- it's a commingled process of fighting -- fighting against implicit bias that I might instinctively have towards men, but also fighting against implicit bias that might be rooted in, like, sexism and prioritizing men's experiences, validations over that of women, and trying to, again, bring a more equitable way of addressing things, which is where the nuance comes from.

Q Have you ever fought against a implicit bias in the favor of women within yourself?

A I'm unsure. I will just say I don't know, because I -- I'm not sure how to answer your question.

Q When you tweeted here that you're doing your part to hold other men accountable, is that in every aspect of your life or there are some aspects of your life where you're not doing your part to hold other men accountable?

MR. SCHNETZLER: Object to the form.
You can answer.
THE WITNESS: I think to answer the question honestly, I think I'm constantly trying in every part of my life to make sure that I'm living up to the standard of holding not only men, but other people in general accountable.
I think just like with anything, I fall short because this is something -- as far as going back to our conversation about the system of patriarchy, this is something that we're born into and then it's constantly reinforced throughout all of our developing years. And so it takes a long time to unlearn a lot of those things.
And so I would even say that part of it is holding other men accountable, but also, like, what does it mean to, like, level the playing field? I don't -- I do want to clarify, it doesn't mean that in certain situations I prioritize listening to if -- in the context of the student conduct case, doesn't mean I prioritize the experience of the hearing of the woman's perspective of what's happening.
My goal is to make sure that her experiences and what she deems to have happened are on equal footing as the -- the male in that perspective.

Because I think it's very easy to think much more about, like, the repercussions of, like, what someone going through this process can face and different things of that nature.

But I think there's still an act of potential violence that occurred. And so how do we (indiscernible - audio disruption) for both man and woman as they're navigating. I think that's the true place of -- of nuance because I think accountability is genderless at the end of the day. But I think the people that have had the most amount of advantage, there has to be some form of accountability for that as well.

BY MR. NORTH:

Q For the people that have had a historical advantage or something?

A Yes. In terms of thinking about a patriarchal system, if you have a system where one group of people have primarily experienced a large amount of privilege for a long period of time, socially, economically, in whatever facet that you consider it, and then you do your best to try to equivalent that experiences with someone else, whether that be gender non-conforming folks, women.

It can feel like it's belief of one side versus the other, but you're trying to balance the power

dynamic between the two.

Q Okay. Because in your view a man would have more power absent leveling the playing field as you described? Is that accurate, or am I missing?

A I would say in the context of if we're talking about --

THE WITNESS: Sorry. Nate, did I interrupt you?

I would just say in the context of -- we were talking about Patriarchal systems, then, yes. Technically, in terms of whether it be economically, politically, socially, men tend to have more power in reference to women or any other gender folks.

BY MR. NORTH:

Q Okay. And in your view, that extends to the student conduct process of (indiscernible - audio disruption) right?

A I would say that it can. Yes.

Q Okay. Is there any -- when you say that it can, is there any place in which you believe that -- well, scratch that.

Have you ever written on Twitter or elsewhere that you're doing your part to hold women accountable?

A Not that I recall. No.

Q Okay. Have you ever told anyone that

verbally?
A In regards to holding women accountable?
Q Yeah.
A Not that I can recall. No.
Q Okay. You believe you're doing your part to hold women accountable?
A To some degree, I would say, yes. I think -- again, I think, as I was saying, accountability is generalist. I think I do what I can to hold people in and of themselves accountable. And I think that takes different form depending on what we're doing, what we're talking -- talking about in the context that we find ourselves in.
Q I want to refer you to another exhibit. I think we're on G?
THE PROCEEDINGS OFFICER: And Attorney North, just the last few questions, we seem to have just become a little clouded on your audio. Just want to make sure we don't have any paper covering your mic or anything like that. It's just been a little --
MR. NORTH: No. I don't think so. It might be the air system in my office. Is it still -- is it still rough?
THE PROCEEDINGS OFFICER: It's a little bit staticky. And yeah. You've just -- your clarity on

the audio is just sort of diminished a little bit, and it didn't come back. So I'm not quite sure. Maybe your mic may be covered or maybe something else?

MR. NORTH: I don't think my mic is covered.

THE PROCEEDINGS OFFICER: Okay.

MR. NORTH: You know what, let's go off the record and we'll figure out the -- it's I think --

THE PROCEEDINGS OFFICER: Okay. We'll just need to close this -- we'll just need to close this exhibit. Would you like me to do that, or would you like to go ahead and do it?

MR. NORTH: I can do it.

THE PROCEEDINGS OFFICER: Okay. It's 11:15, and we'll go off the record.

(Off the record.)

THE PROCEEDINGS OFFICER: Thank you. It's 11:18. We're back on the record.

MR. NORTH: Okay. Thank you.

BY MR. NORTH:

Q All right. I'll refer you to the exhibit that I previously showed, and I'll mark it as Exhibit G.

(Exhibit G marked for identification.)

BY MR. NORTH:

Q DaShawn, is this a retweet of yours?

A I will say yes because that is the -- my Twitter name, from what I recall. Yes.

Q Okay. And you retweeted because you agreed with the tweet, right?

A Yes.

Q Okay. And the tweet says, The future is female, right?

A Yes.

Q Okay. What does "the future is female" mean to you?

A So I do want to clarify really quickly. Are you asking specifically what it means to me, or what does it mean in the concept? Because it was also a slogan that was being used at the time as well. So it could have a larger, like, cultural conversation context versus what I just immediately think about it.

Q Sure. Well, let me ask it this way. When you saw this tweet and decided to retweet it, what did you think the tweet meant when it said "the future is female"?

A At the time that I would have retweeted, I more than likely thought in relation, it was -- I don't believe that was long after many of the women's marches were taking place. And that was the slogan tagline that would come up quite often, which is the future is

female.

In my interpretation of it, from what I understood, from what I saw socially -- on social media, but also women friends that I have in person was just that a broadering -- broadening space of, like, women being in much more visible in places that they typically were not.

Whether that be in politics, much more conversations about them, as far as, from a policy standpoint, in their experiences being centered. And so it was mainly geared towards, like, a further and larger inclusion of women into a lot of spaces that either they had previously been denied for -- denied from or where they often were the minority.

Q Okay. Did you understand the tweet to be communicating any other meeting -- any other meaning other than the one you just articulated?

A No. Not -- not to my knowledge.

Q Okay. And you said earlier that there was a distinction between how you understood the term to how the term was used in the tweet. Or maybe I'm misstating that. Just let me know. But how do you understand the phrase, "the future is female"?

A I also understand it in the same vein of the larger context. I just know, like, sometimes I didn't

want to create any type of misconstruing of, like, giving you my own personal perception of it, which does align. Which that there are a lot of spaces and places where women have generally been underrepresented.

And I -- and I would like to see that change in, like, broader inclusion, be included part of that. So not necessarily, like, my -- my perception of it is not that far off. But I also wanted to make sure I clarified for the record the difference between just my personal opinion about my perception of what it means and what I understood it to mean in the larger cultural context, even though they might be aligned.

Q All right. Thank you. All right. Let me refer you to another exhibit which I'll mark as Exhibit H.

(Exhibit H marked for identification.)

BY MR. NORTH:

Q These series of your tweets; is that right?

A Yes. Correct.

Q Okay. I want to direct your attention to the last tweet on this list, which reads:

Oppression is not just a structure, but also generates a feeling. Since many of us carry both privilege and oppressed identities, it makes me reflect on how painful it can be to unlearn privileged ways of

being without clinging to the unattended feelings of privilege we carry.

Did I read that correctly?

A Yes.

Q Okay. What did you mean by "privileged and oppressed identities"?

A And so what I typically mean, giving my perception of my previous writing, is that many of us often carry both privileged and oppressed identity. So identities that allow us privilege in certain spaces, whether that be how we're able to navigate something easier, or we don't have to encounter certain experiences while also still having an identity that is -- might be marginal based off of certain structures.

And so the prime example I'll use is -- just to give an example is myself. So, yes. I am Black and I navigate the world in the US structure system as a Black man, but I also am a man as well.

And so being able to navigate certain spaces and having a sense of privilege, or not having to encounter or deal with certain things that typically women do, or not having to think about certain things that women often will have to navigate and deal with, that is a privilege that I have as a man, but I am still navigating things as a Black man and that comes with its

own set of oppressive challenges as well.

Q All right. Would it be fair to say that in your view, your maleness would be a privileged identity, and I suppose your Blackness would be an oppressed identity? Would that be a way of understanding what you said?

A I -- I think that can be a way of looking at it. Yes.

Q Okay. And what did you mean when you said, "It makes me reflect on how painful it can be to unlearn privileged ways of being"? What is a privileged ways of -- way of being?

A So I think I -- I -- to answer your question, privilege way of being is just being able to navigate something with a certain privilege, or whether that be having to not really think about doing something or never having to encounter something.

And so these series of tweets were after I attended Higher Education Conference, and one of the sessions that I had gone to talk a lot about unlearning things can be painful because we're trying to redirect our mind and our orientation to the world to something that we once thought was correct and it actually is not.

And so that can go everything from language and how we address people, all the way to, like, how we

think about people and think about structures and think about how people are moving through the world.

So, for me, it was the -- it was making a commentary on, even though I am part of a community that is -- has been marginalized in the United States, I -- there are still elements in which I have certain privileges in terms of things I don't have to think about -- think about.

For example, I am, for the most part, able bodied. And so I don't have to think about anytime I go into a building, whether or not there's an elevator or whether or not there's a ramp so that I can be able to access any of the amenities or things that are in a place.

And so that has nothing to do with my Blackness or my maleness, but it does have to do with my ability to, like, navigate something where someone who does not have the full, like, ability or range of motion that I do, that is something they have to think about in their day-to-day life all the time.

Q Okay. Do you feel that you've had to unlearn male ways of being?

A Yes. I do.

Q Okay. And what male ways of being have you had to unlearn?

A I think of -- to give like a primary example, I'm not -- a prime example, I think is an over tendency to explain things, especially to women, and just having a presumption of understanding that I know about this particular topic and so I'm going to spend time explaining it when that might not be necessary or called for.

I know I have been guilty of that. And that's something that I've been trying to unlearn over the years as well as just, like, how I make space for women or just other people in conversation.

It is culturally very acceptable for men to be loud and boisterous and to interrupt other people in conversation. Yet when women do it, there is a double standard of -- we don't address it the same way.

Like there is an issue when a woman does it versus when a man does it. And so even those small minor social cues communicate something about the relationships between men and women that have to be acknowledged. The privileging of one versus the other.

Q Okay. And do you believe that all men have this tendency to over explain?

A I would make the argument, yes. If we're -- if we're talking specifically about at least men in patriarchal society similar to the United States. And

I'll just leave my answer at that because that's all (indiscernible - simultaneous speech).

Q All right. Fair enough. In a patriarchal society like the United States, do you think it's important for men to believe women when they allege sexual misconduct?

A I think it -- I -- I come from the perspective -- and I will give -- I will start by saying I leave (indiscernible - audio disruption) my perspective. I think it is important for men to believe women in situations where they are claiming or articulating that some form of sexual violence, or even just violence as a whole happens.

Just because statistically it is very common that women experience violence at some point in their lives at a much higher rate in comparison to men. I'm of the perspective that everyone should be believed unless you start to find evidence that is offered to the contrary.

I don't think there's anything wrong with being hesitant to be believed or to believe, but I think extending that grace of believing in the very beginning unless something comes along to say otherwise, I -- I think that's just basic empathy.

Q Okay. All right. All right. So when you say

-- well, let me ask you this first. So when you said it's statistically very common for women to be, I think, victimized -- or maybe misremembering the word you used. What statistics are you drawing from there?

A So I'm drawing from specifically when I think about how common sexual violence, specifically sexual assault, is present in the US. I believe the last statistic, and it's still been pretty consistent over the years, is that consistently 1 in 6 women will experience some form of sexual violence at some point in their lives on college campuses.

Because it's such a condensed number, it tends to be 1 in 4 women at some point during their college experience may -- will experience some form of sexual violence.

Those are important things that I think for a lot of student conduct offices around the country, that is something that -- because most student conduct offices, to my knowledge, also have a part in the Title IX process, that is something that they have to understand statistically to understand if, like, something is becoming a common practice and, like, developing ways to address it.

Q Okay. And how does the 1 in 4 or 1 in 6 statistic affect whether you should believe a particular

female student that comes forward?

A I would say -- I mean, if your statistic is that it's -- if something has happened very commonly, I think it -- it's perfectly appropriate to believe that someone is telling the truth, at least to some degree. Part of the Title IX office's responsibility is to get more information and provide that over to us.

And we're supposed to, as far as, like, from a student conduct standpoint, proceed with the hearing, asking questions, getting clarification about what exactly happened based off of making a decision in relation to the student code of conduct threshold for a decision.

So I think it's, again, appropriate to believe that a student is saying what they are saying, regardless of their gender, regardless of what the particular situation is. I think approaching it from the standpoint of you're believing someone isn't the same as I'm going to believe them and then any evidence that comes up that contradicts that I'm going to disagree with, which was never our case.

Our case was always that we want to get as much information about what exactly happened. Who can connect the dots for us based off of the witness statements, based on what information is provided to us

that we have access to where we can make a decision off the information that we have in accordance with the student code of conduct.

For us, it was -- we -- we weren't trying to, I guess, like, do anything more than that because that was all -- that was -- we were able to do within the role of being a student conduct hearing officer.

Q Okay. All right. So is it fair to say then that you -- when [redacted] came forward in this case, you started by believing her? Is that a fair way to describe it?

A I believe that to be a fair way to -- to how I would have approached it. Yes.

Q Okay. All right. In the -- in the Ortegel case, your understanding was that both Mason and [redacted], the two parties, were both undergraduate students; is that correct?

A Yes.

Q Okay. All right. I'll share this exhibit with you. I think this is I. I'll mark it as Exhibit I.

(Exhibit I marked for identification.)

BY MR. NORTH:

Q Do you recognize this document?

A I recognize it as a tweet and I see my name,

but I don't recall it in terms of, like, I remember retweeting this.

Q Okay. Would you have retweeted it if you didn't agree with the sentiment in the tweet?

A I would not have. I've usually only tweeted or retweeted things that I had agreements with.

Q All right. Fair enough. All right. The tweet reads:

Quite interesting how many college-age boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space.

What did you understand that tweet to be referring to?

A I understood that tweet to be referring to the misconception that a lot of grown adults, men and college-age boys have when it comes to consent. And what does it mean to consent, especially when it comes to sexual interactions that they have with either the opposite sex or just sexual interactions regardless of gender.

I think consent, very much so at the time, was something that a lot of students just in general had a hard time grasping. And it was very clear a lot of -- through a lot of conversations, naive I think from -- I

believe that's retweeting of a video, just like the conversation around consent, specifically geared towards, like, men understanding consent.

Q Okay. And that was a problem you believe, specifically, that college-age boys and men have?

A I do believe that that is something that, yes, both of those groups struggle with. I wouldn't say exclusively those are the only ones. But yes.

Q What other groups do you think?

A I think consent is primarily something that all men, regardless of age, struggle with. I think it's also something as a concept that women tend -- can tend to struggle with if they're not familiar with, like, the actual phrasing of consent or different things like that. But I think more commonly, at least from my experience, a lot more males tend to struggle with the concept of consent.

Q Okay. And you had that belief at the time you served as hearing officer in Mr. Ortegel's case, right?

A I would say so. Yes.

Q All right. How do women struggle with consent as you described?

A I don't have a good example, as far as being able to provide that. Because in many scenarios that I've been in, women, even if they don't understand the

language of consent, they usually have been able to provide some type of answer or response that they -- they understand the -- the connection of what consent, like, entails. So even if they don't necessarily say the word consent or anything like that, they understand the -- the actions that are usually closely aligned with what we define consent to be.

Q I want to make sure -- you're saying women struggle to understand the -- kind of, the language of consent, are you talking about when women will give consent to sexual activity, or when they're obtaining consent to sexual activity?

A No. I mean -- and I appreciate your follow-up question. I mean, when it comes to -- I'm going to reference only when we are -- when I've been in situations where we are teaching college-aged individuals about consent.

A lot of the time -- because I have both in my undergraduate and graduate experiences have been in spaces where we have had conversations and been trying to convey what does -- what does consent mean and what is it defined by.

So I'm talking about the -- just from a definitional standpoint of consent, women, even if they don't -- are not familiar with the phrase "consent," or

like the ongoing continuous process of the elements of consent, they understand, at least, to a certain degree, the behaviors that are associated with consent as far as communication and different things like that.

(Cough) excuse me. Whereas men, from my perspective, always seem to not fully be able to grasp consent as a definition and then associate it with specific practices similar to women. I hope that helped clarify it a little bit more.

Q It does a little bit. But I guess what I'm still trying to understand is when you say men struggle with the (indiscernible - audio disruption) -- struggle with the definition of consent, are you also meaning that men struggle with obtaining consent in the moment in a sexual activity, or just from like an academic standpoint, they struggle with the academic definition of consent?

A I'm -- I'm going to say that they struggle with, like, it as an academic concept because I don't want to speculate based off of any behaviors that they did. But I think from many of the reports that we had seen when I did work in student conduct and even just conversationally, there was always a connection between men who didn't really understand the definition or the concept of consent.

And then behaviors that they would convey or take part in when it came to sexual activity that showed that a lack of understanding and asking for -- and the need to continuously ask for consent. I don't want to quote -- quote that just as truth, but that was something that we tended to notice as far as, like, my observations.

Q Okay. And the problem there, I suppose you would agree, is that men might engage in sexual activity without confirming that the female actually consented to the sexual activity?

A Yes. I would say that -- that comes up as a concern.

Q And do you have -- did you have the same concern that women would -- like, the problem with women not understanding consent was that they would engage in conduct where they didn't confirm that the man consented to sexual activity, or was it that they didn't understand that they were communicating that they had consented? Does that make sense?

A Can you -- I think I understand what you're asking. Do you mind rephrasing it?

Q Yeah. I'll try. So the problem you described earlier, where women -- where you said that women struggle to understand the language of consent, is the

issue there that women might be engaging in sexual conduct where they're not confirming that their male partner consents, or is it that they're giving the impression that they're consenting when they're in fact not consenting?

A I got you. I -- I understand the question now. I think -- again, from personal observation, I think it's actually a little bit outside of the realm of both of those. I think for women, sometimes it is they will understand behaviors that are associated with asking for consent or knowing what consent is supposed to sound like to some degree. But they might not just use the word consent.

I think where it might fall short is that women are much more likely to be -- women are much more likely in certain situations to revoke consent just because I think sometimes when it comes to the academic understanding, especially when we think about the student conduct processes and different things, like that.

I think the fact that, at least, at the time when I would have made this tweet and I was going through college and moving into graduate school and different things like that, I -- I myself, as well as many other people were just -- just starting to

understand that consent is an ongoing process. You can consent multiple times throughout an interaction, and it can be revoked at any point.

And I think sometimes, not that women didn't understand that, but I think, like, not feeling the power of being able to revoke consent and say, either, Yes, I want to continue, or No, I don't want to continue, for fear of rejection, harm, different things like that.

And so I think there -- the ability of women to be able to recognize certain things that they associate with consent was prevalent. And I think at the same time, the ability to, I think, push back in situations where they felt like consent was not appropriately given or not continuously reaffirmed is a little bit of where that -- that nuance piece comes on and I think in terms of, like, understanding.

And I don't think it's from a place of, like, women don't understand, because I -- I don't want to say something where it implies that women don't have the power to speak for themselves, but I think it's much more of the conflict of in those situations, it can feel very much like men have a lot of the power when it comes to those sexual interactions.

Q Okay. Yeah. I guess it -- what I'm deducing

here is that it seems like both of your concerns from the male perspective and female perspective is that the women are not being violated. Is that fair to say? Because on the one -- well, let me just ask that. Is that fair to say?

MR. SCHNETZLER: Object to form.

You can answer.

THE WITNESS: I'm going to ask you to repeat your question just to make sure I heard it correctly.

BY MR. NORTH:

Q Yes. Sure. And maybe I can try to rephrase it. So it seems like -- it seems like both of your concerns from the male perspective, understanding consent and the female perspective of understanding consent, go to making sure that, you know, the women is -- the women are giving appropriate consent for sexual activity, they're -- that they're not being victimized. Is that fair to say?

A I would say, yes and. So it's -- and this is something, like, even from a health standpoint, that I've often tried to have conversation with students. It needs to be a continual conversation and affirmation from both parties. Right?

So women continuously saying, yes, they are

fine with continuing, and men constantly asking and reaffirming that consent is present and that the both parties are wanting to do what is going on. I think that -- that sounds a little bit about where your question was going, and that's -- that's what the primary concern -- essentially just like what we (indiscernible - audio disruption).

And that was something I feel like I saw in a lot of Title IX case situations where miscommunication and a lot of other elements played into a lot of those situations as well.

Q Okay. Did you ever have a Title IX case where you found that a female student had sexually assaulted a male student?

A I do not recall. I don't recall.

Q Okay. And sometimes people struggle with this question. But is the -- when you say "I do not recall," is that you don't recall either way, or you don't have a -- you don't have a memory of that ever happening?

A I don't have a memory of handling a case where the woman in the scenario would have -- was the -- me personally being the hearing officer for a case where the woman was the respondent and the male student was the complainant. I do not recall having a scenario like that.

Q Okay. Thank you. Directing your -- or I guess, directing your attention back to something we discussed earlier, which is a -- any case you've had in which a female student alleged that she was too intoxicated to consent. Do you remember us discussing that a little while ago?

A Yes. I do remember that being a topic in a conversation.

Q Okay. In those cases, did you also make credibility determinations?

A Yes. Generally, in all Title IX cases, we have to -- I think it was a part of the regulations at the time that we had to conduct a credibility assessment in regards to making our final decision. So I would say yes.

Q Okay. For those cases in which the female student alleged that she was too drunk to consent, let's say, did you find that the female complaining student was not credible as a result of her intoxication?

A I -- I will say, no. There was -- as you were talking, it jogged my memory a little bit. There was a specific case where we did not find the female complainant credible, but it was not due to her intoxication, from what I remember, it was due to -- intoxication played an element to it, but it was her

inability to recall events that led up to the prescribed event.

And then none of the witnesses that she had brought or had give witness statements were ever -- were able to verify the incident, the situation, or even that the responding student had been present at the time of the incident. So I would say, no. And then the additional context being that, like, that was not the sole reason that we found the individual not credible.

Q All right. I guess making my question a bit more clear. Did -- have you -- do you have any memory of ever deciding that a female student's -- a female complaining student's intoxication made her less credible?

A I -- I'm just going to say I don't know ever having made a decision like that. I don't recall from memory if that had ever been, like, a leading reason to -- to detail whether or not a female complainant was not credible.

I think there were always other factors that we considered as far as -- like the example I just gave. As far as their credibility, I don't -- I can't recall, like, the intoxication being the sole reason or anything like that.

Q Okay. Have -- do you ever recall an instance

where a female student -- well, let me ask it a different way. You ever recall any instance where you concluded that a female student, whether complainant or respondent, her credibility was diminished by the fact that she was intoxicated?

MR. SCHNETZLER: Objection.

Asked and answered.

But go ahead and answer.

THE WITNESS: I'm going to go back to my original point or original previous statement of just I -- I don't recall that ever being a conversation that -- a conversation or a decision that I've made, as far as, like, making credibility decisions, I just really don't remember that. So I will just go with I don't know.

BY MR. NORTH:

Q Okay. And when you say you don't know, you can't think of any instance -- you don't have any memory, any specific memory of you ever making that --

A Yeah. I'll -- I'll correct myself on that. I was -- I don't recall. I don't recall having a memory of ever making a credibility assessment and diminishing or noting that a female complainant credibility was lowered purely because she was intoxicated or anything like that. I -- I just don't have any memory of -- or recall anything like that.

Q Sure. And because you used the phrase "female complainant," I know I used that phrase like two questions ago, but do you also not have a memory of making that determination with regard to a female student, whether complainant or respondent?

A I don't -- I'm going to say again, I don't recall just because anytime -- anytime that we did -- I think, and this is to help give a little bit more context. Anytime that we made credibility statements, we couldn't just base it solely on the fact that the individual was intoxicated.

Because most of the Title IX cases that we heard the individuals had been drinking or were intoxicated in some fashion. And so we had to provide other additional information of all factors that we thought played into why we think this individual is not credible.

And so I can't speak to if there was ever a time that we -- respondents or complainants, where we felt they weren't credible purely because they were intoxicated or had been drinking.

It usually was another factor in terms of either witness statements not supporting the -- a -- a specific narrative that one party was trying to make sure that was communicated, or -- yeah. That -- that's

the best that I can -- I can, kind of, answer your question. But yeah.

Q Okay. Just because you used the phrase "purely," setting aside whether there was a case where you found a female party not credible purely because of alcohol intoxication, do you have any memory of using a female student's alcohol intoxication as a factor for finding that she was not credible? Does that make sense?

A Yes. It does make sense. I will say I don't know. I think that's a very complicated question to answer in a straightforward way. Not that I'm trying to be speculative or avoid the question. I think it's hard because I think the alcohol element always played a role in the credibility.

I think sometimes if there was a scenario where we ever had a student that could not remember anything from the particular incident, that never was a conversation where, like, we -- like, their credibility was lessened. If anything, those were usually situations where we just could not determine the credibility of someone and we stated that as such.

If we ever felt like we can't determine credible, less credible, then we would just say we're not able to provide a credibility statement for X, Y, Z

reason or for lack of information, which was also something that we were allowed to do.

Q All right. But sitting here today, there's not a specific instance you can think of?

A Not one that can come to mind at the moment. No.

Q Fair enough. Let me refer you back to Exhibit B. Again this is the decision in the case. And I'll direct you to page 8. Under a heading that says, Credibility Assessment. Let me know when you're there.

A Okay. Yes. I'm on the page that -- that starts with Credibility Assessment.

Q Okay. All right. And I'm actually going to direct you to the -- right at the beginning of the next page, page 9.

A Okay.

Q Where you start to discuss Mr. Ortegel's credibility. Do you see the paragraph that begins with, Numerous factors?

A Yes. I do.

Q I'll read a bit -- a bit of this for you. Reads:

Numerous factors undermine Mr. Ortegel's credibility. First, Mr. Ortegel's level of intoxication on the night in question makes his recollection of the

evening less credible.

Did I read that correctly?

A Mm-hmm.

Q Why did you find that Mr. Ortegel's level of intoxication made his recollection less credible?

A Let me see. Let me read the -- the following. Okay. Yes. Can you -- sorry. Can you ask your question again just to make sure I'm answering correctly?

Q Yeah. Why did his level of intoxication make him less credible? If that's a --

A If -- if I'm understanding the way that we outline this for the credibility assessment, just reading it, I think it's less about -- yes. The level of intoxication is a factor, but I think it's much more about the recollection of the evening of the events.

Just because, based off of, like, what I'm reading and seeing, the way that the level of intoxication was described was different between what we'd read in the investigation report and what was presented to us when we asked questions during the hearing. And so there was a little bit of contradiction in terms of, like, the narrative of the story.

And I think the level of recollection was different based off of that as well. And so we noted

that the level of intoxication might have impacted the ability to be able to give a full recollection of how things happened.

And part of that was also the additional witnesses that had contradicting -- some similar, some contradicting -- I'm trying to look for the right word. Ideas of how intoxicated Mr. Ortegel was at the time of when we were -- we're hearing it.

So I think it's a little bit -- it's a -- it's a both and. So, like, we factored in the level of intoxication, which would have altered the events of being able to recollect exactly what happened and the actual recollection of the event.

So it wasn't -- it was less about us saying that the alcohol is the primary factor and more so given that there was a level of intoxication to the point where he had to be helped to his room and there was, like, some fuzziness about what event happened when in the timeline.

The alcohol was a factor in the recollection of the actual events, and that made it harder for us to be able to identify, like, what the clear narrative from point A to point B was.

Q Okay. You recall generally the facts of this case, right?

A Very, very generally. It's been a couple years, so there -- I'm rusty on some things, but very base level things.

Q Okay. You'd agree with me that Mr. Ortegel always maintain that he got intoxicated to the point of Blacking out around 11:30 p.m., right?

A Unclear about the time. But yes. I do recall, like, that was a constant reference point of, like, at least to the level of intoxication for Blacking out.

Q Okay. And right in this paragraph, four lines up from the bottom of the paragraph. During the hearing, Mr. Ortegel's total alcohol intake changed. In the investigation, Mr. Ortegel reported consuming approximately five Truly Lemonades. In the hearing, Mr. [redacted] reported Mr. Ortegel also consumed whiskey while at the bonfire. And then Mr. Ortegel confirmed he consumed an undetermined amount of whiskey by taking sips directly from the whiskey bottle an unknown number of times.

Do you see that?

A Yes. I do.

Q Okay. But regardless of whether Mr. Ortegel took sips of whiskey, it was always maintained that he Blacked out around 11:30 that night, right?

A Again, I'm going to agree based off of the time, just because I can see on the investigation report, but I don't -- I don't recall if that was the time that we had said during the hearing. But that is the time that's noted, so I'm going to say, yes.

Q Okay. Fair enough. Going on to the next paragraph here -- well, actually, let me first ask. You'd agree if it's always maintained that Mr. Ortegel Blacked out around 11:30, his level of intoxication didn't really change, did it?

A I -- I don't know how to answer your question. Can you rephrase?

Q Yeah. So I think we just agreed that Mr. Ortegel always maintained that he blacked out around 11:30, right?

A Yes.

Q Okay. So you'd agree with me that his level of intoxication then wouldn't have changed?

A For -- I guess for the sake of (indiscernible - simultaneous speech).

MR. SCHNETZLER: Calls for an expert opinion.

Go ahead.

THE WITNESS: I would say, yes. I guess, given based off of like what we understood from the

investigation report and how we have it outlined in the report or in the final decision.

BY MR. NORTH:

Q Okay. All right. Moving on to the second paragraph on this page, beginning of that paragraph reads:

Mr. Ortegel's statements during the formal hearing did not remain consistent with statements he made during the investigation. Specifically in the investigation, Mr. Ortegel stated that Ms. -- I am not going to pronounce this correctly. [redacted] was never in his room on the night of August 21st. However, to Ms. [redacted], Mr. Ortegel said Ms. [redacted] was in his room on the night of the incident.

Do you see that?

A I do.

Q Okay. But again, you'd agree with me that Mr. Ortegel always maintained that he blacked out around 11:30, right?

A I -- yes. I will continue to agree based off of again, the report or the decision.

Q Okay. So Mr. Ortegel, in fact, did not -- never maintained affirmatively that she -- that [redacted] was not in his room. Just that because he was blacked out, he doesn't remember either way, right?

A I'm going to assume so again, based off of what we have written in the decision. I don't recollect if something might have been said differently during the hearing that would be part of what we meant by his statements did not remain consistent. So I'm going to go, I'm not sure.

Q Okay. So there's really no inconsistency between his statements about remembering her being in his room that night, right?

A I will say yes just because most of the information, as we have it outlined in the second paragraph, does affirm that he said that he never disputed and did not recall her being present in his room.

Q All right. So then that whole issue should not have detracted from his credibility. Would you agree with that?

A I -- I think I'm just having a hard time. Like what -- can you rephrase your question again, just so I'm understanding what exactly that you're asking?

Q Yeah. Sure. So we -- I think we agreed that Mr. Ortegel always maintained that he Blacked out around 11:30, and therefore didn't remember either way whether [redacted] was in his room, right?

A Yes.

Q Okay. So there's really no contradiction between his statement during the investigation and his statement during the hearing about whether [redacted] was in his room, correct?

MR. SCHNETZLER: Object to the form.

THE WITNESS: I mean, the -- the contradiction was -- if we're talking about the contradiction, I think for us, the contradiction was that it was unclear in the investigation report to the hearing of the comment that he made surrounding her being present in his room.

Because there was -- if I'm recalling it correctly, based off of, like, what I'm seeing in our credibility assessment in the decision, and part of it is, no, I don't recall her being present in my room, and then, no, she was not in my room.

Because I believe in the investigation report that might have been the commentary that was initially -- that -- that was initially present. And then the -- also contradiction was, if I recall correctly, based off of what I remember from the conversation of the hearing during the incident, he had said that he remembered Blacking out, getting to his room, and then never leaving.

But then we had the card swipe log

information that verified that he'd left the room several times.

BY MR. NORTH:

Q Yeah. So let's talk about the card swipe. So do you have an understanding of generally how the card swipe system worked at Virginia Tech at that time?

A I am not well versed in how the swipe system works. So I am not -- I will not say that I'm an expert by any means. But as far as when it was included as part of the investigation report, like the swipe reports and everything like that, I believe it was explained to us, like, how the key cards, like, keep track of, like, when someone swipes in and out.

Q Okay. So real quick before I continue on that line. What about the card swipes, in your view, impugned Mr. Ortegel's credibility?

A So I think part of it, from what I remember, was there was a little bit of confusion around when exactly -- when exactly -- what -- up to what point did Mr. Ortegel remember things from the night and up until what point, like, wherever his recollection end.

He had made the statement that he did not leave his room after a certain point because he remembers, I think, getting back to his room because one of his friends, like, helped him back to his room. And

then he did not -- he had said that he did not leave again.

What was interesting after that for us, was the communications from the text messages and then the card swipes verifying that he had left. And so for us, it was -- it was a contradiction on, okay, so where -- if you said that you did not leave the room, but we have the card swipe information verifying that you had swiped in and out of your room multiple times, but you're saying that you didn't leave your room.

To us, that's a -- a pretty big contradiction, especially around the time that we're assuming that [redacted] or Ms. [redacted], I think, is how you say the last name, was -- would have been present in your room or beforehand -- before swiping in and out.

And so for us, I think it was just, like, a contradiction in terms of just, like, you're saying one thing, but we have record that something else happened, and there's not a clear distinction of, like, did this happen? Or like, are you -- like, are you being truthful, essentially? Like, are we understanding that what you're saying is different than what was done?

Q Okay. But again, from reading the investigation report, you understood that Mr. Ortegel was saying he Blacked out around 11:30, right?

A Yes. And to further go back to that point, oftentimes I want to say that we have it included in here in the beginning, at the run of the events, we often will have to ask students to define, like, what that means. That was a very common thing to do on a lot of Title IX and non-Title IX cases when students say, Oh. Yes. I blacked out. Because that can have a lot of different meanings.

For some students, that means I remember absolutely nothing. And for some students, I remember up to a certain point, and then everything is nothing. And so I do remember that we would have asked that question of like, can you clarify us -- for us what you mean by "Blackout"?

What do -- exactly do you remember up until a certain point? And then where -- where do things, kind of, get fuzzy or do -- do they drop off, and can you clarify it for us, what you remember doing up until a certain point.

Q Okay. And you understood that what Mr. Ortegel meant by Blacking out was that he had a loss of memory after 11:30; was that accurate?

A I want to say, yes. I believe that was the -- the assumption that we were operating on and that had been told to us during the hearing. Yes.

Q Okay. So there's -- I mean -- and did you understand that -- well, let me say that the access log relates to Mr. Ortegel's dorm room; is that right? A residence hall room.
A That is correct.
Q And the bathrooms would have been outside of the residence hall room; is that correct?
A I'm just going to say, based off of what -- I'm not sure. I don't even remember the full layout of the building. But I think if that's noted in the investigation report or in our decision, then -- our decision layout, then yes. Yes.
Q Okay. You'd agree that Mr. Ortegel, after a night of drinking, could have left the room to go to the bathroom and come back, and that would have been reflected in the swipe log, right?
A I do think that that could have been possible. However, I think it was a little hard to believe, at least, at the time of the hearing, because from our understanding, in addition to the Blacking out piece, it was loss of memory. But also Mr. Ortegel was -- if I -- and I think there's a line in here, I'm reading through, he was in his bed and did not move or get up until the following morning.
And so I think with that extra added element,

we were again confused because one part of the story was saying that you got back to your room, you didn't leave. Yes. I do think it's feasible that he could have gone to the bathroom just based off of the information that I'm seeing from the card swipe. But that was not what was part of the original narrative. So, like, we were confused as far as, like, where -- where did that come from?

Q All right. But again, you understood him to be saying that he lost memory around 11:30, right? And that he didn't remember leaving his room after that?

A Yes. I won't fully agree with the remembering leaving his room because again, I'm pretty sure that we were told that he, again, was in his bed and did not go anywhere. And then that's when -- that's the only reason that we brought up the situation of the card swipes because the conversation was leaning towards, I was in my room.

I don't remember much else that happened after that. And I was in my room, and I did -- I woke up in my room the next day. There -- there was no -- nothing in between.

Q Okay. You'd agree with me that someone after a night of drinking and when they are experiencing a Blackout or loss of memory, they could go to the

bathroom and not remember having gone to the bathroom? That's possible?
A Yes. That is possible.
Q Okay. Did you believe Mr. Ortegel, that he, in fact, suffered a loss of memory?
A I -- I think that you'd be asking me to speculate. I believe, based off of what we were told and the information in the investigation report, that's what I could go off. I won't say that --
Q Well --
A -- I did or did not believe him. I just went based off of what I was consistently hearing from the investigation report and from the hearing. So yeah.
Q Well, you understood that when you were serving as a hearing officer in Title IX cases, you had to presume the respondent's not responsible, right?
A I -- I want to make sure I'm understanding. You -- you're saying, as we're going through the hearing process, that it's our -- my -- part of our responsibility was not assuming that the respondent was responsible; is that correct?
Q Is the presumption of non-responsibility. So you're required to presume the respondent is not responsible for the conduct alleged. Does that sound familiar to you?

A Yes.
Q Okay. So you understood that you were required to presume Mr. Ortegel not responsible, right?
A Yes.
Q Okay. And you made factual findings about what [redacted] had alleged about him, right?
A Are you referring to the investigation report?
Q In your -- in your role as hearing officer, you had to decide whether what [redacted] was saying was true -- and I'm using her first name because I can't pronounce her last name. So what she was saying was true and whether it violated the policy, right?
A I would say our presumption was not -- I -- I think I want to be very careful about the use of the word "true." Because we were not present at the incident itself. We can only make an -- make an assumption based off of the information that was provided to us.
And so for us, it was acknowledging, like, yes. There is a large possibility that this could have happened, and there's a large possibility that Mr. Ortegel did not do this. And so we had to approach it from both angles.
And because of that, we had -- the whole point of the hearing was we need to get as much information

about what people remember what happened as possible. I think it gets a little bit to a slippery slope when we start defining something as what one person said is true and what another person said isn't.

Because the threshold for the -- the student code of conduct, is it more likely to have happened than not? We were not trying to find a presumption of guilt or innocence based off of like a court system or anything like that.

For us, it was about, these two people have conflicting stories. There is information that they are able to provide to us and they are bringing witness to contradict or confirm one story versus another or completely, just like they are just elements of the story and we have to figure out the pieces.

But I'd be hesitant to say that, yes. While I believe that [redacted] believed that this incident happened to her, I also believe that Mr. Ortegel believes that he did not do this. So again, my -- my -- I don't -- I wouldn't -- I'd be very hesitant to say, like, I believed one party was being truthful versus the other.

If anything, I'm trying to understand, like, where -- who -- who can I assess from the information that they provided and the -- the information provided, there are witnesses, who has been the most consistent,

and is there information, like, helpful enough for us to understand what exactly is going on enough to make a decision?

Q Okay. Yeah. And that was sloppy language on my part. You'd agree with me that your role was to use the preponderance of the evidence standard?

A Yes.

Q Okay.

A And before we go to the next question, Ben, I would like to go ahead and just take another break for a second.

Q Sure. You want to -- just in the interest of time, you want to come back at like 12:25?

A Yes. That works perfectly.

Q Okay.

MR. NORTH: All right. We'll go off the record.

THE PROCEEDINGS OFFICER: Thank you. We'll go off the record. It's 12:18.

(Off the record.)

THE PROCEEDINGS OFFICER: Thank you. It's 12:32 p.m., Eastern Standard. And we're back on the record.

MR. NORTH: Thank you.

BY MR. NORTH:

Q All right. I think where we left off was the preponderance of the evidence standard. So I think -- I think we agreed that your role as hearing officer was to determine whether the allegations were sustained, let's say by preponderance of the evidence, you'd agree with that?

A Yes.

Q And that means more likely than not, true?

A Yes.

Q So did you make a finding whether Mr. Ortegel was more likely than not actually blacked out?

A I will say, no. That was not the finding that we found. In regards to finding, our finding was in the totality of the actual incident involving [redacted]. So we could not make any, like, final determinations in regards to intoxication level because we were not there.

We can only -- based off of the recollection of the events that took place, we use the preponderance of the evidence standard, whether or not the incident itself is more likely to have happened than not, based off of the information that was provided to us. That's the way that I would frame it.

Q Again, you have to start with the presumption that the respondent is not responsible, right?

A Yes. I think we try to -- my -- I'll speak

for myself. I try to approach the case from the presumption that someone is saying that something happened to her, someone else is saying that they did not do it, and it is within our scope and role to figure out based off of what information, where does that leave us in terms of the preponderance of the evidence?

Q Okay. Was that your only understanding as to the presumption of not responsibility?

A If you're -- if you're asking if my understanding of presumption of not responsibility in terms of just like -- like, assuming that the respondent is not responsible at the -- at the offset of the -- the hearing, then I guess you could make the claim that that is my understanding.

But I think it's also -- I try to make it an equal understanding of an incident has happened, and then we are trying to figure out, based off the information told to us, where -- where is the preponderance of the evidence of whether or not the incident -- we're able to determine -- make a determination of whether or not the incident took place.

Q Okay. All right. So we discussed issues that you found in Mr. Ortegel's testimony. The complainant in this case also was inconsistent in her testimony; is that correct?

A If you're happy to share the case findings again, I can look at it --
Q Oh. Yeah. Sure.
A -- and verify -- and verify.
Q I'm sharing Exhibit B with you again. I thought it was up.
A You are completely fine. Thank you.
Q All right. Directing you to page 8, the heading that begins with, Complainant. Do you see that?
A Yes. I do. Sorry.
Q Okay.
A I thought I had already said that. Yes. I do see that.
Q All right. Do you -- do you see the sentence in the middle of the paragraph that says, Some witnesses shared that Ms. [redacted] shared different details of her -- of her interaction with Mr. Ortegel?
A Yes. I do see that.
Q Okay. So does that refresh your recollection as to whether the complainant was consistent in her testimony?
A I think based off of -- if I'm interpreting right, based off of, like, how we wrote that sentence in the context of the larger paragraph, it was not necessarily that we determined that there was a

differentiation of her story, but more so a difference in language of how she was referring to the incident and how she communicated that to one of the witnesses.

So it was less of like her story was inconsistent. But we wanted to verify that her use of language meant -- meant what she -- what we interpreted to -- meant that she was referring to Mr. Ortegel.

Q Okay.

A (Cough) excuse me, everybody.

Q Do you recall that [redacted] alleged she had a conversation with a student named [redacted], and [redacted] denied that conversation happening?

A Let me see. Yes. I was -- my apologies. I was just looking through the rest of the decision report. Yes. There was a conflicting detail in terms of whether or not who -- whether or not the conversation with [redacted] had taken place.

Q Okay. And do you remember there being an inconsistency as to whether the complainant had been in [redacted]'s room at the same time as a student named [redacted]?

A Yes. I'm reading through the witness -- our witness credibility determination for Mr. [redacted]. Just so I'm answering your question correctly, Ben, do you mind repeating it? My apologies.

Q Yeah. And maybe I'll just rephrase or ask a slightly different question. So would -- so it's easier. You would agree with me that [redacted]'s testimony conflicted with [redacted]'s testimony, right?

A Yes. I guess -- yes. I would say -- I would say that.

Q Okay. And also you'd agree with me that [redacted] testimony conflicted with [redacted] testimony, right?

A Based off of what I'm reading from our determination, I would say, yes.

Q Okay. And it's true that you found both [redacted] [redacted] be not credible, right?

A Yes. Based off of what I'm seeing, just -- I think with the contradiction in how they relayed information during the hearing, I think we had determined that they were both -- both not credible.

Q Okay. You're aware that the complainant, [redacted], alleged that she -- that what caused her to go into Mason's room was that [redacted] told her to go check on Mason?

A Yes. I do recall that.

Q Okay. Let me refer you to -- well, let me ask you this. You're also aware that [redacted] spoke to [redacted]onetic) regarding the incident. Does that

ring a bell?

A Let me see. I -- because I'm still reading through some pieces of it, if you're referring to a specific portion of the decision report, if you'll -- if you could direct me to it. But I -- I don't recall Ms. [redacted]s that what you said?

Q Yeah. Yeah. I think just in the interest of time, let me move on to a different area here. Do you recall a witness testifying at the hearing named [redacted]?

A I believe you're -- I want to clarify. Are you referring to [redacted]?

Q Yeah. I think it might be pronounced [redacted], but.

A Oh. Okay.

Q We're thinking of the same person, I guess.

A Okay. Yes. I do. I do recall [redacted] participating.

Q Yeah. I'll call him [redacted] as well. And you're aware that [redacted] recorded a conversation he had with the complainant?

A Yes. I do recall that that was mentioned -- excuse me. Mentioned during the hearing.

Q And isn't it true that you found [redacted] less credible in part because he recorded a conversation

with the complainant?
A I would have to look again at the credibility assessment just to double check before I make a yes or no answer.
Q All right. Let me refer you back to it. All right. Should be the end of page 10.
A Thank you.
Q It's at the end of the paragraph.
A I am sorry. I just wanted to make sure that I read the entirety of the thing. Do you mind restating your question?
Q Sure. You found that [redacted]'s recording of [redacted] detracted from his credibility, right?
A Yes. At least that's how we have it outlined. Yes.
Q Okay. Why would -- why would a recording of the complainant's own statements detract from his credibility?
A So I -- from my interpretation of how we have it outlined in the decision, we think that we -- I am under the impression that we had made the decision regarding credibility because it was unclear when he had recorded that particular conversation and also can afford recording it without [redacted]'s consent, as well as with the intention of potentially catching her in a lie

or whatever the case is.

I think there was also the -- it was not clear whether or not he was doing this with the intention of having her say something -- catching her say something misleading based off of the conversation that he had previously had with Mr. Ortegel.

So we were unsure, like, was it a recording -- I -- if I'm recalling it correctly, I think we were unsure whether or not the recording was done in good faith of trying to make a valid point, that's there were inconsistencies or if it was done with the intention of getting a conversation that favored one side -- one side of the -- the argument versus another.

There was also inconsistencies about what was said during -- on the recording, just because, as we pointed out, most of it was either inaudible or they were consistent with what [redacted] had been saying in her initial statement.

And so there was not -- we were not led to believe that there was anything different that hindered our ability to understand the narrative of what was going on. But it did seem like a little malicious based off of, like, how it was happening. And we were questioning whether or not that informed how he gave his witness statements.

Q Okay. You weren't concerned that the recording was inauthentic, were you? To -- let me ask it a different way. So you weren't concerned that the recording was fabricated, were you?

A I don't -- I can't imagine that we'd had a reason to -- to be concerned that it had -- it had been fabricated.

Q Okay. So you understood that the recording accurately depicted [redacted]'s statements, whatever those statements were?

A I'm going to be honest, I don't even remember if we even heard the recording during the hearing. So I'm not able to attest to that. I think at the time when we were informed of the -- of the recording and that we'd asked about it during the hearing, it -- there -- it did not add any either clarity to the situation at hand that we were discussing. It did not add anything additional to Mr. Ortegel's credibility or to his point of how the events turned out that night.

And if anything, it still made us question Mr. [redacted] guess how you say his last name, credibility primarily because of I think that -- primarily because of the recording, but also the inconsistency of, like, conversation in terms of his witness statement that he was given -- that he was giving because the -- things

were not lining up based off of, like, how he was describing them.

And so it was hard for us to understand, like, where exactly he was involved, where -- whether he was present during any part of this -- the -- the initial incident. And then the recording did not really help us in one way or the other. That there was no additional information that changed the nature of how we viewed the hearing or anything in regards to the narrative.

Q Okay. Your role as hearing officer was in part to, you know, get to the truth, to see whether the allegations were sustained by preponderance of evidence; is that right?

A The second part of your question, yes. Truth is debatable.

Q Okay. Well, your role was to determine whether the allegations were more likely than not true, right?

A Well, more likely -- more likely than not to have happened. Again, like I mentioned earlier, I'm hesitant to say "truth," because we were not there and we were not present during the incident.

Q But isn't that the same thing as saying it's more likely than not true? Like, what's the difference?

A Well, I think there's a standard difference

because I think for -- we have to -- we as hearing officers, I think, collectively had to be careful with saying more than -- more likely than not if something is true or not, that is something that can be interpreted.

But we try to avoid using that language because it can just be easily construed for either the complainant or the respondent that we're saying we don't believe what happened to you. And that's not something that we try to convey.

We convey, like, based off of the information that is provided to us, this is our understanding of -- of the decision that we're making based off of the standard. But we're also very particular about that because depending on the information, depending on witness statements, depending on a lot of things, we cannot confirm or deny something is true or not because we were not present.

And to say that one way or another we don't want to diminish one person's story versus another. If a woman or a man is saying that they were -- were recipients of sexual violence, our goal as they come through the conduct process is to evaluate that in regards to their student status, not their status as potential victims of violence.

So that -- that's why, again, I'm being very

careful about saying truth because it could just as easily -- if we rely preponderantly on truth, then that would mean us telling a lot of students that we -- we don't believe what happened to them. And that sometimes is not the case. Sometimes it's the case of like, we don't have information to prove one way or another that something may or may not have taken place.

Q Okay. But in this case, didn't you believe the complainant more than the respondent?

A In this case, I -- again, I'd be hesitant to say "believe." I say -- would say in this particular case, she came across as more credible based off the credibility assessment that we'd done and consistency of her statement, what she detailed during the hearing, any information that was provided that aligned with the narrative of the timeline of events from her witnesses.

And so we determined that she was more credible, not necessarily that she's more believable in terms of what happened. Credibility determined that based off of everything that she -- like, what she said and everything that consistently followed, provided more of a structure for, yes, this is more likely than not to have happened based on the facts that we were gathering from the investigation report, the hearing, and any additional information that was provided as a part of

the -- the student conduct process.
Q Back to [redacted]'s recording for just a minute. You testified earlier that you didn't know if his intent in creating the recording was to catch her in a lie. Do you recall testifying to that effect?
A Yes.
Q Okay. But his intent has nothing to do with the credibility of the recording, does it?
A I think -- and I'm going to give -- again, I'm going to try not -- not to speculate because this has been many years. At the onset of, like, more than likely when we were writing this report, to my knowledge -- and again, I'm one of only three hearing officers, so this was a conversation that was ongoing as far as us determining -- because we all had to land in the same place in terms of credibility, right?
So for me, if you're asking me my perception, I think it's a yes and situation. Because we were confused what exactly the intention was because from my understanding, he was not directly present during any of the incident that took place from beginning, middle, or end of the actual incident that the investigation report is in relation to, but he was aware of what happened through communication and then was called as a witness.
And so he was one of the only witnesses, if I

recall correctly, that had a very obvious distrust of the complainant, like, right away. And there seemed to -- and we were unclear about what was the type of relationship that they had together, which neither one of them were able to clarify for us during the hearing.

And so for us, we're asking, like, Okay, like, you're saying that she has this history of some kind, but you're not giving us a lot -- a lot more than anecdotal information about whether or not this happened.

And then the recording, it seems concerning that you would only -- like you recorded her after you'd had a conversation with the respondent in an attempt to gather more information than provided.

And so for us, we were just like, what is the intention here if it's not to -- it -- are you here to tell the truth or are you here -- are you here to provide evidence that someone is not who you think they are to be, for lack of a better term.

And so I think there was just a lot of inconsistencies in terms of that scenario with that particular -- with [redacted] because throughout the entirety of when he was giving his statement in the -- in -- during the hearing, there was just a lot of back and forth.

And it was unclear, like -- like, what his purpose was in providing a witness statement, whether it was I -- I was a part of the -- part of this. I'm aware of this and this is the information that I want to provide. Or if it -- again, if there was ill intention in some capacity. I'm not saying there was or there was not, but it did not seem clear to us, like, what he was trying to do as a part of the process.

Q Okay. And did you -- and you testified that you know, he -- [redacted] was very distrustful of the complainant. Was from the very beginning, I think you said. What -- was [redacted]'s distrust of the complainant relevant to your decision in the case?

A I am unsure if it was relevant to, like, our decision. I believe just because we included it in the credibility statement as a part of it and as a part of the decision as a whole that it was more than likely a topic of conversation. But I wouldn't -- I don't know how much I would say that, like, we can, like, thought that much about it.

We definitely took it into account just because it was something -- it was something that we needed to be aware of in terms of just, like, this is a narrative that's running counter to what the complainant is saying, and, like, let's see if we can find any

evidence or any clarity about anyone else being able to see a lot of these exact same things. And we did not see that. He was the only one that brought up that particular complaint.

Q Okay. All right. Thank you. All right. Just a couple more topics here and then we wrap up. I'll refer you to this next exhibit, which I think is Exhibit J.

(Exhibit J marked for identification.)

THE WITNESS: Okay. Yes. I can see it.

BY MR. NORTH:

Q Okay. And is this one of your retweets?

A It appears to be so. I don't recall specifically retweeting this, but it looks like it is from my Twitter account, so I will say yes.

Q Okay. And you wouldn't have retweeted this if you didn't agree with it, right?

A That is correct.

Q Okay. Tweet reads:

In 2020, we need the straight Black men who keep acting like White conservatives every time you all get bashed for your patriarchy, misogyny and homophobia to stop whining like babies. You sound like White people complaining about racism.

Did I read that correctly?

A Yes. You did.
Q Okay. What did you understand this tweet to mean?
MR. SCHNETZLER: Objection to the form.
THE WITNESS: So I understand -- oh.
MR. SCHNETZLER: Sorry. Go ahead.
THE WITNESS: Sorry, Nate.
MR. SCHNETZLER: Go ahead.
THE WITNESS: I understood the tweet to mean, again, a sense of not to -- again, rehash our conversation earlier about structural oppression and Whiteness and all of those things. But like I had mentioned before, creating a sense of proximity to Whiteness can embolden certain ideologies, for lack of a better term.
And so I remember myself, friend groups and different things like that, having this conversation around this idea that's pretty prevalent and written about of, like, heterosexual Black men specifically tending to be more aligned with conservative, like, thoughts or talking points as an idea of, like, what they consider to be, like, intellectualism or freedom, for lack of a better term.
But it's also rooted in a lot of patriarchy, misogyny, and homophobia as well. So I

think it was making the distinction of just, like, something that's pretty common as a phrase in a lot of academic but also social circles for Black Americans is that freedom in terms of social, economic, political for all of us has to be for all of us.

It can't just be for the straight Black men of our community who have been oppressed. It has to be for everyone that exists within the Black community to have a sense of -- of freedom and reclamation over their lives that is often taken from all of us.

Like we can't have essentially just a one-sided version of freedom that only benefits straight Black men. And sometimes there are a lot of Black men that tend to lean very heavily into the patriarchy, misogyny, and homophobia, just again, for a sense of power, but also a closeness and proximity to Whiteness.

BY MR. NORTH:

Q Okay. And when you say, White conservatives every time you all get -- or when -- sorry. I should rephrase. When -- well, strike that.

MR. NORTH: I think I'm done with this exhibit. Thank you.

BY MR. NORTH:

Q All right. Do you recall the sanctions that you imposed in the Ortegel case?

A Very vaguely. I think I recall one or two, but I don't recall all of them.
Q Okay. Do you recall one of them being to read the book, Man Enough: Undefining My Masculinity by Justin Baldoni?
A Yes. I do recall that being one of the potential sanctions.
Q Okay. Have you read that book?
A I had read snippets from it at the time and I had made the plan to read it in full, but I had not had a chance to do so.
Q Okay. What is your understanding of the thesis of that book?
A My understanding of the basis of that book, from what I know about it, especially now, it's unpacking a lot of things associated with masculinity, whether that be connection to misogyny, connection to just like power in a lot of different dynamics, is essentially unpacking, like what is -- what is a good way to get to a healthy version of masculinity that is beneficial for both me and the people around me.
I was very familiar at the time with -- with Justin Baldoni and a lot of the work that he was doing specifically around -- I forget what he called it, but it was just like masculine circles and just like having

conversations intentionally with men about how do we essentially unpack a lot of things that we've been taught and then use that as a focus point to make sure that we're taking people -- care of people in our community, we're taking care of ourselves, and we're, sort of, fighting against that -- that sense of patriarchy.

Q Okay. What was the purpose in assigning that book as a sanction to Mr. Ortegel?

A The purpose of the -- of it was to, again, provide another avenue for deconstructing and unlearning a lot of things. So I think at the time when we were having conversations for potential sanctions, us as a team, I think in retrospect, thinking back on it, I think we were trying to identify what's like a good book for someone who is in the Corps of Cadets, which is a very heavily masculine space, who is in a situation that revolves around, sort of, this idea of sexual violence.

What is a way to, kind of, provide them a resource to be able to think about very -- very bare bones this dynamic that plays out between men and women, but focus it purely on the man's standpoint. And if that could help, kind of, jump start a larger conversation.

It was pretty common for us as a team where we

would assign for students to do readings or articles or books or something like that, we felt like it went hand in hand with something that they were addressing, dealing with, or just might be beneficial in terms of just, like, thinking about their orientation towards be it the campus, the university, the world after the hearing was over.

Q Okay. Fair to say you would not have assigned Mason that book as a sanction if he were female?

A More than likely not. I probably would have assigned a different book. But I -- as someone who enjoys literature, I -- I was perfectly fine assigning books or articles or any type of readings for students to do as sanctions just because I know they can be pretty beneficial.

Q Have you ever assigned Man Enough: Undefining My Masculinity, to a female respondent who you found responsible?

A No. And the primary reason is that there was never an opportunity for me to be able to do so where that felt like that might be an appropriate book for -- for women to -- for a female student that I had seen through a conduct case to read.

And also I do question whether or not -- how fully appropriate that would be for giving a scenario

for a student because women often know how to navigate and understand masculinity a lot more than men do.

Q What makes you say that?

A Because very similar to the way that people of color and Black people have to navigate White people and Whiteness in the world, women are intimately aware of navigating male-dominated spaces, male -- men in general and are very familiar with the way that men display forms of masculinity because they are often -- they see it and they are often the recipients of it.

Q Okay. And that would factor into your decision in terms of what sanctions to apply?

A Are we in regards to Mr. Ortegel's case, or in this hypothetical?

Q I'm just -- in any case, I mean, I guess I'm just thinking about your view and how it applies to deciding cases.

A I mean, in regards to sanctions, if it's multiple hearing officers on a -- on a case, we usually try to agree on what sanctions to give out and we feel like might be helpful to a student, especially if they're a student on probation or deferred suspension and just providing resources. So yes.

I think that is just another example of looking at cultural context and being able to use it to

help inform practice that we do as student conduct officers, but also to make sure that we're helping students.

I think the long run, it's very easy for students to view the student conduct office as very adversarial when the goal is not to -- not to do that. The goal is to help students become happy, healthy individuals and be able to navigate the university, but also life afterwards, even when they've made a mistake.

Q Do you take student sex into account as a factor in making your decision as to responsibility in cases?

A Can you rephrase your question?

Q Sure. So do you take student's sex, that is like them being male, female, non-binary, gender non-conforming as a factor in terms of, you know, deciding whether the preponderance of evidence standard has been met?

A I am inclined to say --

THE WITNESS: Sorry, Nate.

MR. SCHNETZLER: Objection.

Go ahead.

THE WITNESS: I'm inclined to say no. I don't think that we -- we take sex into consideration when determining preponderance of evidence.

BY MR. NORTH:

Q Okay. Do you take -- but you did take Mr. Ortegel's sex into account when assigning him particular sanctions like Man Enough: Undefining My Masculinity; is that correct?

A That is incorrect. I did not factor that in because of Mr. Ortegel's sex. I -- that was something to think about when I thought about gender and, again, cultural aspect of being a young man navigating a very masculine space such as the Corps of Cadets. It -- it did not have anything to do with his -- his sex.

Q But it did have something to do with his gender?

A I would say less so with his gender specifically and more so with, again, thinking about what might be helpful again for this individual who is presenting as a man who is very -- in a very hyper masculine space.

I think part of it was also a conversation between myself and the other two hearing officers which were women, and they felt that it might be helpful for Mr. Ortegel to have some type of sanction that was centered around alcohol awareness as well as something to -- something to help, like, as far as like processing from a masculinity standpoint. Because sexual violence

in itself is -- is a result of like -- is a result of, like, misuse of power.

And so what -- we wanted to choose something that was, like, very simplistically an entryway into understanding masculinity and how that can play out in internal dynamics within yourself and organizations with -- with others.

And so when I had proposed that particular book, because I had been following Justin Baldoni, the other two hearing officers agreed and they thought that it -- they felt that it was appropriate, given the context of the -- the follow-up of the decision that we were making from the hearing and the type of environment that Mr. Ortegel was in.

Q Okay. All right. You want to go off the record for just a couple minutes while I figure out if I have anything left?

A Sure.

THE PROCEEDINGS OFFICER: Thank you.

We'll go off the record. It's 1:13.

(Off the record.)

THE PROCEEDINGS OFFICER: Thank you. It's 1:16. We're back on the record.

MR. NORTH: All right. I don't have any further questions.

So, Nate, if you have anything.

MR. SCHNETZLER: I don't have any questions for Mr. Dilworth. And he will read.

MR. NORTH: Okay.

MR. SCHNETZLER: All right. DaShawn, you are free to go.

THE PROCEEDINGS OFFICER: Thank you so much. With nothing further, we'll come off the record.

May I just ask if there'll be any purchases of transcripts?

MR. NORTH: Yes. From our side. Yeah.

THE PROCEEDINGS OFFICER: Thank you very much. Okay. And the witness will read. Perfect. I will make a note of that. Great.

So with nothing further, we'll come off the record. It's 1:17 p.m., Eastern Standard Time, and we're off the record.

(Proceedings concluded at 1:17 p.m., ET)

* * * * *

CERTIFICATE OF PROCEEDINGS OFFICER

I, Allison Sewell, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter formatted into a full, true, and correct transcript of same;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED this 23rd day of April, 2025.

______________________________

Allison Sewell

CER-1401

Proceedings Officer

A C K N O W L E D G E M E N T

I do hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony on April 11, 2025.

I further certify that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified.

______________________________

DASHAWN MARQUEZ DILWORTH

Sworn to before me this ___ day of _______________, 20__

______________________________

Notary Public

E R R A T A  S H E E T

Deponent: DASHAWN MARQUEZ DILWORTH

Deposition Date: Friday, April 11, 2025

PAGE LINE CHANGE FROM/TO REASON FOR CHANGE

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

_____ _____ ________________ ___________________________

Under penalties of perjury, I declare that I have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________ ____________

DASHAWN MARQUEZ DILWORTH Date

Sworn to before me this ___ day of _______________, 20__

_____________________________

Notary Public

WORD INDEX


< 1 >
1 91:9, 13, 24
1/24/2022 5:7
1:13 149:20
1:16 149:23
1:17 1:17 150:16, 18
10 33:11 38:19 131:6
10:45 65:4
10:47 65:11
1026 30:16
11 1:15 6:4, 7 152:5 153:1
11:15 82:15
11:18 82:18
11:30 111:6, 25 112:9, 15 113:19 114:23 117:25 118:22 120:10
12/7/2021 5:9
12:18 124:19
12:25 124:13
12:32 124:22
140 5:19
15 5:18 33:13, 15

< 2 >
20 152:15 153:1
200 2:5
2019 5:18
2020 5:13, 19 140:20
2021 5:11
20215302 5:9
2023 6:4
2025 1:15 151:13 152:5 153:1
21st 113:12
22314 2:6
23 5:5
236 3:5
23rd 151:13
24006 2:15
24061 3:8
26 5:17
27 5:13
29 2:14
2nd 5:10

< 3 >
35300 1:20

< 4 >
4 91:13, 24
468 6:8
47 5:6
48 5:8

< 5 >
5 5:19 65:21
5/15/2021 5:14

< 6 >
6 91:9, 24
61 66:1
65 5:10
66 5:12

< 7 >
7:22-CV-00510-EKD 1:7
7:22-CV-C00510-EKD 6:15
71 5:14
717 2:4

< 8 >
8 4:4 5:15 108:9 127:8
800 3:7
82 5:15
85 5:16

< 9 >
9 66:9 108:15
9:03 1:16 6:5
9:36 31:12
9:45 31:6, 10, 14
90s 74:2
93 5:18

< A >
a.m 1:16 6:5 31:12, 14
ability 9:14, 24 21:5 88:17, 18 100:10, 13 110:2 132:21
able 20:6 23:9, 17 26:6, 7 47:9 48:8 50:11 52:4, 19 53:15 55:10, 23 59:16, 18 60:1 63:6 86:11, 19 87:14 88:9, 12 93:6 95:24 96:1 97:6 100:6, 11 104:5 107:25 110:2, 12, 22 123:12 126:20 133:13 138:5 140:1 144:20 145:20 146:25 147:8
absent 80:3
absolutely 118:10
Academia 5:10
Academic 11:12

63:9 97:15, 16, 19 99:17 142:3
**acceptable** 89:12
**access** 88:13 93:1 119:2
**account** 53:16 69:8 72:4 139:21 140:15 147:10 148:3
**accountability** 76:1 79:9, 12 81:8
**accountable** 55:22 57:13 75:10, 14 77:22, 25 78:7, 16 80:23 81:2, 6, 10
**accounts** 51:22 52:1 69:6, 18, 20
**accurate** 18:2 35:20 37:1 46:1 80:4 118:22
**accurately** 133:9
**acknowledge** 55:21 56:5, 7, 16 59:18 60:1 64:12, 17
**acknowledgeable** 55:23
**acknowledged** 89:20
**acknowledging** 122:19
**act** 55:24 79:5
**acting** 15:13 68:6 140:21
**action** 59:25 151:10
**actions** 96:6
**actively** 56:16
**activity** 37:18 96:11, 12 97:15 98:2, 9, 11, 18 101:18
**actual** 29:6 50:9 62:10 95:14 110:13, 21 125:14 137:22
**actuality** 64:3
**add** 52:2 133:16, 17
**added** 119:25
**addition** 119:20
**additional** 104:8 106:15 110:4 133:18 134:7 136:25
**address** 57:16, 21 87:25 89:15 91:23
**addressing** 56:18 59:19, 20, 21 77:15 145:3
**administer** 7:15
**administering** 7:14
**admissibility** 7:10
**adults** 94:16
**advantage** 79:11, 15
**adversarial** 147:6
**Advisor** 11:12 68:7
**Advisory** 24:20 25:13, 17, 21, 22 26:14, 21, 25
**Affairs** 5:12 22:4 25:24, 25
**affect** 9:14 54:3 91:25
**affirm** 8:5 114:12
**affirmation** 101:23
**affirmatively** 113:23
**affix** 153:1
**afford** 131:24
**affording** 63:12
**aftermath** 73:3
**age** 95:11
**ago** 40:6 103:6 106:3
**agree** 7:7, 10, 13 9:21 49:5, 6 52:5 94:4 98:9 111:4 112:1, 8, 17 113:17, 20 114:17 119:13 120:12, 23 124:5 125:5 129:3, 7 140:17 146:20
**agreed** 40:2 68:12 83:3 112:13 114:21

125:*3*
149:*10*

**agreements** 94:*6*
**ahead** 28:*7* 31:*2* 82:*12* 105:*8* 112:*23* 124:*10* 141:*6*, *8* 147:*22*
**air** 81:*22*
**al** 1:*8*
**alcohol** 9:*14* 19:*13*, *15* 107:*6*, *7*, *14* 110:*15*, *20* 111:*13* 148:*23*

**Alexandria** 2:*6*
**align** 85:*3*
**aligned** 51:*6* 85:*12* 96:*6* 136:*15* 141:*20*
**aligning** 46:*23*
**alignment** 51:*16*
**allegations** 34:*12* 125:*4* 134:*12*, *17*
**allege** 90:*5*
**alleged** 37:*10*, *12*, *16* 103:*4*, *17* 121:*24* 122:*6* 128:*10* 129:*19*
**Allison** 1:*19* 6:*6* 151:*3*, *17*
**allow** 86:*10*
**allowed** 49:*24* 50:*8*, *14* 65:*22* 108:*2*
**altered** 110:*11*
**amazing** 75:*8*
**amenities** 88:*13*
**American** 55:*15*
**Americans** 142:*3*
**amorphous** 62:*6*
**amount** 36:*20* 46:*18* 79:*11*, *18* 111:*18*
**and/or** 7:*9* 58:*11*
**ANDERSON** 2:*13*
**anecdotal** 138:*9*
**anecdotally** 54:*16*
**angles** 122:*23*
**answer** 9:*22*, *23* 10:*3*, *8*, *9*, *12*, *23*, *25* 27:*23*, *25* 28:*7* 34:*5* 37:*5* 52:*14* 57:*2* 60:*9*, *11*, *23* 77:*20* 78:*2*, *3* 87:*13* 90:*1* 96:*2* 101:*7* 105:*8* 107:*1*, *12* 112:*11* 131:*4*
**answered** 105:*7*
**answering** 109:*8* 128:*24*
**answers** 9:*19*
**anti-Blackness** 61:*3*
**anybody** 63:*6*
**anytime** 50:*3* 88:*10* 106:*7*, *9*
**apologies** 48:*6* 128:*13*, *25*
**apologize** 27:*24* 45:*21* 63:*1*
**appear** 49:*25*
**Appearing** 2:*11*, *18* 3:*11*
**appears** 140:*13*
**application** 13:*11*
**applied** 13:*10* 15:*1* 16:*16*, *21* 20:*14* 49:*11*
**applies** 146:*16*
**apply** 9:*10* 16:*10* 146:*12*

**appreciate** 96:*13*
**approach** 43:*23* 53:*11* 55:*12* 122:*22* 126:*1*

**approached** 93:*13*
**approaching** 92:*17*
**appropriate** 45:*8* 62:*4* 63:*17* 92:*4*, *14* 101:*17* 145:*21*, *25* 149:*11*
**appropriately** 100:*15*
**approval** 21:*4*
**approximately** 6:*5* 111:*15*
**approximation** 14:*6*
**April** 1:*15* 6:*4* 151:*13* 152:*5* 153:*1*

**area** 130:8
**argue** 58:22
**argument** 62:12 89:23 132:13
**Arroya** 129:25 130:6
**article** 65:22 66:2, 4, 17 70:19
**articles** 145:1, 13
**articulated** 84:17
**articulating** 90:11
**Asian** 63:11
**Asian-American** 63:12
**Aside** 15:9, 16 32:13 62:23 71:12 107:4
**asked** 8:21 23:22 67:5 105:7 109:21 118:12 133:15
**asking** 10:23 13:3 28:2, 4 30:4 34:4 41:12 43:23, 25 67:14 71:1 83:12 92:10 98:3, 22 99:11 102:1 114:20 121:6 126:9 137:17 138:6
**aspect** 77:23 148:9
**aspects** 77:23
**Aspire** 24:18 25:5
**assault** 37:13 73:1 91:7
**assaulted** 37:17 102:13
**Assembly** 66:12
**assess** 53:2 123:23
**assessment** 17:10, 24 18:23 20:8, 12 103:13 105:21 108:10, 12 109:13 115:14 131:3 136:13
**assessments** 50:22 53:1
**assign** 41:4 145:1
**assigned** 35:2 43:10, 12 45:11 67:1, 5, 12, 18 145:8, 11, 16
**assigning** 144:8 145:12 148:3
**assimilate** 63:16
**assistant** 13:14 28:12 29:1 40:16 41:2 45:11
**assistants** 32:10, 22
**associate** 28:11, 24 41:2 97:7 100:12
**associated** 97:3 99:10 143:16
**associations** 54:15
**assume** 114:1
**assuming** 117:12 121:20 126:11
**assumption** 118:24 122:17
**assumptions** 60:3
**attached** 18:10
**attempt** 138:13
**attend** 43:4, 6
**attended** 43:7 87:19
**attention** 85:20 103:2
**attest** 133:13
**attorney** 6:18 68:5, 21 81:16
**attorneys** 24:5
**attributed** 66:3, 12
**audio** 7:9 31:21 37:21 54:25 55:1 57:4 65:9 77:4 79:7 80:16 81:18 82:1 90:9 97:12 102:7
**audiovisual** 7:9
**August** 113:12
**authorized** 7:15
**automatically** 54:17
**availability** 41:5
**available** 5:2
**avenue** 144:11

**average** 32:24
**avoid** 107:13 135:5
**awards** 22:15 24:18 25:6
**aware** 9:7, 9 23:25 129:18, 24 130:20 137:23 139:3, 23 146:6
**awareness** 19:15 148:23

**< B >**
**babies** 140:23
**back** 31:6, 10, 15 38:2 46:19 65:4, 12 74:2 75:15 76:2 78:9 82:2, 18 100:13 103:2 105:9 108:7 116:24, 25 118:1 119:15 120:2 124:13, 22 131:5 137:2 138:24 144:14 149:23
**background** 38:5
**balance** 79:25
**Baldoni** 143:5, 23 149:9
**bare** 19:3 144:20
**base** 51:19 106:10 111:3
**based** 17:24 18:20, 21 22:17 25:4 30:7 40:5 41:4 43:20 44:7 51:2 52:8 55:13 60:2 63:3 73:17 86:14 92:11, 24, 25 97:20 109:17, 25 112:1, 25 113:20 114:1 115:13, 21 119:8 120:4 121:7, 12 122:17 123:8 125:17, 20 126:5, 17 127:22, 23 129:10, 14 132:5, 22 134:1 135:10, 12 136:12, 20, 23
**baseline** 18:14
**bashed** 140:22
**basic** 90:24
**basis** 7:11 68:18 143:14
**bathroom** 119:15 120:4 121:1
**bathrooms** 119:6
**baton** 39:23
**becoming** 91:22
**bed** 119:23 120:14
**beginning** 90:22 108:14 113:5 118:3 137:21 139:11
**begins** 72:3 108:18 127:9
**behalf** 7:4
**behavior** 19:6 29:25
**behaviors** 97:3, 20 98:1 99:10
**belief** 79:24 95:18
**believable** 136:18
**believe** 23:22 25:7 33:25 40:14 41:21 42:5 45:20 50:1 52:3 53:13 55:4, 6 56:14 57:1, 2, 5, 12, 23 58:12, 14 60:6 63:20 64:21 67:4, 19 68:6 69:12, 15 70:1, 20 72:14, 20 73:16, 19 74:3 76:14 77:2 80:20 81:5 83:23 89:21 90:5, 10, 21 91:7, 25 92:4, 14, 19 93:12 95:1, 4, 6 115:17 116:11 118:23 119:18

121:4, 7, 11
123:17, 18
130:11
132:20
135:8
136:4, 8, 11
139:15
**believed**
90:17, 21
123:17, 21
**believes**
123:18
**believing**
66:22
90:22
92:18
93:10
**bell**
130:1
**Belonging**
24:19
25:12, 16 26:21
**Ben**
8:25
65:2
124:9
128:24
**ben@binnall.com**
2:8
**beneficial**
26:10
143:21
145:4, 15
**benefit**
59:19
62:18, 24 63:21
**benefits**
62:19
142:12
**BENJAMIN**
2:7
6:20
**best**
9:23
10:22, 24 21:5
55:22
79:21
107:1
**better**
19:10
39:24
62:7
138:19
141:15, 23
**bias**
54:11, 14, 23, 25 55:5, 7 56:2, 8, 10
57:3, 6, 11, 19
60:5, 6, 15, 18, 24 68:8, 22
75:17
76:18, 25 77:3, 10, 12, 17
**biases**
54:3, 5
55:8, 10, 12, 17, 21, 25
56:6
**big**
44:12
51:14
117:11
**BINNALL**
2:3
**birth**
35:3
**bit**
8:24
12:12
31:24
34:3
36:14
40:8
57:5
60:4
81:25
82:1
97:9, 10
99:8
100:16
102:4
103:21
104:10
106:8
108:21
109:22
110:9
116:18
123:2
**Black**
24:19
25:13, 17, 21, 22, 25
26:4, 10, 11, 14,
20, 25
54:19
55:14
61:4, 11, 16
63:13
64:7
66:12
70:12
86:16, 18, 25
140:20
141:19
142:3, 6, 8, 13
146:5
**Blacked**
111:25
112:9, 14
113:18, 24
114:22
117:25
118:7
125:11
**Blacking**
111:6, 9
115:23
118:21
119:20
**Blackmaled**
5:10
**Blackness**
87:4
88:16
**Blackout**
118:14
120:25
**Blacksburg**
3:8
**bodied**
88:10
**bodies**
58:18
**body**
94:12
**boilerplate** 9:6
**boisterous**
89:13
**bones**
19:3
144:21
**bonfire**
111:17
**book**
143:4, 8, 13, 14
144:9, 15
145:9, 11, 21
149:9
**books**
145:2, 13
**born**
78:11
**bottle**
111:19
**bottom**
23:18
111:12
**bottom-right**
23:19
**bounds**
15:14

**boys**
94:9, 17
95:5
**break**
10:4
31:2, 5
65:3
124:10
**breaks**
10:1
**Breonna**
129:24
**Breonna's**
72:8
**Briefly**
38:5
**bring**
63:11
68:8
77:15
**bringing**
30:4
68:22
123:12
**broadening**
84:5
**broader**
85:6
**broadering**
84:5
**Broadway**
6:7
**broke**
31:24
**brought**
74:20
104:4
120:16
140:3
**brunt**
64:9
**building**
88:11
119:10
**bullet**
24:15
38:17
**Burruss**
3:4
**Business**
11:13

**< C >**
**cadet**
46:2
**Cadets**
45:24
46:2
144:16
148:10
**call**
13:9
130:19
**called**
8:11, 20
22:16
61:24
89:6
137:24
143:24
**Calls**
112:21
**campus**
13:19
26:5, 11
145:6
**campuses**
91:11
**campus-wide**
38:20
**capacity**
76:4
139:6
**captured**
7:12
**capturing**
7:8
**card**
115:25
116:4, 5, 15
117:5, 8
120:5, 16
**cards**
116:12
**care**
144:4, 5
**careful**
61:9
122:14
135:2
136:1
**Carl**
128:21
129:7, 12
**Carrie**
45:20, 22, 23
**carry**
59:17
85:23
86:2, 9
**Case**
1:6
5:8
6:14
19:11
20:22
24:2
32:4, 8
33:21
34:10
36:24
37:9, 11, 15
38:21
39:1, 2, 6, 18, 19, 21 40:3, 8, 9, 13, 15 41:6, 7 42:10, 25
43:10, 12
45:11, 12, 18
46:1, 5
47:3
49:8, 20
50:2, 3
66:23
67:1, 2, 4, 5, 6, 9, 12, 13, 15, 18, 21 68:2, 4, 13, 19
69:1, 3, 15
73:15, 20
78:20
92:21, 22 93:9, 15
95:19
102:9, 12, 20, 22
103:3, 22
107:4
108:8
110:25
126:1, 24
127:1
132:1
136:5, 8, 10, 12
139:13
142:25
145:23
146:13, 15, 19
**cases**
16:18, 19
17:20
18:13
19:2, 4, 8, 13
20:19, 20
28:25
30:14
32:23, 25 33:2, 16, 19, 20, 23
34:1, 6, 11, 16, 17
35:23
36:1, 3, 13, 20, 22 37:2, 20 38:1
40:17, 23 41:4
43:14
44:22
51:1
103:9, 11, 16

106:*12* 118:*6* 121:*15* 146:*17* 147:*12*
**catch** 137:*4*
**catching** 131:*25* 132:*4*
**caused** 16:*10* 129:*19*
**cease** 59:*21*
**center** 58:*9*
**centered** 22:*12* 72:*21* 84:*10* 148:*23*
**Ceol** 130:*10*, *12*, *13*
**Ceol's** 133:*21*
**CER-1401** 1:*19* 151:*18*
**certain** 60:*2* 61:*16* 63:*13*, *17* 78:*18* 86:*10*, *12*, *14*, *19*, *21*, *22* 87:*15* 88:*6* 97:*2* 99:*16* 100:*11* 116:*23* 118:*11*, *16*, *19* 141:*14*
**CERTIFICATE** 151:*1*
**certify** 151:*3*, *9* 152:*3*, *7*
**chair** 71:*4*
**challenges** 87:*1*
**chance** 143:*11*
**change** 85:*5* 112:*10* 153:*1*
**changed** 111:*13* 112:*18* 134:*8*
**charge** 41:*10*, *15*, *18*
**check** 129:*21* 131:*3*
**checked** 40:*2*
**chocolate** 94:*11*
**choose** 30:*9* 149:*3*
**Christian** 130:*10*, *12*, *17*, *19*, *20*, *24* 138:*22* 139:*10*
**Christian's** 131:*12* 137:*2* 139:*12*
**chronological** 13:*9*
**circles** 63:*9* 142:*3* 143:*25*
**circumstances** 12:*21*
**civil** 73:*25*
**claim** 126:*13*
**claiming** 90:*11*
**clarification** 44:*11* 92:*10*
**clarified** 39:*25* 85:*9*
**clarify** 12:*4* 28:*1* 47:*5* 49:*13* 54:*8* 78:*18* 83:*11* 97:*9* 118:*13*, *18* 130:*11* 138:*5*
**clarity** 81:*25* 133:*16* 140:*1*
**classify** 12:*5*
**clear** 10:*15* 12:*12* 44:*8* 62:*21* 94:*24* 104:*11* 110:*22* 117:*19* 132:*2* 139:*7*
**clearance** 21:*4*
**clinging** 86:*1*
**close** 11:*24*, *25* 63:*6*, *7*, *15*, *16* 82:*10*
**closely** 19:*9* 51:*5* 96:*6*
**closeness** 142:*16*
**closer** 63:*12*
**Closing** 25:*20*
**cloud** 62:*6*
**clouded** 81:*18*
**code** 29:*25* 30:*23* 50:*4* 92:*12* 93:*3* 123:*6*
**collaborated** 29:*10*
**collaboration** 28:*19*
**collaboratively** 28:*9*
**collected** 17:*13*, *25* 18:*3*, *17*, *19* 30:*8* 44:*25*
**collective** 73:*23*
**collectively** 61:*5* 135:*2*
**College** 11:*13* 91:*11*, *13* 99:*23*
**college-age** 94:*9*, *17* 95:*5*
**college-aged** 96:*16*

**colloquial** 56:15
**colluding** 74:15
**color** 61:11, 17 62:19 63:14 64:6, 9, 14 146:5
**come** 20:19 26:1 31:6 40:12 46:19 54:17 56:23 61:3 65:4 82:2 83:25 90:7 108:5 119:15 120:7 124:13 135:21 150:8, 15
**comes** 57:23 58:1, 2 70:21 77:16 86:25 90:23 92:1, 20 94:10, 11, 17, 18 96:14 98:12 99:17 100:16, 23
**coming** 17:20
**comment** 115:10
**commentary** 88:4 115:18
**commingled** 77:9
**committee** 21:24 22:1, 7, 10, 12, 20, 22 24:18, 19 25:9, 10, 12, 16, 19 26:22 27:1
**committees** 21:21 22:8 24:17, 24 25:2 27:3 70:22 71:1
**common** 44:4 56:9, 13 61:13 63:8 90:14 91:2, 6, 22 118:5 142:2 144:25
**commonly** 92:3 95:15
**communicate** 89:18
**communicated** 106:25 128:3
**communicating** 84:16 98:19
**communication** 29:8 97:4 137:24
**communications** 16:2, 5 117:4
**communities** 19:15
**community** 88:4 142:7, 8 144:5
**comparison** 63:13 90:16
**compiling** 20:19
**complainant** 16:2 33:21, 24 34:2, 14 36:16 37:10, 12, 16 52:11 102:24 103:23 104:18 105:3, 22 106:2, 5 126:23 127:9, 20 128:19 129:18 130:21 131:1 135:7 136:9 138:2 139:11, 13, 24
**complainants** 34:18, 22, 23 35:2, 6, 20 36:7 106:19
**complainant's** 131:17
**complaining** 103:18 104:13 140:24
**complaint** 140:4
**complaints** 29:13, 16, 17, 18, 19, 21, 23
**completely** 123:14 127:7
**complicated** 34:5 107:11
**concept** 54:10 83:13 95:12, 17 97:19, 25
**concern** 98:13, 15 102:6
**concerned** 22:22 133:1, 3, 6
**concerning** 138:11
**concerns** 61:12 101:1, 14
**concluded** 105:3 150:18
**condensed** 91:12
**Conduct** 5:6 11:15, 21, 22 14:23

15:3, 6, 11, 13, 17, 18
16:19, 24 17:5, 7, 11, 13, 16 18:1
19:2, 4, 20 20:6
22:5, 21, 24
24:12, 16
27:15
28:3, 13, 14, 15, 21, 23, 25
29:12, 20, 25
30:3, 23
31:22
32:1, 24, 25
42:12
43:1
50:4
51:2
53:11
78:20
80:16
91:17, 18 92:9, 12 93:3, 7 97:22
98:17
99:2, 19
103:13
121:24
123:6
135:22
137:1
145:23
147:1, 5
**conducted** 7:4 13:15
**conducting** 39:6
**Conference** 87:19
**confirm** 30:20 49:3 55:2 98:17 123:13 135:16
**confirmed** 111:17
**confirming** 50:10 98:10 99:2
**conflict** 100:22
**conflicted** 129:4, 8
**conflicting** 123:11 128:15
**conforming** 34:8, 23 147:16
**confused** 44:10 120:1, 7 137:19
**confusion** 45:2 116:18
**connect** 41:6 92:24
**connected** 22:3 61:21
**connection** 96:3 97:23 143:17
**consent** 37:17 94:10, 17, 18, 22 95:2, 3, 10, 14, 17, 21 96:1, 3, 5, 7, 10, 11, 12, 17, 21, 24, 25 97:2, 3, 7, 13, 14, 17, 25 98:4, 16, 25 99:11, 13, 16 100:1, 2, 6, 12, 14 101:15, 16, 17 102:2 103:5, 17 131:24
**consented** 98:10, 17, 20
**consenting** 99:4, 5
**consents** 99:3
**conservative** 141:20
**conservatives** 140:21 142:18
**consider** 35:16 49:24 50:11, 14 51:23, 25 52:7, 8 57:18 79:20 141:22
**consideration** 50:9 53:3 147:24
**considered** 45:9 104:21
**considering** 69:23
**consistency** 51:6 74:9 136:13
**consistent** 51:10 91:8 113:8 114:5 123:25 127:20 132:17
**consistently** 25:6 52:5, 10 64:18 91:9 121:12 136:21
**constant** 111:8
**constantly** 57:20 78:4, 12 102:1
**construct** 61:15 62:10
**construed** 135:6
**consumed** 111:16, 18
**consuming** 111:14
**contents** 65:21 66:9
**context** 39:19, 21 51:13 75:18 78:20 80:5, 9 81:12

83:15
84:25
85:12
104:8
106:9
127:24
146:25
149:12
**continual** 101:23
**continue** 100:7, 8 113:20 116:14
**Continued** 3:1
**continuing** 102:1
**continuous** 97:1
**continuously** 51:13 98:4 100:15 101:25
**contradict** 48:17 123:13
**contradicted** 52:20
**contradicting** 110:5, 6
**contradiction** 63:17 109:22 115:1, 7, 8, 20 117:6, 11, 17 129:15
**contradicts** 53:21 92:20
**contrary** 90:19
**conversation** 10:19 43:22 56:4, 15, 19 58:9 68:8, 9, 12, 15 69:4 70:15, 18, 24 71:7, 16, 17 75:16 78:10 83:15 89:11, 14 95:2 101:22, 23 103:8 105:11, 12 107:19 115:22 120:17 128:11, 12, 16 130:20, 25 131:23 132:5, 12 133:24 137:14 138:13 139:18 141:11, 17 144:24 148:19
**conversationally** 97:23
**conversations** 14:22 26:3 27:9 42:6 46:20 57:12 59:20 61:19 63:4 74:14 76:3, 5 84:9 94:25 96:20 144:1, 13
**convey** 96:21 98:1 135:9, 10
**coordinated** 15:23
**coordinating** 16:1 41:7 44:14, 15
**coordinator** 11:21 15:13, 17, 23 24:12 28:15 41:20
**coordinators** 28:15 29:1
**Copy** 5:5 23:14 24:7 30:18 47:9, 14
**corner** 23:18, 19
**cornerstone** 76:10
**Corps** 45:24 46:2 144:16 148:10
**correct** 23:15, 16, 20 46:4 66:23, 24 70:6 75:3 85:19 87:23 93:17 105:19 115:4 119:5, 7 121:21 126:25 140:18 148:5 151:7 152:8 153:1
**correctly** 19:9 20:18 39:8 46:21 50:1, 6 59:11 67:11 72:16 75:11 86:3 101:10 109:2, 9 113:11 115:13, 21 128:24 132:8 138:1 140:25
**cough** 18:21 97:5 128:9
**Council** 24:20 25:13, 17, 21, 22 26:14, 21, 25
**COUNSEL** 3:3 6:25 10:7 68:11 151:9
**counsels** 6:16
**counter** 139:24

**counteract** 57:3 77:2
**country** 91:17
**couple** 9:1, 6 27:10 34:6, 15 65:15 67:18 73:18 111:1 140:6 149:16
**COURT** 1:1 6:14 9:11 123:8
**covered** 52:11 82:3, 5
**covering** 81:19
**COVID** 12:3, 5
**Cox** 45:20
**create** 20:10 85:1
**created** 18:12
**creates** 62:6
**creating** 39:7, 8 137:4 141:13
**credibility** 50:18, 21, 23 51:1, 24 52:1, 16, 17, 25 53:4, 7, 23 103:10, 13 104:22 105:4, 13, 21, 22 106:9 107:15, 19, 22, 25 108:10, 12, 18, 24 109:13 114:16 115:14 116:16 128:23 131:2, 13, 18, 22 133:18, 21 136:13, 19 137:8, 16 139:16
**credible** 52:7, 8, 24 53:8 103:19, 23 104:9, 14, 19 106:17, 20 107:5, 8, 24 109:1, 5, 11 129:13, 17 130:25 136:12, 18
**criminal** 73:15, 20, 24 74:1
**crux** 51:3
**cues** 89:18
**cultivated** 57:8
**cultural** 75:24 83:15 85:11 146:25 148:9
**culturally** 89:12
**currently** 11:3, 4, 12 16:13 48:16

**< D >**
**darker** 63:14
**DASHAWN** 1:14 4:3 6:10, 24 7:23 8:20, 22, 23 11:3 23:7 31:18 65:15, 23 66:3, 13 70:5 71:25 82:25 150:5 152:13 153:1
**D-A-S-H-A-W-N** 8:1
**DaShawn_Dil l** 70:2
**DaShawnDilworth** 69:15
**data** 17:12, 17 18:4, 9, 25 20:8, 18 21:1
**DATE** 1:15 6:4 153:1
**Dated** 5:7, 9, 17, 18, 19 151:13
**dates** 16:5 67:16
**day** 12:14, 18 64:4, 5, 10, 16 79:10 120:21 151:13 152:15 153:1
**days** 67:19
**day-to-day** 17:16 41:12 64:15 88:20
**deal** 19:19, 23 86:21, 23
**dealing** 145:4
**dean** 19:10, 14
**Dear** 72:14
**debatable** 134:15
**decent** 33:17
**decide** 122:9
**decided** 20:10 44:19 83:18
**deciding** 104:12 146:17 147:16

**Decision** 5:6 30:7 44:17, 20 45:7, 13 47:1, 8, 24 48:2, 4, 13, 17, 19 54:3 71:4, 9, 12 92:11, 13 93:1 103:14 104:16 105:12 108:8 113:2, 21 114:2 115:14 119:11, 12 124:3 128:14 130:4 131:20, 21 135:12 139:13, 15, 17 146:12 147:11 149:12
**decisions** 105:13
**declare** 153:1
**deconstructing** 144:11
**deducing** 100:25
**deem** 62:17
**deemed** 36:11 63:15, 16 68:10
**deems** 78:24
**Def** 72:24
**Defendants** 1:9 2:18 3:11 6:23
**deferred** 146:22
**define** 39:24 58:6, 7 96:7 118:4
**defined** 40:4 96:22
**defining** 123:3
**definitely** 21:15 31:3 55:2 139:21
**definition** 97:7, 13, 16, 24
**definitional** 96:24
**degrade** 59:21
**degree** 81:7 92:5 97:2 99:12
**de-identified** 20:9
**de-identify** 18:9
**deleted** 70:7
**deliberate** 46:15, 17
**deliberation** 46:25
**demean** 59:21
**democratic** 71:6
**democratically** 39:15
**demographic** 18:4
**demographics** 17:19, 25 18:15
**denied** 84:13 128:12
**Dennis** 32:19
**denoting** 50:10
**deny** 30:20 135:16
**Department** 22:4
**departments** 11:16 13:7, 19
**depending** 34:11 55:19 81:11 135:14, 15
**depends** 59:15
**depicted** 133:9
**Deponent** 153:1
**deposed** 9:3
**DEPOSITION** 1:11 6:10 7:3 9:2, 17 10:2, 6, 18 23:4 153:1
**depositions** 71:20
**depth** 17:1
**depths** 58:18
**describe** 77:4 93:11
**described** 60:5 80:4 95:22 98:23 109:19
**describing** 77:1 134:2
**DESCRIPTION** 5:4 15:15, 21
**designated** 6:7 21:14 30:19, 22 40:15 42:11
**designation** 71:3
**detail** 46:13 104:18 128:15
**detailed** 12:13 136:14
**details** 127:16
**determination** 106:4 126:21 128:23 129:11
**determinations** 103:10 125:15

**determine** 18:*18* 107:*21*, *23* 125:*4* 126:*20* 134:*16*

**determined** 127:*25* 129:*17* 136:*17*, *19*

**determining** 137:*15* 147:*25*

**detract** 51:*23*, *25* 52:*15*, *17* 131:*17*

**detracted** 114:*16* 131:*13*

**developing** 78:*12* 91:*23*

**development** 22:*1*

**deviating** 52:*9*

**differed** 53:*16*

**difference** 85:*9* 128:*1* 134:*24*, *25*

**different** 12:*6* 13:*6* 15:*25* 16:*12*, *15* 17:*3* 19:*8* 27:*3*, *7*, *8* 38:*13*, *14* 39:*12* 40:*17* 45:*5* 46:*21*, *23* 47:*7* 51:*22* 52:*2*, *14* 53:*9* 54:*1* 55:*19* 56:*12* 59:*23* 62:*11* 79:*3* 81:*11* 95:*14* 97:*4* 99:*19*, *24* 100:*8* 105:*2* 109:*19*, *25* 117:*22* 118:*8* 127:*16* 129:*2* 130:*8* 132:*20* 133:*3* 141:*17* 143:*18* 145:*11*

**differentiation** 128:*1*

**differently** 114:*3*

**difficult** 53:*1*

**DILWORTH** 1:*14* 4:*3* 6:*11*, *24* 7:*20*, *23*, *24* 8:*1*, *8*, *20*, *22* 27:*23* 65:*23* 66:*3*, *13* 70:*5* 150:*3* 152:*13* 153:*1*

**D-I-L-W-O-R-T-H** 8:*2*

**Dilworth-000012** 23:*19*

**Dilworth's** 5:*5*

**diminish** 135:*19*

**diminished** 82:*1* 105:*4*

**diminishing** 105:*21*

**direct** 16:*7* 24:*11* 85:*20* 108:*9*, *14* 130:*5*

**Directing** 103:*1*, *2* 127:*8*

**directly** 15:*22* 23:*24* 52:*20* 53:*21* 111:*19* 137:*20*

**director** 28:*11*, *12*, *23*, *24* 29:*1* 32:*19* 40:*15*, *16* 41:*1*, *2*, *3* 42:*11* 45:*10*, *11* 67:*21*, *24*

**directors** 13:*14*

**disagree** 47:*8* 48:*14* 92:*21*

**discourse** 63:*5*

**discovery** 23:*20*, *22*, *23*, *24* 24:*1*

**discrepancies** 39:*12*

**discuss** 14:*18* 40:*23* 68:*24* 108:*17*

**discussed** 38:*13* 54:*23* 103:*3* 126:*22*

**discussing** 14:*21* 57:*6* 66:*20* 103:*5* 133:*17*

**display** 146:*8*

**disputed** 114:*13*

**disrupting** 70:*13*, *17*, *25*

**disruption** 31:*22* 37:*21* 57:*4* 65:*9* 77:*4* 79:*7* 80:*17* 90:*9* 97:*12* 102:*7*

**disseminate** 28:*22*, *25*

**disseminating** 30:*7*

**distinction** 84:20 117:19 142:1
**DISTRICT** 1:1, 2 6:13, 14
**distrust** 138:1 139:12
**distrustful** 139:10
**division** 22:13
**divisional** 21:21, 23, 24, 25 22:7, 8, 10 24:17, 24 25:2
**Dixon** 72:14, 21 73:11, 14 74:3, 23 75:5 76:12
**Dixon's** 75:2
**Doc** 72:13
**docket** 40:24
**document** 23:7, 20 25:4 44:5, 6, 24 47:14 48:8, 10, 12, 21, 24 49:1, 2 71:21, 25 93:24
**documentary** 72:19 73:8, 9, 18 74:5, 20 76:10
**documentation** 18:12
**documents** 23:23 24:1, 4, 7 29:9
**doing** 22:18 28:20 32:21 33:19 39:4, 13, 22 75:9, 13 77:21, 24 80:23 81:5, 11 87:16 118:18 132:3 143:23
**dominance** 58:8, 21
**dominated** 56:22
**dorm** 119:3
**dots** 92:24
**double** 89:14 131:3
**download** 5:2
**drafting** 48:18
**drawing** 91:4, 5
**Drew** 72:14, 21 73:11, 14, 16 74:3, 23 75:1, 5 76:12
**Drillfield** 3:7
**drink** 31:3
**drinking** 94:11 106:13, 21 119:14 120:24
**Drive** 3:7
**drop** 118:17
**drugs** 9:13
**drunk** 103:17
**due** 103:23, 24
**duly** 8:11 152:4
**dynamic** 80:1 144:21
**dynamics** 143:18 149:6

**< E >**
**earlier** 8:21, 24 19:18 31:18 36:23 38:13 53:22 61:8 75:15 84:19 98:24 103:3 134:20 137:3 141:11
**easier** 58:12 86:12 129:3
**easiest** 40:21
**easily** 135:6 136:2
**Eastern** 6:5 31:15 124:22 150:16
**easy** 75:20 76:19 79:1 147:4
**economic** 142:4
**economically** 79:19 80:11
**ed** 17:3
**Edited** 5:13
**editing** 45:5
**Edition** 5:10
**Education** 87:19
**effect** 137:5
**either** 11:15 22:2 26:6, 10 28:24 29:5 30:3 40:15 51:16 52:22 54:8, 14 56:14 57:11, 13 59:25 67:4 84:12 94:19 100:6 102:18 106:23 113:25 114:23 132:16

133:16
135:6
**element** 103:25 107:14 119:25
**elements** 88:6 97:1 102:10 123:14
**Elephants** 66:11
**elevator** 88:11
**else's** 53:16 94:12
**email** 16:2
**embolden** 141:14
**emotions** 76:7
**empathy** 59:24 90:24
**employed** 11:3, 4, 6 66:25
**employee** 41:14
**employees** 32:2
**employment** 16:12
**encompass** 27:6
**encompassed** 39:3
**encounter** 86:12, 21 87:17
**ended** 44:22
**engage** 98:9, 16
**engagement** 39:8, 14
**engaging** 99:1
**enjoys** 145:12
**entails** 96:4
**entire** 48:10
**entirety** 51:3 131:10 138:23
**entity** 28:10
**entryway** 149:4
**environment** 149:13
**equal** 56:18 60:2 71:7 78:25 126:16
**equitable** 39:7, 16, 17, 25 40:4 77:15
**Equity** 38:21 39:1, 2
**equivalent** 79:21
**era** 12:3, 5
**errors** 29:7
**especially** 55:14 57:6 58:20 89:3 94:18 99:18 117:12 143:15 146:21
**ESQUIRE** 2:7, 9, 16 3:9
**essentially** 16:3 45:4 102:6 117:21 142:11 143:19 144:2
**establish** 51:2
**estimate** 14:8 21:12 33:5, 10 37:23 47:11
**et** 1:8, 16, 17 150:18
**ethnicity** 56:12
**evaluate** 50:18, 23 135:22
**evening** 109:1, 16
**event** 51:23 52:15 104:2 110:13, 18
**events** 22:13 51:17 104:1 109:16 110:11, 21 118:3 125:18 133:19 136:16
**everybody** 6:3 66:16 128:9
**evidence** 49:11 52:21 90:18 92:19 124:6 125:2, 5, 19 126:6, 19 134:12 138:18 140:1 147:17, 25
**exact** 21:11 140:2
**exactly** 19:4 92:11, 23 110:12 114:20 116:19 118:15 124:2 134:4 137:19
**EXAMINATION** 4:3 8:18
**Examining** 66:11
**example** 19:12 63:8 86:15, 16 88:9 89:1, 2 95:23 104:21 146:24
**Excel** 18:8
**Exchange** 5:14
**excluded** 59:6
**exclusive** 59:4, 5
**exclusively** 95:8
**excuse** 18:21 28:18 97:5

128:*9*
130:*23*
**EXHIBIT**
5:*4*
23:*3, 5*
25:*20*
38:*3, 6*
47:*18, 19*
48:*21, 22*
65:*16, 17* 66:*6, 7* 71:*21, 22, 23*
81:*14*
82:*11, 21, 22, 23*
85:*14, 16*
93:*19, 20, 22*
108:*7*
127:*5*
140:*7, 8, 9* 142:*22*
**exhibits**
65:*16*
**exists**
64:*13, 17* 142:*8*
**expectation** 12:*16*
**expected**
12:*13*
**experience**
16:*24*
17:*6, 7, 9* 25:*8*
26:*4, 5*
27:*12*
38:*13, 14*
42:*23*
52:*9*
54:*16*
72:*21, 25* 73:*3*
78:*21*
90:*15*
91:*10, 14* 95:*16*
**experienced** 53:*15*
79:*18*
**Experiences** 24:*17*
25:*11*
39:*9*
55:*14*
74:*8*
75:*21*
76:*6*
77:*13*
78:*24*
79:*21*
84:*10*
86:*13*
96:*19*
**experiencing**
120:*24*
**expert**
112:*21*
116:*8*
**explain**
62:*1*
89:*3, 22*
**explained**
116:*11*
**explaining**
89:*6*
**extending**
90:*22*
**extends**
80:*15*
**extenuating** 12:*21*
**extra**
61:*2*
119:*25*

**< F >**

**fabricated**
133:*4, 7*
**face**
79:*3*
**Facebook**
69:*22*
70:*4*
**facet**
79:*20*
**fact**
35:*10*
57:*24*
58:*1, 2*
59:*16*
62:*21*
99:*4, 21*
105:*4*
106:*10*
113:*22*
121:*5*
**factor**
106:*22*
107:*7*
109:*15*
110:*15, 20*
146:*11*
147:*11, 16* 148:*6*
**factored**
110:*10*
**factors**
40:*1*
104:*20*
106:*15*
108:*19, 23*
**facts**
47:*3*
110:*24*
136:*23*
**factual**
122:*5*
**fair**
10:*4*
14:*16*
23:*25*
24:*10*
35:*22*
36:*21*
47:*1*
60:*2*
66:*21*
70:*3*
77:*3*
87:*2*
90:*3*
93:*8, 10, 12* 94:*7*
101:*3, 5, 19*
108:*7*
112:*6*
145:*8*
**faith**
132:*10*
**fall**
78:*8*
99:*14*
**familiar**
17:*1*
54:*10*
73:*13*
95:*13*
96:*25*
121:*25*
143:*22*
146:*8*
**far**
17:*19*
19:*5*
20:*5*
22:*22*
26:*10, 14, 16*
28:*12*
29:*8*
30:*10, 11*
32:*21*
34:*11, 23, 24*
35:*10*
36:*4, 5, 10*
39:*13*
40:*21*
44:*12*
50:*25*
51:*14*
53:*4*
78:*9*
84:*9*
85:*8*
92:*8*
95:*23*
97:*3*
98:*6*
104:*21, 22*
105:*12*

116:9
120:7
137:14
148:24
**fashion**
106:14
**favor**
54:6
77:3, 18
**favored**
132:12
**fear**
100:8
**fearfulness** 61:1
**feasible**
120:3
**February**
5:11
**feel**
66:1
76:6
79:24
88:21
100:22
102:8
146:20
**feeling**
85:23
100:5
**feelings**
86:1
**feels**
56:17
**felt**
29:7
45:7
76:16
100:14
106:20
107:23
145:2, 21
148:21
149:11
**female**
34:2, 13, 21 35:2, 7, 16, 23
36:7, 16, 24 37:9, 11, 16
83:7, 9, 20 84:1, 23 92:1
98:10
101:2, 15
102:13
103:4, 16, 18, 22
104:12, 18
105:1, 3, 22
106:1, 4
107:5, 7
145:9, 17, 22
147:15
**field**
78:17
80:3
**fighting**
77:10, 12 144:6
**figure**
82:8
123:15
126:4, 17
149:16
**filed**
6:13
73:20, 21
**final**
45:10
47:14
103:14
113:2
125:15
**Finally**
10:11, 17, 18
**find**
52:24
81:12
90:18
103:18, 22
109:4
123:7
139:25
**finding**
73:5
107:8
125:10, 12, 13
**findings**
122:5
127:1
**fine**
8:23
10:5
31:7
53:17
102:1
127:7
145:12
**finish**
10:20, 22, 24
**First**
9:2
13:8, 10, 12, 15
17:9
21:23
23:18
24:11
32:17
37:11
38:6, 18
48:2, 5, 6 67:8, 14 72:2, 3 91:1
108:24
112:7
122:10
152:3
**firsthand**
53:15
**fit**
70:20
**five**
14:9, 10, 14 33:6, 8, 9
111:15
**Florida**
66:13
**fly**
56:21
**focus**
39:9
144:3, 22
**folks**
13:20
63:12
64:8
79:23
80:13
**follow**
29:3
30:16, 22
**followed**
16:5
136:21
**following**
30:15
44:16
46:12, 14
109:6
119:24
149:9
**follows**
8:12
**follow-up**
96:13
149:12
**footing**
78:25
**force**
64:9
**foregoing**
151:4
152:7
153:1
**forget**
143:24
**form**
16:12
27:19, 22 37:4
52:21
57:11, 19 77:5
78:1
79:12
81:11
90:12
91:10, 14
101:6
115:5
141:4

**formal** 30:3 113:7
**formatted** 151:7
**forms** 19:17 58:21 59:20, 24 61:3 146:9
**forth** 138:25 151:5
**forward** 92:1 93:9
**fought** 77:17
**found** 102:13 104:9 107:5 125:13 126:23 129:12 130:24 131:12 145:17
**four** 111:11
**frame** 125:22
**framework** 58:8 62:5
**Frank** 26:19
**Franklin** 2:14
**free** 66:1 150:6
**freedom** 141:22 142:4, 9, 12
**frequent** 42:23
**Friday** 1:15 6:4 153:1
**friend** 141:16
**friends** 76:14 84:4 116:25
**FRITH** 2:13
**FROM/TO** 153:1
**full** 7:21 13:1 38:15 88:18 110:2 119:9 143:10 151:7
**fully** 13:2 32:5, 11 39:2 67:20 97:6 120:12 145:25
**Further** 7:13 84:11 118:1 149:25 150:8, 15 151:9 152:7
**future** 83:6, 9, 19, 25 84:23
**fuzziness** 110:18
**fuzzy** 118:17

**< G >**
**gather** 52:19 138:14
**gathered** 22:14 25:24 51:17
**gathering** 136:23
**geared** 14:22 84:11 95:2
**gender** 18:15 34:7, 18, 22 35:2, 6, 19 79:22 80:13 92:16 94:21 147:15 148:8, 13, 14
**genderless** 79:10
**general** 44:10 51:17 63:4 68:11 75:22 78:7 94:23 146:7
**generalist** 81:9
**Generally** 29:24 50:20 54:6 85:4 103:11 110:24 111:1 116:5
**generated** 18:11
**generates** 85:23
**getting** 19:8 30:5 41:8 52:22 92:10 115:23 116:24 132:12
**give** 8:6 10:12 11:2, 25 14:5 23:2 35:9, 14 52:1 53:13 71:14 86:16 89:1 90:8 96:10 104:4 106:8 110:2 137:9 146:20
**given** 22:15 53:6 56:21 58:19 67:6 100:15 110:15 112:25 133:25 149:11 152:9
**giving** 10:25 73:8 85:2 86:7 99:3 101:17 133:25 138:8, 23 145:25
**go** 9:1, 5 20:15 28:7 31:2, 9 44:24

45:1, 10
58:18
65:6, 24
66:15
82:7, 12, 15
87:24
88:10
101:16
105:8, 9, 14
112:23
114:6
118:1
119:14
120:14, 25
121:9
124:9, 10, 16, 19
129:19, 20
141:6, 8
147:22
149:15, 20 150:6

**goal**
17:4
78:23
135:21
147:6, 7

**goes**
75:15
76:2

**going**
9:5, 17
11:9
14:6, 13
23:3
35:24
38:2
40:17
46:12
48:20
58:11
67:22
73:17
78:9
79:2
89:5
92:19, 20
96:14
97:18
99:22
101:8
102:3, 5
104:15
105:9
106:6
108:13
112:1, 5, 6
113:11
114:1, 5
119:8
121:18
124:2
132:22
133:11
137:9, 10

**Good**
6:3, 19
17:2
45:7
68:7
95:23
132:9
143:19
144:15

**Google**
44:6

**governing**
7:5

**grace**
90:22

**grad**
19:25

**graduate**
16:25
17:6, 9
32:10, 22
96:19
99:23

**grammatical** 29:7

**Grant**
38:22

**grants**
38:20

**grasp**
97:6

**grasping**
94:24

**Great**
150:14

**ground**
9:1

**GROUP**
2:3
25:25
42:19
61:22
79:17

**groups**
62:23
63:18
95:7, 9
141:16

**grown**
94:16

**growth**
26:8

**guess**
9:18, 19, 22 14:5
21:14
36:6, 10
55:18
60:14
61:23
69:9
93:5
97:10
100:25
103:2
104:10
112:19, 24
126:13
129:5
130:16
133:21
146:15

**guilt**
123:7

**guilty**
89:8

**< H >**

**hac** 2:9

**Hall**
3:4
119:4, 7

**hand**
8:4, 14
18:5
44:23
133:17
145:2, 3

**handle**
20:8
69:11, 25 72:6

**handling**
102:20

**happen**
30:18
117:20

**happened**
30:6
51:20
52:3, 6
73:20
74:2, 12
76:12, 23
78:24
92:3, 11, 23
110:3, 12, 18
117:18
120:19
122:21
123:1, 6, 17
125:20
126:3, 16
134:20
135:8
136:4, 19, 23
137:23
138:10

**happening**
75:25
78:22
102:19
128:12
132:23

**happens**
90:13

**happy**
30:20

47:10 71:13 127:1 147:7
**hard** 35:10 52:23 58:22 74:6 94:24 107:13 114:18 119:18 134:3
**harder** 110:21
**harm** 100:8
**harmful** 61:4
**HARTMAN** 3:9 6:25
**HBO** 72:20
**head** 10:13 72:24
**heading** 24:12, 15 38:7, 17 108:9 127:9
**healing** 75:9
**health** 101:21
**healthy** 143:20 147:7
**hear** 32:22 33:2 51:11
**heard** 8:24 29:2 33:15 36:4, 22 37:2 38:1 42:10 49:20 68:13 73:10 101:9 106:13 133:12
**Hearing** 5:6 15:2, 9, 14, 16, 22, 23, 25 16:1, 4, 7, 17 17:23 20:16 29:6 30:14 31:19, 21, 25 32:2, 9 33:3 40:9, 12, 20 41:23, 25 42:4 43:9, 11, 15, 21, 25 44:25 45:17 46:3, 6, 10, 12, 13, 14, 15 47:2, 7, 16, 24 48:1, 2, 13, 18 49:12, 15, 23, 25 50:9, 18, 21 51:8, 12 53:21, 25 54:2 66:22 67:2, 13 68:9 78:21 92:9 93:7 95:19 102:22 109:22 110:8 111:13, 15 112:4 113:8 114:4 115:3, 10, 22 118:25 119:19 121:12, 13, 15, 18 122:8, 25 125:3 126:13 129:16 130:9, 23 133:12, 15 134:9, 10 135:1 136:14, 24 137:13 138:5, 24 145:7 146:19 148:20 149:10, 13
**hearings** 15:3, 6 17:13 32:21 41:24 42:2 44:16 53:2, 6, 11, 12
**hearsay** 49:17, 18, 19
**heavily** 142:14 144:17
**he'd** 116:1
**held** 43:14
**help** 106:8 134:6 144:23 147:1, 7 148:24
**helped** 97:8 110:17 116:25
**helpful** 124:1 146:21 148:16, 21
**helping** 17:11 39:14 147:2
**hesitant** 23:23 90:21 123:16, 20 134:21 136:10
**heterosexual** 141:19
**Hi** 6:19
**hidden** 55:18
**higher** 17:3 87:19 90:16
**highlight** 43:19
**hindered** 73:4 132:20
**hired** 21:18 71:3
**hiring** 20:13 70:22 71:4, 18

**historical** 79:*14*
**history** 138:*7*
**hold** 54:*5* 57:*2, 13* 75:*9, 14* 77:*22, 24* 80:*23* 81:*6, 9*
**holding** 78:*6, 16* 81:*2*
**holes** 53:*20*
**homophobia** 140:*22* 141:*25* 142:*15*
**honest** 27:*9* 133:*11*
**honestly** 72:*12* 73:*13* 78:*4*
**hope** 97:*8*
**hours** 21:*10*
**housed** 22:*6*
**humbled** 75:*6*
**hurts** 62:*19* 64:*6, 10*
**hybrid** 12:*14, 18*
**hyper** 148:*17*
**hypothetical** 146:*14*

**< I >**
**i.e** 63:*15*
**idea** 17:*17* 36:*20* 71:*8* 141:*18, 21* 144:*18*
**Ideas** 110:*7*
**identification** 23:*5* 47:*19* 48:*22* 65:*17* 66:*7* 71:*23* 82:*23* 85:*16* 93:*22* 140:*9*
**identified** 34:*7*
**identify** 6:*16* 55:*10* 59:*16* 64:*8* 110:*22* 144:*15*
**identifying** 18:*16* 55:*14*
**identities** 85:*24* 86:*6, 10*
**identity** 86:*9, 13* 87:*3, 5*
**ideologies** 141:*14*
**ill** 139:*5*
**imagine** 133:*5*
**immediately** 73:*20* 83:*16*
**impacted** 110:*1*
**implement** 19:*7*
**implicit** 54:*11, 14, 23, 25* 55:*4, 6, 8, 10, 11* 56:*2* 57:*6, 11, 19* 60:*6, 15, 18, 24* 75:*17* 76:*18, 25* 77:*2, 10, 12, 17*
**implies** 100:*20*
**important** 10:*20* 54:*2* 76:*12* 90:*5, 10* 91:*16*
**imposed** 142:*25*
**impression** 99:*4* 131:*21*
**impugned** 116:*16*
**inability** 104:*1*
**inappropriate** 20:*1, 4*
**inaudible** 132:*16*
**inauthentic** 133:*2*
**incident** 30:*5* 75:*24* 104:*5, 7* 107:*18* 113:*14* 115:*22* 122:*16* 123:*17* 125:*14, 19* 126:*16, 20, 21* 128:*2* 129:*25* 134:*6, 22* 137:*21, 22*
**incidents** 19:*20, 24* 21:*3* 76:*21*
**inclination** 58:*12*
**inclined** 54:*7* 60:*14* 147:*19, 23*
**include** 7:*8* 58:*25*
**included** 20:*12* 23:*24* 32:*6, 9* 59:*8* 64:*22* 85:*6* 116:*9* 118:*2* 139:*15*
**including** 73:*11*
**inclusion** 23:*22* 24:*18* 25:*11, 16* 26:*21* 27:*1* 84:*12* 85:*6*
**inclusive** 27:*5*
**inconsistencies** 132:*11, 14* 138:*21*
**inconsistency**

114:7
128:19
133:23
**inconsistent**
126:24
128:5
**incorrect**
148:6

**incredibly**
75:6
**independent** 18:5
28:10
**independently**
23:10
**Indiscernible**
29:13
31:21
37:21
49:12
57:4
65:8
77:4
79:7
80:16
90:2, 9
97:12
102:7
112:19

**individual**
43:16
52:24
73:6
75:23
104:9
106:11,
16
148:16
**individuals** 13:18
32:7, 13
34:7
35:17
70:25
96:17
106:13
147:8

**individual's** 68:6
71:12
**industry**
73:1, 4
**influence**
9:13
**inform**
147:1
**informal**
30:4
**information** 17:12
18:5, 10,
15, 16,
18 20:9,
24 21:1,
5 28:22
30:5, 8
44:24
51:5, 7,
10 52:2,
5, 19
53:5
73:10
74:7
92:7, 23,
25 93:2
106:15
108:1
114:11
116:1
117:8
120:4
121:8
122:17,
25
123:11,
23, 24
124:1
125:21
126:5,
18
129:16
134:8
135:10,
14
136:6,
15, 25
138:9,
14 139:4
**informed**
40:19
132:24
133:14

**inherently**
55:17
56:10
57:7
**initial**
27:8
51:6, 10
60:20
73:1
74:1
132:18
134:5
**initially**
74:11,
14
115:19

**initiative**
22:2, 3,
17 27:2
**initiatives** 26:9
27:7
**innocence**
123:8
**input**
42:3, 9
73:8
**Instagram**
69:22, 25
**instance**
104:25
105:2,
17 108:4
**instinctively**
77:11
**instinctual** 57:18
**INSTITUTE**
1:7
6:12
**institution** 59:3

**instructed**
10:8
**intake**
111:13
**intellectualism**
141:22
**intent**
137:4, 7
**intention**
131:25
132:3,
11
137:19
138:16
139:5
**intentional** 44:2
71:2
**intentionally**
34:4
76:2
144:1
**interact**
42:24

**interacted**
74:19
**interaction** 100:2
127:17
**interactions**
74:12
94:19,
20
100:24
**interdepartmentally**
20:11
**interest**
124:12
130:7

**interested**
151:11
**interesting** 94:9
117:3
**interference** 16:7
**intern**
17:10

**internal** 149:6

**internship** 17:8 18:2 19:21 20:5, 7, 20 38:12

**interpretation** 84:2 131:19

**interpreted** 128:6 135:4

**interpreting** 127:22

**interrupt** 80:8 89:13

**interview** 12:22, 25 13:2, 9, 15, 23

**interviewed** 13:6

**interviewing** 13:4 14:1 15:1

**interviews** 14:4, 9, 11, 17, 20

**intimately** 146:6

**intoxicated** 37:17 103:5 105:5, 23 106:11, 14, 21 110:7 111:5

**intoxication** 103:19, 24, 25 104:13, 23 107:6, 7 108:24 109:5, 10, 15, 19 110:1, 11, 16 111:9 112:9, 18 125:16

**investigate** 29:13, 16, 20

**investigated** 30:1

**Investigation** 5:8 28:20 29:5 30:9 40:24 43:13, 17, 21 44:1, 7 46:6 49:21 50:8 51:4, 18 52:18 53:4 67:20 109:20 111:14 112:2 113:1, 9, 10 115:2, 9, 17 116:10 117:24 119:11 121:8, 13 122:7 136:24 137:22

**investigations** 30:12

**investigative** 49:7 50:15

**investigators** 29:4

**invisible** 62:6

**involve** 28:19

**involved** 20:1 22:2, 25 24:24 25:3 36:22 39:15 41:24 42:1 46:2 134:4

**involvement** 11:15 19:13

**involving** 36:4 40:8 125:14

**isolated** 75:24 76:16, 20

**issue** 53:23 62:20 64:21 68:22 76:22, 23 89:16 99:1 114:15

**issues** 47:12 56:15 126:22

**it'll** 9:23

**its** 86:25

**IX** 5:8 11:15 14:2, 18, 21 15:7 17:14 19:19, 23 20:6, 19 21:2, 8 27:15 28:4, 17 29:17, 18, 19, 20, 23 30:11, 14, 16, 23 32:23 33:2, 16, 19, 21, 24 34:11 38:1 40:17, 25 41:10, 13, 15, 18, 19 43:14 44:16 46:1 49:11 50:3, 5 51:1 53:2, 11 68:11, 15 91:20 92:6 102:9, 12 103:11 106:12 118:6 121:15

< J >

**Jackson** 128:11, 12, 17, 20 129:3, 13, 20

**Jam** 72:24

**January** 5:19

**Jef** 72:24
**JOB** 1:20 18:6 55:24 70:20
**jogged** 103:21
**joining** 16:14
**Journal** 5:12
**journey** 75:9
**jump** 144:23
**Justin** 143:5, 23 149:9

< K >
**KATIE** 2:9 6:21, 24 13:23 41:17, 24 42:3, 13, 16, 17, 20, 21 43:4
**katie@binnall.com** 2:10
**keep** 116:12 140:21
**key** 116:12
**Killers** 72:9
**kind** 9:1, 6 10:14 12:3 13:8 17:16 21:12 39:4 62:5 64:20 69:11 71:10, 20 74:20 96:9 107:1 118:16 138:7 144:19, 23
**kinds** 16:18
**King** 2:4
**kjhart06@vt.edu** 3:10
**knew** 45:1 53:15 74:13
**know** 9:21 10:2, 14, 17 13:25 14:7 16:21 21:11 23:1, 11, 21 33:4, 11, 12 35:1, 4, 5, 8, 10, 13, 24 36:23 37:7, 22, 25 39:17 42:18 47:21 49:1, 6 54:5 66:2 67:22 68:14 70:10 75:7 77:19 82:7 84:22, 25 89:4, 8 101:16 104:15 105:14, 16 106:2 107:11 108:10 112:11 134:11 137:3 139:10, 18 143:15 145:14 146:1 147:16
**knowing** 16:4 20:14, 15 99:11
**knowledge** 12:19 19:1 20:23 42:5, 8 50:12 70:9 84:18 91:19 137:12
**known** 34:9
**KRISTINA** 3:9 6:24

< L >
**lack** 39:23 62:6 98:3 108:1 138:19 141:14, 23
**land** 137:15
**language** 87:24 96:1, 9 98:25 124:4 128:2, 6 135:5
**large** 79:18 122:20, 21
**larger** 25:10 56:15 83:15 84:11, 25 85:11 127:24 144:23
**laugh** 63:2
**LAW** 2:3
**laws** 7:5
**lawsuit** 73:21, 23, 24, 25 74:1
**layout** 119:9, 12
**leadership** 46:3
**leading** 104:17
**leads** 38:22 62:10
**lean** 142:14
**leaning** 120:17
**learn** 57:16 67:8
**learned** 67:14
**learning** 57:20 73:11
**leave** 14:7 21:16 34:14 53:7 90:1, 8 116:23 117:1, 7, 10

120:2
126:5
**leaving**
16:13
115:24
120:11, 13
**led**
104:1
132:19
**left**
116:1
117:5
119:14
125:1
149:17
**Legal**
1:18
3:3
6:7, 25
**Lemonades**
111:15
**Lesly**
93:9, 15
113:23
114:24
115:3
117:13
122:6, 9
123:17
125:14
128:10
129:19, 24
131:13
132:17
**Lesly's**
129:4, 8
131:24
133:9
**lessened**
107:20
**Letter**
5:6
47:8, 10
48:14
**letting**
71:2
**level**
78:17
108:24
109:4, 10, 14, 18, 24
110:1, 10, 16
111:3, 9
112:9, 17
125:16
**leveling**
80:3
**lie**
131:25
137:5
**Lieutenant**
45:19, 22, 23
**life**
77:23, 24 78:5
88:20
147:9
**Lindsay**
32:17
45:19
**Line**
66:12
116:15
119:22
153:1
**lined**
41:7
51:13
**lines**
111:11
**lining**
134:1
**LinkedIn**
69:24
70:4
**list**
85:21
**listen**
55:1, 2
71:15
**listening**
78:19
**literally**
75:8
**literature**
145:12
**little**
11:8
31:24
34:3, 5
36:14
57:5
60:4
81:18, 20, 24
82:1
97:9, 10
99:8
100:16
102:4
103:6, 21
106:8
109:22
110:9
116:18
119:18
123:2
132:22
**live**
58:3, 6, 14, 23
**lives**
90:16
91:11
142:10
**living**
78:5
**load**
48:5
66:16
**loading**
65:24
**LOCATION**
1:18
**log**
115:25
119:2, 16
**logistical**
16:6
44:13
**long**
11:6, 23
40:6
45:15
46:17, 24
66:16
71:14
78:13
79:19
83:23
147:4
**look**
27:5
47:10
76:21
110:6
127:2
131:2
**looked**
30:10
35:17
**looking**
16:14
18:22
39:4, 11
87:7
128:14
146:25
**looks**
65:21
74:22
140:14
**loss**
72:12
118:21
119:21
120:25
121:5
**lost**
120:10
**lot**
17:12
19:12
21:4
22:14
39:9
53:3
55:17
73:4, 9
74:14
75:20
76:23
78:13
84:12
85:3
87:20
91:17

94:16, 23, 24, 25
95:16
96:18
100:23
102:9, 10
118:5, 7
135:15
136:3
138:8, 20, 24
140:2
141:24
142:2, 13
143:16, 18, 23
144:2, 12 146:2
**loud** 89:13
**lower** 8:14
**lowered** 105:23

**< M >**
**main** 52:10
**maintain** 111:5
**maintained** 111:24 112:8, 14 113:18, 23 114:22
**majority** 14:21 36:3 37:2
**makeup** 13:21
**making** 15:24 16:3, 5 71:9, 12 76:4 88:3 92:11 101:16 103:14 104:10 105:13, 18, 21 106:4 135:12 142:1 147:11 149:13
**male** 33:21, 24 36:1, 4, 6, 16, 20, 22, 25 56:10, 22 58:8, 21 59:16, 17 60:5 75:17 76:13, 19 78:25 88:22, 24 99:2 101:2, 14 102:14, 23 146:7 147:15
**male-dominated** 56:24 146:7
**maleness** 87:3 88:16
**males** 57:3 58:7 95:16
**malicious** 132:22
**man** 57:24 58:2 79:7 80:2 86:18, 24, 25 89:17 98:17 135:20 143:4 145:16 148:4, 9, 17
**manager** 32:4, 8
**manner** 55:24
**man's** 144:22
**March** 5:15, 17
**marches** 83:23
**marginal** 86:14
**marginalized** 88:5
**mark** 23:3 47:17 48:21 65:16 66:6 71:22 82:22 85:14 93:20
**marked** 23:5 47:19 48:22 65:17 66:7 71:23 82:23 85:16 93:22 140:9
**M-A-R-Q-U-E** 8:1
**MARQUEZ** 1:14 4:3 7:23 152:13 153:1
**masculine** 58:8 143:25 144:17 148:10, 18
**Masculinity** 143:4, 16, 20 145:17 146:2, 9 148:4, 25 149:5
**MASON** 1:4 6:11 40:8 66:23 93:15 129:21 145:9
**Mason's** 129:20
**materials** 46:9
**matter** 6:11 7:6 21:3
**McMurray** 32:20
**mean** 16:19 41:14 47:4 49:14 54:13 58:4 59:6 61:8 62:15 70:16 76:21 78:17, 18, 20 83:9, 13 85:11 86:5, 7 87:9 92:2 94:18

96:*13*, *14*, *21* 115:*6* 118:*14* 119:*1* 136:*3* 141:*3*, *10* 146:*15*, *18*

**meaning** 84:*16* 97:*13*

**meanings** 118:*8*

**means** 7:7, *10* 83:*12* 85:*10* 116:*9* 118:*5*, *9* 125:*8*

**meant** 15:*23* 39:*25* 64:*18* 83:*19* 114:*4* 118:*21* 128:*6*, *7*

**measure** 26:*10*

**media** 68:*25* 69:*6*, *17*, *20*, *24* 84:*3*

**meeting** 13:*18* 42:*13*, *15*, *16*, *17*, *19*, *21* 43:*7* 84:*16*

**meetings** 26:*2* 27:*10* 40:*23* 42:*25* 43:*3*, *5*

**Melian** 38:*21*

**Mellon** 38:*21*

**member** 46:*2*

**members** 26:*14*

**memory** 25:*5* 42:*2* 102:*19*, *20* 103:*21* 104:*11*, *17* 105:*18*, *20*, *24* 106:*3* 107:*6* 118:*22* 119:*21* 120:*10*, *25* 121:*5*

**men** 54:*6* 56:*13*, *14* 57:*12* 58:*12* 59:*22* 75:*9*, *10*, *14* 76:*3*, *8* 77:*3*, *11*, *22*, *24* 78:*6*, *16* 80:*12* 89:*12*, *19*, *21*, *24* 90:*5*, *10*, *16* 94:*10*, *16* 95:*3*, *5*, *11* 97:*5*, *11*, *14*, *24* 98:*9* 100:*23* 102:*1* 140:*20* 141:*19* 142:*7*, *13* 144:*1*, *21* 146:*2*, *7*, *8*

**Mendez** 111:*16*

**men's** 77:*13*

**mentioned** 17:*5* 19:*18* 42:*25* 68:*21* 130:*22*, *23* 134:*20* 141:*13*

**mess** 45:*20*

**messages** 117:*4*

**met** 22:*11* 74:*10* 147:*18*

**method** 7:*12*

**mic** 81:*19* 82:*3*, *4*

**Microsoft** 44:*5*

**middle** 127:*15* 137:*21*

**milk** 94:*11*

**mill** 17:*15* 32:*24*

**mind** 27:*20* 87:*22* 98:*22* 108:*5* 128:*25* 131:*10*

**minimal** 18:*14*

**minor** 89:*18*

**minority** 63:*10*, *18* 84:*14*

**minute** 137:*3*

**minutes** 149:*16*

**miscommunication** 102:*9*

**misconception** 61:*13* 94:*16*

**misconduct** 20:*20* 90:*6*

**misconstruing** 85:*1*

**misleading** 132:*5*

**misogynistic** 57:*13*

**misogyny** 58:*21* 59:*20* 140:*22* 141:*25* 142:*15* 143:*17*

**misquote** 34:*16*

**misremembering** 91:*3*

**missing** 29:*8* 52:*23* 80:*4*

**misstating** 84:*21*

**mistake** 147:*9*

**misunderstands** 62:*20*

**misuse** 149:*2*

**mm-hmm** 10:*14*

26:*23* 109:*3*
**model** 19:*8* 63:*10*
**Molualisi** 113:*11*, *13* 117:*13* 127:*16*
**moment** 97:*14* 108:*5*
**monthly** 22:*13*
**months** 11:*25*
**morning** 6:*3*, *19*, *22* 119:*24*
**motion** 88:*18*
**move** 28:*21* 65:*2* 119:*23* 130:*8*
**moved** 13:*17*
**moving** 88:*2* 99:*23* 113:*4*
**multi-day** 21:*16*
**multi-interview** 13:*3*
**multiple** 13:*5* 28:*14* 49:*4* 52:*11* 53:*20* 72:*22* 100:*2* 117:*9* 146:*19*
**multi-step** 13:*17*
**music** 73:*1*, *4*

**< N >**
**naive** 94:*25*
**name** 6:*6* 7:*21*, *23* 8:*2*, *25* 22:*12* 45:*21* 69:*14* 70:*4* 83:*2* 93:*25* 117:*14* 122:*10*, *11* 133:*21*
**named** 128:*11*, *20* 130:*9*
**narrative** 52:*2*, *10* 106:*24* 109:*23* 110:*22* 120:*6* 132:*21* 134:*9* 136:*16* 139:*24*
**Nate** 27:*18* 60:*10*, *21* 80:*7* 141:*7* 147:*20* 150:*1*
**NATHAN** 2:*16* 6:*22*
**natural** 58:*11*
**naturally** 57:*11*
**nature** 17:*14*, *23* 56:*12* 62:*12* 79:*4* 134:*8*
**navigate** 55:*13* 64:*14* 86:*11*, *17*, *19*, *23* 87:*14* 88:*17* 146:*1*, *5* 147:*8*
**navigating** 70:*20* 79:*8* 86:*25* 146:*7* 148:*9*
**necessarily** 30:*1* 53:*8* 62:*17* 85:*7* 96:*4* 127:*25* 136:*18*
**necessary** 89:*6*
**need** 9:*20* 10:*1* 16:*22* 31:*3* 49:*6* 82:*10* 98:*4* 122:*25* 140:*20*
**needed** 16:*1*, *12* 76:*16* 139:*23*
**needs** 101:*23*
**neither** 138:*4* 151:*9*
**network** 73:*5*
**never** 42:*8* 73:*10* 74:*10*, *19* 87:*17* 92:*21* 107:*18* 113:*11*, *23* 114:*12* 115:*24* 145:*20*
**New** 6:*8* 57:*20*
**Nick** 32:*18* 67:*25* 68:*10*
**night** 108:*25* 111:*25* 113:*12*, *14* 114:*9* 116:*20* 119:*14* 120:*24* 133:*19*
**nodding** 10:*13*
**non** 34:*7*, *22* 147:*15*
**non-binary** 34:*7*, *18*, *22* 35:*1*, *5*, *19* 147:*15*
**non-Black** 26:*13*
**non-conforming** 34:*18* 35:*2*, *6*, *19* 79:*22*
**non-heterosexual** 59:*22*
**non-responsibility** 121:*22*

**non-Title** 29:18, 23 30:11 32:23 118:6
**normal** 43:9
**NORTH** 2:7 4:4 6:19, 20 7:18 8:16, 19, 25 23:6 27:18 28:5 31:9, 16, 17 37:8 47:20 48:23 60:17 61:6 62:22 63:19 64:19, 25 65:6, 13, 14, 19 66:8, 18 71:24 77:7 79:13 80:14 81:17, 21 82:4, 7, 13, 19, 20, 24 85:17 93:23 101:11 105:15 113:3 116:3 124:16, 24, 25 140:11 142:17, 21, 23 148:1 149:24 150:4, 11
**notary** 8:12 152:19 153:1
**note** 150:14
**noted** 109:25 112:5 119:10 153:1
**notes** 44:25
**notice** 98:6
**noticed** 43:19
**noticing** 6:18 53:19
**noting** 105:22
**nschnetzler@faplawfirm.com** 2:17
**nuance** 77:16 79:9 100:16
**nuanced** 76:24
**Number** 5:8 6:14 11:25 21:12 30:21 33:18 91:12 111:19
**Numerous** 108:19, 23
**NYU** 5:12

**< O >**
**oath** 7:14, 15 9:7, 10
**object** 10:7 27:18 37:4 77:5 78:1 101:6 115:5
**Objection** 27:16, 22 60:8 62:2, 25 64:1, 23 66:14 68:5, 18 105:6 141:4 147:21
**observation** 99:7
**observations** 26:3 98:7
**obtaining** 96:11 97:14
**obvious** 138:1
**Obviously** 35:25
**occurred** 79:6
**occurrence** 42:23
**offered** 90:18
**offering** 22:4
**Office** 6:25 11:21 12:8, 17 13:5, 19 14:2, 23 15:7, 11, 13, 18, 25 17:11, 18 19:10 22:5, 21, 24 24:16 27:14, 15 28:3, 4, 17 29:12, 20 31:22 32:1, 2, 3, 4, 8 33:18 40:18, 25 41:10, 13, 15 43:1 67:7 68:11, 14 81:22 147:5
**OFFICER** 1:19 6:2, 7 7:2, 14, 20, 25 8:3, 13 15:2, 9, 14, 16, 22, 25 16:7, 17 17:23 20:16 30:14 31:11, 14, 19 32:1, 9 33:3 40:9, 12, 20 41:23, 25 42:4 43:9, 11, 15 44:15 49:12, 16, 23 50:18, 21 53:25 65:8, 11 66:23 67:2, 13 81:16, 24 82:6,

9, 14, 17 93:7 95:19 102:22 121:15 122:8 124:18, 21 125:3 134:10 149:19, 22 150:7, 12 151:1, 19

**officers** 31:21 32:2 43:21 45:17 46:15 48:18 54:2 135:2 137:13 146:19 147:2 148:20 149:10

**offices** 28:9 29:10 38:23 91:17, 19

**office's** 92:6

**official** 7:8

**offset** 126:12

**oftentimes** 61:10 118:2

**Oh** 75:22 118:7 127:3 130:15 141:5

**Okay** 6:3 9:5 11:2, 6, 10, 18, 23 12:2, 11, 22 13:23 14:1, 4, 11, 25 15:5, 9, 16 17:5, 25 18:7 19:18 20:17 21:7, 10, 17, 23 22:8, 20 23:2, 9 24:4 25:2 26:18, 20 27:13 28:8 29:23 30:13, 25 31:8 32:11, 15 33:5, 10, 13, 23 34:1, 15, 21 35:1, 5, 11, 25 36:3, 8, 19 37:9, 15, 20, 23 38:2, 4, 10, 12, 16 39:1, 16 40:7, 19 41:9, 22 42:3, 13, 25 43:4, 8 44:16 45:17, 23 46:9, 17 47:1, 17 48:3 50:14, 17, 23 52:13 53:24 54:5, 13, 22 55:4, 8 56:5 57:1, 23 58:4, 14, 17, 24 59:5, 10 60:4, 11, 18 61:7, 23 62:23 63:20, 23 64:20 65:1, 3, 18, 24 66:1, 5, 25 67:8, 23, 24 68:1, 14, 24 69:5, 8, 11, 17, 20, 25 70:3, 7, 11, 16 71:10, 19 72:2, 6, 8, 11, 18 73:13 74:3, 22, 25 75:4, 13 80:2, 15, 19, 25 81:5 82:6, 9, 14, 19 83:3, 6, 9 84:15, 19 85:20 86:5 87:9 88:21, 24 89:21 90:25 91:24 93:8, 14, 19 94:3 95:4, 18 98:8 100:25 102:12, 16 103:1, 9, 16 104:25 105:16 107:3 108:11, 13, 16 109:7 110:24 111:4, 11, 23 112:6, 17 113:4, 17, 22 114:7 115:1 116:14 117:6, 23 118:20 119:1, 13 120:23 121:4 122:2, 5 124:4, 8, 15 126:7, 22 127:11, 19 128:8, 18 129:7, 12, 18, 23 130:15, 17 131:16 133:1, 8 134:10, 16 136:8 137:7 138:6 139:9 140:5, 10, 12, 16, 19

141:2
142:18
143:3, 8, 12
144:8
145:8
146:11
148:2
149:15
150:4, 13
**once**
42:22
45:6
67:4
87:23
**one-on-one**
42:16, 19
**ones**
95:8
**one-sided**
142:12
**ongoing**
97:1
100:1
137:14
**online**
16:4
**onset**
137:11
**open**
16:23
**operated**
50:3
**operating**
118:24
**operation**
50:2
**operations**
14:23
17:16
41:13
**opinion**
35:13
47:3, 4
85:10
112:22
**opinions**
45:9
**opportunities**
12:18
22:2
25:8
26:7
**opportunity** 16:23
17:2
25:22
67:19
145:20
**oppose**
7:10
63:23
64:3, 11
**opposed**
61:25
**opposing**
64:16
**opposite**
94:20
**oppressed**
85:24
86:6, 9
87:4
142:7
**oppression**
62:11
85:22
141:11
**oppressive**
87:1
**orchestrated** 73:9
**order**
13:9
**organizations**
149:6
**organize**
17:12
18:6, 7
**organized**
18:8, 20, 21
58:10, 20
**organizing**
17:17
18:25
**orientation** 57:8
87:22
145:5
**oriented**
58:20
60:15, 19
**original**
105:10
120:6
**ORTEGEL**
1:4
6:11
40:9
93:14
110:7
111:4, 14, 16, 17, 23
112:8, 14
113:10, 13, 18, 22
114:22
116:20
117:24
118:21
119:13, 21
121:4
122:3, 22
123:18
125:10
127:17
128:7
132:6
142:25
144:9
148:22
149:14
**Ortegel's**
45:12, 18 46:5
66:23
95:19
108:17, 23, 24
109:4
111:13
113:7
116:16
119:3
126:23
133:18
146:13
148:3, 7
**outcome**
44:17
151:11
**outline**
44:8
109:13
**outlined**
18:12
113:1
114:11
131:14, 20
**outside**
49:20
50:12
99:8
119:6
**overarching** 27:2
**overlapping** 44:9
**oversaw**
41:12
**oversee**
41:5
**Oversees**
38:19

**< P >**
**P.C** 2:13
**p.m**
1:17
111:6
124:22
150:16, 18
**PAGE**
4:3
5:4
23:18
24:11
38:6
47:13
48:2, 6
65:20

66:1, 9 69:23 108:9, 11, 15 113:5 127:8 131:6 153:1
**pages** 23:18 48:12, 25 49:4 70:4
**painful** 85:25 87:10, 21
**panel** 46:3 47:2
**paper** 81:19
**paragraph** 108:18 111:11, 12 112:7 113:5 114:12 127:15, 24 131:8
**part** 15:15, 21 16:9 21:21 22:9, 10 23:24 25:7, 9, 17 26:20, 25 30:22 39:3, 4 50:22 53:1 56:3 57:8 70:18 71:1 75:9, 13 77:22, 24 78:5, 15 80:23 81:5 85:6 88:4, 9 91:19 92:6 98:2 103:12 110:4 114:4 115:14 116:10, 17 120:1, 6 121:19 124:5 130:25 134:5, 11, 14 136:25 139:3, 8, 16 148:19
**participated** 50:7
**participating** 130:18
**particular** 16:1 19:15 27:12 29:10 42:10 56:2 61:18 67:21 69:2 89:5 91:25 92:17 107:18 131:23 135:13 136:11 138:22 140:4 148:3 149:8
**particularly** 61:11
**parties** 7:7, 13, 17 13:5 47:15 93:16 101:24 102:3 151:10
**partner** 99:3
**partnering** 19:14 38:22
**partnership** 28:3 29:10
**parts** 45:5, 13
**partway** 24:11
**party** 106:24 107:5 123:21
**patriarchal** 58:3, 4, 23, 24 79:16 80:10 89:25 90:3
**patriarchy** 58:7, 15 59:9, 12, 14 66:20 78:10 140:22 141:25 142:14 144:7
**PEAKE** 2:13
**penalties** 153:1
**pending** 10:3
**people** 32:16 33:18 59:24 61:2, 4, 11, 14, 16, 17, 20 62:1, 15, 16, 19, 20, 24 63:11, 14, 21 64:6, 7, 8 75:19 78:6 79:11, 14, 17 81:9 87:25 88:1, 2 89:11, 13 99:25 102:16 123:1, 10 140:24 143:21 144:4 146:4, 5
**percentage** 36:25
**perception** 61:10 85:2, 7, 10 86:8 137:17
**Perfect** 150:13
**perfectly** 8:23 10:5 53:17 92:4 124:14 145:12
**period** 41:3 79:19
**perjury** 153:1
**permeates** 59:2

**person** 7:14 12:8, 10, 12, 14, 20 64:14 71:8 84:4 123:3, 4 130:16
**personal** 47:2, 4 54:3 55:14 85:2, 10 99:7
**personally** 102:22
**personnel** 7:12
**person's** 135:19
**perspective** 35:9, 13, 15 53:12 63:24 74:18 76:20, 22 78:22, 25 90:7, 9, 17 97:6 101:2, 14, 15
**phenomenon** 75:25
**phonetic** 129:25
**Photo** 5:14, 18, 19
**phrase** 84:23 96:25 106:1, 2 107:3 142:2
**phrasing** 95:14
**picture** 51:15
**piece** 51:20 76:2, 18, 25 100:16 119:20
**pieces** 15:24 44:13 53:19 123:15 130:3
**place** 52:4 56:11 63:24 67:17 73:2 79:9 80:20 83:24 88:14 100:18 125:18 126:21 128:17 136:7 137:16, 21
151:5 152:9
**places** 84:6 85:3
**Plaintiff** 1:5 2:11 6:20, 21 7:4 8:25
**plan** 27:5 143:10
**Planning** 24:19 25:12, 16 26:22 27:1
**platform** 1:18 69:16
**play** 149:5
**played** 102:10 103:25 106:16 107:14
**playing** 78:17 80:3
**plays** 144:21
**please** 6:16 7:21, 25 9:21 10:12 47:21
**PLLC** 2:3
**plus** 38:19
**podcast** 54:18, 19, 22 56:2 70:12 71:14
**point** 10:17 24:15 38:17 45:7 54:19, 22 90:15 91:10, 13 100:3 105:10 110:16, 23 111:5, 8 116:19, 21, 23 118:1, 11, 16, 19 122:24 132:10 133:18 144:3
**pointed** 132:16
**points** 45:2 141:21
**Policy** 30:16, 19, 21, 22, 24
84:9 122:12
**Polidoro** 6:24 13:24 41:17, 24 42:3, 14, 16, 18, 20, 21 43:4
**political** 142:4
**politically** 80:12
**politics** 84:8
**POLYTECHNIC** 1:7 6:12
**populating** 44:6
**population** 26:12
**portion** 70:14 75:16 130:4
**position** 11:19, 23, 24 12:2, 7, 14, 23 14:17 15:19 16:9, 11, 13, 16 20:14 38:15 41:3

**possibility** 122:*20*, *21*
**possible** 31:*1* 74:*18* 119:*17* 121:*2*, *3* 123:*1*
**Post** 5:*15*
**posted** 70:*8*
**posts** 68:*25*
**potential** 26:*8* 68:*8* 79:*6* 135:*24* 143:7 144:*13*
**potentially** 15:*2* 33:*8* 131:*25*
**power** 56:*24* 58:*9* 63:7 70:*13*, *17*, *25* 71:*9*, *11*, *12* 79:*25* 80:*3*, *12* 100:*6*, *21*, *23* 142:*16* 143:*18* 149:*2*
**practice** 43:*10*, *12*, *18* 44:*21* 50:*20* 91:*22* 147:*1*
**practices** 71:*18* 97:*8*
**prefer** 8:*21*
**prejudice** 62:*11*
**preparation** 46:*10*
**preponderance** 124:*6* 125:*2*, *5*, *18* 126:*6*, *19* 134:*12* 147:*17*, *25*
**preponderantly** 136:*2*
**prepping** 44:*13*
**prescribed** 104:*1*
**present** 8:*12* 12:*17* 18:*22* 42:*22* 50:*8* 52:*18* 91:7 102:*2* 104:*6* 114:*13* 115:*11*, *15*, *19* 117:*14* 122:*15* 134:*5*, *22* 135:*17* 137:*20*
**presented** 21:*2* 23:*21* 25:*23* 35:*6* 53:*10* 109:*21*
**presenting** 35:*16* 148:*17*
**President** 25:*23*
**presume** 121:*16*, *23* 122:*3*
**presumption** 89:*4* 121:*22* 122:*13* 123:7 125:*23* 126:*2*, *8*, *10*
**pretty** 32:7 44:*4* 56:*9* 59:*2* 91:*8* 117:*11* 120:*13* 141:*18* 142:*2* 144:*25* 145:*15*
**prevalent** 58:*22* 100:*12* 141:*18*
**prevention** 19:*17*
**previous** 18:*17* 86:*8* 105:*10*
**previously** 16:*24* 53:*10* 82:*22* 84:*13* 132:*6*
**primarily** 12:*8*, *10*, *12* 17:*8*, *11*, *22* 28:*18* 35:*6* 38:*20* 79:*18* 95:*10* 133:*22*
**primary** 39:*9* 71:*16* 89:*1* 102:*6* 110:*15* 145:*19*
**prime** 19:*11* 86:*15* 89:*2*
**prior** 11:*19* 41:*1* 52:*9* 54:*16*
**prioritize** 78:*19*, *21*
**prioritizing** 77:*13*
**Pritchard** 32:*18*
**privilege** 58:*11* 59:*17* 79:*18* 85:*24* 86:*2*, *10*, *20*, *24* 87:*14*, *15*
**privileged** 85:*25* 86:*5*, *9* 87:*3*, *11*
**privileges** 61:*15*, *22* 63:*13* 88:7
**privileging** 89:*20*
**privy** 42:7
**pro** 2:*9*
**probably** 21:*15* 32:*12* 33:7, *9*,

14
34:11, 14
35:10
47:12
55:11
145:10
**probation**
146:22
**problem**
56:19
95:4
98:8, 15, 23
**problematic** 57:14

**procedural**
7:5
**proceed**
8:15
92:9

**proceeding**
6:9
7:11, 14
8:6
**PROCEEDINGS** 1:19
6:2
7:2, 20, 25 8:3, 13
31:11, 14 65:8, 11
81:16, 24 82:6, 9, 14, 17
124:18, 21
149:19, 22
150:7, 12, 18
151:1, 4, 6, 19
**process**
13:3, 18, 22
17:20
18:1
28:22
30:3, 4, 10
46:25
50:8, 22
71:7
77:10
79:3
80:16
91:20
97:1
100:1
121:19
135:22
137:1
139:8
**processes**
99:19

**processing**
67:11
148:24
**produced**
23:19
24:4

**production**
24:1
**products**
62:13
**professional** 22:1, 25 26:5
55:24
70:21
**professionals**
22:14
25:25
26:1, 11
**profile**
69:24
**program**
22:3
**programming** 26:8
**programs**
27:3, 8
**progression** 73:4
**project**
39:23
**projected**
63:11
**projects**
38:19
39:5, 10
**pronounce**
113:11
122:11

**pronounced**
130:13
**proof**
52:21
**proposed**
149:8
**prove**
136:6
**provide**
9:22
19:10
47:9
92:7
95:24
96:2
106:14
107:25
123:12
138:18
139:5
144:11, 19
**provided**
42:8
51:5, 7, 11 74:7
92:25
122:18
123:24
125:21
135:11
136:15, 21, 25
138:14
**providing**
51:12
139:2
146:23
**proximity**
63:5, 6, 7
141:13
142:16
**public**
8:12
63:5
152:19
153:1
**pull**
70:11
**purchases**
150:10
**purely**
53:2
105:23
106:20
107:4, 5
144:22
**purpose**
18:25
20:7
139:2
144:8, 10
**purposes**
10:11
**pursuant**
7:5
**push**
100:13
**pushing**
71:7
**put**
53:18, 22

**< Q >**
**Qualitative** 38:7, 16, 19
39:5
**question**
9:3, 20
10:3, 8, 9, 23, 24
12:4, 6
16:21
21:24
27:24
28:1, 7
31:23
34:3, 5
41:11
43:23, 25
49:13
54:8
64:20
65:3

67:10
77:20
78:4
87:13
96:14
99:6
101:9
102:5, 17
104:10
107:2, 11, 13
108:25
109:8
112:11
114:19
118:13
124:9
128:24
129:2
131:11
133:20
134:14
145:24
147:13
**questioning** 132:24
**questions**
9:6, 18, 19, 22
29:4
43:20
44:2, 6, 9, 10
46:13, 23 71:2
81:17
92:10
106:3
109:21
149:25
150:3
**quick**
116:14
**quickly**
83:11
**quite**
69:16
82:2
83:25
94:9
**quote**
63:9
98:5

**< R >**
**race**
18:15
56:11
60:7, 15, 19
62:13
77:1
**Rachel**
13:13
32:18
**racial**
68:22
**racism**
61:12, 22 62:5, 10, 13, 19 64:5, 10
140:24
**radar**
56:21
**raise**
8:4
**ramp**
88:12
**range**
60:25
88:18
**rate**
90:16
**RAYMOND**
2:9
6:21
**read**
43:13
47:25
67:20
72:16
75:11
86:3
108:21
109:2, 6, 20
131:10
140:25
143:3, 8, 9, 10
145:23
150:3, 13 153:1
**reading**
109:14, 18
117:23
119:22
128:22
129:10
130:2
**readings**
145:1, 13
**reads**
23:19
66:10
72:11
75:5
85:21
94:8
108:22
113:6
140:19
**ready**
8:15

**reaffirmed**
100:15
**reaffirming** 102:2
**real**
116:14
**realistically**
74:17
**really**
9:2
10:18
21:14
27:10, 21 29:3
54:7
68:23
73:9
83:11
87:16
97:24
105:13
112:10
114:7
115:1
134:6
**realm**
69:24
99:8
**reason**
48:4
62:3
71:17
104:9, 17, 23
108:1
120:16
133:6
145:19
153:1
**reassign**
67:22
**recall**
12:16, 19
13:13, 25 14:3, 20, 24
15:20
16:8
19:9, 12
20:22
21:6, 13
22:12, 19, 23
26:15, 16 27:2, 8 28:10
29:9
34:6
36:5
37:7
39:8
40:4, 14, 21 42:1, 6, 15, 22
43:1, 6
44:12, 21
45:13, 16
46:11, 18, 20
50:1, 6, 25
54:24
55:3
67:3, 16, 17
68:20,

23 69:3 70:9, 13 73:17, 25 80:24 81:4 83:2 94:1 102:15, 17, 18, 24 104:1, 16, 22, 25 105:2, 11, 20, 25 106:7 110:24 111:8 112:3 114:13 115:15, 20 128:10 129:22 130:5, 9, 17, 22 137:5 138:1 140:13 142:24 143:1, 2, 3, 6

**recalling** 68:3 115:12 132:8

**receive** 64:9

**received** 23:25 40:24

**recipient** 56:24

**recipients** 135:21 146:10

**reclamation** 142:9

**recognize** 23:11, 13 47:22, 23 49:1, 2 71:25 93:24, 25 100:11

**recollect** 110:12 114:2

**recollection** 24:23 108:25 109:5, 16, 24 110:2, 13, 20 116:21 125:17 127:19

**record** 6:3, 8, 17 7:8, 22 10:11, 15, 20 31:10, 12, 13, 15 48:7 65:7, 9, 10, 12 72:13 82:8, 15, 16, 18 85:9 117:18 124:17, 19, 20, 23 149:16, 20, 21, 23 150:8, 16, 17

**recorded** 130:20, 25 131:23 138:12 151:6

**recording** 7:9 54:25 55:1 131:12, 16, 24 132:7, 9, 15 133:2, 4, 8, 12, 14, 23 134:6 137:2, 4, 8 138:11

**Recordings** 72:24

**records** 34:10

**redirect** 87:21

**refer** 23:3 30:2, 9 48:20 65:15 81:14 82:21 85:14 108:7 129:23 131:5 140:7

**reference** 57:14 61:14, 19, 20 65:22 70:25 72:18, 19 73:7 80:13 96:15 111:8

**referenced** 42:18

**referred** 8:22 15:7

**referring** 19:21 29:17, 18 36:9, 15 39:18 49:19 69:13 71:11 94:14, 15 122:7 128:2, 7 130:3, 12

**refers** 35:18

**reflect** 85:24 87:10

**reflected** 119:16

**refresh** 24:23 25:5 127:19

**regard** 46:5 106:4

**regarding** 68:25 129:25 131:22

**regardless** 56:11 92:16 94:20 95:11 111:23

**regards** 28:16 39:18 40:3 61:12 69:2 70:19, 23 81:2 103:14 125:13, 16 134:9 135:23

146:*13*, *18*
**regularly** 22:*11* 32:*21*
**regulations** 103:*12*
**rehash** 141:*10*
**reinforced** 78:*12*
**rejection** 100:*8*
**related** 19:*19*, *24* 38:*20* 62:*1* 64:*20* 70:*20* 73:*15* 151:*10*
**relates** 27:*15* 119:*3*
**relation** 30:*23* 50:*5* 83:*22* 92:*12* 137:*23*
**relationship** 28:*16*, *18* 138:*4*
**relationships** 89:*19*
**relative** 63:*24*
**relayed** 129:*15*
**Relevance** 60:*8* 66:*14*
**relevant** 139:*13*, *14*
**rely** 49:*18* 136:*2*
**remain** 113:*8* 114:*5*
**remember** 13:*2*, *4*, *20*, *21* 14:*1* 20:*24* 22:*16* 25:*6* 27:*11* 30:*21* 32:*15* 34:*23*, *24* 36:*4*, *23* 39:*2* 45:*18* 46:*19* 50:*13* 68:*21* 70:*14* 71:*16* 94:*1* 103:*5*, *7*, *24* 105:*14* 107:*17* 113:*25* 114:*23* 115:*21* 116:*17*, *20* 118:*9*, *10*, *12*, *15*, *18* 119:*9* 120:*11*, *19* 121:*1* 123:*1* 128:*18* 133:*11* 141:*16*
**remembered** 115:*23*
**remembering** 114:*8* 120:*12*
**remembers** 116:*24*
**REMOTE** 1:*18* 6:*7* 12:*9* 71:*19*
**remotely** 7:*3*
**removal** 69:*1*, *2*
**removed** 67:*2*, *5*
**repeat** 31:*23* 67:*10* 101:*9*
**repeating** 128:*25*
**repercussions** 79:*2*
**rephrase** 9:*20* 16:*22* 54:*9* 101:*12* 112:*12* 114:*19* 129:*1* 142:*20* 147:*13*
**rephrasing** 98:*22*
**replied** 74:*23*
**reply** 75:*1*, *2*, *4*
**Report** 5:*8* 18:*23* 20:*10* 29:*5* 43:*13*, *17*, *21* 44:*1*, *7* 46:*7* 49:*7*, *21* 50:*15* 51:*4*, *18* 52:*19* 53:*5* 67:*20* 109:*20* 112:*3* 113:*1*, *2*, *21* 115:*9*, *18* 116:*10* 117:*24* 119:*11* 121:*8*, *13* 122:*7* 128:*15* 130:*4* 136:*24* 137:*12*, *22*
**reported** 111:*14*, *16*
**reports** 18:*11* 40:*24* 97:*21* 116:*10*
**represent** 6:*17*, *23* 8:*25* 48:*15* 72:*2*
**representative** 68:*7*
**representatives** 13:*19*
**represented** 22:*23* 45:*8*
**representing** 22:*21*
**represents** 6:*21* 24:*16* 47:*2*
**request** 24:*5*
**requests** 24:*1*
**required** 12:*20* 121:*23* 122:*3*

**requirements** 14:18
**research** 17:24 18:5 20:13 38:7, 19, 20 39:3, 5, 10 58:19
**Researcher** 38:17
**reserved** 15:24
**reside** 7:16
**residence** 119:4, 7
**resource** 144:20
**resources** 146:23
**responded** 75:7
**respondent** 16:2 35:23 36:1, 17, 21, 22, 25 52:11 102:23 105:4 106:5 121:20, 23 125:24 126:11 135:7 136:9 138:13 145:17
**respondents** 36:4, 7 37:1 106:19
**respondent's** 68:5, 18, 21 121:16
**responding** 73:8 104:6
**response** 24:5 96:2
**responsibility** 43:16 92:6 121:20 126:8, 10 147:11
**responsible** 121:16, 21, 24 122:3 125:24 126:12 145:18
**rest** 34:1 48:3 128:14
**restating** 131:10
**result** 103:19 149:1
**Resume** 5:5 23:14 24:8
**retrospect** 144:14
**Retweet** 5:15, 18, 19 82:25 83:18
**retweeted** 83:3, 21 94:3, 6 140:16
**retweeting** 94:2 95:1 140:14
**retweets** 140:12
**review** 43:17, 19 45:6, 10 46:6, 9 47:21 48:8, 24 49:6
**reviewed** 23:11
**revoke** 99:16 100:6
**revoked** 100:3
**revolves** 144:18
**right** 8:4, 16, 24 9:5, 9 10:1, 6 11:3 14:16 16:10, 16 18:24 19:20 20:3 21:7, 11 23:14, 17, 18 24:10 25:20 26:13 29:12 30:13 31:2, 9, 18 32:13 33:1, 20 34:15, 19 35:18, 22 36:1, 15, 19 38:2 40:7, 10 41:19, 22 43:8 44:17 45:12, 24 47:24 48:8, 11, 20 49:5, 10 53:24 54:18, 20 59:10 60:4, 22 61:7 65:2, 6 66:5, 19 68:17 69:5 70:7 71:20 72:11 75:2 77:8 80:17 82:21 83:4, 7 85:13, 18 87:2 90:3, 25 93:8, 14, 19 94:7 95:19, 21 101:24 104:10 108:3, 13, 14 110:6, 25 111:6, 11, 25 112:15 113:4, 19, 25 114:9, 15, 24 117:25 119:3, 16 120:9, 10 121:16 122:3, 6,

12
124:16
125:1, 24
126:22
127:8, 14, 23
129:4, 9, 13
131:5, 6, 13
134:13, 18
137:16
138:2
140:5, 17
142:24
149:15, 24 150:5
**ring**
130:1
**Road**
2:14
**Roanoke**
2:15
**role**
15:15
16:6, 8
17:22
19:19
20:21
31:19, 20
41:21
50:17
76:3
93:7
107:14
122:8
124:5
125:3
126:4
134:10, 16
**roles**
15:10, 12, 18, 20
**room**
66:11
110:17
113:12, 14, 24
114:9, 14, 24
115:4, 11, 15, 16, 24
116:1, 23, 24, 25
117:7, 9, 10, 14
119:3, 4, 7, 14
120:2, 11, 13, 18, 20, 21
128:20
129:20
**rooted**
77:12
141:24
**Ross**
128:11, 12, 17
129:13, 20
**Ross's**
128:20
129:3
**roster**
13:1
**rotate**
33:18
**rough**
21:12
81:23
**roughly**
12:3
37:20
**round**
13:17
**rule**
49:16
**rules**
7:5, 15
9:1
49:11
**run**
17:15
32:24
118:3
147:4
**running**
27:20
139:24
**Russell**
72:23
73:2, 23
74:12
**rusty**
111:2

**< S >**
**sake**
112:19
**sanction**
144:9
145:9
148:22
**sanctions**
142:24
143:7
144:13
145:14
146:12, 18, 20
148:4
**sat**
25:18
**saw**
18:13
26:8
36:12
48:5
83:18
84:3
102:8
**saying**
29:16
34:4
51:14
52:21
53:20
57:10
68:7
75:22
81:8
90:8
92:15
96:8
101:25
110:14
117:10, 17, 22, 25
120:2, 10
121:18
122:9, 11
126:2, 3
132:17
134:23
135:3, 7, 20
136:1
138:7
139:6, 25
**says**
24:12, 15
25:13
38:18
72:8
83:6
108:9
127:15
**scale**
39:24
56:15
**scales**
40:5
**scenario**
102:21, 24
107:16
138:21
145:25
**scenarios**
95:24
**schedule**
12:15
**scheduled**
41:8
**schedules**
12:18
46:21

**SCHNETZLER**
2:16
6:22, 23
7:19
27:16, 20 37:4
60:8, 12, 22 62:2, 25 64:1,

23
66:14
77:5
78:1
101:6
105:6
112:21
115:5
141:4, 6, 8
147:21
150:2, 5
**school**
16:25
17:6, 10
99:23
**scope**
17:3
126:4
**scratch**
80:21
**Screenshot**
5:15, 16
**scroll**
23:10
65:20
66:1
**second**
11:2
17:9
23:2
31:4
48:5
75:4
113:4
114:11
124:11
134:14
**section**
65:21
**see**
19:4
21:4
23:7, 17
24:13, 21, 22
25:5, 14
38:8, 24
39:6
48:3, 9, 12, 13, 16 49:3
56:13
59:11
63:21
65:18, 23, 24, 25
66:17
74:23
85:5
93:25
108:18
109:6
111:21
112:2
113:15
127:9, 13, 14, 18
128:13
130:2
134:11
139:25
140:2, 3, 10 146:9
**seeing**
17:18, 21 19:3, 5, 11, 12
26:3
109:18
115:13
120:5
129:14
**seeking**
16:17
**seen**
19:8
73:10, 18
97:22
145:22
**selected**
40:18, 20 42:4
**semblance**
59:17
**semester**
33:16
**send**
75:8
**Senior**
11:12
**sense**
10:9, 15
36:14
51:21
86:20
98:20
107:9, 10
141:10, 13
142:9, 15 144:6
**sensitive**
18:10
21:3
**sensitivity** 61:2
**sent**
47:15
**sentence**
127:14, 23
**sentiment**
94:4
**separate**
25:18, 19 59:1
**separated**
21:2
**Sept**
5:18
**Series**
5:16
9:18
85:18
87:18
**serious**
63:2
**serve**
11:12
15:10, 12, 19, 22
43:10
46:3
**served**
30:13
32:2, 9
43:8
66:22
95:19
**serving**
13:14
15:2, 9
31:20
41:23
121:15
**sessions**
87:20
**set**
50:4
87:1
151:5
**setting**
107:4
**Sewell**
1:19
6:6
151:3, 17
**sex**
64:21
94:20
147:10, 14, 24
148:3, 7, 11
**sexism**
77:13
**sexual**
20:20
37:12, 18
72:22
75:21
76:11
90:6, 12
91:6, 10, 14
94:19, 20
96:11, 12
97:15
98:2, 9, 11, 18
99:1
100:24
101:17
135:21
144:18
148:25

**sexually** 37:16 102:13
**shaking** 10:13
**Shapiro** 128:21, 23 129:13
**Shapiro's** 129:8
**share** 20:11 30:19 38:3 44:5 47:17 75:21 93:19 127:1
**shareable** 44:6
**shared** 20:10 74:11 127:16
**sharing** 28:19 74:15 75:19 127:5
**Sharman** 32:18 45:19
**shed** 73:10
**shook** 75:6
**short** 41:3 78:9 99:14
**shortly** 21:17
**show** 48:11 57:21 59:24
**showed** 82:22 98:2
**showing** 38:5
**Shushok** 26:19
**sic** 6:4, 15 38:7
**side** 56:14 76:19 79:24 132:12 150:11
**signature** 153:1
**similar** 89:25 97:8 110:5 146:4
**Simmons** 72:23 73:2, 23 74:13
**simplistically** 149:4
**simply** 76:14
**simultaneous** 29:14 90:2 112:20
**singular** 43:15 71:8
**sips** 111:19, 24
**sit** 35:25
**sitting** 108:3
**situation** 54:17 55:19 71:9 92:17 104:5 120:16 133:16 137:18 144:17
**situations** 56:25 59:15 78:19 90:11 96:16 99:16 100:14, 22 102:9, 11 107:21
**six** 32:6, 12, 15
**skinned** 63:14
**slightly** 129:2
**slippery** 123:2
**slogan** 83:14, 24
**slope** 123:2
**sloppy** 16:21 124:4
**slow** 27:21
**small** 89:17
**snippets** 143:9
**social** 68:24 69:5, 17, 20, 24 84:3 89:18 142:3, 4
**socially** 79:19 80:12 84:3
**society** 58:3, 5, 7, 23, 24 63:3 64:11 89:25 90:4
**sole** 71:4 104:9, 23
**solely** 106:10
**solutions** 26:7
**somebody** 68:13
**somewhat** 10:19 17:1
**Sooooo** 72:8
**Sorry** 27:17, 18 31:23 48:4 60:10, 12, 21 66:15 67:10 71:19 80:7 109:7 127:10 131:9 141:6, 7 142:19 147:20
**sort** 33:5 40:23 49:17 60:6 71:11 73:14 82:1 144:6, 18
**sound** 99:12 121:24 140:23
**sounds** 77:1 102:4
**source** 57:25
**Southwest** 2:14

**space** 15:24 16:1 84:5 89:10 94:12 144:17 148:10, 18
**spaces** 56:21 58:13 59:18 61:16 63:13, 17 70:21 84:12 85:3 86:10, 19 96:20 146:7
**speak** 100:21 106:18 125:25
**speaking** 12:3 59:25
**specific** 33:17 43:19 67:16 73:19 97:8 103:22 105:18 106:24 108:4 130:4
**specifically** 13:4 14:22 50:2 54:24 55:2 62:15 67:3 70:21, 23 83:12 89:24 91:5, 6 95:2, 5 113:9 140:14 141:19 143:24 148:15
**specifics** 40:14
**specified** 11:25 46:18 152:9
**specify** 61:12
**spectrum** 64:8
**speculate** 35:12 37:22 42:8 97:20 121:7 137:10
**speculation** 35:9
**speculative** 107:13
**speech** 29:14 90:2 112:20
**spell** 7:21, 24
**spend** 89:5
**spoke** 13:10, 12 54:18 129:24
**sponsored** 38:21
**staff** 40:22 43:3
**staffed** 32:5, 12
**Standard** 6:5 31:15 36:14, 15 43:18 44:21 50:7, 20 51:2 78:6 89:15 124:6, 22 125:2, 19 134:25 135:13 147:17 150:16
**standards** 50:4
**standpoint** 17:19 84:10 92:9, 18 96:24 97:16 101:21 144:22 148:25
**START** 1:16 10:24 13:8 28:6 29:19 44:6 90:8, 18 108:17 123:3 125:23 144:23
**started** 9:2 32:17 53:18 93:10
**starting** 6:18 73:1 99:25
**starts** 10:21 108:12
**STATE** 1:8 6:12 7:21 66:13
**stated** 107:22 113:10
**statement** 50:11 51:7, 11 53:22 105:10 107:25 115:2, 3 116:22 132:18 133:24 136:14 138:23 139:2, 16
**statements** 49:24 53:5 92:25 104:4 106:9, 23 113:7, 8 114:5, 8 131:17 132:25 133:9, 10 135:15
**STATES** 1:1 6:13 88:5 89:25 90:4
**staticky** 81:25
**stating** 6:17
**statistic** 91:8, 25 92:2
**statistically** 90:14 91:2, 21

**statistics** 91:*4*
**status** 135:*23*
**stenographic** 7:*9*
**stereotype** 36:*6*, *8*
**stereotypically** 36:*13*
**stipulate** 7:*17*
**stop** 66:*21* 140:*23*
**stories** 74:*9* 75:*19* 123:*11*
**story** 51:*19* 73:*14* 74:*16* 109:*23* 120:*1* 123:*13*, *15* 128:*1*, *4* 135:*19*
**straight** 140:*20* 142:*6*, *12*
**straightforward** 107:*12*
**Strategic** 24:*19* 25:*12*, *16* 26:*22* 27:*1*
**Street** 2:*4*
**strengths** 22:*17*
**strike** 142:*20*
**structural** 63:*3* 141:*11*
**structure** 27:*14* 28:*2*, *12* 61:*20* 62:*16* 64:*5*, *13*, *17* 85:*22* 86:*17* 136:*22*
**structures** 86:*14* 88:*1*
**struggle** 95:*7*, *11*, *13*, *16*, *21* 96:*9* 97:*11*, *12*, *14*, *16*, *18* 98:*25* 102:*16*
**Student** 5:*6*, *12* 11:*15*, *21*, *22* 14:*23* 15:*2*, *6*, *11*, *13*, *18* 16:*19*, *24* 17:*5*, *7*, *10*, *16* 18:*1*, *10* 19:*5*, *10*, *20*, *25* 22:*4*, *5*, *21*, *24* 24:*16*, *17* 25:*7*, *10*, *24*, *25* 26:*4*, *11* 27:*15* 28:*3*, *12*, *14*, *21*, *23* 29:*12*, *13*, *16*, *20*, *25* 30:*3*, *4*, *23* 31:*22* 32:*1*, *24*, *25* 39:*8*, *13* 42:*12* 43:*1* 50:*4* 51:*2* 53:*11* 78:*20* 80:*16* 91:*17*, *18* 92:*1*, *9*, *12*, *15* 93:*3*, *7* 97:*22* 99:*19* 102:*13*, *14*, *23* 103:*4*, *17*, *18* 104:*6* 105:*1*, *3* 106:*5* 107:*17* 123:*5* 128:*11*, *20* 135:*23* 137:*1* 145:*22* 146:*1*, *21*, *22* 147:*1*, *5*, *10*
**students** 17:*19* 18:*1* 19:*10*, *14* 39:*14* 93:*16* 94:*23* 101:*22* 118:*4*, *6*, *9*, *10* 136:*3* 145:*1*, *13* 147:*3*, *5*, *7*
**student's** 104:*12*, *13* 107:*7* 147:*14*
**Studies** 38:*21* 39:*1*, *3*, *6*, *19*, *21* 40:*3*
**stuff** 10:*14*
**submitted** 47:*11*, *14*
**subsides** 62:*13*
**Success** 54:*19* 70:*12*
**suffered** 121:*5*
**Suite** 2:*5* 3:*5* 6:*7*
**super** 17:*1* 37:*2*
**support** 19:*11* 26:*10* 75:*8* 76:*15*
**supporting** 106:*23*
**suppose** 87:*4* 98:*8*
**supposed** 92:*8* 99:*11*
**Sure** 12:*6* 14:*8*, *14* 15:*24* 16:*3*, *5* 20:*8*, *17*, *23* 30:*9*, *24* 31:*5*, *25* 33:*9* 39:*20* 40:*4*

41:7 44:7, 11 46:22, 24 47:6, 13 48:11 49:15 52:13 54:7, 10 55:9, 22 65:4 67:11, 12 71:13 76:4 77:20 78:5, 23 81:19 82:2 83:17 85:8 96:8 101:9, 12, 16 106:1, 25 109:8 114:6, 21 119:9 120:13 121:17 124:12 127:3 131:9, 12 144:3 147:2, 14 149:18
**surrounding** 115:10
**surveys** 18:17
**suspension** 146:22
**sustained** 125:4 134:12
**swear** 8:5
**Swift** 113:13
**swipe** 115:25 116:4, 6, 7, 10 117:8 119:16 120:5
**swiped** 117:8
**swipes** 116:13, 15 117:5 120:17
**swiping** 117:15
**sworn** 8:11 152:4, 15 153:1
**symbol** 69:14
**system** 58:25 59:8 61:21, 25 64:22 78:10 79:17 81:22 86:17 116:6, 7 123:8
**systems** 80:10

**< T >**
**table** 65:21 66:9
**tagline** 83:24
**take** 6:8 10:4 21:8 31:2, 5 45:4 50:9 53:3 56:14 65:3 98:2 124:10 147:10, 14, 24 148:2
**taken** 6:11 7:3 67:9, 13, 14 73:2 128:17 136:7 142:10 151:4
**takes** 56:11 78:13 81:10
**talk** 26:2, 6, 7 40:8 56:1 71:18 87:20 116:4
**talked** 56:1 60:4
**talking** 10:21 27:4 31:18 54:24 55:3 62:9 68:4 70:13, 24 72:25 74:8 75:16 80:5, 10 81:12 89:24 96:10, 23 103:21 115:7 141:21
**tangible** 59:25
**TaSawn** 70:1
**taught** 144:3
**teaching** 96:16
**team** 39:3, 22 43:15 50:21 144:14, 25
**Tech** 3:6 6:23 7:1 11:22 12:7 13:11 14:17 15:3, 10 16:11, 14 21:8, 20 24:13 25:3 27:4, 13 30:17 31:19 33:2 41:15, 23 43:9 58:25 59:3, 7, 8 64:22 67:1 116:6
**technically** 25:13 80:11
**tell** 53:14 68:1, 17 138:17
**telling** 51:19 92:5 136:3
**tend** 80:12 95:12,

16
142:14
**tended**
36:5
98:6
**tendency**
89:2, 22
**tending**
141:20
**tends**
91:12
**Tennessee**
11:5, 11, 14, 19, 20
**term**
39:24
61:7, 9, 24, 25
62:7
84:20, 21
138:19
141:15, 23
**terms**
14:8
16:4
18:15
27:1
29:25
33:10
35:11, 12, 15
36:25
37:23
39:7
51:10, 20
55:12
56:18
62:9
71:7
79:16
80:11
88:7
94:1
100:17
106:22
109:23
117:17
126:6, 11
128:15
133:24
136:19
137:16
138:21
139:23
142:4
145:4
146:12
147:16
**testified**
8:12
137:3
139:9
**testify**
9:14
152:4
**testifying**
9:10
130:9
137:5
**testimony**
7:11, 12
8:5
126:23, 24
127:21
129:4, 8
152:5, 9
**text**
117:4
**Thank**
7:2
8:3, 13, 16 11:2
25:20
31:11, 16 40:7
48:20
63:20
65:13
66:5, 19
82:17, 19
85:13
103:1
124:18, 21, 24
127:7
131:7
140:5
142:22
149:19, 22
150:7, 12
**Thanks**
48:12
**that'd**
49:18
**theoretically** 64:2
**theory**
63:10
**thereof**
151:11
**thesis**
143:13
**thing**
10:2
74:20
117:18
118:5
131:10
134:23
**things**
20:2, 9
30:11
39:13
43:19, 24, 25
44:1, 12
46:22, 23
49:19
53:3
54:15
55:13, 19
56:12, 20
57:14, 15, 21
58:8, 10, 12
59:23
61:3
62:11
66:22
77:15
78:14
79:3
86:21, 22, 25
87:21
88:7, 13
89:3
91:16
94:6
95:14
97:4
99:19, 24
100:8, 11
110:3
111:2, 3
116:20
118:16
133:25
135:15
140:2
141:12, 17
143:16
144:2, 12
**think**
14:21
19:7, 18
22:16
23:9
25:14, 15
26:20
31:3
32:5
33:15
34:9
40:1, 17
41:5
50:2, 6
52:1
53:8
55:16, 17, 18
56:3, 8, 9, 10, 13, 16, 20
57:5
58:1, 2, 6, 18, 19, 20 59:3, 15
60:20, 24
61:10, 13 62:4,

5 63:3, 4 64:3, 7 65:20 67:18 68:11 71:14, 21 74:5, 6, 8, 14 75:15, 18 76:1, 9, 18, 20 77:9 78:3, 4, 8 79:1, 5, 8, 9, 10 81:7, 8, 9, 10, 15, 21 82:4, 8 83:16, 19 86:22 87:7, 13, 16 88:1, 7, 8, 10, 19 89:1, 2 90:4, 7, 10, 20, 21, 24 91:2, 5, 16 92:4, 14, 17 93:20 94:22, 25 95:9, 10, 11, 15 97:21 98:21 99:7, 8, 9, 14, 17, 18, 21 100:4, 5, 10, 12, 13, 17, 18, 21 102:3 103:12 104:20 105:17 106:8, 16 107:11, 13, 14, 16 108:4 109:14, 15, 24 110:9 112:13 114:18, 21 115:8 116:17, 24 117:13, 16 119:10, 17, 18, 22, 25 120:3 121:6 122:14 123:2 125:1, 2, 3, 25 126:15 127:22 129:15, 16 130:7, 13 131:20 132:2, 8 133:13, 22 134:25 135:1, 2 137:9, 18 138:18, 20 139:11 140:7 142:1, 21 143:1 144:12, 14, 15, 20 146:24 147:4, 24 148:8, 19

**thinking**
36:10 51:3 63:9 79:16 130:16 144:14 145:5 146:16 148:15

**thinks**
42:9

**third**
65:20 66:10

**thought**
42:9 83:22 87:23 106:16 127:6, 12 139:19 148:8 149:10

**thoughts**
46:23 141:21

**three**
11:9 14:11, 12, 15 37:24, 25 38:1 43:16 137:13

**threshold**
92:12 123:5

**TIME**
1:16, 17 6:4, 5 9:21 10:7 13:10, 12, 14 15:21 17:2 21:13 22:5, 18 25:24 28:17, 23 29:11 31:15 32:5, 8, 19 34:13 38:15 40:16 41:4, 9, 18 44:15 46:18 47:10, 25 48:9, 16, 18 49:6 51:21 64:12, 17 65:5 66:16, 22 67:16, 25 69:16 70:20 72:20, 23 73:16 78:13 79:19 83:14, 21 88:20 89:5 94:22, 24 95:18 96:18 99:21 100:13 103:13 104:6 106:19 110:7 111:7 112:2, 4, 5 114:18 116:6 117:12 119:19 124:13 128:20 130:8

133:13 140:21 142:19 143:9, 22 144:12 150:16 151:5 152:9
**timeline** 51:17 110:19 136:16
**times** 16:5 100:2 111:20 116:2 117:9
**Title** 5:8 11:15 14:2, 18, 21 15:7 17:14 19:19, 23 20:6, 19 21:2, 8 27:15 28:4, 17 29:17, 19, 20 30:11, 14, 16, 23 33:2, 16, 19, 21, 24 34:11 38:1 40:17, 25 41:10, 13, 15, 18, 19 43:14 44:16 46:1 49:11 50:3, 5 51:1 53:2, 11 68:11, 14 91:19 92:6 102:9, 12 103:11 106:12 118:6 121:15
**titled** 30:24 65:22
**today** 8:6 9:7 35:25 108:3
**Today's** 6:3
**told** 53:25 80:25 118:25 120:14 121:7 126:18 129:20
**topic** 89:5 103:7 139:18
**topics** 140:6
**total** 111:13
**totality** 125:14
**track** 116:12
**trained** 20:5, 7 53:24
**training** 20:6, 12 21:8, 10, 16
**transcript** 151:8 152:8
**transcripts** 150:10
**trial** 73:15
**trick** 34:3, 4
**tricky** 71:20
**tried** 18:8 33:18 51:1 53:10 101:22
**true** 53:13 79:8 122:9, 12, 15 123:3 125:8 129:12 130:24 134:17, 24 135:4, 16 151:7 152:8 153:1
**Truly** 111:15
**truth** 8:7 52:22 92:5 98:5 134:11, 14, 21 136:1, 2 138:17 152:4
**truthful** 9:23 117:21 123:21
**truthfully** 9:15
**try** 56:5, 17 79:21 98:23 101:12 125:25 126:1, 15 135:5, 9 137:10 146:20
**trying** 19:4, 7 42:7 53:12 57:1, 3, 21 59:12 61:23 63:2 70:11 77:14 78:4 79:25 87:21 89:9 93:4 96:20 97:11 106:24 107:12 110:6 123:7, 22 126:17 132:10 139:8 144:15
**Tufts** 38:10
**Tully** 13:13 32:18
**turned** 133:19
**Turning** 71:19
**turns** 45:5
**Tweet** 5:14 72:3, 4, 11, 18, 19 74:22, 25 75:1, 4, 7 83:4, 6,

*18, 19*
84:*15, 21*
85:*21*
93:*25*
94:*4, 8, 13, 15*
99:*22*
140:*19*
141:*2, 9*
**tweeted**
77:*21*
94:*5*
**Tweets**
5:*16*
70:*8*
85:*18*
87:*18*
**twice**
42:*22*
46:*20*
67:*4*
**Twitter**
69:*8*
72:*3, 6, 9* 80:*22*
83:*2*
140:*15*
**two**
43:*16*
75:*8*
80:*1*
93:*16*
106:*2*
123:*10*
143:*1*
148:*20*
149:*10*
**two-and-a-half**
11:*8*
**type**
18:*13*
19:*2, 4*
69:*13*
85:*1*
96:*2*
138:*3*
145:*13*
148:*22*
149:*13*
**types**
17:*20*
36:*12*
**typical**
36:*11*
43:*12*
56:*8*
**typically**
17:*21*
36:*6*
40:*22*
55:*21*
84:*6*
86:*7, 21*
**typo**
25:*15*

**< U >**
**uh-huh**
10:*14*

**unattended**
86:*1*
**uncertainty** 60:*25*
**unclear**
45:*2*
111:*7*
115:*9*
131:*22*
138:*3*
139:*1*
**unconscious** 55:*18*

**Undefining**
143:*4*
145:*16*
148:*4*
**undergraduate**
93:*16*
96:*19*

**underlying**
54:*14*
**undermine**
108:*23*
**underrepresented**
85:*4*

**understand**
18:*24*
20:*18*
21:*25*
22:*6*
28:*6*
41:*9*
49:*16*
52:*13*
57:*2*
59:*10*
61:*23*
62:*10*
72:*13*
84:*15, 22, 24*
91:*21*
94:*10, 13*
95:*25*
96:*3, 5, 9* 97:*2, 11, 24*
98:*19, 21, 25*
99:*6, 10*
100:*1, 5, 19*
119:*2*
123:*22*
124:*2*
132:*21*
134:*3*
141:*2, 5*
146:*2*
**understanding**
14:*25*
15:*5*
19:*2*
27:*14*
28:*2, 8*
29:*15*
30:*15*
41:*11*
49:*10, 23*
66:*12*
87:*5*
89:*4*
93:*15*
95:*3*
98:*3, 16*
99:*18*
100:*17*
101:*14, 15*
109:*12*
114:*20*
116:*5*
117:*21*
119:*20*
121:*17*
126:*7, 10, 14, 16*
135:*11*
137:*20*
143:*12, 14* 149:*5*

**understood**
41:*17*
43:*24*
44:*1*
51:*4*
84:*3, 20*
85:*11*
94:*15*
112:*25*
117:*24*
118:*20*
120:*9*
121:*14*
122:*2*
133:*8*
141:*9*
**undetermined**
111:*18*
**UNITED**
1:*1*
6:*13*
88:*5*
89:*25*
90:*4*
**universities** 39:*6, 13* 40:*2*

**UNIVERSITY**
1:*8*
3:*3*
6:*12, 25*
11:*4, 10, 14, 18,*

20 26:1 38:10, 22 58:25 66:13 145:6 147:8
**unknown** 111:19
**unlearn** 78:13 85:25 87:10 88:21, 25 89:9
**unlearning** 87:20 144:11
**unpack** 56:10 144:2
**unpacked** 64:18
**unpacking** 143:16, 19
**unquote** 63:10
**unsure** 73:24 77:19 132:7, 9 139:14
**unwavering** 75:8
**Uploaded** 5:11
**use** 39:16 59:16, 18 61:9 62:3 63:10 86:15 99:13 122:14 124:5 125:18 128:5 144:3 146:25
**username** 72:9
**usually** 32:8 36:13 41:1 44:24 51:1 63:8 94:5 96:1, 6 106:22 107:20 146:19

**< V >**
**vacant** 41:3
**vaguely** 143:1
**valid** 132:10
**validated** 76:7
**validating** 76:5
**validations** 77:14
**various** 58:21
**vein** 84:24
**verbally** 81:1
**verified** 116:1
**verify** 52:4, 22 104:5 127:4 128:5
**verifying** 117:5, 8
**versed** 116:7
**version** 142:12 143:20
**versions** 52:14
**versus** 6:11 44:1 61:22 75:24 79:25 83:16 89:17, 20 123:13, 21 132:13 135:19
**vice** 2:9 25:23
**victim** 37:12
**victimized** 91:3 101:18
**victims** 72:22 73:6 135:24
**video** 95:1
**VIDEOTAPED** 1:11
**view** 52:16 62:24 80:2, 15 87:3 116:15 146:16 147:5
**viewed** 134:8
**views** 48:15 66:20
**violated** 101:3 122:12
**violation** 29:24
**violence** 72:23 75:21, 22 76:11 79:6 90:12, 15 91:6, 10, 15 135:21, 24 144:18 148:25
**VIRGINIA** 1:2, 7 2:6, 15 3:6, 8 6:12, 14, 23 7:1 11:22 12:7 13:11 14:17 15:3, 10 16:11, 14 21:8, 20 24:13 25:3 27:4, 13 30:16 31:19 33:2 41:15, 23 43:9 58:25 59:3, 7, 8 64:22 66:25 116:6
**visible** 84:6
**voice** 56:18
**Volume** 5:12
**voter** 39:8, 14
**VPSA** 26:17
**VT** 24:17, 25 25:7, 10

**< W >**

**want**
9:*1*, *18*
13:*16*
14:*5*
20:*17*
21:*15*
24:*10*
31:*5*, *6*
32:*20*
34:*16*
35:*11*
37:*22*
40:*8*
44:*2*
48:*11*
52:*13*
55:*1*
65:*4*, *15*
68:*12*
74:*2*
78:*18*
81:*14*, *18*
83:*11*
85:*1*, *20*
92:*22*
96:*8*
97:*20*
98:*4*
100:*7*, *19*
118:*2*, *23*
121:*17*
122:*14*
124:*12*, *13*
130:*11*
135:*19*
139:*4*
149:*15*

**wanted**
16:*20*
28:*21*
43:*23*
44:*9*, *11*
49:*3*
85:*8*
128:*5*
131:*9*
149:*3*

**wanting**
20:*15*
102:*3*

**watch**
72:*14*

**watched**
73:*7*

**watching**
72:*13*
74:*5*

**water**
31:*3*

**way**
14:*19*
40:*21*
41:*25*
47:*7*
49:*22*
51:*18*
52:*10*
54:*1*
58:*9*
62:*4*
74:*7*
76:*13*
77:*3*, *15*
83:*17*
87:*5*, *7*, *12*, *14*, *25*
89:*15*
93:*10*, *12*
102:*18*
105:*2*
107:*12*
109:*12*, *18*
113:*25*
114:*23*
125:*22*
133:*3*
134:*7*
135:*18*
136:*6*
143:*20*
144:*19*
146:*4*, *8*
151:*11*

**ways**
27:*4*
57:*20*
59:*23*
76:*16*
85:*25*
87:*11*
88:*22*, *24* 91:*23*

**weekly**
40:*22*

**weird**
25:*14*

**well**
13:*7*, *8*, *20*
17:*20*
21:*23*
25:*8*
29:*19*
31:*1*
32:*10*
37:*10*
38:*3*
53:*6*
54:*1*
55:*6*, *25*
57:*20*
59:*11*
61:*2*
64:*7*, *14*
69:*23*, *24*
72:*15*
73:*9*, *22*
75:*9*
79:*12*
80:*21*
83:*14*, *17*
86:*18*
87:*1*
89:*10*
91:*1*
99:*24*
101:*4*
102:*11*
105:*1*
109:*25*
112:*7*
116:*7*
119:*2*
121:*10*, *14*
129:*23*
130:*19*
131:*24*
134:*16*, *19*, *25*
141:*25*
142:*20*
148:*23*

**went**
13:*17*
27:*10*
28:*18*
121:*11*
145:*2*

**we're**
8:*15*
19:*4*
31:*12*, *15* 57:*6*
62:*9*
65:*12*
68:*4*
69:*12*, *13*
71:*21*
78:*11*
80:*5*
81:*11*, *15*
82:*18*
86:*11*
87:*21*
89:*23*, *24* 92:*8*
107:*24*
110:*8*
115:*7*
117:*12*
121:*18*
124:*22*
126:*20*
130:*16*
135:*7*, *12*, *13*
138:*6*
144:*4*, *5*
147:*2*
149:*23*
150:*17*

**WESTERN**
1:*2*
6:*14*

**we've** 66:20 144:2
**whining** 140:23
**whiskey** 111:16, 18, 19, 24
**White** 54:19 61:1, 14, 15, 20 62:1, 15, 18, 19, 23 63:11, 21 70:12 140:21, 23 142:18 146:5
**Whiteness** 61:1, 8, 9, 15, 21, 24 62:8, 14, 15, 18, 24 63:5, 7, 11, 15, 21, 23, 25 64:3, 4, 11, 13, 22 66:21 141:12, 14 142:16 146:6
**Whitesell** 32:19 67:25 68:1, 10, 17, 24 69:3
**wise** 51:13
**WITNESS** 1:14 8:11 27:25 37:6 49:24 50:10 51:6, 22 52:14 53:5, 8, 22 60:10, 13, 21, 24 62:3 63:1 64:2, 24 65:18 66:15 77:6 78:3 80:7 92:24 101:8 104:4 105:9 106:23 112:24 115:6 123:12 128:22, 23 130:9 132:25 133:24 135:15 137:24 139:2 140:10 141:5, 7, 9 147:20, 23 150:13
**witnesses** 49:24 50:7, 19, 24 51:14 52:4, 12, 20 104:3 110:5 123:25 127:15 128:3 136:16 137:25
**woke** 120:20
**woman** 79:8 89:16 102:21, 23 135:20
**woman's** 78:21
**women** 54:6 57:14 59:22 72:15, 22 73:5, 23 74:4, 10 75:20 76:6, 13 77:14, 18 79:23 80:13, 23 81:2, 6 84:4, 5, 12 85:4 86:22, 23 89:3, 10, 14, 19 90:5, 10, 15 91:2, 9, 13 95:12, 21, 25 96:8, 10, 24 97:8 98:15, 24 99:1, 9, 15 100:4, 10, 19, 20 101:3, 16, 17, 25 144:21 145:22 146:1, 6 148:21
**women's** 73:22 83:23
**word** 39:16 44:5 91:3 96:5 99:13 110:6 122:15
**words** 72:12
**work** 12:15 20:16 28:9 55:24 56:9, 17 59:12, 14 97:22 143:23
**worked** 11:20 12:7 15:17 21:20 32:3 116:6
**working** 11:18 19:9 31:25 32:21 33:1 44:22 70:19 77:2
**works** 31:7 116:8 124:14
**world** 55:13 57:9 58:10 86:17 87:22 88:2 145:6 146:6

**worries**
48:*7*
**Wow**
72:*4, 11, 12*
**wrap**
140:*6*
**write**
44:*19*
45:*1*
66:*4*
**writing**
44:*23*
45:*5*
75:*20*
86:*8*
137:*12*
**written**
44:*17*
45:*21*
80:*22*
114:*2*
141:*18*
**wrong**
90:*20*
**wrote**
45:*13*
66:*2, 17*
127:*23*

**< X >**
**XVI** 5:*12*

**< Y >**
**yeah**
22:*19*
31:*5*
35:*15*
37:*7*
47:*6, 17*
49:*15*
51:*22*
60:*12*
65:*4*
81:*3, 25*
98:*23*
100:*25*
105:*19*
106:*25*
107:*2*
109:*10*
112:*13*
114:*21*
116:*4*
121:*13*
124:*4*
127:*3*
129:*1*
130:*7, 13, 19*
150:*11*
**year**
11:*24*
12:*1*
17:*9*
**years**
11:*9*
57:*16*
71:*15*
73:*18*
78:*13*
89:*10*
91:*9*
111:*2*
137:*11*
**yes/no**
10:*12*
**York** 6:*8*
**young**
148:*9*