UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

MASON ORTEGEL,

    Plaintiff,

v.

VIRGINIA POLYTECHNIC
INSTITUTE AND STATE
UNIVERSITY, et al.,

    Defendants.

Case No. 7:22-cv-00510-EKD

## PLAINTIFF'S OPPOSITION TO DEFENDANTS VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY'S AND DASHAWN DILWORTH'S <u>MOTION FOR SUMMARY JUDGMENT</u>

Mr. Ortegel will show at trial that Defendant Dilworth harbors a bias on the basis of sex, based at least in part on his statements: he has written publicly, "[I'm] doing my part to hold men other men [sic] accountable," "[It's] quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space" among other statements. Mr. Ortegel will also show that the University knowingly appointed him as hearing officer anyway, that his co-hearing panelist also knew of these statements and did not object to Dilworth's appointment, and further that Mr. Ortegel was found responsible despite inconsistencies in his female accuser's statement. Worse still, he will prove that Defendant Dilworth chose to assign the book *Man Enough: Undefining My Masculinity*, as a sanction (which of course went unchallenged and even endorsed by the other members of the hearing panel), credibly

1

showing that the panel believed that Mr. Ortegel's *masculinity* was somehow at fault. These facts and others could lead a reasonable jury to find in Mr. Ortegel's favor on his sex discrimination claims (and the unchallenged due process claim), and therefore this Court must deny Defendants' motion.[1]

### STATEMENT OF DISPUTED MATERIAL FACTS

While many key facts are disputed, the background of this case is not disputed. It is undisputed that Mason Ortegel ("Mr. Ortegel") matriculated to Virginia Polytechnic Institute and State University ("Virginia Tech" or "University") in Fall 2020. He was eagerly awaiting the opportunity to formally serve his country in the armed forces after graduation. During his time in the Virginia Tech Corps of Cadets and the United States Army's Reserve Officers' Training Corps ("ROTC") program, he met a female student, "Jane Roe." On August 21, 2021, Mr. Ortegel consumed a significant amount of alcohol during a social gathering. He became intoxicated, eventually to the point of incapacitation.

The disputed facts begin with the University's treatment of the Title IX complaint that followed. As an initial matter, Defendants contend that "once a formal complaint was referred to the Office of Student Conduct, it was ultimately the Director of Student Conduct's responsibility to oversee the adjudication process." ECF No. 48, citing Def. Ex. 4, 18:7–16. But Defendant Polidoro stated that adjudication of

---

[1] Defendants have again failed to raise qualified immunity. Any qualified immunity arguments are waived and may no longer be considered at summary judgment. *M.B. v. Fairfax Cnty. Sch. Bd.*, 660 F. Supp. 3d 508, 526 (E.D. Va. 2023) ("This argument must be rejected at the outset because it is well-established that an argument raised for the first time in a reply brief is waived and will not be considered"), *citing United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006).

cases would be under both the Title IX policy and the student code of conduct, as well as the federal Title IX regulations. As the Title IX Coordinator, Polidoro shared the regulatory responsibility of ensuring that the hearings comply with regulations enforcing Title IX along with the Director of Student Conduct. Def. Ex. 3, 27:10-23; Def. Ex. 4, 18:17-23. It is undisputed that the Director of Student Conduct, Mr. Whitesell, appointed the hearing officers in Mr. Ortegel's case. All hearing officers were at least nomically trained that they could not harbor biases, including those on the basis of sex. Def. Ex. 3, 38:20–39:11, 40:6–14.

On August 21, 2021, Mr. Ortegel, a student at the University, was at an off campus gathering and consumed alcohol to the point that he was incapacitated. Def. Ex.5. When Mr. Ortegel and Jane Roe were socializing that night, he told Roe that he was not "sloshed" and that he was "just really tired and . . . going to bed." Def. Ex. 5. He told Jane Roe this because he became nervous about telling other people he was drinking underage. Pls. Ex. A. Prior to making these statements, Mr. Ortegel explicitly told Jane Roe that "No, I am actually pretty sloshed right now." Jane Roe responded immediately, saying, "I'm a tiny bit sloshed but I'm alive." *Id.* Mr. Ortegel later returned to his dorm room after drinking more, and he blacked out from alcohol intake. Def. Ex. 5.

Jane Roe and Mr. Ortegel seemingly interacted in some form after Mr. Ortegel blacked out. Jane Roe reported varying stories about that interaction to several different individuals, including resident advisors. Def. Ex. 6. For example, multiple

3

witnesses, including students S.S. and O.A.,[2] reported that Roe's initial statements to them differed materially from her later official Title IX account. For example, Roe originally told S.S. and O.A. that she had not been drinking, despite contemporaneous text messages from her to Mr. Ortegel stating she was "a little bit sloshed." O.A. further relayed that Roe initially claimed Mr. Ortegel "attempted to kiss her but did not actually do it," which is in direct conflict with her later Title IX statement alleging a forcible kiss and repeated physical contact as she tried to "pull [him] off." *Compare* Pl. Ex. A - E.

Roe's narrative about how and why she entered Mr. Ortegel's room is also inconsistent. She alternately claimed she was patrolling the halls at the behest of "some girl," then later she said she went to Mr. Ortegel's room because he called to ask where she was. *Id.* She also said that J.R. told her to check on Mr. Ortegel, despite contradictory text evidence and witness statements indicating no one asked her to do so. *Id.* Her description of the encounter itself shifted as well: in some versions, she said Mr. Ortegel pulled her into his room unprovoked and blocked her from leaving; in others, she said she entered to check on him and he grabbed her by the wrist or, in different versions, by the shoulders or throat. *Id.* These details are not only inconsistent with each other but also with her Title IX statement, where she claimed he forcibly kissed her and continued to do so as she tried to pull away—contradicting her earlier statement to O.A. that Mr. Ortegel only "attempted" to kiss her but did not actually do so. *Id.*

---

[2] Initials are used to protect the privacy of the students.

Finally, Roe's narrative of leaving the room also varies depending on to whom she was speaking. *Id.* She claims Mr. Ortegel blocked the door to prevent her exit but also noises in the hallway allowed here to escape. *Id.* Even the details of how she left the building are unclear, as she could not recall whether she took the elevator or stairs, and her card swipe logs do not align with her stated movements that night. Def. Ex. 20. Witnesses, including S.S., O.A., C.C., and B.A., all noted discrepancies in Roe's stories as she recounted them to different people, with each version changing key details about who prompted her to visit, how she entered the room, the nature of the contact, and how she ultimately left. *Compare* Pls. Ex. A-E.

Jane Roe subsequently filed a Title IX complaint against Mr. Ortegel alleging that he sexually assaulted her, which was accepted by Defendant Polidoro. Defendant Polidoro then appointed Daniel Hardy as investigator, who them interviewed Jane Roe. Def. Ex. 6.

Mr. Hardy also interviewed Mr. Ortegel. According to Mr. Ortegel, Mr. Hardy told Mr. Ortegel that he could not file a formal complaint against Jane Doe, despite Mr. Ortegel telling Mr. Hardy that he believed he was too intoxicated to consent to sexual activity with Jane Roe. Def. Ex. 9, Ortegel Dep., 179:11–180:12, 120:7-121:9. Mr. Hardy denies this occurred. Because Mr. Ortegel was incapacitated, he has no recollection of Jane Roe sexually assaulting him or otherwise engaging in sexual activity with him. Def. Ex. 9, Ortegel Dep., 180:13–17.

After the matter was referred to a hearing by Defendant Polidoro, Mr. Whitesell, the Director of Student Conduct, appointed Defendant Dilworth and

Lindsay Pritchard to serve as the hearing officers for the student conduct hearing. Def. Ex. 4, 31:21–32:2. Prior to the appointment of Defendant Dilworth as a hearing officer in Ortegel's case, another male Virginia Tech student challenged Dilworth's ability to be objective based on social media posts and other statements Dilworth had previously made. Pls. Ex. F-G. These statements included Defendant Dilworth tweeting or retweeting "[I'm] doing my part to hold men other men [sic] accountable," and "[It's] quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space" among other statements. Pls. Ex. G.

Mr. Whitesell testified that did not agree with that student's claim that Dilworth could not be an objective hearing officer. Def. Ex. 4, 27:24–28:17, 33:4–11. Mr. Whitesell, however, appointed a different hearing officer to replace Dilworth in that case, purportedly to encourage confidence in the process. Def. Ex. 13. Despite reviewing Dilworth's social media statements, and removing him from this other student's case, Mr. Whitesell then appointed Dilworth and Lindsay Pritchard Sharman (who had separately reviewed Dilworth's social media statements) to be hearing officers in Mr. Ortegel's case. Pls. Ex. F. Another third hearing officer representing the Corps of Cadets was present at the hearing. Def. Ex. 15; Def. Ex. 16.

Both Dilworth and Pritchard contend that they understood that Mr. Ortegel was presumed to be not responsible for the Code of Conduct violations. Def. Ex. 17, 121:22–122:4; Def. Ex. 18. Defendant Dilworth had the mindset that "everyone should be believed unless you start to find evidence that is offered to the contrary,"

6

and that "it is important for men to believe women in situations where they are claiming or articulating that some form of sexual violence, or even just violence as a whole happens." Def. Ex. 17, 90:10-24. He started by believing Jane Roe instead of starting by presuming Mr. Ortegel not responsible. Def. Ex. 17, 93:8.

Defendant Dilworth testified that he understood that it was important to not let any personal biases affect his decision. Def. Ex. 17, Dilworth Dep., 54:2–4. But he also admits to "actively working against" the notion that "men often believe or take the side of men." Defendant Dilworth believes that "we live in a patriarchal society" and that Virginia Tech is part of this system, and he strives to "work against [it] as much as [he] can." Def. Ex. 17, 58:22-59:13. Dilworth identifies in himself a "male bias"—stating, "I think there's inherently a male bias... I think it's very common to see men often believe or take the side of men either in colloquial conversation or in larger scale issues." Defendant Dilworth further explained, "that's something that I actively acknowledge and I try to work against, so that everyone feels like they have an equal voice in terms of... addressing a problem or a conversation." Therefore, rather than approaching the hearing from a position of neutrality, Dilworth was consciously working to counteract what he perceived as a common bias among men. Def. Ex. 17, 56:8–19.

While Defendant Dilworth claims he has tried to fight against implicit bias "that might be rooted in, like, sexism and prioritizing men's experiences, validations over that of women," his own testimony reveals the persistent influence of such biases. Dilworth stated, "I think just like with anything, I fall short because this is

7

something—as far as going back to our conversation about the system of patriarchy, this is something that we're born into and then it's constantly reinforced throughout all of our developing years. And so it takes a long time to unlearn a lot of those things." He further explained, "My goal is to make sure that her experiences and what she deems to have happened are on equal footing as the—the male in that perspective." Def. Ex. 17, 78:8-79:4.

While Defendant Dilworth wants this Court to believe that he thinks "accountability is genderless at the end of the day" and that his goal is to put both parties "on equal footing," his own deposition testimony reveals that he explicitly focuses on correcting what he perceives as systemic imbalances. Defendant Dilworth stated, "But I think the people that have had the most amount of advantage, there has to be some form of accountability for that as well." … "In terms of thinking about a patriarchal system, if you have a system where one group of people have primarily experienced a large amount of privilege for a long period of time, socially, economically, in whatever facet that you consider it, and then you do your best to try to equivalent that experiences with someone else, whether that be gender non-conforming folks, women. It can feel like it's belief of one side versus the other, but you're trying to balance the power dynamic between the two." Def. Ex. 17, 79:10-80:18.

Defendant Dilworth also believes that "1 in 4 women at some point during their college experience may or will experience some form of sexual violence." He further stated, "If something has happened very commonly, I think … it's perfectly

8

appropriate to believe that someone is telling the truth." When asked whether he started by believing Jane Roe when she came forward in this case, Defendant Dilworth answered, "Yes." Def. Ex. 17, 91:12-93:13.

Unsurprisingly given the above, Mr. Ortegel was found responsible. The Student Conduct sanctions for Ortegel's violation were numerous, including a deferred suspension and an assignment to read *Man Enough: Undefining My Masculinity* by Justin Baldoni with a written reflection on each chapter. Def. Ex. 15. The VTCC hearing officer (part of the same hearing panel) similarly found that Mr. Ortegel violated the VTCC regulations. Def. Ex. 16.

Mr. Ortegel appealed the decisions of the Office of Student Conduct and the VTCC with an eight page single spaced appeal. Def. Ex. 20. His appeal was denied with no analysis of his arguments whatsoever. Def. Ex. 21-22.

## ARGUMENT

### I.  Standard of Review.

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment to a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving the motion, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The nonmoving party—here, Mr. Ortegel—"is entitled to have the credibility of all his evidence presumed." *Id.* And Defendants' burden is an onerous one – "[T]he record could defeat summary judgment even if the evidence

consisted exclusively of so-called 'self-serving' declarations from [the nonmovant] himself." *Harrell v. DeLuca*, 97 F.4th 180, 187 (4th Cir. 2024); *Evans v. Schultz*, No. CV ELH-22-3073, 2024 WL 3568569, at *6 (D. Md. July 29, 2024) ("Testimony that is based on personal knowledge or firsthand experience can constitute evidence of disputed material facts, even if it is uncorroborated and self-serving"). Summary judgment must be denied if "a reasonable jury could return a verdict for the nonmoving party." *Hixson v. Moran*, 1 F.4th 297 (4th Cir. 2021).

Finally, "when the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment," as "the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979).

## II.    Mr. Ortegel's Title IX and Equal Protection Claims Turn on Credibility of Witnesses, a Genuine Dispute of Material Fact.

In order to prevail at summary judgment Defendants must show, as to Mr. Ortegel's Title IX claim, that no reasonable jury could find that sex was "a but for cause" of the discipline. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 (W.D. Va. Aug. 11, 2022); *Sheppard*, 993 F.3d at 236. Courts look at the totality of the circumstances. *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 (W.D. Va. Aug. 11, 2022); *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 792 (7th Cir. 2022) ("the ultimate inquiry must consider the totality of the circumstances"). "So long as the plaintiff's sex was one but-for cause of that

decision [to discipline], that is enough to trigger the law." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020); *see Sheppard*, 993 F.3d at 236, *citing Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020) ("a defendant cannot avoid liability just by citing some other factor that contributed to its challenged . . . decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law"); *see also Doe v. Univ. of Denver,* 1 F.4th 822, 831-36 (10th Cir. 2021) (denying summary judgment on Title IX claim where university posited "anti-respondent bias" as a nondiscriminatory reason for its discipline of plaintiff, because whether the university disciplined Doe on the basis of his sex or his status as a respondent is a question of fact for the jury to decide). Finally, the Parties agree that Courts analyze sex-based Equal Protection claims together with Title IX claims. *See Sheppard*, 993 F.3d at 238 (deciding equal protection claim "for largely the same reasons" as Title IX claim); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018) (same).

The only two arguments advanced here by Defendants are that (1) Defendant Dilworth was not biased against men; and (2) even if he was biased against men, there were other purportedly neutral adjudicators that were not biased. Neither of these arguments succeed.

### A. Defendant Dilworth harbored a bias on the basis of sex.

Defendant Dilworth's own social media statements reflect a bias against men on their face. He tweeted or retweeted "[I'm] doing my part to hold men other men [sic] accountable," "[It's] quite interesting how many college aged boys and men seem

11

to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space" among other statements. Pl. Ex. G. He also believes that *all men* struggle with the concept of consent, and he had all of these beliefs at the time he served as hearing officer. Def. Ex. 17, Dilworth Tr. 94:5-95:20. It is well established that gendered "statements by members of the disciplinary tribunal" are sufficient to generate an inference of gender bias. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586 (E.D. Va. 2018).

For example, in *Doe v. Purdue* (following the Seventh Circuit's remand in *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019)), the district court denied Purdue's motion for summary judgment where a university employee involved in John Doe's case (a witness on behalf of the female accuser) shared an article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2022 WL 3279234, at *11 (N.D. Ind. Aug. 11, 2022). The Court held that reasonable jurors could disagree on whether this statement supported an inference of gender bias or whether it reflected a simple statement that men are more often those accused of sexual assault. *Id.* Of course, if reasonable jurors could disagree, summary judgment is inappropriate. *Univ. of Denver,* 1 F.4th at 831-36.

Consider also a summary judgment case in this Circuit; in *Doe v. Washington & Lee Univ.*, Judge Moon denied summary judgment to a university where the investigator "introduced and endorsed the article, *Is It Possible That There Is Something In Between Consensual Sex And Rape ... And That It Happens To Almost Every Girl Out There?" Doe v. Washington & Lee Univ.,* No. 6:14-CV-00052, 2015 WL

12

4647996, at \*10 (W.D. Va. Aug. 5, 2015). Judge Moon explained, "[b]ias on the part of Ms. Kozak is material to the outcome of John Doe's disciplinary hearing due to the considerable influence she appears to have wielded in those proceedings." *Id.*

So too, here. Not only did Defendant Dilworth wield "considerable influence" in Mr. Ortegel's case, *Washington & Lee*, 2015 WL 4647996, at \*10, his statements are far more egregious than those discussed in *Purdue* or *Washington & Lee*, both in number and substance. Instead of merely republishing one article found in mainstream news sources, Defendant Dilworth repeatedly made or reposted gendered statements on his social accounts specifically disparaging men as a class. His twitter repost stating that "[It's] quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space" was buttressed by his admitted beliefs in his deposition that "all men" struggle with the concept of getting consent to sexual activity. Def. Ex. 17, 94:5-95:20. He held these beliefs at the time he served as hearing officer, and of course, he assigned *Man Enough: Undefining My Masculinity* as a hearing sanction. Def. Ex. 17, 144:8-146:2. While Defendant Dilworth had not read the book (only "snippets"), he chose to assign the book to Mr. Ortegel because of his involvement in the Corps of Cadets, a "very heavily masculine space" in Defendant Dilworth's view. *Id.* He would not have assigned this book to a female student respondent because, according to Defendant Dilworth, "women often know how to navigate and understand masculinity a lot more than men do." *Id.* The other two (female) hearing officers agreed with Defendant Dilworth that it was

13

appropriate to assign *Man Enough: Undefining My Masculinity* because "it might be helpful for Mr. Ortegel to have some type of sanction … as far as like processing from a masculinity standpoint." Def. Ex. 17, 148:19-149:14. A reasonable jury could find from all of these many statements, Defendant Dilworth believed that Mr. Ortegel's masculinity was at fault, which is another way of saying that Defendant Dilworth was biased against Mr. Ortegel because he is a man.

Defendants seek to avoid this conclusion through appeals to a legally irrelevant fact – that Defendant Dilworth expressed his bias through a private social media page rather than through a University sponsored vehicle. ECF No. 48, at 16-17. This is a distinction without a difference, since the test is whether Defendant Dilworth was biased in the totality of the circumstances, not whether he expressed that discriminatory animus on public or private channels. *See Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 235-236 (4th Cir. 2021); *see also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) (holding that a student plausibly alleges gender bias by pointing to "statements by university officials evidencing gender bias" and making no distinction as to the forum in which the statements are made).

Moreover, Defendants' cited case has nothing to do with Title IX claims – instead they have to do with a hypothetical public employee's First Amendment retaliation claim. ECF No. 48, at 16, citing *Lindke v. Freed*, 601 U.S. 187, 197 (2024). Whether Defendant Dilworth could have stated a First Amendment claim against the University if he was fired for expressing these opinions is completely beside the point,

14

especially because all that matters to Mr. Ortegel was that Defendant Dilworth was assigned to and heard his case even though it was clear that he was biased. A simple reassignment to other cases not involving students of different sexes would not have functioned as a constructive termination of Defendant Dilworth in any event, applying this Court's reasoning in *Pappas v. James Madison University. Pappas v. James Madison Univ.*, No. 5:22-CV-00028, 2023 WL 2768425, at *14-15 (W.D. Va. Mar. 31, 2023) (even depriving a professor of student assistance necessary for him to secure research grants was not enough to amount to constructive termination). In short, there is no conflict between Defendant Dilworth's First Amendment rights and Mr. Ortegel's rights under Title IX and the Equal Protection Clause.

Finally, Defendants argue that because Defendant Dilworth gave self-serving testimony that he has a bias that favors men, that testimony disposes of any sex discrimination claim. ECF No. 48, at 17. As a matter of civil procedure, while a non-movant may defeat a summary judgment motion through self-serving testimony, a movant's self-serving testimony is not afforded the same weight because all reasonable inferences are drawn in favor of the non-moving party. *See Harrell*, 97 F.4th at 187. So the Court should not take Defendant Dilworth at his word, especially considering the litany of sex-based statements described above that rather plainly impeach his contention. This is especially true given that Defendant Dilworth makes clear that he tries to "counteract" this bias in a way that is specifically designed to benefit women and non-heterosexual men living in a "patriarchy" like the United States and Virginia Tech specifically. Def. Ex. 17, at 56:5-60:3. His purported bias in

favor of men is not credible; instead, it is an excuse for affirmative steps he takes to preference women and non-heterosexual men over heterosexual men, under the guise of leveling the proverbial playing field. A reasonable jury could so conclude, considering all of Defendant Dilworth's statements together.[3]

Further, whether Defendant Dilworth made findings in favor of the male in other cases is not helpful without knowing the details of those cases.[4] Ultimately, the question is whether a reasonable jury could find that Defendant Dilworth was biased against Mr. Ortegel because he is a man, and in light of Defendant Dilworth's own statements a reasonable jury could conclude that Defendant Dilworth acted on the bias he clearly expressed in his own word on social media and in his deposition. Although Defendant Dilworth said he knew he was required to presume Mr. Ortegel "not responsible," he "started by believing" the female accuser. Def. Ex. 17, at 93:8-13, 122:2-4. Ultimately, this comes down to credibility and whether the finder of fact believes Defendant Dilworth that despite his many statements, he was not biased. *See Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979). Since the Court cannot draw credibility determinations at summary judgment, summary judgment must be denied.

---

[3] Defendant Dilworth has never, for example, said he is trying to hold women accountable. Def. Ex. 17, 80:22-81:4. He reserved that language for men.

[4] Of note, Defendant Dilworth's deposition testimony seems to conflict with Mr. Blythe's declaration. While Mr. Blythe states that Defendant Dilworth heard a case involving a female respondent, Def. Ex. 12 at ¶15, Defendant Dilworth could not remember hearing a case involving a female respondent. Def. Ex. 17, at 35:22-24.

16

## B. The other decisionmakers do not save Defendants from liability.

Defendants next argue that even if Defendant Dilworth was biased on the basis of sex, that bias is not material because there were other decisionmakers. This argument misunderstands the causation standard and otherwise is wrong on the facts.

First, it is well settled that in the Fourth Circuit, a defendant is liable on a Title IX (and by extension, Equal Protection) claim if the plaintiff establishes "but for" causation – that is, "[s]o long as the plaintiff's sex was one but-for cause of that decision [to discipline], that is enough to trigger the law." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020); *see Sheppard*, 993 F.3d at 236, *citing Bostock*, 140 S. Ct. at 1739. As long as Defendant Dilworth's bias was one "but for" cause of the discipline, even if there were other unbiased decisionmakers, "that is enough to trigger the law." *Id.* Mr. Ortegel need not prove that every decisionmaker was biased, since one event can have many "but for" causes. *Id.* This strawman argument fails on the law.

It also fails on the facts because the rest of the University was not neutral. Beginning with the investigation, Mr. Hardy told Mr. Ortegel (contrary to University policy) that because the female accuser filed a complaint first, Mr. Ortegel could not file a complaint against her. *Doe v. Princeton Univ.*, 30 F.4th 335, 344 (3d Cir. 2022) ("Doe has plausibly alleged that he reported a violation that was not investigated by the University. And that, in turn, plausibly supports the inference that sex was a motivating factor in Princeton's investigation"). The fact that Mr. Hardy vehemently

17

denies this occurred only makes clear that a genuine dispute of material fact exists precluding summary judgment. *Compare* Def. Ex. 9, at 180:2-5; *with* Def. Ex. 10, at ¶¶10-12.

Continuing through the appointment of Defendant Dilworth, the evidence shows that the University had prior knowledge of Defendant Dilworth's biased statements at the time it appointed him hearing officer in Mr. Ortegel's case. Pl. Ex. F. This information was specifically sent to Lindsay Pritchard Sharman and Nick Whitesell, both of whom knew from that moment forward that Defendant Dilworth had made disparaging remarks about men as a class. *Id.* Despite the issues raised in the email and its attachments, Ms. Pritchard Sharman does not recall reading the entire email or its attachments. Pl. Ex. H. Mr. Whitesell then appointed Defendant Dilworth and Ms. Pritchard Sharman to serve as hearing officers in Mr. Ortegel's case, both he and Ms. Pritchard Sharman knowing that Defendant Dilworth had expressed this bias. Pl. Ex. F. As discussed above, all hearing officers (including Lt. Col. Cox from the Corps of Cadets) agreed to assign *Man Enough: Undefining My Masculinity* as a sanction. *See supra.*

In rendering their decision, all hearing officers ignored critical inconsistencies in Jane Roe's statements. While Jane Roe did report to several individuals, including resident advisors, that she went to check on Mr. Ortegel and described alleged misconduct—including kissing, inappropriate comments, physical restraint, and blocking the door—her accounts are riddled with significant discrepancies and contradictions that undermine the credibility and reliability of her allegations.

Multiple witnesses, including S.S. and O.A., reported that Roe's initial statements to them differed materially from her later official Title IX account. For example, Roe originally told them that she had not been drinking, despite contemporaneous text messages from her to Mr. Ortegel stating she was "a little bit sloshed." O.A. further relayed that Roe initially claimed Mr. Ortegel "attempted to kiss her but did not actually do it," which is in direct conflict with her later Title IX statement alleging a forcible kiss and repeated physical contact as she tried to "pull [him] off".

Roe's narrative about how and why she entered Mr. Ortegel's room is also inconsistent. She alternately claimed she was patrolling the halls at the behest of "some girl," then later it became because Mr. Ortegel called to ask where she was, to then "J.R. told her" to check on Mr. Ortegel, despite text evidence and witness statements indicating no one asked her to do so. Her description of the encounter itself shifts to various witnesses: in some versions, she said Mr. Ortegel pulled her into his room unprovoked and blocked her from leaving; in others, she said she entered to check on him and he grabbed her by the wrist or, in different versions, by the shoulders or throat. These details are not only inconsistent with each other but also with her official Title IX statement, where she claimed he forcibly kissed her and continued to do so as she tried to pull away—contradicting her earlier statement to O.A. that Mr. Ortegel only "attempted" to kiss her but did not kiss her.

Roe's narrative of leaving the room also varies depending on to whom she was speaking. She claims Mr. Ortegel blocked the door to prevent her exit but also claims that noises in the hallway allowed her to escape. Even the details of how she left the

19

building are unclear, as she could not recall whether she took the elevator or stairs, and her card swipe logs do not align with her stated movements that night. Witnesses, including S.S., O.A., C.C.,[5] and B.A., all noted discrepancies in Roe's stories as she recounted them to different people, with each version changing key details about who prompted her to visit, how she entered the room, the nature of the contact, and how she ultimately left. Pl. Ex. A - E. Despite these inconsistencies, the hearing panel found Mr. Ortegel responsible. This refusal to address Jane Roe's inconsistencies supports an inference of gender bias that imputes to the entire hearing panel. *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020); *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 792 (7th Cir. 2022) ("if procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination").

Finally, Mr. Ortegel's appeal was summarily denied without any analysis of the extensive arguments presented, a true rubber stamp. *Compare* Def. Ex. 20-22. But "Title IX's protection from sex discrimination in education requires more than a rubber stamp." *Wassel v. Pennsylvania State Univ.*, No. 4:23-CV-02071, 2024 WL 2057514, at *12 (M.D. Pa. May 7, 2024). A reasonable jury could find that this was not a legitimate appeal process (even if a legitimate appeal process would have saved Defendants from liability, which is questionable at best at least as it relates to

---

[5] The hearing panel also, bizarrely, looked with skepticism on C.C.'s testimony because he legally recorded a conversation with Jane Roe. Def. Ex. 17, at 130:19-131:15. This suggests that the hearing panel was less interested in finding the truth (a legally recorded conversation has only truth value absent any contention that it was manipulated) and more interesting in protecting Jane Roe, or as Defendant Dilworth might put it, "holding men accountable."

Defendant Dilworth), especially considering that it falls short of the requirement that any appeal decision must fully "[describe] the result of the appeal and the rationale for the result." 34 C.F.R. §106.45(b)(8)(iii)(E); *see also Doe v. Univ. of Virginia*, 668 F. Supp. 3d 448, 456-457 (W.D. Va. 2023) ("Evidence of clear procedural irregularities can support a plausible inference of sex discrimination") (internal quotation omitted).

Finally, Defendants raise the fact that the Army conducted its own investigation. A fair reading of the Army report suggests that it relied heavily on the University's finding, but this is ultimately not at an issue because even if the Army conducted its own completely independent investigation and did not rely on the University's finding, that would at best be a damages issue at trial. The Army report has nothing to do with whether the discipline imposed by the University was caused by discriminatory animus in violation of Title IX and the Equal Protection Clause. *Sheppard*, 993 F.3d at 236. Therefore, Defendants' arguments that the Army reached a particular conclusion are not relevant to the issue of liability and the Army report (Def. Ex. 25) is not admissible for that purpose, and therefore it is not appropriate for this Court to consider the Army report at summary judgment where the only issue is liability. Fed. R. Civ. P. 56(c)(2). For all these reasons, the mere fact that there were other decisionmakers does not save Defendants from liability.

## CONCLUSION

Defendants knew Defendant Dilworth was biased based on his own statements and they appointed him anyway. Defendant Dilworth admits that he carried these beliefs with him when he served as hearing officer. Once appointed, Defendant

21

Dilworth "start[ed] by believing" the female accuser and ignored her inconsistencies.

A reasonable jury could find that Mr. Ortegel's sex was one but for cause of

Defendants' discipline and therefore this Court must deny Defendants' motion.

Dated: May 30, 2025                                    Respectfully submitted,


                                                       /s/ Benjamin North
                                                       Benjamin North (VSB No. 97439)
                                                       Lindsay R. McKasson (VSB No. 96074)
                                                       Katie L. Raymond (pro hac vice)
                                                       BINNALL LAW GROUP, PLLC
                                                       717 King Street, Suite 200
                                                       Alexandria, Virginia 22314
                                                       Tel: (703) 888-1943
                                                       Fax: (703) 888-1930
                                                       ben@binnall.com
                                                       lindsay@binnall.com
                                                       katie@binnall.com

                                                       Counsel for Plaintiff Mason Ortegel

23

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: May 30, 2025                    */s/ Benjamin North*
                                       Benjamin North (VSB No. 97439)

                                       *Counsel for Plaintiff Mason Ortegel*