CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VIRGINIA
**FILED**

April 16, 2026

Laura A. Austin, Clerk
By: s/ *Kelly Anglim*
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MASON ORTEGEL,　　　　　　　　　）
　　　　　　　　　　　　　　　　　）
　　　　Plaintiff,　　　　　　　　）
　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　）　　Civil Action No. 7:22-cv-00510
　　　　　　　　　　　　　　　　　）
VIRGINIA POLYTECHNIC　　　　　　）　　By: Elizabeth K. Dillon
INSTITUTE & STATE　　　　　　　　）　　　　Chief United States District Judge
UNIVERSITY, et al.,　　　　　　　）
　　　　　　　　　　　　　　　　　）
　　　　Defendants.　　　　　　　　）

**MEMORANDUM OPINION**

Plaintiff Mason Ortegel ("Ortegel") asserts a Title IX sex discrimination claim against

defendant Virginia Polytechnic Institute and State University ("Virginia Tech" or "VT"), a 42

U.S.C. § 1983 Fourteenth Amendment Equal Protection claim against defendant DaShawn

Dilworth ("Dilworth") in his individual capacity, a 42 U.S.C. § 1983 Fourteenth Amendment

Equal Protection claim against defendant Katie Polidoro ("Polidoro") in her official capacity,[1]

and a 42 U.S.C. § 1983 Fourteenth Amendment Due Process claim against Polidoro in her

official capacity.  These claims arise from sexual assault and harassment allegations against

Ortegel while he was a student at Virginia Tech and the ensuing disciplinary process, which

resulted in various sanctions against him.

Pending before the court are two motions for summary judgment.  One is filed by

Virginia Tech and Dilworth (Dkt. No. 47) and the other by Polidoro (Dkt. No. 49).  For the

---

[1] Katie Polidoro was the Title IX Coordinator at Virginia Tech at the time of the incidents giving rise to this action but has since left the University and has been replaced by Angela Catena as Title IX Coordinator. Polidoro is a named defendant only in her official capacity.  Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Catena is automatically substituted as the party.  Although the parties acknowledged this substitution at the last hearing, the docket has not yet been updated to reflect the change.  Because the pending motions refer to Polidoro, this memorandum opinion will continue to use her name throughout for consistency and to avoid confusion.

reasons set forth below, the court will grant in part and deny in part the motion filed by Virginia

Tech and Dilworth and will grant Polidoro's motion in full. This case will proceed with the Title

IX claim against Virginia Tech.

## I. BACKGROUND

The background below is taken from the wide swath of materials in the summary

judgment record, Virginia Tech policy documents, depositions, reports, and more. The court

begins by providing a general overview of Virginia Tech's Title IX Policy and Procedures as

they existed at the time of the events giving rise to this action, the 2021–2022 school year. With

that frame of reference, it then recounts the events surrounding the alleged sexual assault and

harassment, followed by a discussion of the proceedings that led to the University's

determination, finding Ortegel, more likely than not, in violation of Virginia Tech's Title IX

policy. It finishes with a discussion of the evidence regarding the alleged discrimination against

Ortegel on the basis of his sex. As the court must on summary judgment, it views disputed facts

in the light most favorable to Ortegel, the non-moving party.

**A. Virginia Tech Title IX Policy and Procedures**

During the 2021–2022 academic year, Virginia Tech maintained a Title IX Policy (VT

Title IX Policy, Dkt. No. 48-1) that included detailed grievance procedures for handling

complaints of sexual harassment and violence involving students (VT Title IX Procedures, Dkt.

No. 48-2).

All reports of sexual harassment and violence were directed to Virginia Tech's Title IX

Coordinator, who could provide resources, supportive measures, and guidance on filing a formal

complaint under the University's Title IX Policy. (VT Title IX Procedures 3.) A formal

complaint filed under Title IX triggered an obligation for the University to take action. (VT Title

2

IX Procedures 5.)   The Policy provided that any formal complaint began "with a presumption of non-responsibility for the [accused]." (VT Title IX Policy 4.)  Additionally, the procedures prohibited "anyone who ha[d] a conflict of interest or a bias for or against a particular Complainant or Respondent, or Complainants and Respondents generally, from participating as an investigator, Title IX Coordinator, hearing officer, or appellate officer." (*Id.*)

Once a formal complaint was filed, the Title IX Coordinator reviewed the complaint to determine whether the allegations met the definition of Title IX Sexual Harassment.  (VT Title IX Procedures at 6.)  If so, the Title IX Coordinator designated a trained investigator with experience in sexual harassment investigations.  (*Id.* at 8.)  The investigator then gathered information from the complainant, respondent, and relevant witnesses, including statements, documents, communications, electronic records, and, when appropriate, medical records.  (*Id.* at 9.)  "The goal of the investigation [was] to gather all relevant facts and evidence that [to] aid in determining if there [was] sufficient information to refer a complaint for adjudication by the Office of Student Conduct, which oversees the university's disciplinary process." (*Id.* at 8.)

Once the investigation was complete, the investigator compiled a final report summarizing the evidence, highlighting agreements and disagreements between the parties, and assessing the relevance of the information gathered.  (VT Title IX Procedures 10.)  Thereafter, the Title IX Coordinator would review the investigation report and determine whether the alleged conduct would meet the definition of Title IX Sexual Harassment if proved.  If so, the Coordinator would refer the complaint to the Office for Student Conduct for adjudication.  (*Id.* at 11.)

Upon receiving the referral, the Office for Student Conduct would "hold a live hearing with cross examination to determine whether the respondent [was] responsible for the alleged

conduct and provide appropriate sanctions[.]" (VT Title IX Policy 7.)  The hearing process included several procedural guarantees, such as the right for each party to be accompanied by an advisor of his or her choice (at their own cost) or to have one provided free of charge, the opportunity to present evidence and witnesses and to cross-examine the opposing party's witnesses, and the right to challenge the objectivity of a hearing officer if there were reasonable cause to believe they were biased or had a conflict of interest.  (*Id.*)

After the hearing, the hearing officers determined whether the respondent violated the Code of Conduct using a preponderance of the evidence standard, meaning they decided if it is more likely than not that a violation occurred based on the investigation report and hearing information.  (VT Title IX Policy 9.)  Thereafter, the hearing officer issued a written decision to both parties detailing "allegations and policies charged, procedural steps taken during the grievance procedure, information used to determine the findings and their application to the policies charged, rationales for each finding, any sanctions imposed on the respondent, any remedies provided to the complainant, and information about the appeal process."  (*Id.*)  The Policy provided for a wide variety of possible sanctions, ranging from a formal warning to dismissal, as well as educational, community, and wellness activities.  When assigning sanctions, hearing officers considered the type and nature of the violation, any mitigating or aggravating factors, and the student's prior conduct record.  Following the conclusion of the hearing, the Director of Student Conduct worked with the Title IX Coordinator, who oversaw any necessary "remedial action to restore or preserve the complainant's equal access to the university's educational programs or activities."  (*Id.*)

The right to appeal was available on limited grounds, including procedural errors, newly discovered evidence, bias or conflicts of interest, and findings or sanctions that are unduly harsh

or arbitrary. (VT Title IX Policy 10.) Appeals were reviewed by an appellate officer designated by the Assistant Vice President for Student Affairs (AVP), the University's Chief Appellate Officer. Appellate officers were external to the Office of Student Conduct and Title IX. The AVP ensured that the appellate officer had no conflicts of interest or bias, allowing for an objective review of the case. (*Id.*) Upon review, the appellate officer issued a written decision explaining the rationale for the outcome.

All records related to reports, investigations, and resolutions of sexual harassment allegations were securely maintained in confidential electronic files maintained by the Office for Equity and Accessibility. (VT Tile IX Procedures 16.) These records included "any investigation materials gathered, records of actions taken and supportive measures provided to each party, and documentation that the resolution followed these procedures." (*Id.*) The Office for Student Conduct maintained records related to the adjudication of complaints. (*Id.*)

During the time of the events given rise to this case, Polidoro was the Title IX Coordinator at Virginia Tech. In that role, she was "responsible for monitoring institutional compliance with Title IX." (VT Title IX Policy 4.) More specifically, her job duties entailed "coordinating the effective implementation of Supportive Measures; ensuring the university's prompt and equitable response to any formal complaint of Title IX Sexual Harassment; coordinating the university's internal Title IX-related training programs, and maintaining records of Title IX-related complaints and reports and any response thereto in accordance with state and federal laws." (*Id.* at 5.)

Nick Whitesell served as the interim Director of Student Conduct during the period relevant to this case. (Whitesell Dep. 13:23–14:6, Dkt. No. 48-4.) In that role, one of his responsibilities was assigning hearing officers to review Title IX investigation reports referred by

5

the Title IX Coordinator.  The hearing officers ultimately conducted the hearings and made the determinations.  (*Id.* at 20:17–25.)

## B. August 21, 2021 Incident Between Ortegel and Roe

Ortegel matriculated at Virginia Tech in the Fall 2020 semester, where he participated in both the Virginia Tech Corps of Cadets ("VTCC") and the United States Army's Reserve Officers' Training Corps ("ROTC") program at the University.  Jane Roe matriculated at Virginia Tech in the Fall 2019 semester and was likewise a member of the VTCC and the ROTC program.  The two became acquainted through their shared involvement in these organizations.

On the night of August 21, 2021, Ortegel was at an off-campus gathering and consumed large amounts of alcohol.  At some point during the night. he received a call from Roe asking whether he could raise the flag the following morning, a responsibility of the Color Guard, an organization within VTCC.  (Investigation Report 5, Dkt. No. 48-5.)  Ortegel admits that he told Roe on the phone that he was "sloshed," meaning that he was drunk, thereby suggesting that he was not a good candidate to raise the flag the following morning.  (Ortegel Written Stmt. 2, Dkt. No. 59-1.)  Ortegel's friend, a mutual friend of Roe, then took his phone, and also told Roe that Ortegel was drunk.  (Investigation Report 5.)  The phone call ended shortly after.

Following the call, Ortegel texted Roe, "I'm not sloshed that was just kidding I'm just really tired and I'm going to bed[.]"  (*Id.* at 29.)  Ortegel did so because he realized that it was not a good idea to tell people that he was drinking underage, but he acknowledged that he was very intoxicated and the effects were quickly worsening.  (Ortegel Written Stmt. 2.)  Roe responded, "I'm a tiny bit sloshed but I'm alive[,]" and informed Ortegel that she had found someone else to raise the flag.  (Investigation Report 30.)

This was the last time Ortegel remembers speaking with or interacting with Roe that

6

night.  He did not respond to her last text message.  He eventually returned to his dorm room, with the help of one of his friends, and the last thing he remembers is going to bed.  "As a result of the alcohol having a strong effect on [Ortegel] by this time, combined with the sleep, [he does] not remember anything after [his] head hit the pillow."  (Investigation Report 5; Ortegel Written Stmt. 3.)

Roe reported to University officials that sometime after the phone call with Ortegel and their friend, she went to the friend's dorm room to check on him.  (Investigation Report 5.) When she was there, she received a call from Ortegel who asked her where she was.  She responded that she was in the friend's room checking on him, but that she would come to Ortegel's room afterward to check on him as well.  At 11:36 p.m., Roe sent a text message to Ortegel that read, "Ok I'm coming now[.]"  (*Id.* at 31.)  Roe then went to check on Ortegel, knocked on his door, and he let her into his room.  (*Id.* at 5.)

Roe reported that, while in the room, Ortegel made inappropriate sexual comments to her. Then, while Roe was helping Ortegel set up his bed, he kissed her.  Roe tried to pull him off, and Ortegel was gentle at first.  However, he then asked Roe to engage in sexual intercourse with him.  She refused his request, responding, "No, you're drunk."  When she tried to pull away, Ortegel grabbed her by the throat, though she reported that his grip was "gentle" and did not restrict her airway.  (Investigation Report 10.)  Roe then grabbed Ortegel's wrists and told him to relax, attempting to deescalate the situation.  Ortegel responded by grabbing her wrists.  (*Id.* at 5.)  When she was able to escape his grip, Roe attempted to grab her jacket to leave, but Ortegel stood in front of the door and made another inappropriate sexual comment.  She told Ortegel that he needed to sleep and was able to get him away from the door.  Roe then left Ortegel's room and went to her own room on the floor above in the same building.  (Investigation Report 5.)  At

7

11:52 p.m., Roe received a text message from Ortegel's phone that read, "I'm sorry" immediately followed by another text reading "please don't tell anybody[.]" (*Id.* at 32–33.)

### C. Reporting of the Incident, Formal Complaint, and Ensuing Investigation

The night of the alleged sexual assault and the following day, Roe reported the incident to several people. (Dkt. No. 48-6.) These reports were relayed to the Office of Equity and Accessibility, the office responsible for Title IX compliance, and where Polidoro worked as Title IX Coordinator. On Monday, August 23, Polidoro flagged the reports as Title IX matters and assigned investigator Daniel Hardy to reach out to Roe to gather more information. (*Id.*)

Thereafter, Hardy contacted Roe, and they were able to schedule a time to meet, along with a representative from Virginia Tech's Women's Center, to discuss her situation and the options available to her on the following Tuesday, August 31, 2021. (Dkt. No. 48-7.) On September 12, 2021, Roe filed a formal complaint against Ortegel alleging sexual assault regarding the incident that occurred on August 21, 2021. (Dkt. No. 48-8.) Hardy was assigned as the investigator. (Investigation Report 3.)

Hardy conducted a comprehensive review as part of the investigation, examining formal statements from Roe and Ortegel, collecting additional witness accounts, analyzing text messages exchanged between the parties and with others, examining Virginia Tech door access logs to corroborate accounts, and evaluating a range of other relevant evidence. (*See generally* Investigation Report.) Hardy's report identified a variety of facts on which Roe and Ortegel were in agreement, as well as key areas where their stories diverged. The disagreements included whether anyone asked Roe to check on Ortegel that night, whether Roe ever went up to Ortegel's room that night, the events that occurred between Roe and Ortegel in his dorm room, as well as whether Ortegel ever sent the text saying, "I'm sorry" and "please don't tell

anybody[.]"  (*Id.* at 7–8.)  Ortegel's disputes stem from his lack of recollection of the events, as he was incapacitated and blacked out due to his alcohol consumption.  He notes some inconsistencies with Roe's version of events compared to what she told witnesses, including whether she was drinking that night, how and why she entered his room, and the circumstances surrounding her leaving his room.  (*See* Dkt. No. 59-1.)

After completing his investigation, Hardy finalized the report, including all case materials, and sent it to both parties in accordance with Title IX procedures.  (Investigation Report 4.)  He then submitted the report to Polidoro for review.  (Polidoro Dep. 56:3–5, Dkt. No. 48-3.)  Upon review, Polidoro referred the matter to the Office of Student Conduct for adjudication.  (*Id.* at 58:4–7.)

## C.  Ortegel's Title IX Hearing and Outcome

As Director of the Office of Student Conduct, Whitesell received the investigation report from Polidoro for adjudication.  Upon receipt, he appointed defendant DaShawn Dilworth and Lindsay Pritchard to serve as hearing officers for Ortegel's case.[2]  (*Id.* at 32:22–33:22.)  Both hearing officers were trained in Title IX matters, including that they could not discriminate on the basis of sex. (Polidoro Dep. 39:20–40:6; Blythe Decl. ¶¶ 17–20, Dkt. No. 48-11.)  Additionally, they both have stated under oath that they understood Ortegel was presumed not to be responsible for the Code of Conduct violations alleged against him.  (Dilworth Dep. 122:22– 123:4, Dkt. No. 48-16; Pritchard Decl. ¶ 4, Dkt. No. 48-17.)  Furthermore, they recognized that the applicable standard of proof for determining a violation of the Code of Conduct was the preponderance of the evidence.  (Dilworth Dep. 125:4–7; Pritchard Dep. 23:25–24:6.)

---

[2] At the time, Dilworth and Pritchard were working as a Student Conduct Coordinators within the Office of Student Conduct at Virginia Tech. (Dilworth Dep. 12:18–22, Dkt. No. 48-16; Pritchard Dep. 11:6–10, Dkt. No. 59-8.)  One of their job responsibilities was to serve as hearing officers for student conduct hearings.

Ortegel's disciplinary hearing took place on January 10, 2022.  (VT H'rg Decision Letter, Dkt. No. 48-14.)  In addition to Dilworth and Pritchard presiding over Ortegel's case, a separate hearing officer from VTCC was also present and was conducting VTCC's own proceedings.  (*See* VTCC H'rg Decision Letter, Dkt. No. 48-15.)  VTCC issued an independent decision regarding the alleged violations of the VTCC regulations, separate from Dilworth and Pritchard's determination concerning alleged violations of the Code of Conduct on behalf of the Office of Student Conduct.  (*See* VT H'rg Decision Letter; VTCC Hearing Decision Letter.)  This case focuses on Dilworth and Prichard's findings, as those form the basis for the claims alleged against the defendants.

After hearing the evidence at Ortegel's disciplinary hearing on January 10, 2022, Dilworth and Pritchard conferred and reviewed all relevant information before issuing a decision letter on January 24, 2022, detailing the findings, rationales, and outcomes of Ortegel's case. (VT H'rg Decision Letter.)  In relevant part, the hearing officers found Roe to be credible because her version of events remained consistent throughout the investigation and formal hearing, was corroborated by her Virginia Tech door access card swipe logs, and was supported by several witnesses to whom she reported the incident shortly after the alleged sexual assault. Although there were some discrepancies between witness accounts of what Roe told them about her interactions with Ortegel that evening, her overall account remained consistent.  They found that she was not intoxicated on the night of August 21, 2021, a conclusion confirmed by other witnesses.  (*Id.* at 9.)

The hearing officers found that several factors undermined Ortegel's credibility, primarily due to his level of intoxication and his inability to recall key events.  Additionally, they found inconsistencies between his statements during the investigation and the formal hearing.

Furthermore, although Ortegel claimed he went straight to bed that night, his Virginia Tech door access card swipe logs show activity just after midnight, approximately 10 minutes after he allegedly sent Roe text messages stating, "I'm sorry" and "please don't tell anybody[.]"  (VT Hr'g Decision Letter 10.)

"Given all the information available about the night of the incident, as well as the credibility assessments, the hearing officers determined, based on a preponderance of evidence, it is more likely than not, on the night of August 21, 2021, [] Ortegel made an unwelcomed comment to [Roe] that was sexual in nature and forcibly kissed [Roe's] mouth without her consent." (*Id.* at 13.)  Therefore, Dilworth and Pritchard found Ortegel to be in violation of the Student Code of Conduct, specifically Policy 1026—Sexual Harassment.[3] (VT Hr'g Decision Letter 14.)

Based upon these findings, Dilworth and Pritchard issued the following sanctions for Ortegel: (1) a deferred suspension; (2) participation in services provided by Hokie Wellness; (3) submission of a counseling log reflecting on his well-being; (4) reading *Man Enough: Undefining My Masculinity* by Justin Baldoni and submitting written reflections on each chapter; (5) writing two letters of acknowledgment to individuals impacted by the incident or who may learn of it in the future; (6) identifying and meeting with a mentor, along with submitting written responses regarding those meetings; and  (7) attending three follow-up meetings with either Dilworth or Pritchard.  (VT H'rg Decision Letter 14–15.)  Ortegel was also informed of his right to appeal the outcome of the hearing, which he was required to exercise within seven days of the decision date.  (*Id.*)

---

[3] In a separate decision, the VTCC hearing officer similarly determined, by a preponderance of the evidence, that Ortegel violated VTCC's regulation prohibiting sexual harassment.  (*See* VTCC Hearing Decision Letter, Dkt. No. 48-15.)

Ortegel filed an appeal with the Office of Student Conduct on three grounds: (1) procedural irregularity or denial of procedural guarantees; (2) significant and relevant new information that was not available at the time of the hearing; and (3) unduly harsh or arbitrary findings or sanctions.[4]  (Ortegel Appeal Letter, Dkt. No. 48-19.)  The appeal was ultimately forwarded to Dr. Keene, then the AVP, who served as the Chief Appellate Officer.  (Whitesell Dep. 43:16–23.)  On February 10, 2022, Dr. Keene concluded that there were no violations of Ortegel's procedural guarantees, that the purported new information was not related to the incident in question, and that the findings and sanctions were not unduly harsh or arbitrary.  Accordingly, the original decision was upheld.[5]  (VT Appeal Decision, Dkt. No. 48-20.)

**D.  Alleged Discrimination Against Ortegel Based on Sex**

This case centers on Ortegel's allegations of being discriminated against on the basis of his being a man.  Certainly, Ortegel has misgivings about the outcome of his Title IX hearing, but he contends that the decision was not merely unfavorable, but the product of unlawful gender bias against him as a man.  Central to these allegations is Dilworth, whose conduct Ortegel identifies as indicative of such bias.

In support of his claim, Ortegel points to three categories of evidence in the record: (1) Dilworth's public statements via social media; (2) his deposition testimony; and (3) the sanction requiring Ortegel to read *Man Enough: Undefining My Masculinity*.  The existence of this evidence is undisputed.  What remains in dispute, however, is whether this evidence demonstrates that Dilworth harbored bias against males.  That issue is discussed below in

---

[4] Although this lawsuit focuses on the alleged bias by Dilworth, that issue was not specifically raised as one of Ortegel's grounds on appeal.  Ortegel did assert more general claims that he was treated differently because he is male, but none of the evidence discussed in this section was included in his formal appeal.  (*See generally* Dkt. No. 48-19.)

[5] Ortegel also appealed VTCC's decision, which was denied as well.  (VTCC Appeal Decision, Dkt. No. 48-21.)

Section III.A.1.b.  For present purposes, the court simply describes each category of evidence as it appears in the record.

### 1.  Dilworth's public statements on social media

Prior to the appointment of Dilworth as a hearing officer for Ortegel's hearing, on October 15, 2021, another male Virginia Tech student challenged Dilworth's bias against men based on certain social media posts he had made.  (*See generally* Dkt. No. 59-6.)  The student alleged that these posts showed Dilworth's bias against men, and as such, he should be excluded from being a hearing officer for his case.[6]  (*Id.*)  In particular, the student pointed to Dilworth's tweet that he is "doing [his] part to hold [] other men accountable"[7] and his retweet stating, "Quite interesting how many college aged boys and men seem to understand consent when it comes to drinking their chocolate milk, but not when it comes to someone else's body and space" as evidence of bias against males.  (Dkt. No. 59-7.)  Reviewing the student's challenge, Whitesell ultimately decided to remove Dilworth as a hearing officer in that case.  He did so not because he believed Dilworth harbored a bias against men, but rather he wanted to "mak[e] sure that [the] student[] felt the process was fair."  (Whitesell Dep. 28:24–29:17.)  When Whitesell assigned Dilworth as a hearing officer for Ortegel's adjudication, he did not believe Dilworth was biased on the basis of sex or race.  (*Id.* at 34:4–8.)

### 2.  Dilworth's deposition testimony

Dilworth was asked about a number of questions regarding bias during his deposition.  One line of questioning involved a discussion of implicit biases.  When asked if he had implicit bias, Dilworth responded, "Well, I believe that everyone has implicit bias."  (Dilworth Dep.

---

[6] The student also alleged Dilworth harbored racial bias.  (*See generally* Dkt. No. 59-6.)  This case, however, does not involve race discrimination.  Accordingly, those facts are not relevant here.

[7] This statement was made in response to the 2020 documentary film, *On the Record*, which concerns sexual abuse and harassment allegations against hip-hop mogul Russell Simmons.

56:4–7.) Dilworth went on to explain that these implicit biases can be "hidden" or

"unconscious" but that he does his best to make sure he is "accountable and acknowledgeable" to

his biases. (*Id.* 56:11–25.) When asked to elaborate on what biases he acknowledges, Dilworth

responded:

> I think there's inherently a male bias that -- that takes place and
> that's regardless of race, ethnicity and different things of that nature.
> I think it's very common to see men often believe or take the side of
> -- of men either in colloquial conversation or in larger scale issues.
> And so I think that's something that I actively acknowledge and I
> try to work against, so that everyone feels like they have an equal
> voice in terms of, like, addressing a problem or a conversation.

(*Id.* at 57:10–19.) When asked directly if he thinks he holds a bias against males, Dilworth

elaborated:

> I, more than likely, do have a form of implicit bias where I either
> naturally I'm likely to believe men in their conversations or not hold
> them accountable for either misogynistic or problematic things they
> might say in reference to women or other things like that, because
> that is something that I've had to learn over the years to -- to address.
> That's not – that's not always been something that's been
> instinctual. And so that's why I consider that a form of implicit bias,
> because you're -- myself as well as anyone, you're constantly
> learning new ways that those things show up and trying to address
> them accordingly.

(*Id.* at 58:10–22.)

Dilworth further elaborated on what he believes is the source of this bias: "I think [this

bias] comes not just from the fact that I myself am a man, but I think it also comes from the fact

that we live in a very patriarchal society." (Dilworth Dep. 59:1–3.) He then describes this

patriarchal society:

> So I think we live in -- but to define patriarchy is just to define a
> society in which males, male dominance and things from a
> masculine framework are often the center of conversation, power in
> the way that things are organized in the world. And so there's always
> going to be more privilege and/or just natural inclination to believe
> for things to be easier for men in those spaces.

14

(*Id.* at 59:6–13.)  Dilworth then says he believes we live in a patriarchal society "given how especially the US is organized and oriented."  (*Id.* at 59:19–20.)  He thinks "misogyny and various other forms of male dominance are just very prevalent, that it would be hard to argue that we don't live in a patriarchal society."  (*Id.* at 59:21–23.)

Dilworth then acknowledges that Virginia Tech is part of this "system of patriarchy." (Dilworth Dep. 60:8–9.)  Describing his individual efforts to work against the patriarchy "as much as [he] can[,]" Dilworth explains:

> For me, I think it depends on situations and being able to use the fact that I do identify as male or just carry some semblance of -- of male privilege, being able to acknowledge that in spaces and use that to benefit others, whether that be addressing -- that be addressing forms of misogyny in -- in conversations, addressing anything that -- cease to demean or degrade women or even non-heterosexual men.
>
> Just different things of ways that I can just show up and show forms of empathy for other people, either through tangible action like speaking up or just even being able to -- to acknowledge that something might not seem fair or equal based off of certain assumptions that might be had.

(*Id.* at 60:15–61:3.)

When discussing the tweets referenced above, Dilworth was asked what he was doing to hold other men accountable.  He mentions his previous discussion on implicit male bias and says that he is "making sure that [he is] having conversations where – or validating the experiences of women who feel like their experiences, emotions or anything like that are not validated by the men around them."  (Dilworth Dep. 77:4–8.)  Dilworth does note that he thinks he is "constantly trying in every aspect of his life to make sure that [he is] living up to the standard of holding not only men, but other people in generally accountable."  (*Id.* at 79:4–7.)  However, he explains:

> I think just like with anything, I fall short because this is something -- as far as going back to our conversation about the system of patriarchy, this is something that we're born into and then it's

15

constantly reinforced throughout all of our developing years. And so it takes a long time to unlearn a lot of those things.

(*Id.* at 79:8–14.)  Dilworth then explains that he thinks "accountability is genderless," but notes:

In terms of thinking about a patriarchal system, if you have a system where one group of people have primarily experienced a large amount of privilege for a long period of time, socially, economically, in whatever facet that you consider it, and then you do your best to try to equivalent that experiences with someone else, whether that be gender non-conforming folks, women.

It can feel like it's belief of one side versus the other, but you're trying to balance the power dynamic between the two.

(Dilworth Dep. 80:9–81:1.)  He emphasizes that in this patriarchal system, "in terms of whether it be economically, politically, socially, men tend to have more power in reference to women or any other gender folks." (*Id.* at 81:9–13.)  Asked if this system extends to the student conduct process, Dilworth responds, "I would say that it can. Yes." (*Id.* at 81:15–18.)

Dilworth was also asked if it was important for men to believe women when they allege sexual misconduct.  He responded that it was "because statistically it is very common that women experience violence at some point in their lives at a much higher rate in comparison to men." (Dilworth Dep. 91:3–16.)  However, he emphasized that he was "of the perspective that everyone should be believed unless you start to find evidence that is offered to the contrary." (*Id.* at 91:17–19.)  Dilworth cited a statistic he understood to be accurate, stating that "1 in 6 women will experience some form of sexual violence at some point in their lives on college campuses." (*Id.* at 92:9–11.)  He then clarified that, "Because it's such a condensed number, it tends to be 1 in 4 women at some point during their college experience may – will experience some form of sexual violence." (*Id.* at 92:12–15.)  Dilworth thinks that those statistics "are important things . . . for a lot of student conduct offices around the country, . . . that is something they have to understand statistically to understand if, like, something is becoming a common

16

practice and, like, developing ways to address it." (*Id.* at 92:16–23.)

When asked about the concept of consent, particularly as it relates to college-aged men, Dilworth responded:

> I think consent is primarily something that all men, regardless of age, struggle with. I think it's also something as a concept that women tend -- can tend to struggle with if they're not familiar with, like, the actual phrasing of consent or different things like that. But I think more commonly, at least from my experience, a lot more males tend to struggle with the concept of consent.

(Dilworth Dep. 96:10–17.)  He further explained, "men, from my perspective, always seem to not fully grasp consent as a definition and then associate it with specific practices similar to women." (*Id.* at 98:5–8.)  Dilworth maintained this belief at the time of Ortegel's hearing. (*Id.* at 96:20.)

### 3. Ortegel's sanction to read *Man Enough: Undefining My Masculinity* and related deposition testimony

One of the sanctions imposed on Ortegel by Dilworth and Pritchard was to read *Man Enough: Undefining My Masculinity* by Justin Baldoni.  (VT H'rg Decision Letter 14.)  Additionally, Ortegel was required to complete a supplemental written reflection.  The reflection was to identify at least two themes from each chapter and explain tangible ways he could incorporate what he learned from the book into his own life.  (*Id.*)

This sanction was recommended by Dilworth despite him never reading the entire book.[8]  Dilworth testified, "I had read snippets from [the book] at the time and I had made the plan to read it in full, but I had not had a chance to do so."  (Dilworth Dep. 144:9–11.)  He understood the thesis of the book to be "unpacking a lot of things associated with masculinity, whether that be connection to misogyny, connection to [] power in a lot of different dynamics . . . what is a

---

[8] Pritchard also did not read the book and did not understand the thesis of the book.  She could not recall why the book was assigned.  (Pritchard Dep. 44:11–22.)

good way to get to a healthy version of masculinity that is beneficial for both me and the people around me." (*Id.* at 144:14–21.) Dilworth went on to explain:

> I was very familiar at the time with -- with Justin Baldoni and a lot of the work that he was doing specifically around -- I forget what he called it, but it was just like masculine circles and just like having conversations intentionally with men about how do we essentially unpack a lot of things that we've been taught and then use that as a focus point to make sure that we're taking people -- care of people in our community, we're taking care of ourselves, and we're, sort of, fighting against that -- that sense of patriarchy.

(*Id.* at 144:22–145:7.) Dilworth noted the purpose of assigning the book was to "provide another avenue for deconstructing and unlearning a lot of things." (*Id.* at 145:10–12.) The hearing panel was "trying to identify . . . what's a good book for someone who is in the Corps of Cadets, which is a very heavy masculine space, who is in a situation that revolves around, sort of, this idea of sexual violence." (*Id.* at 145:15–18.) Dilworth testified that the panel was trying to provide Ortegel with "a resources to be able to think about very – very bare bones this dynamic that plays out between men and women, but focus it purely on the man's standpoint." (*Id.* at 145:19–22.)

When asked if he would have assigned the book to Ortegel if he were female, Dilworth responded, "More than likely not. I probably would have assigned a different book." (Dilworth Dep. 146:10–11.) He has never assigned *Man Enough: Undefining My Masculinity* to a female respondent who was found responsible in a hearing panel he participated in, noting "women often know how to navigate and understand masculinity a lot more than men do." (*Id.* at 146:16–147:2.) Dilworth went on to explain:

> [V]ery similar to the way that people of color and Black people have to navigate White people and Whiteness in the world, women are intimately aware of navigating male-dominated spaces, male -- men in general and are very familiar with the way that men display forms of masculinity because they are often -- they see it and they are often the recipients of it.

(*Id.* at 147:4–10.)

18

When asked if he takes a student's sex into consideration when deciding whether the preponderance of evidence standard has been met, Dilworth responded: "I'm inclined to say no. I don't think that we -- we take sex into consideration when determining preponderance of evidence." (Dilworth Dep. 148:14–25.) When pressed on if he took Ortegel's sex into account when he assigned the book, Dilworth responded:

> I did not factor that because of Mr. Ortegel's sex. I -- that was something to think about when I thought about gender and, again, cultural aspect of being a young man navigating a very masculine space such as the Corps of Cadets. It – it did not have anything to do with his -- his sex.

(*Id.* at 149:6–11.)

Nothing in the record provides any information about the subject matter of *Man Enough: Undefining My Masculinity* by Justin Baldoni.

## II.  LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving

19

party must produce "significantly probative" evidence from which a reasonable jury could return

a verdict in his favor. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

III.  DISCUSSION

The court begins by addressing the summary judgment motion filed by Virginia Tech and

Dilworth.  In Section A, it considers (1) the Title IX claim against Virginia Tech and (2) the

Equal Protection claim against Dilworth in his individual capacity.  The court then turns to

Polidoro's summary judgment motion.  In Section B, it addresses the Equal Protection and Due

Process claims against Polidoro in her official capacity as Title IX Coordinator.

**A.  Virginia Tech and Dilworth's Motion for Summary Judgment**

**1.  Title IX sex discrimination claim against Virginia Tech**

Virginia Tech argues that Dilworth understood and complied with his obligation to act

impartially, and that the alleged evidence of bias consists only of personal, protected speech

unrelated to his official role.  It contends that the summary judgment record lacks specific

evidence of bias in Ortegel's proceeding, and therefore, no reasonable juror could find that

Dilworth harbored bias against men.  Furthermore, Virginia Tech argues that even if there is a

genuine dispute of material fact regarding Dilworth's bias against men, the Title IX claim still

fails because multiple independent decisionmakers reviewed the evidence and all concluded that

Ortegel was responsible, breaking any causal link between the alleged bias and the disciplinary

decision—thus defeating the required element of causation.  (VT & Dilworth Br. Supp. Mot.

Summ. J. 16–19, Dkt. No. 48; *see also* Defs.' Reply Br. Supp. Mot. Summ. J. 6–17, Dkt. No.

62.)  The court disagrees.

*a.  Legal standard*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

20

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

"A Title IX plaintiff may pursue a private cause of action against—and obtain damages from—a 'funding recipient [that] engages in intentional conduct that violates the clear terms of the statute.'" *Doe 2 by & through Doe 1 v. Fairfax Cnty. Sch. Bd.*, 832 F. App'x 802, 804 (4th Cir. 2020) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)) (alteration in original).

At summary judgment, the court must determine whether a reasonable jury, viewing the evidence in the record in the light most favorable to the nonmoving party, could find that sex was a but-for cause of the university's disciplinary decision. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021) (stating that, on a motion to dismiss, the court asks whether the complaint's alleged facts, accepted as true, "raise a plausible inference that the university discriminated against [the student] on the basis of sex?" (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019)) (alteration in original)); *see also Doe v. Rollins Coll.*, 77 F.4th 1340, 1352 (11th Cir. 2023) (adapting the motion-to-dismiss standard for summary judgment review by asking: "[C]ould a jury presented with the record evidence, viewed in [nonmoving party's] favor, reasonably find that [defendant] discriminated against [plaintiff] on the basis of sex?"). This inquiry necessarily includes a requirement of "causation—that is, a causal link between the student's sex and the university's challenged disciplinary proceeding." *Sheppard*, 993 F.3d at 236. "'[O]n the basis of sex' requires 'but-for' causation in Title IX claims alleging discriminatory school disciplinary proceedings." *Id.* at 237. It does not require that sex be "the" but-for cause, only that it be "a" but-for cause of the disciplinary decision.[9] *Cf.*

---

[9] Defendants mischaracterize the applicable legal standard in this case, asserting that Ortegel is pursuing his claim under an erroneous-outcome theory. (Va. Tech & Dilworth Br. Supp. Mot. for Summ. J. 15–16, Dkt. No. 48.) Ortegel, however, makes clear that he is not. (Pl. Br. Opp'n Va. Tech & Dilworth Mot. for Summ. J. 10–11, Dkt. No. 59.) Although the Fourth Circuit acknowledged in *Sheppard* that a Title IX discrimination claim can be

21

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020) (holding, in the context of Title VII, that, "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law"); *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."); *Sheppard*, 993 F.3d at 236 (citing *Bostock*, 590 U.S. at 656, for the "'simple' and 'traditional' standard of but-for causation"); *accord Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 n. 11 (W.D. Va. Aug. 11, 2022), *aff'd on other grounds sub nom.*, *Doe v. Virginia Polytechnic Inst. & State Univ.*, 77 F.4th 231 (4th Cir. 2023) (citing *Sheppard* and *Bostock* to find that "sex must be 'a' but-for cause, not 'the' but-for cause" in a Title IX claim).

"A plaintiff bringing a Title IX claim can show discrimination on the basis of sex in many ways." *Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 962 (7th Cir. 2024). However, "generalized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden." *Roe v. Marshall Univ. Bd. of Governors*, 145 F.4th 561, 571 (4th Cir. 2025) (internal citations omitted). Courts have explained that "rather, generalized evidence must be supported with particularized evidence that would indicate that the university's decision in plaintiff's particular case was based on sex.'" *Doe v. Virginia Polytechnic Inst.*, No. 7:19-CV-00249, 2022 WL 3334501, at *7 (citing *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021)) (citation modified). "Although the factors assessed are case dependent, the 'ultimate inquiry must

---

stated under the "erroneous outcome" or "selective enforcement" frameworks articulated in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994), those are not the only viable avenues for pursuing a Title IX claim. *Sheppard*., 993 F.3d at 236. Instead, the court emphasized that Title IX prohibits all discrimination on the basis of sex and adopted the Seventh Circuit's approach articulated in *Purdue. Id.* Accordingly, the court analyzes Ortegel's claim under that standard, rather than the erroneous-outcome framework.

consider the totality of the circumstances.'" [10] *Gash*, 117 F.4th at 962 (quoting *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022)).

>    b.  *Analysis*

The crux of the Title IX sex discrimination claim against Virgina Tech focuses on Dilworth, one of the two hearing officers from the Office of Student Conduct assigned to oversee Ortegel's adjudication regarding the sexual harassment claim against him.  There are three general categories of evidence that Ortegel cites to argue that Dilworth harbored a bias against him on the basis of his sex: (1) Dilworth's public statements via social media; (2) his deposition testimony; and (3) the sanction requiring Ortegel to read *Man Enough: Undefining My Masculinity*.  Each is discussed in turn.

First, Dilworth's social media statements, although not egregious or overtly reflecting sex-based bias, nonetheless raise questions about his objectivity in Title IX hearings more broadly.  In May 2021, less than a year before he served as a hearing officer in Ortegel's case, he tweeted that he was "doing [his] part to hold [] other men accountable."  (Dkt. No. 59-7.)  This tweet was in response to Dilworth watching the documentary film *On the Record*, which centers on  "the experience of Drew Dixon and multiple other women who were all victims of sexual violence by Russell Simmons, who at the time was the head of . . . Def Jam Recordings." (Dilworth Dep. 73:21–24.)  Although he was responding to Ms. Dixon herself in this tweet, he specifically mentioned holding *men* accountable.  Additionally, he retweeted a post stating, "Quite interesting how many college aged boys and men seem to understand consent when it

---

[10] Ortegel's claim is based on direct evidence of Dilworth's bias against males.  Accordingly, the court need not apply the burden-shifting framework set forth in *McDonnell Douglas*, which the Fourth Circuit has found to be an alternative way to prove a Title IX claim.  *See Marshall Univ. Bd. of Governors*, 145 F.4th at 569 (noting that a plaintiff can prove a Title IX retaliation claim "through either direct or indirect evidence, or by proceeding under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)"); *see also Staves v. Prince George's Cnty. Bd. of Educ.*, No. 19-CV-02262-LKG, 2023 WL 2648794, at *6 (D. Md. Mar. 27, 2023) (noting *McDonnell Douglas* applies to discrimination claims brought under Title IX).

comes to drinking their chocolate milk, but not when it comes to someone else's body and space." (Dkt. No. 59-7.)  Although it is not clear from the record when Dilworth retweeted this, it emphasizes men in discussions of consent—an issue directly relating to sexual assault and harassment.  Likely, a reasonable jury could not find that sex was a but-for cause of Virginia Tech's disciplinary decision based on Dilworth's social media statements alone.  *See cf.*, *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023) (finding that public statements did not plausibly demonstrate anti-male bias or show that such bias was a but-for motivating factor of the university's disciplinary action at the motion-to-dismiss stage).  However, the statements constitute some evidence that must be considered in relation to the totality of the circumstances.  That inquiry does not end with Dilworth's social media activity.

Second, Dilworth's deposition testimony further calls his objectivity into question.  It is replete with statements referencing implicit sex-based bias and broader patriarchal systems, which could reasonably give rise to concerns—or at least raise an eyebrow—regarding his impartiality with respect to male respondents in student conduct hearings.  Dilworth stated that he "more than likely" has an implicit bias in favor of males that he "actively acknowledge[s] and try[s] to work against."  He explained that this bias stemmed from the "very patriarchal society" in which we live.  He further acknowledged that Virginia Tech was part of the patriarchal system that he actively tried to work against as much as he could.  When discussing the tweets referred to above, Dilworth noted that he was making sure he was "validating the experiences of women who feel like their experiences, emotion or anything like that are not validated by the men around them."  He also explained that he was born into the system of patriarchy, and that this system is "reinforced throughout all of our developing years,"  so "it takes a long time to unlearn a lot of those things."  He further stated that "men tend to have more power in reference to

24

women[.]"  This system, Dilworth acknowledged, can extend to student conduct hearings. Additionally, he testified that consent is "something that all men, regardless of age, struggle with."  He noted that women can struggle with it too, but men struggle with it more.  From his perspective, men "always seem to not fully grasp consent as a definition and then associate it with specific practices" in the same way as women.  Dilworth maintained these beliefs at the time of Ortegel's Title IX hearing.

Dilworth also offered testimony reflecting an understanding of the importance of impartiality.  He stated that "accountability is genderless at the end of the day."  (Dilworth Dep. 80:9–10.)  Furthermore, he testified that it is "appropriate to believe that a student is saying what they are saying, regardless of their gender, regardless of what the particular situation is."  (*Id.* at 93:14–17.)  He also clarified that his discussions of holding men accountable, "doesn't mean that . . . in the context of the student conduct case, doesn't mean [he] prioritize[s]  . . . the woman's perspective of what's happening."  (*Id.* at 79:15–22.)  Rather, his "goal is to make sure that her experiences and what she deems to have happened are on equal footing as the -- the male in that perspective."  (*Id.* at 79:23–25.)

Taking all of these statements together, at best they reflect a tension between Dilworth's professed commitment to impartiality and his acknowledgment of sex-based implicit bias in favor of men, created in part by the patriarchal society, which he tries to actively counteract. This conflicting narrative creates a genuine dispute of material fact as to whether Dilworth held a sex-based bias against men that influenced his role in Ortegel's case as one of two hearing officers.  A reasonable juror could find either way.  Drawing all reasonable inferences in Ortegel's favor, as is required at the summary judgment stage, a jury could find that Ortegel's sex was a but-for cause of the disciplinary action taken by Virginia Tech.  This conclusion is

further reinforced by additional evidence in the record.

Third, the assignment of *Man Enough: Undefining My Masculinity* as a sanction for Ortegel, introduces additional concerns as to Dilworth's objectivity.  Dilworth acknowledges that he had never read the book, yet he understood the thesis to be "unpacking a lot of things associated with masculinity, whether that be connection to misogyny, connection to [] power in a lot of different dynamics . . . what is a good way to get to a healthy version of masculinity that is beneficial for both me and the people around me."  He was familiar with the author and his work in "masculine circles" in unpacking "a lot of things that we've been taught" and then using "as a focus point to make sure that we're taking . . . care of people in our community, we're taking care of ourselves, and we're, sort of, fighting against that – that sense of patriarchy."  His purpose in assigning the book to Ortegel was "to provide another avenue for deconstructing and unlearning a lot of things."  He viewed the Corps of Cadets as a "heavy masculine space" and with Ortegel being in that space, he was looking to provide a resource for him "to think about . . . this dynamic that plays out between men and women, but focus it purely on the man's standpoint."  Dilworth had never assigned this book to a female student and noted that "women often know how to navigate and understand masculinity a lot more than men do."  When asked explicitly if he took Ortegel's gender into account when assigning this book, he responded, "I did not factor that because of Mr. Ortegel's sex. . . . that was something to think about when I thought about gender and, again, cultural aspect of being a young man navigating a very masculine space such as the Corps of Cadets."

Although there is nothing in the record that sheds light on what *Man Enough: Undefining My Masculinity* is actually about, all reasonable inferences must be drawn in Ortegel's favor. From Dilworth's own testimony, a reasonable juror could conclude that he believed Ortegel had

26

a "masculinity problem," that such a problem was common among male cadets, and that

Dilworth imposed a sanction rooted in sex-based assumptions rather than in a case-specific

analysis of Ortegel's conduct—which, from the record, suggests a potential alcohol problem,

among other things, rather than solely—or even primarily—a masculinity problem.  Finally, of

particular emphasis, Dilworth was asked point blank if he takes a student's sex into consideration

when deciding whether the preponderance of the evidence standard has been met in student

conduct hearings, to which he responded: "I'm inclined to say no."  Notably, he did not say "no."

Dilworth's social media statements, deposition testimony, and assignment of *Man

Enough: Undefining My Masculinity* raise a genuine issue of material fact as to whether he

harbored a sex-based bias that influenced his role as a hearing officer overseeing Ortegel's Title

IX adjudication.  While each of these pieces of evidence, viewed in isolation, may not be

sufficient to create a genuine dispute of material fact, taken together, and viewed in the light

most favorable to Ortegel, this evidence is sufficient to survive summary judgment.  As one of

two hearing officers responsible for adjudicating the matter and issuing a decision on behalf of

the Office of Student Conduct, Dilworth played a significant role in Virginia Tech's disciplinary

decision.  Therefore, a reasonable jury could conclude sex was a but-for cause of the outcome in

Ortegel's case.  Accordingly, Virginia Tech's motion for summary judgment on the Title IX sex

discrimination claim will be denied.[11]

---

[11] The court acknowledges Virginia Tech's argument that multiple independent decisionmakers—each of whom concluded Ortegel was responsible—breaks the causal chain.  In support, Virginia Tech points to the absence of sex-based bias by other officials, including Pritchard, the Office of Student Conduct appellate officer, the VTCC hearing and appellate officers, a separate U.S. Army ROTC investigation, all of whom reached the same conclusion. This evidence may well be dispositive if Ortegel were proceeding under an erroneous outcome theory.  However, Ortegel does not advance such a claim.  His claim instead focuses on the disciplinary proceeding before the Office of Student Conduct, specifically whether Dilworth harbored a sex-based bias against men and whether that bias influenced the hearing panel's determination.  "Title IX prohibits all discrimination on the basis of sex." *Sheppard*, 993 F.3d at 236 (citing 20 U.S.C. § 1681(a)).  Under Title IX, sex need only be a but-for cause—not the sole cause—of the disciplinary outcome.  Accordingly, the existence of subsequent or parallel determinations by other decisionmakers does not defeat liability if sex was a but-for cause of the challenged adjudication.  To hold otherwise

## 2. Fourteenth Amendment Equal Protection claim against Dilworth in his individual capacity[12]

Dilworth argues that summary judgment is warranted on the Equal Protection claim brought against him in his individual capacity because Ortegel has neither alleged nor produced evidence that he was treated differently from similarly situated individuals and thus failed to identify a proper comparator. (*See generally* Dkt. Nos. 65, 67.) The court agrees.

### a. Legal standard

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Its "central aim is to bar government decisionmakers from 'treating differently persons who are in all relevant respects alike.'" *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 112 (4th Cir. 2023) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). To succeed on an Equal protection claim, a plaintiff "must show both that 'he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *English v. Clarke*, 90 F.4th 636, 649 (4th Cir. 2024) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)); *see also Sheppard*, 993 F.3d at 238 (articulating the standard at the pleading stage as, a "plaintiff must

---

would permit the very discrimination Title IX prohibits, so long as a non-biased decisionmaker later reached the same conclusion. Moreover, at least in this case, the record does not conclusively establish the extent to which Dilworth's potential bias may have influenced other decisionmakers. Such factual questions are properly reserved for the jury. Because a genuine dispute of material fact exists as to whether Dilworth harbored bias against men and whether that bias affected the outcome of Ortegel's hearing, a reasonable juror could find that sex was a but-for cause of the University's disciplinary decision. Accordingly, the claim may proceed.

[12] The initial briefing on the summary judgment motions analyzed both the Title IX claim and the Fourteenth Amendment Equal Protection claim under the same legal standard. As the court emphasized during the hearing, however, these standards are distinct. The court therefore ordered supplemental briefing on this issue, directing the parties to evaluate the Equal Protection claim under the correct legal framework. The parties complied, with defendants filing a joint supplemental brief (Dkt. No. 65), Ortegel submitting a supplemental brief in opposition (Dkt. No. 66), and defendants filing a reply (Dkt. No. 67). The court has considered these submissions, along with the full summary judgment record, in addressing the Equal Protection claims against Dilworth and Polidoro (*see infra* Sec.III.B.).

plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus" (citing *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011))).

For Equal Protection claims, individuals are similarly situated if they are "in all relevant respects alike." *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)); *see also Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 580 (W.D. Va. 2021)). "For a plaintiff to demonstrate that [he] is 'similarly situated,' [his] evidence 'must show an extremely high degree of similarity between [himself] and the persons to whom [he] compares' [himself]." *Willis v. Town of Marshall, N. Carolina*, 275 F. App'x 227, 233 (4th Cir. 2008) (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006)).

b. *Analysis*

Ortegel argues that Dilworth had experience hearing other Title IX cases involving female students who claimed they were too intoxicated to consent. He contends that, in those instances, Dilworth either never found—or does not recall ever finding—that a female student was not credible because of her level of intoxication, unlike what occurred with Ortegel. Ortegel contends that this treatment amounted to applying a different credibility standard to male students compared to female students experiencing the same level of intoxication. (*See generally* Dkt. No. 66.) However, Ortegel's reliance on "other intoxicated females" is far too broad to constitute a valid comparator for purposes of an Equal Protection claim. He fails to identify any record evidence demonstrating that he is similarly situated to these purported female comparators. The Fourth Circuit has made clear that individuals are similarly situated only when they are "in all relevant respects alike." *Settle*, 24 F.4th at 939. Here, the record is devoid of information necessary to make such a determination. The record contains no information about the circumstances of these alleged comparators that would allow for a meaningful comparison.

There is no evidence regarding their level of intoxication, whether they were respondents or complainants, the factual context of their cases, or whether any other relevant circumstances align with Ortegel's situation.  Absent such details, no reasonable inference can be drawn that these individuals are similarly situated to Ortegel in any meaningful way.  Ortegel "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby, Inc.*, 477 U.S. at 248.  Because the record contains no specific facts from which a similarly situated comparator can be ascertained, Ortegel's Equal Protection claim fails.

To the extent Ortegel relies on Roe as a comparator, this argument too fails.  Courts in the Fourth Circuit and others have rejected the argument that an accuser and the accused are similarly situated for purposes of Equal Protection claims.  *See e.g.*, *Doe v. Univ. of Virginia*, 668 F. Supp. 3d 448, 459 (W.D. Va. 2023) (holding that a sexual assault accuser and the accused are not similarly situated for purposes of an Equal Protection claim); *Doe 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 580 (8th Cir. 2021) ("[I]t goes almost without saying that a sexual assault complainant and those she accuses of sexual assault are not similarly situated as complainants.") (internal citation and quotation marks omitted); *Armstrong v. James Madison Univ.*, No. 5:16-CV-00053, 2017 WL 2390234, at *12 (W.D. Va. Feb. 23, 2017), *report and recommendation adopted*, No. 5:16-CV-53, 2017 WL 2399338 (W.D. Va. June 1, 2017) (dismissing the plaintiff's Equal Protection claims on the ground that he was not similarly situated to his sexual misconduct accusers).

Ortegel does cite one Fourth Circuit district court case, *Doe v. Marshall Univ. Bd. of Governors*, 683 F. Supp. 3d 522, 540 (S.D.W. Va. 2023), in which the court found an accuser and accused to be similarly situated for purposes of an Equal Protection claim.  However, that

case is distinguishable. There, a female student filed a Title IX complaint alleging sexual assault against the plaintiff, and the plaintiff subsequently filed a cross-complaint against her for retaliation. The court concluded that the parties were similarly situated because both were students, both filed Title IX complaints, and both were subject to the university's disciplinary policies. The court held that the plaintiff plausibly alleged that the female student was treated more favorably than he was based upon his sex. However, the court also acknowledged the general principle that "someone accused of sexual assault is not similarly situated to the accuser for equal protection purposes." *Id.* at 540 n.12. The court distinguished the case on the basis of the cross-complaint. Here, by contrast, Ortegel did not file a cross-complaint against Roe under Title IX.[13]

Accordingly, Dilworth's summary judgment motion will be granted as to the Equal Protection claim against him in his individual capacity because Ortegel has failed to identify anyone who is similarly situated to him.

## B. Polidoro's Motion for Summary Judgment[14]

As a threshold matter, Polidoro contends that she is not a proper defendant under the *Ex parte Young* exception and that summary judgment should therefore be granted in her favor on both the Equal Protection and Due Process claims asserted against her in her official capacity as

---

[13] Although in relation to Ortegel's Equal Protection claim against Polidoro in her official capacity, Ortegel argues that he was similarly situated with Jane Roe because both supposedly raised allegations of sexual misconduct under the same policy, yet were treated differently. Specifically, he asserts that he told the Title IX investigator, Hardy, that he was a victim of sexual assault, and Hardy told him that he could not file a complaint against Roe because she had already filed one against him. Although this argument lacks merit in light of the record evidence, it nonetheless does not concern Dilworth specifically. Dilworth had nothing to do with the filing of the complaint, the investigation, or the subsequent appeals. Hardy's actions, as well as those of other University officials, are not attributable to the Equal Protection claim against Dilworth in his individual capacity.

[14] The court reiterates that, although Polidoro filed this motion and her name is used throughout this opinion, the claims are brought against her solely in her official capacity as Title IX Coordinator. She has since left that position. Accordingly, the court clarifies that, despite continued reference to Polidoro for consistency, the analysis concerns the actions and role of the Title IX Coordinator in Ortegel's proceedings, not Polidoro in her individual capacity.

Title IX Coordinator.  Further, Polidoro contends that, even if she were deemed a proper defendant, the Equal Protection claim fails because Ortegel has not identified any similarly situated individual who was treated differently and the Due Process claim fails because Ortegel has not identified a protected property interest.  Because the court finds that the *Ex parte Young* exception does not apply to Polidoro, her summary judgment motion will be granted as to both claims.  Accordingly, the court does not reach Polidoro's alternative arguments regarding the absence of a similarly situated individual or a protected property interest.[15]

### 1.  Legal standard

"Under *Ex parte Young*, 209 U.S. 123 (1908), suits that would otherwise be barred by a State's sovereign immunity may proceed when a plaintiff seeks forward-looking relief to halt an ongoing violation of federal law."  *King v. Youngkin*, 122 F.4th 539, 542 (4th Cir. 2024).  "For a state officer to be sued under the *Ex parte Young* doctrine, general authority to enforce the laws of the state is not sufficient."  *Id.* at 548 (citing *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)) (citation modified).  Rather, there must be "a special relation between the officer being sued and the challenged government action."  *Id.* (citing *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010)) (quotation marks removed).  "A 'special relation' requires both '*proximity to* and *responsibility for* the challenged state action.'"  *Id.* (emphasis in original).  "This requirement ensures that a federal injunction will be effective with respect to the underlying claim."  *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008); *see also Pappas v. James Madison Univ.*, No. 5:22-CV-00028, 2023 WL 2768425, at *17 (W.D. Va.

---

[15] The court notes that, even if Polidoro had been the properly named defendant for *Ex parte Young* purposes, Ortegel's official-capacity claims against Polidoro would still not survive summary judgment.  Ortegel failed to identify a similarly situated individual to support his Equal Protection claim, for many of the same reasons discussed *supra* Section III.A.2., and he did not identify a protected property interest, which is necessary to sustain his Due Process claim.

Mar. 31, 2023) (finding the requirement is met when the "defendant has the ability to order the relief requested"); *Doe v. Citadel*, No. 2:21-CV-04198-DCN, 2022 WL 2806473, at *5 (D.S.C. July 18, 2022), *aff'd sub nom. Doe v. The Citadel*, No. 22-1843, 2023 WL 3944370 (4th Cir. June 12, 2023) (same).

### 2. Analysis

For both the Equal Protection and Due Process claims against Polidoro in her official capacity, Ortegel seeks the same forms of relief. He seeks injunctive relief in the form of a permanent injunction prohibiting Polidoro "from making or maintaining any notation on Mr. Ortegel's educational record relating to the investigation of [] Roe's complaint at Virginia Tech and taking any further action depriving him of his constitutional right[s]" to Equal Protection and Due Process.[16] (Am. Compl. ¶¶ 128, 144, Dkt. No. 20.) Furthermore, he seeks declaratory relief against Polidoro "in the form of a declaration that the adjudication at issue in this case violated Mr. Ortegel's right[s] to" Equal Protection and Due Process. (*Id.*) This request for relief arises from the hearing panel's decision—composed of Dilworth and Pritchard—that Ortegel was more likely than not in violation of the Student Code of Conduct.

Polidoro argues that she is not a proper defendant because she lacks the authority to provide the injunctive relief that Ortegel is requesting. Ortegel, however, contends that it is undisputed that the Title IX Coordinator retains control over and access to Title IX records and is responsible for ensuring the University's compliance with Title IX. From this, he asserts that the Coordinator's authority and control over records necessarily imply the power to remedy the alleged harm through expungement. (Dkt. No. 60, 3–5.) The court finds this inference unsupported by the record.

---

[16] During oral arguments on the summary judgment motion, Ortegel characterized his requested injunctive relief as a request to expunge his disciplinary record.

The undisputed evidence shows that the Title IX Coordinator (Polidoro at the time) plays no part in Title IX disciplinary hearings.  That responsibility falls to the Office of Student Conduct.  The Title IX Coordinator does oversee the initial Title IX complaint and ensuing investigation process.  As Polidoro explained, her role in investigations is limited.  She would "from a [sic] high level, be aware of how an investigation was progressing.  If there were requests by the parties that it be dismissed, or if there were maybe a time problem, like investigations going too long, I would [sic] become a little more actively involved."  (Polidoro Dep., 21:22–22:2.)  She would review investigation reports to ensure "the process used to do the investigation was both compliant and thorough," and, if satisfied, she would "make a referral to the office for student conduct for adjudication of the case."  (*Id.* at 26:19–23.)

 Polidoro further stated that she did not participate in hearings (*id.* at 35:16) and had no role in appointing hearing officers (*id.* at 39:19).  Although she helped train hearing officers and other university staff—including training on bias—she had no oversight or control over employees in the Student Conduct Office.  The Title IX Policy and Procedures specifically delineated the separate roles of the Title IX Coordinator and the Office of Student Conduct.  (*See generally* VT Title IX Policy; VT Title IX Procedures.)  With respect to Ortegel's case and consistent with the Policy and Procedures, Polidoro did not assign Dilworth as the hearing officer.  Rather, she referred the matter to Whitesell, Director of the Office of  Student Conduct, following the completion of the investigation.  (*Id.* at 58:4–59:17.)  The hearing officers rendered an independent determination regarding Ortegel's case, over which Polidoro had no influence or control.

Although it is undisputed that the Title IX Office maintained all final case files, there is no record evidence showing who ultimately has the authority to expunge student conduct

records.  Even drawing all reasonable inferences in Ortegel's favor, it is unreasonable to conclude that the Title IX Coordinator had the authority to expunge the records relating to a hearing over which she exercised no authority.  While courts have found that authority to modify or expunge student records may be sufficient to support *Ex parte Young* relief, those cases require the defendant actually possesses such authority and there is no such evidence here.  *Cf. Doe v. Loh*, No. CV PX-16-3314, 2018 WL 1535495, at *4  (D. Md. Mar. 29, 2018), *aff'd*, 767 F. App'x 489 (4th Cir. 2019) (recognizing expungement of records as a form of injunctive relief subject to the *Ex parte Young* exception and collecting cases); *see also Jordan v. Steward*, No. 1:19-CV-02660-RM-SKC, 2023 WL 6466516, at *3 (D. Colo. Sept. 12, 2023), *report and recommendation adopted*, No. 19-CV-02660-RM-SKC, 2023 WL 6464916 (D. Colo. Oct. 4, 2023) (in deciding motion to dismiss, noting that expungement of student records qualifies as prospective relief under *Ex parte Young*, but finding the claim failed because the plaintiff did not plausibly allege that the named defendant, in her official capacity, had authority to grant that relief).  Ortegel has not provided, and the court is unaware of, any precedent that holds that mere maintenance of a case file is sufficient to support expungement-based injunctive relief under *Ex parte Young*.  It declines to so hold in this case.

Accordingly, based on the record before the court, Polidoro's role as Title IX Coordinator does not constitute the kind of "special relation" required for *Ex parte Young* to apply.  The Fourth Circuit has made clear that "special relation" requires both "*proximity to* and *responsibility for* the challenged state action." *Youngkin*, 122 F.4th at 548 (emphasis in original) (citation omitted).  Polidoro maintains that the Title IX Coordinator cannot provide the requested injunctive relief of expungement.  Ortegel has not cited to any evidence that she can.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the

35

assertion by citing to particular parts of materials in the record[.]").  Absent such authority, an injunction against the Title IX Coordinator would be ineffectual.

Accordingly, because Polidoro lacks the necessary "special relation" to the challenged action and cannot provide the requested injunctive relief, Ortegel's claims against Polidoro in her official capacity cannot proceed under the *Ex parte Young* exception.  Therefore, the court will grant Polidoro's summary judgment motion on both the Equal Protection and Due Process claims alleged against her, in her official capacity as Title IX Coordinator.

## IV.  CONCLUSION

For the reasons set forth above, the court will grant in part and deny in part Virginia Tech and Dilworth's motion for summary judgment.  The motion will be granted as to the Equal Protection claim against Dilworth, but the motion will be denied as to the Title IX claim against Virginia Tech.  Additionally, the court will grant Polidoro's motion for summary judgment, both as to the Equal Protection and Due Process claims against her, in her official capacity as Title IX Coordinator.

Accordingly, this case will proceed to trial on Ortegel's Title IX sex discrimination claim against Virginia Tech.

An appropriate order will issue.

Entered: April 16, 2026.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge